ACCEPTED
15-25-00207-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/14/2025 4:30 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/14/2025 4:30:06 PM
CHRISTOPHER A. PRINE
Clerk

Cause No. _____

IN THE

# Court of Appeals for the 15ᵗʰ District of Texas

IN RE NOVARTIS PHARMACEUTICALS CORPORATION,
*Relator.*

_____

ORIGINAL PROCEEDING FROM THE 71ˢᵀ DISTRICT COURT,
IN HARRISON COUNTY, TEXAS • CAUSE NO. 23-0276,
THE HONORABLE BRAD MORIN PRESIDING

## RECORD IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS

DANNY S. ASHBY
(Texas Bar No. 01370960)
**O'MELVENY & MYERS LLP**
2801 N. Harwood Street, Suite 1600
Dallas, Texas 75201
Telephone: +1 972.360.1900

DERON R. DACUS
(Texas Bar No. 00790553)
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903.705.1117

ANTON METLITSKY
ROSS B. GALIN
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas,
    Suite 1700
New York, New York 10019
Telephone: +1 212.326.2000
(Applications for *pro hac vice*
admission pending)

*Counsel for Relator Novartis Pharmaceuticals Corporation*

**TEMPORARY STAY REQUESTED**

CP COUNSEL PRESS    (800) 4-APPEAL • (814349)

**Table of Contents**

| | Page |
|---|---|
| Declaration of Danny S. Ashby............................................................... | ii |
| First Amended Petition.......................................................................... | MR001 |
| Defendant Novartis Pharmaceuticals Corporation's Plea to the Jurisdiction and Motion to Dismiss................................................... | MR061 |
| Plaintiff-Relator's Response to Defendant's Plea to the Jurisdiction and Motion to Dismiss ................................................................... | MR098 |
| The State of Texas's Statement of Interest in Response to Defendant's Plea to the Jurisdiction and Motion to Dismiss........................................ | MR116 |
| Defendant Novartis Pharmaceutical Corporation's Reply in Support of Plea to the Jurisdiction and Motion to Dismiss ................................. | MR139 |
| Order Denying Defendant's Plea to Jurisdiction and Motion to Dismiss ................................................................................... | MR167 |
| Novartis Petition For Writ of Mandamus................................................ | MR170 |
| Novartis Motion for Temporary Stay ...................................................... | MR270 |
| Health Services Group Combined Response to Petition for Writ of Mandamus and Motion for Temporary Stay ........................................... | MR347 |
| Health Services Group Supplemental Mandamus Record...................... | MR383 |
| The State of Texas's Response to Petition for Writ of Mandamus ......... | MR390 |
| Novartis Reply in Support of Motion for Temporary Stay ..................... | MR445 |
| Novartis Reply in Support of Petition for Writ of Mandamus................ | MR456 |
| Order Denying Relator's Petition for Writ of Mandamus....................... | MR496 |
| Judgment Denying Relator's Petition for Writ of Mandamus ................ | MR498 |
| Memorandum Opinion Denying Relator's Petition for Writ of Mandamus ............................................................................................ | MR499 |

## DECLARATION OF DANNY S. ASHBY

I, Danny S. Ashby, hereby declare under penalty of perjury the following:

1.      I am counsel of record for Relator Novartis Pharmaceuticals Corporation ("Novartis") in connection with the Petition for Writ of Mandamus styled *In re Novartis Pharmaceuticals Corporation*, filed concurrently herewith, in the Court of Appeals for the Fifteenth District of Texas.

2.      In compliance with Texas Rule of Appellate Procedure 52.7, I have reviewed the copies of the documents contained in this Mandamus Record, and I hereby verify that all the documents contained herein are true and correct copies of the documents they purport to be, which were filed, submitted, or received by my law firm in connection with the underlying district court proceeding, Case No. 23-0276, in the 71st Judicial District Court, Harrison County, Texas, the Honorable Brad Morin presiding, the appeal before the Court of Appeals for the Sixth District of Texas, Case No. 06-24-00005-CV, before the Honorable Scott E. Stevens, Jeff Rambin, and Charles van Cleef, and the appeal before the Supreme Court of Texas, Case No. 24-0239.

3.      Texas Rule of Appellate Procedure 52.7(a)(2) requires the Relator to include "a properly authenticated transcript of any relevant testimony from any underlying proceeding, including any exhibits offered in evidence, or a statement that no testimony was adduced in connection with the matter complained."

Accordingly, I hereby state that no testimony or evidence was adduced or offered at the December 14, 2023 hearing on Novartis's Plea to the Jurisdiction and Motion to Dismiss.

4.      My birthdate is October 1, 1964, and my firm address is 2801 North Harwood Street, Suite 1600, Dallas, Texas 75201.

Executed in Dallas County, Texas on November 14, 2025.

_____
Danny S. Ashby

Filed 4/5/2023 2:33 PM
Sherry Griffis
District Clerk
Harrison County, Texas

Robyn Nielsen
Deputy

**CAUSE NO. 23-0276**

| | | |
|---|---|---|
| THE STATE OF TEXAS<br>*ex rel.*<br>HEALTH SELECTION GROUP, LLC | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| *Plaintiff,* | §<br>§ | |
| v. | §<br>§ | |
| | § | 71st JUDICIAL DISTRICT |
| NOVARTIS PHARMACEUTICALS<br>CORPORATION, | §<br>§ | |
| | §<br>§<br>§ | |
| *Defendant.* | §<br>§ | HARRISON COUNTY, TEXAS |

**MR001**

Copy from re:SearchTX

Relator Health Selection Group, LLC, brings this civil law enforcement action pursuant to the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code Ann. Chapter 36. Plaintiff files this Original Petition and respectfully shows the Court as follows:

**PRELIMINARY STATEMENT**

1.      For at least a decade, Novartis has fraudulently engaged in unlawful marketing schemes and illegally reaped hundreds of millions of dollars from Texas Medicaid. To enrich itself at the expense of Texans, Novartis, with substantial assistance from third parties, including Amerisource and Lash, engaged in three unlawful marketing schemes involving at least six drugs, all under the guise of helping patients.[1]

2.      By inducing doctors to prescribe and/or continue to prescribe its products in violation of Texas law, Novartis committed (and continues to commit) a number of unlawful acts in violation of the Texas Medicaid Fraud Prevention Act. This case is not about whether the drugs to help Alzheimer's and other diseases are effective. It is about whether Novartis violated Texas law by providing an incentive or something of value to induce doctors to prescribe its drugs over other drugs on the market. Novartis's schemes are so lucrative and effective at influencing doctors it continues to pour money into them to this day.[2]

3.      This is a civil action brought on behalf of Relator under the TMFPA to recover unlawful payments, civil penalties, and remedies owed to Texas as a result of these three

---

[1] AmerisourceBergen Corporation and AmerisourceBergen Specialty Group, are collectively referred to as "Amerisource", and Lash Group is referred to as ("Lash") herein.

[2] The state of Texas passed the Texas Medicaid and Fraud Prevention Act to help combat Medicaid Fraud against the state.

Copy from re:SearchTX

unlawful kickback schemes perpetuated by Novartis.

### *The Specific Conduct*

4.     Novartis's unlawful conduct involves at least the following products: (1) Exjade, (2) Jadenu, (3) Promacta, (4) Exelon, (5) Sandostatin, and (6) Afinitor. Collectively, Exjade, Jadenu, Promacta, Exelon, Sandostatin, and Afinitor are referred to herein as the "Covered Drugs".

5.     To enrich themselves at the expense of Texas, Novartis, with substantial assistance from UQVIA Holdings, Inc. (f/k/a Quintiles IMS Holdings, Inc. ("IQVIA/Quintiles"), Lash, Amerisource, Ashfield Healthcare, LLC ("Ashfield"), UDG Healthcare PLC ("UDG"), and Syneos Health (f/k/a inVentiv Health Inc.) ("inVentiv/Syneos"), resorted to three intertwined, unlawful marketing schemes for the Covered Drugs.

6.     First, Novartis contracted with and paid remuneration to IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos, to deploy nurse educators to recommend Exjade, Jadenu, Promacta, Exelon, Sandostatin, and Afinitor to Prescribers[3] and patients, and also to supply quid pro quo nurse educator and other support services to providers.  While purporting to provide independent medical advice and disease-awareness information, the nurses were in reality acting as undercover sales reps for Novartis, focused on the singular mission Novartis had paid them to accomplish: drive prescribers and patients to the Covered Drugs.

7.     Second, with assistance from IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos, Novartis provided in-kind remuneration to prescribers in the form of reimbursement support services, saving providers thousands of dollars in administrative

---

[3] As used herein, the term "Prescriber" refers to any physician or Advance Practice Provider authorized to write prescriptions, as well as their employers.

3

MR003

Copy from re:SearchTX

expenses. These reimbursement support services were provided, in part, to induce providers to prescribe the Covered Drugs to their patients.

8. Third, Novartis contracted with and paid remuneration to third parties to deploy nurses to recommend Covered Drugs to Prescribers and patients. While purporting to provide independent medical advice and disease-awareness information, the third-party nurses were in reality acting as undercover sales representatives for Novartis, focused on the singular mission Novartis had paid them to accomplish: refer the Covered Drugs to Prescribers and patients.

9. Novartis intentionally and knowingly agreed to work with IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos to design and implement the free nurse services, white coat marketing campaign, and reimbursement support services with the goal of defrauding Texas by causing the submission of claims for the Covered Drugs that were knowingly and intentionally induced by unlawful remuneration.

***The Violations***

10. Novartis committed unlawful acts to the detriment of Texas Medicaid, including by offering remuneration to physicians when they prescribed certain pharmaceutical products. Similar to the federal Anti-Kickback Statute, the Tex. Hum. Res. Code § 32.039b(b)(1-d), expressly prohibits offering or paying, "directly or indirectly, overtly or covertly *remuneration*, including any kickback, bribe or rebate . . . *to induce a person to refer* . . . any item or service for which payment may be made, in whole or in part under the medical assistance program [e.g., Medicaid]." (emphasis added.)

11. Further, the U.S. Department of Health and Human Services has repeatedly warned pharmaceutical companies that they should refrain from engaging in marketing or promotional activities that utilize individuals who are involved in the delivery of healthcare or

4

MR004

Copy from re:SearchTX

rely on the provision of free services such as billing, nursing, or other staff services.[4]

12.     Texas law ensures that it pays only for conflict-free medical care and prescriptions that are provided in the best interests of the patient. A kickback eliminates any sound basis for such assurance because it taints the prescribing physician's medical decisions with the prescriber's financial interests. These tainted prescriptions were paid in whole or in part by Texas Medicaid. Under the TMFPA, "a person commits an unlawful act if the person" knowingly pays, charges, solicits, accepts, or receives . . . a gift, money, a donation, or other consideration as a condition to the provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program." Tex. Hum. Res. Code § 36.002(5).

13.     Novartis is a sophisticated corporation with years of experience in the healthcare industry. It is well-versed in the regulations prohibiting remuneration and kickbacks, including Texas law, as well as the regulatory guidance, and is aware of its prohibition on the use of kickbacks to induce prescriptions of the Covered Drugs. It nonetheless designed and executed the three schemes to use kickbacks to boost prescriptions and increase profits in violation of Texas law.

14.     As demonstrated below, due to Novartis's conduct, claims for thousands of prescriptions for the Covered Drugs resulted from the unlawful, substantial kickbacks Novartis offered to Prescribers.

15.     As a result of Novartis's illegal marketing and promotion schemes, pharmacies have submitted and continue to submit claims to Texas Medicaid, causing Texas Medicaid to pay millions of dollars in improper reimbursements in violation of Texas law.  Accordingly, Relator

---

[4] *See, e.g.*, 56 Fed. Reg. 35952-01, 35981 (July 29, 1991); 59 Fed. Reg. 65372-01, 65376 (Dec. 19, 1994).

5

Copy from re:SearchTX

seeks remedies from this Court for Novartis's unlawful fraudulent acts.

## DISCOVERY CONTROL PLAN

16.     Relator intends to conduct discovery in this case under a Level 3 Discovery Control Plan, pursuant to Rule 190.4 of the Texas Rules of Civil Procedure.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this action pursuant to the TMFPA, which provides statutory remedies to redress Novartis's violations of Tex. Hum. Res. Code Ann. § 36.052(e). The TMFPA provides authority for this action to be brought by Relator and on behalf of the state. Tex. Hum. Res. Code § 36.101.

18.     This Court has jurisdiction over Novartis because Novartis does business in the State of Texas and committed the unlawful acts alleged in this Petition in whole or in part in Texas.

19.     Jurisdiction is further proper because the amounts sought from Novartis is in excess of the minimum jurisdictional limits of this Court.

20.     Venue is proper in Harrison County pursuant to the TMFPA. Tex. Hum. Res. Code Ann. § 36.052(d). A lawsuit filed under the TMFPA "shall be brought in Travis County or in a county in which any part of the unlawful act occurred." *Id*. Venue is proper in Harrison County because Novartis's unlawful act occurred, in part, in Harrison County.

## THE PARTIES

21.     The Plaintiff, Relator Health Selection Group, LLC ("Relator"), is an affiliate of the National Healthcare Analysis Group, a research organization based in New Jersey.

22.     The Defendant, Novartis Pharmaceuticals Corporation ("Novartis") is a pharmaceutical company headquartered in East Hanover, New Jersey.  Novartis is a United

6

MR006

Copy from re:SearchTX

States subsidiary of Novartis AG, a Swiss pharmaceutical company.

## STATUTORY BACKGROUND

23. In relevant part, the Texas Human Resources Code § 36.052(a)(1) - (a)(4) establishes civil penalties for each unlawful act committed by Novartis and two times the value of payment(s) made and/or benefit(s) provided to Novartis under the Medicaid program as a result of its unlawful acts.

24. Texas Medicaid is a jointly funded state-federal health care program administered by the Texas Health and Human Services Commission. Texas uses Medicaid to improve the health and wellness of people who might otherwise not be able to obtain medical care. Medicaid makes payments directly to health care providers and/or managed-care organizations, and not directly to individuals seeking a prescription.

25. In relevant part, the Texas Human Resource Code, § 36.002(5), provides as follows:

> A person commits an unlawful act if the person:
>
> (5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program.

26. Within the meaning of the Texas Human Resource Code, "knowingly" is defined to include reckless disregard and conscious indifference. § 36.0011(a)(2)-(3). Further, proof of "specific intent to commit an unlawful act under Section 36.002 is not required" to show a person "acted 'knowingly' with respect to information under this chapter." § 36.001(b).

27. Further, a violation includes offering, directly or indirectly, remuneration.

7

Copy from re:SearchTX

Specifically, § 32.039(b)(1-d) states:

> (b) A person commits a violation if the person:
>
> offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services.

28. Texas enacted the TMFPA to recover and prevent fraud and unlawful kickbacks. Accordingly, violations of § 32.039(b)(1-d), are incorporated under the TMFPA § 36.002(13) as an unlawful act.

29. Remuneration, for purposes of Texas law, includes the transfer of "anything of value," whether cash or in-kind consideration, directly or indirectly, covertly or overtly. Importantly, the statute has been consistently interpreted broadly to cover any arrangement where one purpose of the remuneration is to obtain money for referral of services or to induce further referrals.

30. Anti-kickback provisions are designed to, among other things, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry, and that healthcare professionals remain free of conflicts of interest that could impact treatment decisions.

31. To participate in Texas Medicaid, providers and suppliers certify compliance with Texas law prohibiting kickbacks and fraud.

8

**MR008**

Copy from re:SearchTX

## MULTIPLE HEALTH PROGRAMS INCLUDING
## TEXAS MEDICAID ARE AFFECTED BY NOVARTIS'S SCHEMES

32.    Generally, when a Prescriber prescribes one of the Covered Drugs, a patient is provided with a prescription that is then filled at a pharmacy. The pharmacy then submits the claim for payment to Texas Medicaid for reimbursement.

*Medicaid*

33.    Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. Each state, including Texas administers a State Medicaid program.

34.    The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A). While drug coverage is an optional benefit, the Medicaid programs of all states provide reimbursement for prescription drugs.

35.    The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Federal funding under Medicaid is provided only when there is a corresponding state expenditure for a covered Medicaid service to a Medicaid recipient. The federal government pays to the state the statutorily established share of the "total amount expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(l).

36.    The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies generate funding requests to the state Medicaid programs.

9

MR009

Copy from re:SearchTX

37.     Before the beginning of each calendar quarter, each state submits to the Center for Medicare and Medicaid Services ("CMS") an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as the actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. § 430.30.

38.     Claims arising from illegal kickbacks are not authorized to be paid under state regulatory regimes. In fact, providers who participate in the Medicaid program must sign enrollment agreements with their states that certify compliance with the state and federal Medicaid requirements. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

39.     Furthermore, in many states, including Texas, Medicaid providers, including both physicians and pharmacies, must affirmatively certify compliance with applicable federal and state laws and regulations.

40.     In Texas, "providers (and submitters on behalf of providers) must affirm that they have read, understood, and agree to the certification and terms and conditions of the prior

10

MR010

Copy from re:SearchTX

authorization request"[5] before submitting each prior authorization request. By agreeing, the provider and authorization request submitter certify that the information supplied concerning the prior authorization "constitute true, correct, and complete information."[6] Further, the provider and authorization request submitter "understand that payment of claims related to this prior authorization will be from federal and state funds, and that falsifying entries, concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and/or state law."[7] The consequences of omitting information or failing to provide true and accurate information include "termination of the provider's Medicaid enrollment and/or personal exclusion from Texas Medicaid."[8]

41.     Additionally, "Texas Medicaid service providers are required to certify compliance with or agree to various provisions of state and federal laws and regulations."[9]

**RELATOR'S INVESTIGATION**

42.     To unmask Defendant's unlawful conduct, Relator and its representatives conducted a rigorous, multi-part investigation that included the following: (1) interviews of numerous individuals with knowledge of and involvement in the schemes; (2) examination of Prescriber-specific Medicare data; and (3) examination of product-specific Medicare and

---

[5] Texas Medicaid Provider Procedures Manual § 5.5.1.2.1 (May 2020), available at
http://www.tmhp.com/Manuals_HTML1/TMPPM/Current/index.html#t=TMPPM%2F1_05_Prior_Authorization%2F1_05_Prior_Authorization.htm%23TOC_5_5_Prior_Authorizationbc-25&rhtocid=_5_4
 (last accessed, May 1, 2020).
[6] *Id*. at § 5.5.1.2.2.

[7] *Id*.

[8] *Id*. at § 5.5.1.2.3.

[9] Texas Medicaid Provider Procedures Manual § 1.6.8 (Dec. 2017) (emphasis in original), available at http://www.tmhp.com/Pages/Medicaid/Medicaid_Publications_Provider_manual.aspx (last accessed, April 6, 2020).

11

Copy from re:SearchTX

Medicaid data.

43.    The individuals whom Relator interviewed during its investigation include:

- Charmaine Anthony ("Anthony") is employed by IQVIA/Quintiles as a nurse educator for Exjade, she has been employed since 2014, and her territory is GA, SC, and FL.

- Debra Bliesner ("Bliesner") was employed by IQVIA/Quintiles as a nurse educator for Jadeneu from 2014 until 2016. Her territory included northern CA.

- Theresa McDonald ("McDonald"), was employed by IQVIA/Quintiles as a nurse educator for Exjade from 2010 to 2013. Her territory included the entire United States.

- Sara Huff ("Huff") was employed by Novartis as an Exjade drug rep from 2012 to 2014. Her territory included KS, NE, and MO.

- Fernando Adriano was employed by IQVIA/Quintiles as a nurse educator for Exjade from 2010 to 2012. His territory included NJ, NY, and PA.

- Latoya Calvo ("Calvo") was employed by Lash as reimbursement support services personnel for Novartis Oncology Medications, including Exjade and Afinitor (and many others) from 2006 until 2015. Her territory was nationwide.

- Michael J. Van Loon ("Van Loon") was employed by Lash as reimbursement support services personnel for Exjade in 2013. His territory is nationwide.

- Robin Curley ("Curley") was employed by Ashfield as a nurse educator for Exelon from 2012 to 2014. Her territory was southern CA.

- Mary Delahanty ("Delahanty") was employed by Ashfield as a nurse educator for Exelon from 2012 to 2014. Her territory was southern CA.

- Kelly Roberson ("Roberson") was employed by Novartis as an Exelon drug rep from 2006 to 2014. Her territory was GA.

- Susan Simmons ("Simmons") a/k/a S.S. was employed by Ashfield as a nurse educator for Exelon 2012 to 2013. Her territory was FL.

- Maura Pagano ("Pagano") a/k/a M.P. was employed by Ashfield as a nurse educator for Exelon in 2012. Her territory was IL and the surrounding region.

12

**MR012**

Copy from re:SearchTX

44.     Given their years of relevant experience, the individuals intereviewed were familiar with numerous aspects of Defendant's unlawful schemes, as detailed herein. Stated differently, while their formal job responsibilities within the IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos organizations may have covered only particular aspects of Defendant's conduct, the individuals Relator interviewed had general knowledge about the schemes described herein.

45.     Further, as part of its investigation into Novartis's conduct herein, Relator has conducted data analytics using a private healthcare data vendor that aggregates both public and private healthcare data. Among other things, Relator has aggregated data from various State Medicaid providers. These data sources give Relator significant insight into prescription drug utilization over a multi-year period.

## NOVARTIS PARTICIPATED IN THREE UNLAWFUL SCHEMES TO INDUCE AND INFLUENCE PRESCRIBERS TO PRESCRIBE THE COVERED DRUGS

46.     Based on Relator's investigation, there is overwhelming evidence that Novartis, with substantial assistance from IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos, and other third parties, engaged in three schemes to induce recommendations by giving something of value to Prescribers and white coat marketers for the purpose of inducing a recommendation of the Covered Drugs.

47.     In the first scheme, Novartis, with assistance from IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos, provided remuneration in the form of paying for free nursing services to potential Prescribers in part to induce recommendations for the Covered Drugs to those Prescriber's patients. Specifically, the first scheme includes prescriptions for Exjade and Jadenu, and in all likelihood, other drugs as well, including

13

MR013

Copy from re:SearchTX

Promacta and Sandostatin. A similar issue exists for Exelon. Patients that use Exelon have Alzheimer's, and the nurse educators educate patients' families in lieu of educating patients, which is also a service the Prescribers should be performing. Exelon nurse educators also educate Prescribers' staff free of charge, which results in the staff receiving CLE credits (for nurses) and/or in-service credits (for MAs and CNAs).

48. In the second scheme, Novartis' remuneration took the form of reimbursement support services ("Support Services"). As is detailed below, Support Services can save Prescribers thousands of dollars in administrative expenses which in turn induced providers in part to recommend the Covered Drugs. Specifically, the second scheme includes prescriptions for Exjade, and in all likelihood, other drugs, including Promacta, Jadenu, and Sandostatin.

49. In the third and final scheme, the remuneration involved direct payment by Novartis to so called "independent" nurse educators who in turn recommended Covered Drugs to Prescribers and patients as the drug treatment of choice, also known as "white coat marketing."[10] Specifically, the third scheme includes prescriptions for Exjade, Jadenu, and Exelon.[11]

50. Upon information and belief, the three unlawful schemes were carried out methodically and systematically, pursuant to written contracts between Novartis Lash, Amerisource, amongst others, as set forth herein.

## SCHEME ONE: NOVARTIS ORCHESTRATED AND PROVIDED IN-KIND REMUNERATION IN THE FORM OF FREE NURSE SERVICES

### *The Background of the Unlawful "Free Nurse" Program*

51. In its first scheme, Novartis offers free nurse services, patient education and

---

[10] *See U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 246-48, 263 (S.D.N.Y. 2014).

[11] The third scheme likely involves prescriptions for Promacta, Exelon, and Sandostatin as well, which is an issue Relator is continuing to investigate.

MR014

Copy from re:SearchTX

management services, to induce Prescribers across the United States and specifically in Texas to prescribe the Covered Drugs to patients over competitor products. Novartis, through IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos, began pitching "solutions" to the particular needs and challenges that Prescriber's faced in managing certain patients. Novartis used independently-contracted nurses, as well as nurses provided to Novartis by third parties.

52. Novartis developed a marketing strategy to overcome potential barriers to entry. Consistent with that strategy, Novartis contracted with the nurse educator vendor organizations. These nurse educator vendors in turn hired scores of nurse educator's whom Novartis could deploy to help improve the sales of the Covered Drugs. Novartis' goal was to improve the sales of the Covered Drugs by offering potential prescribers services from these nurse educators. These nurse educator services ranged from: (i) assisting with practice efficiency, training staff for CLE and/or in-service credits; (ii) training on care; (iii) eliminating the administrative expense of teaching patients self-administration; (iv) educating Alzheimer's patients' families; and (v) being "on call" to answer a patients' care questions. Of course, in typical quid pro quo fashion, in order to be given these support services, providers would have to "support" (i.e., write prescriptions) for the Covered Drugs.

53. IQVIA/Quintiles openly boasts the true role of the nurse educators it employs. IQVIA/Quintiles' website states:

> Faced by a broad array of challenges from healthcare reforms to evolving practice dynamics **physicians have little time to spend with patients, and still less for biopharma sales representatives.** This time pressure can limit a healthcare pracitioner's [sic] awareness of the latest advances and techniques, and their ability to fully support and educate patients. Further, one third to one half of patients with long term conditions fail to take their medications as prescribed.

15

Copy from re:SearchTX

Against this backdrop, innovative solutions are needed. Clinical Nurse Educators (CNEs) also known as Clinical Educators, Nurse Advisors, Patient Advocates or Coaches are highly trained individuals who provide educational outreach to both healthcare providers (HCPs) and patients, optimizing diagnoses, **prescribing rates and patient adherence**.[12] (emphasis added).

As such, rather than fairly promoting and marketing the Covered Drugs based upon patient outcomes and efficacy, Novartis added unlawful incentives (i.e., nurse education service) for providers to recommend the Covered Drugs over competing drugs to patients.

54.     The individuals interviewed confirm that the nurse educator services were a significant tangible value to providers because these services saved staff time, money and resources and "eliminate[d] an expense that [the provider] would have otherwise incurred"[13] in employing a nurse educator. Not surprisingly, Novartis saw its drug sales increase when a nurse educator supported a Prescriber.[14]

55.     The free nurse educators provide an independent and substantial benefit to Prescribers. Specifically, by providing patient-support services to help professionally manage the wellness of patients under the Prescriber's "care," nurse educators save Prescribers significant time and resources for which the Prescribers would otherwise have to pay employees or other nurses to provide.

56.     As background, most Prescribers typically allocate between 10 to 15 minutes to

---

[12] PharmaVOICE February 2013, http://www.pharmavoice.com/article/clinical-nurse-educators/ (last visited April 17, 2018).

[13] Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23,731 (May 5, 2003) Section II (2) suspect remuneration as it "eliminate[d] an expense that the physician would have otherwise incurred (i.e., have independent value to the physician)".

[14] The sales tracking data from the nurse educator would reveal the time, place, and service provided which could then be correlated with subsequent sales.

16

MR016

Copy from re:SearchTX

see routine patients. But patients suffering from chronic diseases such as Alzheimer's often require extra office time, training, follow-up, and resources to manage their disease. Furthermore, where the treatment selected by the Prescriber involves the administration of medication,), it is the duty of the Prescriber and his/her staff to administer the medication or teach the patient how to self-administer the medication correctly. For these purposes, Prescribers frequently rely on their highly skilled and paid nursing staff—called "nurse educators"—to help manage and treat chronically ill patients. The cost associated with the use of these nurses, however, is significant—a nurse educator often commands an annual salary that exceeds $60,000, or an average hourly wage of $40.00 per hour. Novartis provided them for free, in exchange for Prescribers prescribing the Covered Drug.

57.     Seeking to exploit the needs of Prescribers and healthcare organizations and the challenges they face in managing patients affected by chronic diseases, Novartis developed a marketing strategy that involved providing free nurses to Prescribers to induce them to prescribe the Covered Drugs to patients.

58.     The relevant literature recognizes that Prescribers have a "duty to attend" to the patient throughout the course of treatment.[15] Thus, whenever a Prescriber is treating a patient

---

[15] *See, e.g.*, T. Thirumoorthy, *The Professional Duties of the Doctor in the Role of a Healer*, SMA News, Aug. 2012, at 22 ("The doctor should continue to serve the patient and provide appropriate access to care in a timely manner. The doctor has an ethical and legal duty to attend as required by his patient's needs and should not delegate critical duties to juniors. If a doctor delegates duties to another clinician, he must ensure that the attending clinician is adequately informed and competent. The doctor should never abandon his patient . . ."); AMA Code of Medical Ethics Opinion § 1.1.3(b) ("Physicians can best contribute to a mutually respectful alliance with patients by serving as their patients' advocates and by respecting patients' rights. These include the right . . . [t]o receive information from their physicians and to have opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives, including the risks, benefits and costs of forgoing treatment. Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment.").

17

Copy from re:SearchTX

affected by Alzheimer's or another disease, the Prescriber has an ongoing duty to the patient that continues throughout the course of treatment. This duty requires the Prescriber or his or her staff to consistently monitor the patient's response to medication, treatment, and vitality—a task that typically involves multiple telephone calls, office visits, and communication with the patient.

59.     The duty to monitor the patient is important and serves several purposes. Chronic diseases such as Alzheimer's are unpredictable and often disabling diseases, and their progression, severity, and symptoms can vary significantly from patient to patient. Case management can also be complex due to relapses and patients who fluctuate between good days and bad days. Furthermore, Alzheimer medications are oftentimes associated with significant side effects that may require treatment or management. To manage these side effects, Prescribers may adjust the treatment dosage, prescribe medications that may lessen the side effects, or, at times, discontinue treatment in favor of other options.

60.     While the treatment of Alzheimer's requires Prescribers' continuous involvement post-diagnosis and the constant monitoring of the patients' reaction to and tolerance for treatment, following-up and monitoring patients are not profitable endeavors for Prescribers. Simply put, an offer for a pharmaceutical company to provide these pricy services for "free" is a big benefit.

61.     Most importantly, much of the required follow-up and monitoring work requires telephonic interactions. But Prescribers are not allowed to bill patients' insurance—including Medicaid and other government-sponsored plans—for phone interactions with the patients. As a result, as market commentators have noted, "doctors' offices are struggling to man the phones: handling everything from appointment and prescription refill requests, to concerns from sick patients, to billing issues—and lately, more patients' questions about how the health reform law

18

Copy from re:SearchTX

will affect them. But insurance carriers don't pay doctors for any of those phone calls, which doctors estimate cost $15 to $20 each. Now, more offices and hospitals are looking for ways to take fewer patients' calls."[16]

62. And even in instances when the patients are able to travel to the Prescribers' offices for in-person follow-up, Medicare and other government-sponsored plans usually pay a reduced rate for care administered by the Prescribers' staff.[17] Full rates are paid for staff's services only if the Prescribers are "present in the office suite and immediately available to provide assistance and direction throughout the time the aide is performing services."[18]

### *Nurse Educator Services were Offered to Prescribers in True Quid Pro Quo Fashion*

63. Novartis's Exjade and Jadenu nurse educator program is currently managed by IQVIA/Quintiles. The IQVIA/Quintiles program started in roughly 2010 and consists of roughly 20 nurse educators. The Exelon nurse educator program was managed by Ashfield. The Ashfield program started in roughly 2012, consisted of 68 nurse educators per Simmons, and the program ended in 2014 per Curley.

64. The interviews conducted by Relator confirm Novartis drug reps and nurse educators encouraged providers to "off-load" their patients to the nurse educators for

---

[16] *See* J. Wieczner, *The Doctor Won't Take Your Call: Physicians Hate Phone Calls, and Not Just Because They Can't Bill You*, MarketWatch, July 16, 2013, *available at* www.marketwatch.com/story/the-doctor-wont-take-your-call-2013-07-16; *see also Coding for Telephone Consultations*, Tex. Med. Ass'n, Mar. 23, 2010, *available at* https://www.texmed.org/template.aspx?id=5422 (noting that "Medicare does not reimburse" for, among other things, "telephone evaluation and management (E&M) service provided by a physician to an established patient, parent, or guardian not originating from a related E&M service or procedure within the next 24 hours or soonest available appointment").

[17] *See* G. John Verhovshek, *The Basics of Incident-to Billing*, Physicians Practice, Nov. 24, 2016, *available at* http://www.physicianspractice.com/medical-billing-collections/basics-incident-billing.

[18] *See id.*

19

MR019

Copy from re:SearchTX

management. As a general matter, the nurse educators accompanied the drug reps during sales calls to offer their services along with the drug reps. During these sales calls, providers were encouraged to enroll all Covered Drug patients into these "patient support" programs so that the nurse educators could begin to directly manage these patients and free the provider from the time and expense in doing so.

65. Huff, an Exjade drug rep, explained her pitch to providers: "Mentioning her personal, clinical experience and expertise in the areas she and I worked. So, emphasizing to them that, she as a nurse practitioner, as a provider has actual clinical experience with managing patients… knowing that she was able to meet with the patients and families… to teach them how to take the drug…" Anthony, an Exjade nurse educator, and Bliesner, a Jadenu nurse educator, confirmed they pitched nurse educator services to providers.

66. Pagano, an Exelon nurse educator, explained how the drug rep detailed her services to providers. She said:

> I think a big sale was the fact that you bring your 95-year-old mum or 75-year-old mum and she's just been diagnosed with alzheimers don't have a lot of office time to explain to family members about the disease. We often do know a little about it but there is a lot to know about it. And Dr. Smith, I have this nurse educator…who I can certainly come into your office one day and *have an in-service with your staff* so that when this diagnosis comes to family that we are to *spend more time with the family or perhaps we do some in-service* on a Wednesday evening at 7:00 for family members to attend." (emphasis added).

67. Pagano also was specifically asked if continuing education credits were part of the offer of nurse educator services. She replied "sure…people were all over it." Curley, an Exelon nurse educator, and Roberson, an Exelon drug rep, confirmed nurse educator services were offered to providers.

20

MR020

Copy from re:SearchTX

***Nurses Educators Spent Ample Time on Patient Management Services***

68.     Another service offered by Novartis was one-on-one nurse educator to patient education sessions.  Anthony, an Exjade nurse, explained she usually sees patients twice; one thirty-minute meeting when the patients starts Exjade and then a follow-up visit, and 80% of the time she sees the patient in a conference room at an infusion center.  Bliesner confirmed a similar schedule for Jadenu patient education.  Anthony summed up the quid pro quo by stating "as long as they are on my drug I work one-on-one with a patient."

69.     Those interviewed by Relator confirmed that these services were a tangible benefit to providers.   Anthony, an Exjade nurse, explained, "…by working with their patients…then the provider doesn't have to invest as that energy and time into it…"  McDonald and Adriano, both Exjade nurse educators, confirmed they educated patients.  Huff, an Exjade drug rep, further explained the benefit to providers; "Number one; actual clinical expertise in their therapeutic area. Number two; a clinical source of information... And then number three; If they are able to meet with the patients and families for actual counselling and face to face interaction."  Huff estimated that 50-60% of drug sales come from providers who are receiving the services of a nurse educator.

70.     Bliesner, a Jadenu nurse educator, confirmed that she educated patients, but the "bulk" of patients were children, particularly at the Oakland Children's Hospital.  Bliesner explained the benefits to providers and patients by stating:

> "[S]o one patient, for example, had been taking this medicine for a long time because that's what they have to do, and so we're bringing his iron levels down, and so in exploring that with him we discovered that he was taking it at the wrong time. Like mixing it with some of the foods that you really shouldn't eat when you take this. And that's why it was altering the absorption. So, he changed, based on the conversation that we had, he changed how he was taking it."

21

MR021

Copy from re:SearchTX

71. Curley, an Exelon nurse educator, explained that 80% of her time was spent with office staff while 20% of her time was spent with patients' families; two to three office staff meetings a week and one family meeting a month. Pagano, another Exelon nurse educator, estimated 50% of her time was spent with office staff and 40% was spent with family members, the remaining time was spent meeting with Novartis drug reps.

72. In regard to family training, the sessions lasted about 45 minutes. Curley stated:

> [T]hey have a better understanding of what's happening to their family member. They aren't just getting demented and getting confused, there's an actual disease process that's going on and then they can also -- the benefits of knowing where it's going to go, the different stages. So they can kind of prepare with what's going to happen with the family member.

73. Curley stated there were two separate training sessions for families, one as an introduction, and the second explained patient behaviour. She explained how that helped the providers by saying:

> [A]bsolutely it did, like the social workers and the licensed nurses that had to deal with the families; the more that they [family members] understood what was going on, the less upset and but with understanding it, then they're [staff] more able to deal with the family and not become difficult to handle themselves, with the staff. So, yeah, it's very beneficial to the staff as well.

Simmons, another Exelon nurse educator, explained that her education offerings included five different slide decks, one for family members specifically.

74. In regard to hosting provider in-services, Curley, an Exelon nurse educator, explained:

> I don't know about other states, you know, you have to provide five in-services a year to the nursing staff on dementia and or Alzheimer's. So that's a lot for a DOC [Director of Compliance at a facility] to do, so of course they were excited to having somebody else come in and do it... they were like half-hour, 45 minutes in-services, I mean they were full on in-services and they did count with the CNAs towards their continuing education… it helped out the DOC and the DON [Director of Nursing] tremendously because then they didn't have the hassle to do

22

Copy from re:SearchTX

it.  It's been provided for them.

75.     Delahanty, an Exelon nurse educator, also confirmed she performed in-services for Prescribers, which included 20 staff members on average.

76.     Pagano, another Exelon nurse educator, explained her in-services included continuing education credits for licensed nurses.  She said, "I also did service where like nurses, licensed professionals could get like continuing education credit… Sitting there 45 minutes they'd get a credit or two for the facility."  These sessions occurred "bi-monthly."  Lastly, Roberson, an Exelon drug rep, estimates that 75% of drug sales come from providers who utilize nurse educator services.

77.     In sum, in return for prescribing the Covered Drugs to patients, Prescribers reduced the time and cost required to treat those patients, freed up time to see other patients, and increased profitability.  The nurse educators are effectively free employees given to Prescribers in exchange for the Prescribers' commitment to recommend the Covered Drugs over competing products. Novartis, through the services of a nurse educator, enabled the Prescriber to "eliminate an expense that [the provider] would have otherwise incurred"[19] if the Prescriber directly employed the nurse educator or provided the services themselves. Novartis assumed and took over the costs, time, and expenses of numerous tasks associated with follow-up and patient monitoring work that Prescribers would otherwise be duty-bound to perform. Novartis's free nurse educator marketing scheme thus violated Texas law.

_____

[19] *OIG* Compliance Program Guidance for Pharmaceutical Manufacturers, Dep't of Health & Human Servs., 68 Fed. Reg. 23731-01, 23737 (May 5, 2003), *available at* https://oig.hhs.gov/fraud/docs/complianceguidance/042803pharmacymfgnonfr.pdf (if "services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (*i.e.,* have independent value to the physician) . . . the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer").

23

MR023

Copy from re:SearchTX

*The Compensation Novartis Paid to Provide the Free Nurse Program*

78.     To obtain the services of nurse educators, Novartis paid significant compensation to third parties, such as Lash. Novartis was willing to pay and continues to pay compensation because its schemes are profitable in obtaining and maintaining Prescribers to write prescriptions for the Covered Drugs.

79.     The fees Novartis paid to implement the free nurse program underscore that the free nurse program delivered substantial value to Prescribers. The tasks performed by Lash nurses and other free nurses encompass medical care that the Prescribers were duty-bound to deliver to patients that had been prescribed the Covered Drugs. But for Novartis agreeing to underwrite this work, Prescribers would have had to hire staff or outsource the nurse services, and pay fees like those paid by Novartis to Lash (and likely even more, as individual practices would lack the bargaining power and volume that Novartis had when negotiating the entire program with Lash).

## SCHEME TWO: NOVARTIS OFFERED REIMBURSEMENT SUPPORT SERVICES AS AN INDUCEMENT FOR THE COVERED DRUGS

*The Background of the Unlawful Reimbursement Support Services Program*

80.     To induce recommendations of the Covered Drugs over competing products, Novartis sales reps offered a second type of unlawful inducement: free reimbursement support services for Prescribers who wrote prescriptions for Novartis Covered Drugs. This remuneration was a tangible, "in kind" benefit that greatly reduced, and in some instances eliminated, Prescribers' administrative costs related to prescribing Covered Drugs.  In practice, the services were intended to induce Prescribers to choose Novartis's Covered Drugs over a competitor's drugs. This remuneration was targeted at providers and their staff who manage the administrative

24

Copy from re:SearchTX

tasks on behalf of the doctors.

81. As is detailed below, Novartis paid millions of dollars each year for provider Support Services in order to induce providers to choose the Covered Drugs over a competitor's drugs.[20] Through Lash, a subsidiary of Amerisource, Novartis hired and trained dozens of skilled workers to provide free reimbursement support services, patient insurance benefit verification services, patient prior authorization services, and coverage appeals in violation of the Texas law and specifically the TMFPA.

82. Novartis's provider reimbursement support services include call center (often referred to as "HUB") personnel. The call center personnel are outsourced to Lash. The call center personnel are on-call to assist providers with Support Services. Clavo, Support Services personnel, confirmed that she performed Support Services for both private and "government" insurance, such as Medicare and Medicaid. She estimated that 70% of prescriptions were obtained using Lash's Support Services.

83. Novartis, through Lash, hired and trained skilled insurance specialists who would work on behalf of Prescribers and manage most, if not all reimbursement support functions, including patient insurance benefit verifications services, patient prior authorization services and coverage appeals. Novartis' drug reps who had expertise in insurance coverage issues pitched this value proposition to potential Prescribers.

84. Put simply, in exchange for prescribing the Covered Drugs, Novartis, through Lash, would undertake the providers' administrative responsibilities and costs associated with starting a patient on the Covered Drugs. The more a Prescriber prescribed the Covered Drugs as

---

[20] Reimbursement Support Services not only reduces a cost the providers, it also increases the cost of the Covered Drugs, since Novartis has to employ staff and facilities to perform the support services.

25

Copy from re:SearchTX

a percentage of its overall prescription volume, the greater the savings and profits to the practice, as time and money spent on handling insurance and coverage issues for the Covered Drugs would now fall on Novartis. As detailed below, Novartis's Support Services were the "carrot" (remuneration) dangled to induce providers to prescribe the Covered Drugs to their patients.

85. When a Prescriber writes a prescription for a Covered Drug, a number of additional steps must be completed before the patient is able to "fill" the prescription at the pharmacy. These steps customarily include:

- Determining whether and to what extent the patient has prescription drug insurance benefits;

- Handling prescription refill requests;

- Determining if the drug is on the formulary lists and, if so, the applicable tiers;

- Seeking a coverage determination for the drug from the patient's carrier;

- Determining the patient's co-pays and deductibles;

- Making telephone calls to patients and returning messages and faxes;

- Responding to patient complaints;

- Determining whether a patient may qualify for "co-pay" assistance or coupons;

- Appealing any denial of coverage or prior-authorization;

- Determining the in-network pharmacy where the patient can have the drug filled;

- Communicating this information to the patient; and

- Managing the resultant paper trail.[21]

---

[21] In 2006, primary care providers spent a mean of 1.1 hours per week on authorizations, primary care nursing staffs spent 13.1 hours, and primary care clerical staff spent 5.6 hours, according to a 2009 study published in Health Affairs. The study estimated overall costs to the healthcare system of all practice interactions with health plans was between $23 billion and $31 billion annually. *See* Lawrence P. Casalino, Sean Nicholson, David N. Gans, Terry Hammons, Dante Morra, Theodore Karrison, Wendy

**MR026**

Copy from re:SearchTX

86.    As part of managing a patient's care, it is the Prescriber's responsibility to complete the numerous steps between the writing of a prescription and the patient's receipt of the drug. These steps are time-consuming, averaging roughly 20 hours per week for a Prescriber's office.[22] Because completing these tasks requires the attention of the Prescriber and his or her staff, each task bears discrete economic costs to the Prescriber.

87.    For certain prescription drugs that are particularly expensive, such as the Covered Drugs, a Prescriber's staff must also work with the patient's insurance carrier to obtain what is known as a "prior authorization[23]." A prior authorization is the requirement that a Prescriber obtain approval from the patient's health insurance plan before the drug can be dispensed by a pharmacy—or the patient may be required to pay for the medicine "out of pocket."

88.    Because it entails advocacy on behalf of the patient, obtaining prior authorization is a responsibility that falls within the Prescriber's duty of care.[24] Importantly, numerous states, including Texas, have enacted legislation that requires Prescribers to obtain prior authorizations

---

Levinson, *What Does It Cost Physician Practices To Interact With Health Insurance Plans?*, Health Affairs (July-August 2009), Vol. 28 no. 4, at 533-43), available at https://www.healthaffairs.org/doi/10.1377/hlthaff.28.4.w533 (last visited May 1, 2020).

[22] *See* Christopher P. Morley, David J. Badolato, John Hickner, and John W. Epling, *The Impact of Prior Authorization Requirements on Primary Care Physicians' Offices: Report of Two Parallel Network Studies*, J. Am. Board Fam. Med. (January-February 2013), Vol. 26 no. 1, at 93-95.

[23] *See id*. (A study of 12 primary care practices published in the Journal of the American Board of Family Medicine put the mean annual projected cost per full-time equivalent physician for prior authorization activities between $2,161 and $3,430. The study's authors concluded that "preauthorization is a measurable burden on physician and staff time.".)

[24] *See* Getting Medical Pre-approval or Prior Authorization, available at https://www.cancer.org/treatment/finding-and-paying-for-treatment/understanding-health-insurance/managing-your-health-insurance/getting-medical-pre-approval-or-prior- authorization.html (noting that "Prior authorization is often used with expensive prescription drugs. It means that your doctor must explain that the drug is medically necessary before the insurance company will cover it. The company may want you to use a different medicine or try a different one before they will approve the one your doctor prescribes.").

27

**MR027**

Copy from re:SearchTX

on behalf of the patients.[25]

89.    Further, large Managed Care Organizations, which administer the Medicaid programs in several states and Medicare Advantage plans throughout the country, also specifically require the Prescribers to perform prior authorization services for the drugs they prescribe.[26]

90.    Medicaid carriers also use the prior authorization process to contain costs associated with expensive medications. This is particularly true for products like the Covered Drugs, which are expensive and come with a myriad of potential side effects that may require other medications to manage. For such products, carriers routinely require Prescribers to "make a case" of medical necessity and explain why a less expensive product is not an acceptable alternative.[27] –This process is designed to save taxpayer dollars by ensuring that the more expensive medications are prescribed only when needed.

---

[25] See Tex. Admin. Code. Title 28, § 19.1820; Texas Admin. Code. Title 4, Subtitle I. § 531.073.

[26] *See*, e.g., Molina Medicaid New Mexico 2014 Provider Manual, § 6; *see also* Anthem BlueCross BlueShield, Preauthorization requirements, available at https://www.anthem.com/ wps/portal/ahpfooter?content_path=shared/noapplication/f2/s3/t0/pw_006531.htm&state=co&la bel=Preauthorization ("The physician who . . . orders the procedure or service is responsible for obtaining preauthorization"); Michael Bilhari, M.D., Insurance Companies Use Prior Authorization to Keep Health Care Costs in Check (Jan. 21, 2017), available at https://www.verywell.com/prior-authorization-1738770 ("Prior authorization is a requirement that your physician obtain approval from your health care provider before prescribing a specific medication for you or to performing a particular operation. Without this prior approval, your health insurance provider may not provide coverage, or pay for, your medication or operation, leaving you to cover some, or all, of the costs out of pocket.")

[27] *See, e.g.*, *Exceptions and Appeals for Drug Therapies: A Guide for Healthcare Providers*, *available at* https://www.janssencarepath.com/sites/www.janssencarepath.com/files/ exceptions-and-appeals-for-drug-therapies.pdf ("Prior authorization (PA) processes require healthcare providers to contact and receive approval from a patient's payer before that payer will cover a certain prescription drug. In these situations the prescriber must substantiate-verbally or in writing-why a particular therapy is medically necessary."). *See also Prior Authorizations: A Payer's Perspective*, Medical Economics (July 8, 2014), *available at* https://www.medicaleconomics.com/modern-medicine-feature-articles/prior-authorizations-payers-perspective (last visited May 1, 2020).

28

MR028

Copy from re:SearchTX

91.     As a coalition of healthcare organizations led by the American Medical Association has recognized, coverage determinations, prior authorization, and appeals often entail "very manual, time-consuming processes . . . [that can] divert valuable and scarce resources away from direct patient care."[28]  Further, industry research demonstrates that these tasks are time-consuming and costly for Prescribers. For instance, a study of 12 primary care practices published in 2013 in The Journal of the American Board of Family Medicine concluded that "preauthorization is a measurable burden on physician and staff time."[29]

92.     According to another study published in 2009 in Health Affairs, primary care Prescribers spent a mean of 1.1 hours per week on authorization-related work, primary care nursing staff spent 13.1 hours, and primary care clerical staff spent 5.6 hours.[30]  The same study estimated that the overall cost to the healthcare system of all practice interactions with health plans, including authorizations, was between $23 billion and $31 billion annually.

93.     Alternatively, if a Prescriber does not wish to pay its own staff to carry out these administrative tasks, Prescribers can outsource them to third-party commercial vendors for a fee. Numerous vendors provide such outsourcing services. As a study conducted by Deloitte on behalf of a large pharmaceutical company demonstrates, medical practices pay up to $98 per initial insurance verification, up to $75 for insurance re-verification, up to $111.82 for prior authorizations, and other à la carte fees:

---

[28] *See Prior Authorization and Utilization Management Reform Principles*, *available at* https://www.ama-assn.org/sites/default/files/media-browser/principles-with-signatory-page-for- slsc.pdf.

[29] *See* Morley, *supra* note 22, at 93.

[30] *See id.* at 95 (citing Lawrence P. Casalino, Sean Nicholson, David N. Gans, Terry Hammons, Dante Morra, Theodore Karrison, Wendy Levinson, *What Does It Cost Physician Practices To Interact With Health Insurance Plans?*, Health Affairs (July-August 2009), Vol. 28 no. 4, at 533-43).

29

MR029

Copy from re:SearchTX

| Activities | Lash | McKesson | Covance | Incumbent Average |
|---|---|---|---|---|
| Re-verfication | $20.75 | $75.00 | $50.00 | $41.53 |
| Insurance Verification | $98.00 | $75.00 | $75.00 | $88.50 |
| Reimbursement Support - Rate Verification | $68.00 | $65.00 | $0.00 | $62.52 |
| Coding & Reimbursement Assistance | $20.75 | $30.00 | $12.45 | $23.43 |
| Claims Support and Appeals | $104.28 | $125.00 | $57.78 | $108.45 |
| Ad Hoc Support and Consulting | $100.00 | $100.00 | $1.00 | $93.54 |
| Co-Pay Card Program Administration | $1.00 | $0.00 | $1.00 | $0.65 |
| Field Reimbursement Services | $19,180.00 | $10,000.00 | $1.00 | $14,736.15 |
| Site Visit/ Telecon | $2,150.00 | $100.00 | $1.00 | $1,296.80 |
| General Inquiry | $20.75 | $15.00 | $12.45 | $18.21 |
| Injection Network and Location Support | $104.28 | $30.00 | $12.45 | $72.45 |
| Sales Portal | $5,000.00 | $100.00 | $45,000.00 | $5,904.35 |
| Provider Portal | $8,000.00 | $2.50 | $0.00 | $4,696.52 |
| Plan Comparison | $20.75 | $125.00 | $88.65 | $61.44 |
| Send Hotline Material | $0.60 | $15.00 | $12.45 | $6.38 |
| Benefit Summary Call | $0.00 | $100.00 | $0.00 | $34.78 |
| PAP Prescreening and Referrals | $62.00 | $30.00 | $89.65 | $52.67 |
| Prescription Triage | $68.00 | $100.00 | $12.45 | $75.51 |
| Prior Authorization | $68.00 | $75.00 | $111.82 | $73.29 |
| Injection Reminder | $21.00 | $15.00 | $12.45 | $18.36 |
| Analytics and Reporting | $110.00 | $100.00 | $135.00 | $108.15 |
| Sales Rep Hotline | $20.75 | $15.00 | $12.45 | $18.21 |
| Sample/Vouchers | $100.00 | $30.00 | $12.45 | $69.94 |
| CSR Training and On-boarding | $0.00 | $100.00 | $0.00 | $34.78 |
| Language Line | $0.00 | $100.00 | $1.00 | $34.85 |
| Telecommunications | $0.40 | $100.00 | $1.00 | $35.08 |

94. Thus, whether outsourced or performed in-house, the tasks that must be completed before prescriptions are filled result in significant, tangible administrative costs to Prescribers. These are direct costs that Prescribers would have to incur to perform or outsource the burdensome administrative tasks associated with Support Services.

95. Despite the significant costs associated with Support Services, Prescribers are not allowed to charge the patient or their insurance provider for such tasks. For example, in Texas, "[p]roviders must certify that no charges beyond reimbursement paid under Texas Medicaid for

30

MR030

Copy from re:SearchTX

covered services have been, or will be, billed to an eligible client." The Texas Medicaid Provider Procedures Manual makes clear to providers that "Federal regulations prohibit providers from charging clients a fee for completing or filing Medicaid claim forms" and notes that the "cost of claims filing is part of the usual and customary rate for doing business." Further, providers cannot charge "Texas Medicaid clients, their family, or the nursing facility for telephone calls, telephone consultations, or signing forms."[31]

96.    Thus, when an office-based Prescriber receives payment for an office consultation,[32] the payment is intended to compensate the Prescriber for medical care given and administrative tasks associated with that patient's care. These tasks include Support Services.

97.    Given that the administrative tasks associated with the provision of Support Services are time-consuming, Prescribers are less likely to prescribe a drug that imposes an undue burden on support staff because doing so decreases profitability. Conversely, a Prescriber is much more likely to prescribe a drug if it can be prescribed with little or no administrative burden.

98.    These factors were not lost on Novartis. Indeed, Novartis readily assumed the expense the Prescribers would otherwise have had to incur, knowing that the availability of Support Services would act as a powerful inducement to Prescribers to recommend the Covered Drugs over a competitor's products, especially in Texas where reimbursement for administrative

---

[31] Texas Medicaid Provider Procedures Manual § 1.7.10 (April 2020), available at http://www.tmhp.com/Pages/Medicaid/Medicaid_Publications_Provider_manual.aspx (last accessed, April 6, 2020).

[32] The technical term for an office visit is "evaluation and management services" or "E/M." In 2012, the most commonly billed Medicare physician service was the $70 "doctor office visit" for a 15-minute consultation, closely followed by the $100 "doctor office visit" for a 30-minute consultation. Medicare pays over $11 billion each year for E/M services alone. Medicaid and private insurers also pay billions each year.

31

MR031

Copy from re:SearchTX

expenses associated with approval is prohibited.

99.     While pitching Prescribers, Novartis sales reps emphasized that, if the Prescribers prescribed the Covered Drugs, Novartis would provide—free of charge—the services and resources of a full reimbursement support team to manage the administrative tasks associated with prescribing the drug. Novartis sales reps further emphasized that the cost and expenses normally associated with managing a patient's prescription would be shifted to Novartis, thereby increasing the Prescriber's bottom line.

100.    This value proposition was a powerful tool in the hands of Novartis's drug reps and its outside field reps and was used to induce Prescribers to recommend Novartis drugs. Novartis assumed and took over numerous administrative tasks Prescribers would otherwise be duty-bound to perform.   For the Covered Drugs, Novartis provided key services, including benefits verification, prior authorization assistance, and appeals of coverage denials.

101.    As explained above, all of the tasks outlined above were the sole responsibility of the Prescribers—albeit work that would have been unprofitable for Prescribers. Novartis's profit motive in paying for Support Services is obvious. Given the exorbitant prices Novartis charges for its product, if just a handful of Prescribers choose the Covered Drugs over competing products, Novartis's investment in the program generates significant returns.

### *Reimbursement Support Services are a Tangible Benefit to Prescribers*

102.    As set forth above, Support Services are a great value to Prescribers because these services reduce, and in some instances eliminate, the administrative costs associated with prescribing drugs. These services increase profitability for physicians, particularly for "office-based" providers because those providers derive most of their revenue from 15, 30, and 45-minute units of service provided to patients during office visits.

32

Copy from re:SearchTX

103.     The technical term for an office visit is "evaluation-and-management services" or "E/M" for short. By way of example of how pervasive and valuable these services are, in 2012, the most commonly billed Medicare physician service was the $70 "doctor office visit" for a 15-minute consultation, closely followed by the $100 "doctor office visit" for a 30-minute consultation. Medicare pays over $11 billion each year for E/M services alone. Medicaid and private insurers also pay billions each year.

104.     When an office-based Prescriber receives payment for an E/M service, part of the payment is intended to compensate the Prescriber for medical care given and administrative tasks associated with that patient's care. Despite the enormous administrative costs and expenses,[33] office-based Prescriber are not permitted, under federal or state regulations, to directly charge patients a fee for any of these services pursuant to the payer-physician contract.[34] Instead, Prescribers get paid for these services indirectly through the E/M unit charge.

105.     For example, if a Prescriber receives $50 for an E/M service, a portion of that $50 is intended to compensate the Prescriber for the administrative tasks inherent in managing that

---

[33] A 2011 study published in Health Affairs found that providers spend an annual average of nearly $83,000 of overhead staff time and cost associated with coverage issues plans. That means the total cost to physicians for prior authorizations is around $69 billion annually. With approximately 835,000 physicians practicing in the nation, that represents 868.4 million hours given over annually to this administrative task—not counting other staff members' time. *See* Lawrence P. Casalino, Sean Nicholson, David N. Gans, Terry Hammons, Dante Morra, Theodore Karrison, Wendy Levinson, *What Does It Cost Physician Practices To Interact With Health Insurance Plans?*, Health Affairs (July-August 2009), Vol. 28 no. 4, at 533-43).

[34] For example, in Texas, "[p]roviders must certify that no charges beyond reimbursement paid under Texas Medicaid for covered services have been, or will be, billed to an eligible client." The Texas Medicaid Provider Procedures Manual makes clear to providers that "Federal regulations prohibit providers from charging clients a fee for completing or filing Medicaid claim forms" and notes that the "cost of claims filing is part of the usual and customary rate for doing business." Further, providers cannot charge "Texas Medicaid clients, their family, or the nursing facility for telephone calls, telephone consultations, or signing forms." Texas Medicaid Provider Procedures Manual § 1.6.9 (Dec. 2017), *available at* http://www.tmhp.com/Pages/Medicaid/Medicaid_Publications_Provider_manual.aspx (last accessed, Dec. 20, 2017).

33

MR033

Copy from re:SearchTX

patient's care.

106. Since a Prescriber's E/M reimbursement for each office visit is fixed per unit, Prescribers are continuously seeking ways to combat and reduce overhead costs and expenses in order to earn more profit from each E/M unit billed.

107. One way to earn more profit is to reduce the administrative costs associated with prescribing drugs. If a Prescriber can reduce this cost, each E/M unit will be more profitable. These economics have a direct impact on a Prescribers' prescribing behavior. Prescriber are less likely to prescribe a drug that imposes an undue burden on support staff because this decreases profitability by requiring more staff and/or reducing the number of patients that can be seen in a day. Conversely, a Prescriber is much more likely to prescribe a drug if it can be prescribed with little or no administrative burden. Thus, the provider's relative cost and burden in prescribing one company's drug when compared to another company's drug can directly influence which drug a provider will recommend to a patient.

108. These factors are not lost on pharmaceutical manufacturers like Novartis who want to increase Covered Drug sales. As such, Novartis developed a concierge of services that are marketed to providers along with the Covered Drugs in order to increase the likelihood that providers choose to recommend them. While these services cost Novartis millions of dollars each year, Novartis readily incurs this expense, knowing that these services would act as a powerful inducement to providers to recommend the Covered Drugs over a competitor's drugs.

109. Novartis Drug reps' pitch to providers was essentially as follows:

> Dear Part D Doctor: If you prescribe our drug (i.e., "recommend" the patient use our drug), we will give you the services and resources of a full reimbursement support team to manage the administrative tasks associated with prescribing the drug, including in-person support. This service will

34

MR034

Copy from re:SearchTX

save you the cost and expenses normally associated with managing a patient's prescription and make your practice more profitable.

110. This value proposition was a powerful tool in the hands of the Novartis drug reps and nurse educators, and it was used to induce providers to recommend the Covered Drugs. Huff, an Exjade drug rep, explained her pitch included "…emphasizing the practical components of the reimbursement services..." such as benefit verifications, prior authorizations, and coverage appeals".

111. Because many drugs are expensive, most, if not all, patients cannot afford therapy unless it is covered by insurance. As a result, successfully starting patients on a drug therapy typically requires an initial determination to verify whether the patient has prescription drug coverage to cover the cost of the drug. This process is called an insurance or benefit verification. For most Prescribers, the benefit verification of a patient is performed by staff at the expense of the practice. It can take multiple calls and over an hour just to determine the nature and extent of the patient coverage. However, if the Prescriber recommends a Covered Drug, the verification task is handled by Lash's staff, rather than the Prescriber's staff.

112. Each day, Lash's provider Support Services team receives electronic and fax prescription requests from providers. Each request is immediately forwarded to the verification specialists who will perform the benefit verification process for the provider. The verification specialist verifies the patients' primary and secondary insurance benefits (i.e., private insurance, Medicare, Tricare, and/or Medicaid), and contacts that insurer (either on the phone or through an electronic information exchange) to verify the nature and extent of the patient's coverage. In cases of Medicare and Medicaid, this is called a "coverage determination." By way of example, for Medicare patients, a coverage determination is particularly cumbersome and time consuming

35

MR035

Copy from re:SearchTX

given the complexity of many Part D plans that have four coverage phases.[35]

113. Calvo, Support Services personnel for Lash, explained the benefit to the Prescriber:

> I think it's definitely a benefit for the doctor's office because it's a time saver. They have so many patients that they see each day and so 30 minutes per patient each day could add up to a lot of time and often times they don't also have the resources or the resources, if the nurses are doing it they are doing that work…so I think it does save time for the office… It could potentially save them money if it's a small office that could save them from having to employ additional resources.

Van Loon, also Lash Support Services personnel, agreed.

114. In addition to verifications and coverage determinations, Novartis also provides prior authorization services, as mentioned above. Many insurance carriers require a provider to first obtain a prior authorization from the patient's insurance carrier before prescribing medications. Further, if a medication receives an authorization, that prior authorization may only be valid for a limited time, such as for one year or one month. After that, the provider must start the prior authorization process over again. For the most expensive drugs like the Covered Drugs, that almost always require prior authorizations from a patients' drug coverage plan, there is a significant value in being able to off-load this task to a third-party. In fact, the cumbersome and reviled paperwork required to obtain a prior authorization of a certain drug may, in many cases, result in a provider choosing to write a cheaper competitor medication that does not require a prior authorization – which in many instances is the desired result of the Part D carriers because

---

[35] The (1) deductible phase, where a patient pays 100% for drug costs until the deductible amount; (2) initial coverage limit phase, where a patient pays a percentage of the cost depending on the carrier and the drug's formulary position; (3) coverage gap or "donut hole" phase, where patients pay 45% of the cost for brand-name drugs and 65% of the cost for generic drugs in 2015; and (4) catastrophic coverage phase, where a patient pays either 5% of the covered drug cost or $2.65 for generics and $6.60 for brand name drugs in 2015.

MR036

Copy from re:SearchTX

it uses the prior authorization process as means to contain costs associated with highly reimbursed drugs. Thus, if a Prescriber wants to recommend one of Novartis' more expensive Covered Drugs, the Part D carriers require the provider to go through the administrative process and "make the case" for prescribing them to a patient over a cheaper drug. Under the scheme outlined above, it is Novartis, rather than the patient's physician, "making the case" for the drug.

115. Van Loon, Lash Support Services personnel, explained "…if each doctor's office had to call in to the specialty pharmacies and try to figure out which one was handled yet, often they would get the wrong one so they would call through to Walgreens, they would have to call over to Kmart, they would call over to ---I think it was called Optum. That would waste time for the doctor's office, so absolutely we knew…which particular pharmacy was preferred by a particular company and then we would go to them…we saved them a lot of time… I believe it is saving them a lot of money because you have information at your fingertips… we have the Exjade form in front of us, we know the pharmacies, we know how to get through to them. We have all the information at our fingertips definitely saving the office time…" Calvo concurred.

116. Further, if a patient's carrier denies coverage for a Covered Drug or denies the authorization request, a patient's provider must file a formal appeal of the carrier's denial of the authorization. Not surprisingly, this appeal process takes a prescriber's time and his/her staff's expertise because each patient's carrier may have a different appeal process. Ordinarily, if a patient's carrier denies coverage for a drug, both the provider and his/her staff must take the time to appeal the adverse determination. However, if a patient's carrier denies authorization for a Novartis Covered Drug, Lash will take the steps to appeal that adverse determination – thereby saving the provider the time and expense of doing so.

MR037

Copy from re:SearchTX

117. Van Loon, Lash Support Services personnel, explained how the Support Services scheme is both a benefit to the provider and Novartis; "That's because if there is no one to call, if there is no support services, that claim is out there dangling and falling into those gaps---we all know that some of these claims just disappear or whatever---how do they know that when they faxed it, it is even going to get handled?"

118. Further, the process of obtaining a prior authorization and/or appealing a denial requires direct medical input from the provider regarding a patient's medical necessity for a drug and specialized knowledge from the Prescriber's staff about each carrier's unique prior authorization and coverage criteria. Although these steps ordinarily require time and expertise from the provider and staff, like benefit verifications, Prescribers are not permitted to charge a fee to patients for obtaining a prior authorization pursuant to payor contracts that pay for this service in the E/M unit payment.

119. For many years, Novartis and Lash trained personnel have handled nearly all Support Services for the Covered Drug prescriptions, giving a clear advantage and tangible financial incentive to physicians choosing to prescribe the Covered Drugs over competitors. Like with the nurse educators, Novartis and Lash will have detailed data regarding the time, place, amount and other particularized details of each time it provided a reimbursement support service for a Covered Drug prescribing Prescriber. The number of instances this service was provided will obviously directly correlate with the number of Covered Drug prescriptions. Although correlation is not always causation, here the causal link is particularly strong as providers overwhelming use the Support Services offered by Novartis, rather than handling the tasks themselves.

38

MR038

Copy from re:SearchTX

120. Further, while Novartis and Lash may argue that these services do not harm patients – since it helps the patient get the medication – that notion misses the mark. The patients are not only entitled to the medication, but also independent unfettered medical judgment from the Prescribers who recommend that medication. Novartis and Lash's conduct impugns that judgment.

121. In summary, Novartis assumed and took over numerous administrative tasks Prescribers would otherwise be duty-bound to perform. Novartis provided key services for Prescribers of the Covered Drugs, including benefits verification, prior authorization assistance, and appeals of coverage denials, among others.

122. As explained above, all of the tasks outlined above were the sole responsibility of the Prescribers—albeit work that would have been unprofitable for Prescribers. Novartis's profit motive in paying for reimbursement support services is obvious. Given the exorbitant prices Novartis charges for its products, if just a handful of Prescribers choose the Covered Drugs over competing products, Novartis's investment in the program generates significant returns.

123. The Support Services deliver significant value to Prescribers. Without them, Prescribers would have to use their own staff and resources or outsource the Support Services to a private vendor, either way at significant expense to the Prescriber. Importantly, the payer-provider contracts with Medicare, Medicaid, and private insurers prohibit the Prescriber from charging patients a fee for these administrative services separate from the E/M unit charge. Novartis offers Prescribers a means to "outsource" this function without any direct or indirect cost to the Prescriber, but only if the Prescriber chooses to recommend Novartis's Covered Drugs. By offering these in-kind services as a means to induce Prescribers to recommend Novartis's Covered Drugs, Novartis violated Texas law.

39

**MR039**

Copy from re:SearchTX

## SCHEME THREE: NOVARTIS HIRED NURSES TO ACT AS UNDERCOVER SALES AGENTS AND RECOMMEND THE NOVARTIS COVERED DRUGS

### *The Background of the Unlawful White Coat Marketing Program*

124. In the third scheme, with assistance from third parties, including Lash and Ashfield, Novartis improperly capitalized on the status of the skilled registered nurses to promote the Novartis Covered Drugs, obtain access to Prescribers, and induce Prescribers to prescribe the Covered Drugs.

125. The scheme was designed and intended to gain access to Prescribers and leverage this access into sales. The need for the scheme arose because Prescribers often restrict or deny access to drug reps but are naturally inclined to meet with and listen to healthcare professionals. Accordingly, with support from Lash and Ashfield, Novartis created a scheme where registered nurses purported to provide independent medical advice to Prescribers and patients. In reality, the Lash and Ashfield nurses were paid to promote and recommend the Novartis Covered Drugs to Prescribers and patients.

126. For illustration purposes, the channel of remuneration in this scheme is illustrated below:

40

**MR040**

Copy from re:SearchTX



127. Since pharmaceutical companies are prohibited from giving kickbacks to doctors, as demonstrated with arrows A and B, they are now resorting arrows C, D and E, which demonstrates that remuneration flows to nurse educators who, in turn, are recommending Covered Drugs to Prescribers and patients. However, while the remuneration flows through a different channel, the legal significance remains the same: The conduct violates Texas law.

128. In this case, the interviewees confirm that Novartis paid remuneration to nurse educators (*i.e.*, hired via a third party) to recommend the Covered Drugs over competing drugs to patients and Prescribers. Remuneration by a drug company, like Novartis, to "white coated" nurse educators differs slightly from the traditional form of unlawful remuneration of the past: (arrow A). Thus, while payment to the nurse educators differ in some manner because the nurse cannot write a prescription, that is a distinction without a material difference – payment to "anyone" results in a violation if part of that payment is to induce a recommendation.

129. Novartis needed a clever and nuanced approach to disguise this marketing strategy. After all, nurse educators could not openly appear to act in the role of drug reps for several reasons. One, Prescribers would not allow nurse educators to educate patients if

41

Copy from re:SearchTX

Prescribers knew their true role was marketing. Two, pharmaceutical companies are prohibited from paying non-employees (*i.e.*, third parties) to "recommend" its drugs to others as is set forth in the previous section.

### *Novartis Provided Sales Training to the Nurse Educators*

130. Novartis invested heavily in training nurse educators how to gain access to Prescribers and promote the Covered Drugs. This training was a vital component of Novartis's scheme because Novartis's ultimate goal was to drive drug sales.

131. As a result, Novartis contrived disease awareness programs that would act as a cover for the nurse educators – a program that could make nurse educators appear to be functioning distinct and independent from the role of marketing. Novartis designated the nurses as "educators" who, instead of being paid to recommend drugs, were now claiming to market and promote free educational services to providers and patients. Although "on paper" the nurses were called educators, the witnesses all make clear that the nurse educators were expected to recommend the Covered Drugs to patients.

132. IQVIA/Quintiles, a nurse educator vendor, even touts their ability to train nurse educators with "persuasion skills" on their "Fact Sheet":

> Selected [nurse educator] candidates are trained regarding their specific program, the relevant disease state, product data and legal and regulatory compliance mandates. IQVIA/QUINTILES/Quintiles also provides training in presentation and persuasion skills.[36]

133. The website goes on to boast that the objective of nurse educators is to: "Increase

---

[36] *See* https://www.dropbox.com/s/bw5zbkcfueaawiy/Quintiles%20clinical-educator-programs-supporting-brand-strategy-for-optimal-patient-outcomes.pdf?dl=0 (last visited on April 6, 2020).

42

MR042

Copy from re:SearchTX

brand and disease awareness among practitioners and patients...”[37]

134. Novartis gained access to providers under the guise of "education." Anthony, an Exjade nurse educator, explained "It's getting harder and harder accessing especially academic sites with products so we have un branded stuff that we can offer to an account coz [because] all the sales people have is drugs and this stuff. And I have gained access into several places by my unbranded stuff I have to offer. And just by saying I'm not a sales rep, I'm a nurse." Bliesner, a Jadenu nurse educator, concurred, "…all [drug] reps have to be credentialed. They'll [Prescriber] just see that you're a nurse… you cannot get in without your silver bullet from the nurse [nurse educator]." McDonald, and Exjade nurse educator, said it best "…they're [nurse educators are] not perceived as selling...You'd say you're not a sales person. You provide education." Further, Anthony, McDonald, and Adriano, all Exjade nurse educators, received target lists, exactly like drug reps.

135. After the access was gained, the nurse educators were in an ideal position to recommend the Covered Drugs to Prescribers. Anthony, an Exjade nurse educator, explained "…you can't discuss branded or unbranded on the same day… I can set up another in-service and we can come and talk about… the drugs we have available… talking about the product [Exjade] and how the product works." She continued, "Because as nurses [nurse educators] we are able to help drive the business… we are able to find hidden business and also by doing disease awareness on branded sessions you get nurse[s] talking and thinking and moving them towards a patient that's good for the product. If they don't know what the options are out there then how can they offer their patients?"

136. However, importantly, Anthony admits that she does not talk about other

---

[37] *Id.*

43

Copy from re:SearchTX

treatment options. In fact, she is not allowed to discuss competitor medications; "No. We can't talk about competitors." She said, "I give you the information about my product and again taking it down for the right product for the right patients." (emphasis added) When asked if nurse educators who work on behalf of a pharmaceutical company will promote that company's drug as the medication of choice, she answered, "Yeah, I agree…because that's the drug you are promoting…."

137. McDonald, another Exjade nurse educator, explained training consisted of "selling skills." She also stated her role was to "help identify appropriate patients for the therapy." McDonald explained the scheme in more detail; "You go in there, and say, 'I'm just educating on iron overload, explaining to your staff what it is, what symptoms might be, who it's most prevalent with, what occurs.' The natural questions you get from the staff will be 'okay, now I understand what it is, what do you do for it?' And then sometimes that opens up to letting you speak about the drug [Exjade] itself." McDonald also confirmed that she's not going to "talk about somebody else's product."

138. McDonald further explained that nurse educators who work on behalf of a pharmaceutical company will promote that company's drug as the medication of choice; "…if they're hired promotionally to represent that drug, they can't speak about other things, other drugs because they're not approved. They can't have a regular nurse conversation, for example, with the doctor." A "regular nurse conversation" being an unbiased, non-sales, medical conversation between a nurse and a doctor.

139. Further, Anthony and McDonald, both Exjade nurse educators, used Viva, sales tracking software.

140. Huff, an Exjade drug rep, said "…I increased my sales so substantially…that was

44

MR044

Copy from re:SearchTX

primarily due to my ability to identify my Nurse Educators' strength and then plugging her into areas of need and opportunity in the territory, that helped leverage her strength. And, she was definitely part of why things turned out the way they did." Anthony, an Exjade nurse educator, explained nurse educators are "the whipped cream on the ice cream sundae."

141. Delahanty, an Exelon nurse educator, explained she targeted providers who prescribed competitor medications "Aricept or Reminyl." Delahanty was trained to overcome objections such as "…there's three cholinesterase inhibitors currently available and the dosing for Exelon is very complicated. Why would we use it?" She overcame that objection by stating "…'the dosing is outlined this way and it's only written this way for tolerance because one of the biggest reasons that Alzheimer's patients stop taking their medication is because of their intolerability. This takes care of tolerance.' That was a huge problem with the cholinesterase inhibitors so you go right to the biggest problem, which is tolerance. It was a huge advantage."

142. Bliesner, a Jadenu nurse educator, explained her job was to convert Exjade patients to the newer Jadenu medication. She said her training included how to overcome objections such as "why should I switch my patients who are perfectly happy and compliant with the old version?" Her response was, "…just saying that 'I don't understand why you would think that your patients are happy drinking a very thick solution as opposed to taking pills,' or 'tell me why you would prefer that'…"

143. As with the Exjade nurse educators, Bliesner explained her strategy was to first discuss disease states such as multiple myeloma and sickle cell disease. She stated that inevitably led to questions from providers such as "What do you do about this?" Her response would be, "I can't talk about this today. I can come back." Then she would return with an Exelon branded slide deck. She further stated that she cannot discuss competitor medications, "I

45

Copy from re:SearchTX

can only speak about my product."

144. In this way, Novartis gained market share using white-coated nurse educators to directly promote the Covered Drugs to providers.

***The Conflict of Interest for White Coat Marketing Nurses***

145. By paying nurses to engage in white coat marketing, Novartis created a disturbing conflict of interest for the nurses. This conflict can harm patients and vastly increase pharmaceutical spending.

146. In an ethical and medically appropriate nurse-to-patient relationship, a nurse has an absolute fiduciary duty of care to the patient. That duty can and should never be compromised - in particular, it should not be compromised by a concurrent allegiance or affiliation with any drug or drug company. Without question, nurses and medical practitioners should make medical decisions based solely upon the best interests of the patient. This is not expected but is a fundamental principle of our healthcare system. However, during recent years, scholars have pointed to increased promotional spending by pharmaceutical companies on nurses (mostly in the form of small gifts, dinners or drug samples) as creating a serious conflict that justifies a ban or strong limitation to protect patients.[38] The conduct here is far beyond gifts and drug samples. The nurse educator compensation is derived from Novartis. This conflict raises an ethical dilemma for nurse educators, which disturbingly manifested in the situations below.[39] All

---

[38] Nancy J. Crigger, *Pharmaceutical Promotions and Conflict of Interest in Nurse Practitioner's Decision Making: The Undiscovered Country*, 17 J. Am. Academy Nurse Practitioners 207-12 (May 27, 2005).

[39] Judith A. Erlen, *Conflict of Interest – Nurses at Risk!*, 27 Orthopaedic Nursing 135-39 (Mar.-Apr. 2008). Erlen argues that a nurse simply accepting small gifts (such as notepads and promotional items) or listening to a marketing pitch is enough to cloud their judgment and create a conflict of interest. *Id.* at 137. This is a far cry from the situation highlighted here where the nurse *is indirectly employed* by the drug manufacturer.

46

Copy from re:SearchTX

patients have a right to be able to count on a nurse's behavior as a source of valid and uncompromised information – especially when it comes to matters of treatment recommendations; and especially when a patient is suffering from a debilitating disease.

147. The conflict of interest manifests in two related situations, continuity of care[40] and medication adherence. A provider's decision to keep a patient on a certain drug or switch to a competing drug is directly affected by a patient's response to a drug treatment. Here, the nurse educators work with patients on an ongoing basis and, as such, are part of the patient's disease care team. Further, since the nurse educators are observing a patient's clinical response to the Covered Drugs, the nurse is the conduit through which this clinical data is reported back to the provider upon which a provider is making healthcare decisions on behalf of the patient. Since the nurse educators are being paid, in part, to promote the interests of the drug company, there is a substantial risk that a nurse educator will selectively filter important medical information in order to ensure that a patient starts and stays on a Covered Drug. This risk includes minimizing or concealing adverse reactions, contraindications and side effects.

148. Moreover, the nurse's medical judgment is severely compromised because, nurse educators are specifically prohibited from discussing other potential drugs to treat a patient's disease even if those drugs could potentially result in a better outcome. Similarly, the nurse educators must always discuss a Covered Drug, irrespective of whether, in their judgment, it is the best choice for the patient. Furthermore, the conflict may also result in a nurse educator recommending a Covered Drug despite cheaper alternatives which would result in the same

___

[40] Continuity of care is concerned with quality of care over time. It is the process by which the patient and his/her physician-led care team are cooperatively involved in ongoing health care management toward the shared goal of high quality, cost-effective medical care.

MR047

Copy from re:SearchTX

outcome. Finally, the nurse educator is disincentivized to learn and explore other potential treatment options which potentially could contribute to a patient's outcome as any other treatment would potentially have adverse financial effects on the nurse educator.

149.     Anthony and McDonald, Exjade nurse educators, Bliesner, a Jadenu nurse educator, and Simmons and Pagano, Exelon nurse educators, all explained that they do not educate providers or patients on any other drug besides the Covered Drugs.  The interviewed reps also explained in the "white coat marketing" section above that nurse educators hired by a pharmaceutical company will promote that company's drug as the medication of choice. McDonald stated the conflict of interest best when she said, "…if they're [nurse educators are] hired promotionally to represent that drug, they can't speak about other things, other drugs because they're not approved. They can't have a regular nurse conversation, for example, with the doctor." A "regular nurse conversation" being an unbiased, non-sales, medical conversation between a nurse and a doctor.

150.     Finally, the conflicts above may not, in all or even some cases, result in a compromise of medical judgment.  For example, in some situations, medication adherence to a Covered Drug may positively affect a particular patient's outcome.  However, patients have a right to medical advice that is not compromised by a drug company's bottom line.  There is no way to reconcile the conflict resulting from a nurse educator being paid by Novartis to push a patient to continue to refill a Covered Drug.  While revenue is obviously a concern of Novartis' drug reps, marketing managers, officers and board of directors, it should not be a concern of any third-party healthcare professional, like a nurse, nurse educator, or otherwise, whose only concern should be the best interests of patients.  Here, Novartis and the nurse educator vendors have disgustingly perverted the interests of these nurse educators to directly conflict with that of

48

Copy from re:SearchTX

patients for financial gain.

*__Novartis' Conduct Violated Texas Law__*

151. Novartis's relationship with Amerisource, Lash, and Ashfield plainly involves the payment of cash consideration— kickbacks—in return for services that led to prescriptions being filled and paid for with Texas Medicaid and government money. By paying remuneration to recommend products that were subsequently reimbursed by government programs, Novartis violated Texas law.

152. In this case, Novartis paid remuneration for nurses to recommend Novartis drugs over competing drugs to Prescribers and patients. Novartis believed that the nurses were likely to be viewed by Prescribers as better credentialed and more credible than traditional drug reps, and, thus, they were more likely to gain access to Prescribers and their staff.

153. Novartis's actions are precisely the type of conduct the Texas law and specifically, the TMFPA, were enacted to curb. By paying healthcare professionals to influence their peers, Novartis improperly influenced the Prescribers' behavior, causing them to write prescriptions that were reimbursed by state and Government insurance programs, including the state of Texas.

154. The Office of Inspector General ("OIG"), which coined the term "white coat marketing," has expressly warned against it:

49

Copy from re:SearchTX

The fraud and abuse risks are compounded where . . . a physician or other health care professional is involved in the marketing activity—a practice sometimes referred to as "white coat" marketing. White coat marketing is closely scrutinized under the anti-kickback statute because physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services.[41]

As detailed below, Novartis paid Lash and Ashfield to hire nurses to recommend Novartis drugs to doctors and patients and drive sales. Not only did Novartis violate public trust with the white coat marketing scheme, it violated Texas law.

### *The White Coat Marketing Program Was Used by Novartis to Drive Prescriptions*

155. Because Texas law prohibits pharmaceutical companies from paying non-employees to "recommend" Novartis drugs to others, Novartis needed a clever approach to disguise its marketing strategy.[42] Since the nurses involved in this scheme were not Novartis employees, Novartis could not openly pay them to exclusively market the Covered Drugs.

156. In an attempt to circumvent the law, Novartis contrived a disease awareness program, seemingly distinguishing the nurses from drug reps and enabling them to appear to be independent. Novartis designated the nurses as "educators" who, instead of being paid to recommend drugs, were purportedly tasked to promote educational services to Prescribers and patients about the diseases the Covered Drugs were approved to treat. By using nurses, Novartis's white coat marketers had a veneer of independence that distinguished them from drug reps who often times could not get access to Prescribers. In reality, these nurses were expected to and did recommend Novartis drugs. This conclusion is compelled by numerous facts Relator

---

[41] See, e.g., OIG Advisory Op. 11-08, at 6 (Jun. 14, 2011), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn11-08.pdf.

[42] Tex. Hum. Res. Code § 32.039b(b)(1-d).

50

MR050

Copy from re:SearchTX

uncovered during its investigation.

### *The White Coat Marketing Nurses Were Tasked with Promoting Novartis Covered Drugs*

157. Novartis invested heavily in training nurses to effectively gain access to Prescribers and promote the Covered Drugs. This training was a vital component of the scheme because Novartis's ultimate goal was to drive drug sales of the Covered Drugs. For example, one way that nurses were trained was through role-playing exercises where the nurse would pivot from providing clinical information to actually promoting the Novartis products.

158. The trainees were from all over the United States, including Texas, California, Georgia, Florida, New York, and Illinois, as well as several others. The training focused on sales techniques for the Covered Drugs. At the end of the week, the trainees had to demonstrate how they would market the product to the Prescribers. The trainers played the role of the Prescribers for purposes of the exercise.

### *The White Coat Marketing Nurses Gained Access to Prescribers*

159. Once trained, the Lash and Ashfield nurses immediately began to gain access and infiltrate Prescriber offices and facilities. This access put the nurses, often in tandem with the drug representative, in a position to recommend drugs. Novartis trained the sales reps and nurse promoters to be product messaging masters. The initial goal was to get the first prescription—or even for a Prescriber to start the patient on a sample of the drug. Thereafter, each time the nurse promoter and sales rep interacted with that Prescriber's office, the goal was to seek out the provider's experience with the patient outcome (i.e., did the drug work as advertised). Typically, that outcome information could only come from the patient to whom the Prescriber gave the drug. Yet, by using a nurse promoter—someone who was directly managing the patient so the Prescriber would not have to—the Lash nurse would then return to the Prescribers' office and

51

Copy from re:SearchTX

take time to explain, in detail, in the context of the patient, what the drug does, why it is the best, and how the Prescriber can further use it in her practice. This is how nurse promoters were able to influence Prescribers and patients and drive profits to Novartis.

160. The nurses worked with Novartis drug reps to strategize approaching Prescribers. Given their training, education, and experience, nurse promoters were able to gain access to potential Prescribers in some circumstances that drug reps could not.

161. This situation underscores the promotional aspect of the nurses' purported "education." A true nurse educator's role would inherently include a discussion of the many treatment options for Alzheimer's and other diseases. However, Novartis forced these nurse promoters to focus only on the Covered Drugs, to the exclusion of competitor products that may have been better suited to particular patients. This highlights the insidious nature and dangers of white coat marketing. The incentives offered by Novartis to the white coat marketing nurses directly conflict with the nurses' duty to their patients, such as discussing all available options to treat each patient's disease. Because they were not permitted to discuss courses of treatment that did not involve Novartis products, the nurses abdicated their role of "educators" and, despite being experts on the diseases and the drugs that treat it, withheld potentially important information from the patients.

162. The fact that the white coat marketing nurses worked closely with the Novartis sales reps to target Prescribers underscores that the true motivation for Novartis's efforts was to drive prescriptions for the Covered Drugs.

### *The White Coat Marketing Nurses Engaged in Direct Marketing to Patients*

163. Even more disturbing is the fact that the white coat marketing nurses promoted the Covered Drugs directly to patients. They gained direct access to individuals suffering from

52

Copy from re:SearchTX

Alzheimer's, which placed them in a prime position to recommend and promote Novartis's products directly to patients. As with the Prescribers, by purporting to educate patients, these nurse promoters would be in a prime position to recommend and promote the Covered Drugs directly to these patients.

164. Importantly, these encounters were direct nurse-to-patient contacts that, in general, took place at lunch or dinner programs and health fairs. These patient education sessions could be used to actively convert patients from their current medications to the Covered Drugs.

165. In sum, Novartis's nurse "educator" programs were nothing more than a scheme to drive prescriptions for the Covered Drugs. By providing remuneration to Lash and others, to employ and deploy "white coated" nurses to recommend the Covered Drugs, Novartis violated Texas law. In Texas, the law proscribes the conduct, *i.e.*, payment or offer of payment or any remuneration, to induce a person to refer any recommendation or referral. Tex. Hum. Res. Code § 32.039(b)(1-d). It is immaterial if the payee receiving the remuneration in exchange for recommending a drug is a doctor (who can recommend by writing a patient a prescription) or some other payee, such as a nurse, a medical assistant, a patient recruiter, or a runner, who can recommend the drug to a patient or a Provider. By compensating nurses in part to recommend the Covered Drugs, Novartis committed unlawful acts in Texas.

## THE SCHEMES RESULTED IN SUBMISSION OF FRAUDULENT CLAIMS TO TEXAS MEDICAID

166. During the relevant time period, Novartis's actions knowingly have caused pharmacies, PBMs, fiscal intermediaries and others to submit millions of dollars in claims to Texas Medicaid for Covered Drugs provided to beneficiaries as a result of Novartis's illegal marketing and quid pro quo arrangements. Those fraudulent claims have caused Texas (and the

53

MR053

Copy from re:SearchTX

government) to disburse millions of dollars in reimbursements that were tainted by kickbacks and should not have been paid.

***Given the Breadth of Novartis's Misconduct and the Large Volume of Claims Submitted to Texas, it is Statistically Impossible that Novartis's Conduct did not Result in the Submission of Unlawful Claims to Texas Medicaid***

167. Novartis employed the three schemes detailed above across the nation, and specifically, in Texas, and the Novartis Covered Drugs were marketed, prescribed, and sold in Texas and nationwide. Claims were submitted to federal and state healthcare programs, including Medicare and Medicaid, in most, if not all, states for each of the Covered Drugs. Given that the marketing schemes described herein were actively promoted by Novartis and widely used by Prescribers, it is statistically impossible that claims for the Covered Drugs were not submitted to government programs.

168. The breadth of the kickback scheme that Relator's investigation revealed is truly breathtaking. It encompasses every prescriber that, since 2013, received a visit from a nurse educator that purported to provide "education" concerning treatments for Alzheimer's, cancer, or growth hormone deficiency. The scheme encompasses every prescriber that, since at least 2013, received Support Services from IQVIA/Quintiles, Lash, Amerisource, Ashfield, UDG, and inVentiv/Syneos.

169. Novartis profited from the illegal schemes described in this Complaint and amongst others, Medicaid and the state of Texas were made to bear the costs. Since at least 2013, Novartis's actions knowingly have caused claims to be submitted to Medicaid and Texas for the Covered Drugs as a result of these schemes. They have resulted in hundreds of millions of dollars of reimbursements, payments, and tainted kickbacks that should not have been paid.

54

MR054

Copy from re:SearchTX

## NOVARTIS KNOWINGLY IMPLEMENTED AND PROFITED FROM THE THREE SCHEMES

170. As a significant player in the healthcare marketplace, Novartis is acutely aware of the need to comply with Texas law in promoting its drugs to health care professionals.

171. In addition, Novartis is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA").[43] The PhRMA is an organization that represents the country's leading biopharmaceutical researchers and biotechnology companies. "In interacting with the medical community, [PhRMA is] committed to following the highest ethical standards as well as all legal requirements…. The [PhRMA] Code is based on the principle that a healthcare professional's care of patients should be based, and should be perceived as being based, solely on each patient's medical needs and the healthcare professional's medical knowledge and experience."[44]

172. The PhRMA promulgates the PhRMA Code as "part of an ongoing effort to ensure that biopharmaceutical marketing practices and informational activities comply with the highest ethical and professional standards."[45] Novartis is not only a member of the PhRMA but is also a signatory to the PhRMA Code and has thereby announced its intention to abide by the

---

[43] PhRMA Code on Interactions with Healthcare Professionals, *Signatory Companies, available at* http://phrma-docs.phrma.org/sites/default/files/pdf/signatory_companies_code_on_interactions_with_healthcare_professionals.pdf (last accessed, April 1, 2020).

[44] PhRMA, Code on Interactions with Healthcare Professionals, at Preamble (revised September 2019), *available at* https://www.phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/A-C/Code-of-Interaction_FINAL21.pdf (last accessed, April 1, 2020).

[45] PhRMA, Press Release: "PhRMA Code on Interactions with Healthcare Professionals" (Apr. 30, 2013), *available at* http://www.phrma.org/press-release/phrma-code-on-interactions-with-healthcare-professionals-reaches-new-milestone-with-54th-signatory-company (last accessed, Dec. 20, 2017).

55

**MR055**

Copy from re:SearchTX

Code.[46] The PhRMA Code states that pharmaceutical companies like Novartis should not provide or offer subsidies, support, or practice-related items "to a healthcare professional in exchange for prescribing products or for a commitment to continue prescribing products." In fact, the Code specifically states that "[n]othing should be offered or provided in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices."[47]

173. Although Novartis knew that the NJFCA prohibited it from providing anything of value to providers or from giving kickbacks to promote the Novartis Covered Drugs, Novartis disregarded the law, choosing instead to put sales growth and profits before its duties to comply with the law and ensure patient safety and integrity in the healthcare marketplace. In violation of Texas law, and its own policies, Novartis committed unlawful acts and offered remuneration to influence Prescribers to prescribe the Novartis Covered Drugs.

## REQUESTED RELIEF

## CAUSE OF ACTION – VIOLATIONS OF THE
## TEXAS MEDICAID FRAUD PREVENTION ACT

174. Relator restates and incorporates the foregoing facts and allegations in paragraphs 1 through 173 as if fully set forth in their entirety.

175. Novartis knowingly committed multiple unlawful acts as defined in the applicable version of TMFPA § 36.002, including the following:

---

[46] PhRMA Code on Interactions with Healthcare Professionals, *Signatory* Companies*, available at* http://phrma-docs.phrma.org/sites/default/files/pdf/signatory_companies_code_on_interactions_with_healthcare_professionals.pdf (last accessed, Dec. 20, 2017).

[47] PhRMA, Code on Interactions with Healthcare Professionals, at 13 (July 2008)(emphasis added), *available at* http://phrma-docs.phrma.org/sites/default/files/pdf/phrma_marketing_code_2008-1.pdf (last accessed, Dec. 20, 2017).

56

MR056

Copy from re:SearchTX

(i) Novartis knowingly induced doctors to prescribe and/or continue to prescribe its products in violation of Texas law. Tex. Hum. Res. Code § 32.039b(b)(1-d). Novartis did so to receive benefits or payments under the Texas Medicaid program, which payment was made in whole or in part by Texas Medicaid. In doing so, it violated Tex. Hum. Res. Code § 32.039b(b)(1-d).

(ii) In addition to an amount paid under the Medicaid program, Novartis knowingly paid, charged, or solicited a gift, money, donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product that is paid for, in whole or in part, under Texas Medicaid. In doing so, Novartis violated TMFPA Tex. Hum. Res. Code § 36.002(5).

176. Relator seeks on behalf of Texas recovery of the value of all payments under the Medicaid program as a result of Novartis's unlawful schemes and acts, together with pre-judgment and post-judgment interest, pursuant to TMFPA § 36.052(a)(1).

177. Relator seeks on behalf of Texas civil penalties in accordance with the penalty range prescribed in TMFPA § 36.052(a)(3)(b) for each unlawful act committed by Novartis that did not result in injury to an elderly person, or disabled person, or a person younger than 18 years of age, pursuant to TMFPA § 36.052(a)(3).

178. Relator seeks on behalf of Texas an additional two times the value of payment(s) and/or benefit(s) unlawfully received by Novartis, pursuant to TMFPA § 36.052(a)(4).

179. Relator requests the Court enter an order pursuant to TMFPA § 36.051 permanently enjoining Novartis from committing further unlawful acts.

57

MR057

Copy from re:SearchTX

180. Relator seeks fees, expenses, and costs reasonably incurred by it in obtaining civil remedies or in conducting investigations in connection with this litigation, including court costs, reasonable attorney fees, witness fees, expert fees, and deposition fees pursuant to TMFPA § 36.007.

181. Relator asks that it be awarded:

(A)     Expenses, costs, and attorney's fees;

(B)     Relator's share as provided by the TMFPA; and

(C)     Such other and further relief Relators may show it is entitled, either at law or in equity.

### *Jury Demand*

182. Relator respectfully requests a trial by jury pursuant to Rule 216 of the Texas Rules of Civil Procedure.

### PRAYER FOR RELIEF

183. Plaintiff respectfully prays that when the instant case is removed from under seal Novartis be cited to appear in this lawsuit, and upon a trial of this case, the Plaintiff has judgment against Novartis for the civil recoveries, statutory multiples and statutory penalties sought in this petition, pre-judgment interest at the legal rate, entry of an injunction against further unlawful acts, attorneys' fees, litigation and investigation expenses, witness fees, expert fees, deposition fees, costs of court, and such other relief, at law and in equity, to which Plaintiff is justly entitled.

MR058

Copy from re:SearchTX

Dated: April 5, 2023        Respectfully submitted,

*/s/ Sam Baxter*
Samuel F. Baxter (co-lead counsel)
sbaxter@mckoolsmith.com
Jennifer L. Truelove
jtruelove@mckoolsmith.com
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
(903) 923-9000
Fax: (903) 923-9099

Eric B. Halper (*pro hac vice* to be filed)
ehalper@mckoolsmith.com
Radu A. Lelutiu (*pro hac vice* to be filed)
rlelutiu@mckoolsmith.com
One Manhattan West
395 Ninth Avenue, 50th Floor
New York, New York 10001
(212) 402-9400
Fax: (212) 402-9444

*/s/ W. Mark Lanier*
Mark Lanier (co-lead counsel)
WML@LanierLawFirm.com
Alex J. Brown
Alex.Brown@LanierLawFirm.com
Zeke DeRose III
Zeke.DeRose@LanierLawFirm.com
Jonathan Wilkerson
Jonathan.Wilkerson@LanierLawFirm.com
THE LANIER FIRM, PC
10940 W Sam Houston Pkwy N Suite
Houston, Texas 77064
(800) 723-3216
Fax: (713) 659-2204

***ATTORNEYS FOR RELATOR HEALTH
SELECTION GROUP, LLC***

59

**MR059**

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 74371111
Filing Code Description: Amended Petition
Filing Description: First Amended Petition
Status as of 4/5/2023 2:50 PM CST

Associated Case Party: HEALTH SELECTION GROUP, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Denise Lopez | | dlopez@mckoolsmith.com | 4/5/2023 2:33:05 PM | SENT |
| Kim Shoults | | kshoults@mckoolsmith.com | 4/5/2023 2:33:05 PM | SENT |
| Joel Leach | | jleach@mckoolsmith.com | 4/5/2023 2:33:05 PM | SENT |
| Jonathan Wilkerson | | Jonathan.Wilkerson@LanierLawFirm.com | 4/5/2023 2:33:05 PM | SENT |
| Zeke DeRose | | Zeke.DeRose@LanierLawFirm.com | 4/5/2023 2:33:05 PM | SENT |
| Alex J.Brown | | Alex.Brown@LanierLawFirm.com | 4/5/2023 2:33:05 PM | SENT |
| Mark Lanier | | WML@LanierLawFirm.com | 4/5/2023 2:33:05 PM | SENT |
| Radu A. Lelutiu | | rlelutiu@mckoolsmith.com | 4/5/2023 2:33:05 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 4/5/2023 2:33:05 PM | SENT |
| Jennifer L.Truelove | | jtruelove@mckoolsmith.com | 4/5/2023 2:33:05 PM | SENT |
| Samuel Baxter | | sbaxter@mckoolsmith.com | 4/5/2023 2:33:05 PM | SENT |

Associated Case Party: NOVARTIS AG

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ross Galin | | rgalin@omm.com | 4/5/2023 2:33:05 PM | SENT |

**MR060**

Copy from re:SearchTX

Filed 9/15/2023 2:07 PM
Sherry Griffis
District Clerk
Harrison County, Texas

Lori Hightower

Deputy

## CAUSE NO. 23-0276

| | | |
|---|---|---|
| THE STATE OF TEXAS *ex rel.* HEALTH SELECTION GROUP, LLC, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § § | |
| v. | § § § | 71st JUDICIAL DISTRICT |
| NOVARTIS PHARMACEUTICALS CORPORATION, | § § § | |
| *Defendant*. | § § | OF HARRISON COUNTY, TEXAS |

**DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S
PLEA TO THE JURISDICTION AND MOTION TO DISMISS**

**MR061**

Copy from re:SearchTX

**TABLE OF CONTENTS**

                                                                                            **Page**

OVERVIEW ................................................................................................................ 1

BACKGROUND ......................................................................................................... 2

LEGAL STANDARD .................................................................................................. 3

ARGUMENT ............................................................................................................... 5

    I.      Relator Lacks Constitutional Standing To Pursue the TMFPA Claims Absent a Personal, Concrete Harm to Relator. .................................................................. 5

    II.     The TMFPA's *Qui Tam* Provisions Are Unconstitutional and Void.................... 12

        A. The Texas Constitution Commits the Duty and Responsibility of Representing The State's Interests Exclusively To The Duly-Elected State Attorneys. ...... 13

        B. The *Qui Tam* Provisions Violate the Texas Constitution by Authorizing Private Parties to Represent the State, and by Infringing on the Executive Department. ................................................................................................ 17

CONCLUSION ........................................................................................................... 27

**MR062**

Copy from re:SearchTX

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agey v. Am. Liberty Pipe Line Co.*,
172 S.W.2d 972 (Tex. 1943)................................................................................ 16, 17, 18

*Allen v. Fisher*,
9 S.W.2d 731 (Tex. 1928)..................................................................................... 10, 11, 17

*Am. K-9 Detection Servs., LLC v. Freeman*,
556 S.W.3d 246 (Tex. 2018) .......................................................................................... 23

*American Liberty Pipe Line Co. v. Agey*,
167 S.W.2d 580 (Tex. App.—Austin 1942) .................................................... 1, 15, 16

*Bell v. Moores*,
832 S.W.2d 749 (Tex. App.—Houston [14th Dist.] 1992, writ denied)...................... 2

*Board of Water Engineers v. McKnight*,
229 S.W. 301 (Tex. 1921)............................................................................................... 26

*Bullock v. Tex. Skating Ass'n*,
583 S.W.2d 888 (Tex. App.—Austin 1979, writ ref'd n.r.e.).................................... 18

*Charles Scribner's Sons v. Marrs*,
262 S.W. 722 (Tex. 1924)........................................................................................ 18, 24

*City of Beaumont v. Bouillion*,
896 S.W.2d 143 (Tex. 1995)............................................................................................. 8

*City of Dallas v. Stewart*,
361 S.W.3d 562 (Tex. 2012)........................................................................................... 12

*City of San Antonio v. Stumburg*,
7 S.W. 754 (Tex. 1888).................................................................................................... 11

*DaimlerChrysler Corp. v. Inman*,
252 S.W.3d 299 (Tex. 2008)............................................................................................. 2

*Data Foundry, Inc. v. City of Austin*,
620 S.W.3d 692 (Tex. 2021) ........................................................................................ 5, 6

*Dep't of Trans. v. Ass'n of Am. Railroad*,
575 U.S. 43 (2015).......................................................................................................... 26

*Elliott v. City of College Station*,
2023 WL 5617344 (Tex. App.—Texarkana Aug. 31, 2023, no pet. h.) ................... 24

*Farmers Group, Inc. v. Lubin*,
222 S.W.3d 417 (Tex. 2007)........................................................................................... 22

*Farmers Tex. Cnty. Mut. Ins. Co. v. Beasley*,
598 S.W.3d 237 (Tex. 2020)......................................................................................... 3, 5

*Garcia v. City of Willis*,
593 S.W.3d 201 (Tex. 2019) ............................................................................................. 9

**MR063**

Copy from re:SearchTX

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................................. 24

*Heckman v. Williamson County*,
369 S.W.3d 137 (Tex. 2012) ................................................. 6, 9

*Hill County v. Sheppard,*
178 S.W.2d 261 (Tex. 1944) ............................................... 17, 18

*Hill v. Texas Water Quality Board*,
568 S.W.2d 738 (Tex. App.—Austin 1978, writ ref'd n.r.e.) ................... 26

*Hughes Aircraft Co. v. U.S. ex rel. Schumer*,
520 U.S. 939 (1997) .................................................................. 23

*In re Allcat Claims Serv., L.P.*,
356 S.W.3d 455 (Tex. 2011) ................................................. 19

*In re Shire PLC*,
633 S.W.3d 1 (Tex. App.—Texarkana 2021, pet. denied) ..................... 4

*In re State Bd. for Educator Certification*,
452 S.W.3d 802 (Tex. 2014) ................................................. 9

*Kalke v. City of College Station*,
2023 WL 5617344 (Tex. App.—Texarkana Aug. 31, 2023, no pet. h.) ......... 13

*Lewright v. Bell*,
63 S.W. 623 (Tex. 1901) ....................................................... 18

*Malouf v. State ex rels. Ellis*,
656 S.W.3d 402 (Tex. App.—El Paso 2022, pet. filed) ....................... 2

*Marshall v. City of Lubbock*,
520 S.W.2d 553 (Tex. App.—Amarillo 1975, writ ref'd n.r.e.) ............... 10

*Maud v. Terrell*,
200 S.W.375 (Tex. 1918) ................................................ passim

*Meshell v. State*,
739 S.W.2d 246 (Tex. Crim. App. 1987) ................................... 19

*Nootsie, Ltd. v. Williamston Cnty. Appraisal Dist.*,
925 S.W.2d 659 (Tex. 1996) ................................................. 14

*Pike v. Texas EMC Mgmt., LLC*,
610 S.W.3d 763 (Tex. 2020) ................................................ 1, 10

*PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. P'ship*,
146 S.W.3d 79 (Tex. 2004) ................................................... 23

*Reyes v. State*,
753 S.W.2d 382 (Tex. Crim. App. 1988) ................................... 13

*Ridenour v. Kaiser-Hill Co.*,
397 F.3d 925 (10th Cir. 2005) .............................................. 24

**MR064**

Copy from re:SearchTX

*Riley v. St. Luke's Hosp.*,
252 F.3d 749 (5th Cir. 2001) .......................................................................... 12

*Spokeo, Inc. v. Robbins*,
578 U.S. 330 (2016) ..................................................................................... 6, 8

*Spradlin v. Jim Walter Homes*,
34 S.W.3d 578 (Tex. 2000) ............................................................................. 8

*Staples v. State*,
245 S.W. 639 (Tex. 1922) ......................................................................... 14, 15

*State v. Moore*,
57 Tex. 307 (1882) ....................................................................................... 13

*State v. Starnes*,
246 S.W. 424 (Tex. App.—Fort Worth 1922, no writ) ................................. 15, 25

*State v. Stephens*,
663 S.W.3d 45 (Tex. Crim. App. 2021) ........................................................... 9

*Sw. Airlines Pilots Ass'n v. Boeing Co.*,
2022 WL 951027 (Tex. App.—Dallas Mar. 30, 2022, pet. filed) ...................... 2

*Swift v. United States*,
318 F.3d 250 (D.C. Cir. 2003) ...................................................................... 24

*Terrazas v. Ramirez*,
829 S.W.2d 712 (Tex. 1991) ..................................................................... 21, 24

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) ......................................................................... 3, 4

*Tex. Medicine Res., LLP v. Molina Healthcare of Tex., Inc.*,
659 S.W.3d 424 (Tex. 2023) ........................................................................ 4, 10

*Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen*,
952 S.W.2d 454 (Tex. 1997) .......................................................................... 26

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ............................................................................. passim

*U.S. ex rel. Stone v. Rockwell Int'l Corp.*,
282 F.3d 787 (10th Cir. 2002) ...................................................................... 12

*United States ex rel. Bauchwitz v. Holloman*,
671 F. Supp. 2d 674 (E.D. Pa. 2009) ............................................................ 19

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .......................................................................... 2

*United States ex rel. Harris v. EMD Serono, Inc.*,
370 F. Supp. 3d 483 (E.D. Pa. 2019) ............................................................ 12

*United States ex rel. Law v. Spurlock*,
582 F. Supp. 2d 1350 (N.D. Ala. 2008) ........................................................ 19

**MR065**

Copy from re:SearchTX

**Page(s)**

*United States ex rel. Odom v. Southeast Eye Specialists, PLLC*,
  586 F. Supp. 3d 787 (M.D. Tenn. 2022) ................................................................ 19

*United States ex rel. Polansky v. Exec. Health Resources, Inc.*,
  599 U.S. 419 (2023) .................................................................................. 12, 20, 25

*United States ex rel. Reynolds v. General Elec. Co.*,
  2007 WL 3020464 (D.S.C. Oct. 11, 2007) ........................................................... 21

*United States ex rel. SCEF, LLC v. AstraZeneca, Inc.*,
  2019 WL 5725182 (W.D. Wash. Nov. 5, 2019) ................................................... 11

*United States v. Academy Mortg. Co.*,
  2018 WL 3208157 (N.D. Cal. June 29, 2018) ...................................................... 20

*United States v. Eli Lilly Co.*,
  4 F.4th 255 (5th Cir. 2021) ...................................................................................... 1

*United States v. Everglades College, Inc.*,
  2015 WL 11004888 (S.D. Fla. Sept. 11, 2015) .................................................... 21

*United States v. Methodist Le Bonheur Healthcare*,
  2022 WL 765499 (M.D. Tenn. Mar. 11, 2022) .................................................... 19

*Van Dorn Preston v. M1 Support Servs., L.P.*,
  642 S.W.3d 452 (Tex. 2022) ................................................................................. 24

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) .............................................................................................. 12

*Wayte v. United States*,
  470 U.S. 598 (1985) .............................................................................................. 25

**Statutes**

42 U.S.C. § 1396h(b) ................................................................................................. 3

Tex. Hum. Res. Code Ann. § 36.101 .......................................................................... 3

Tex. Hum. Res. Code Ann. § 36.101(a) .................................................................... 18

Tex. Hum. Res. Code Ann. § 36.102(c) .................................................................... 18

Tex. Hum. Res. Code Ann. § 36.102(d) .................................................................... 18

Tex. Hum. Res. Code Ann. § 36.102(e) .................................................................... 23

Tex. Hum. Res. Code Ann. § 36.104(b) ............................................................ 2, 3, 22

Tex. Hum. Res. Code Ann. § 36.104(b-1) ........................................................... 23, 24

Tex. Hum. Res. Code Ann. § 36.107(a) .................................................................... 22

Tex. Hum. Res. Code Ann. § 36.107(b) .................................................................... 20

Tex. Hum. Res. Code Ann. § 36.107(c) ............................................................... 20, 21

Tex. Hum. Res. Code Ann. § 36.107(d) .................................................................... 22

Tex. Hum. Res. Code Ann. § 36.108 ........................................................................ 23

**MR066**

Copy from re:SearchTX

**Page(s)**

**Other Authorities**

J. Randy Beck, *The False Claims Act And The English Eradication of Qui Tam Litigation*, 78 N.C. L. REV. 539 (2000) ........................................................................ 11, 21, 23

**Rules**

Tex. R. Civ. P. 91a.1 ........................................................................... 4

Tex. R. Civ. P. 91a.6 ........................................................................... 4

**Constitutional Provisions**

Tex. Const. art. I, § 13 ..................................................................... 5, 6, 8

Tex. Const. art. II, § 1 ......................................................................... 9

Tex. Const. art. IV, § 22 ............................................................... passim

Tex. Const. art. V, § 21 ................................................................ passim

MR067

Copy from re:SearchTX

## OVERVIEW

Defendant Novartis Pharmaceuticals Corporation ("Novartis") respectfully moves for dismissal of the above-captioned case because Relator Health Selection Group, LLC ("Relator") (i) lacks constitutional standing and (ii) a valid cause of action under the Texas Medicaid Fraud Prevention Act ("TMFPA"). *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 775 (Tex. 2020) ("Both capacity and standing are necessary to bring a lawsuit").

Relator, which is an entity that was created to pursue and recover bounties from false claims act litigation,[1] does not allege that it personally suffered any injury from the alleged violations of the TMFPA to confer constitutional standing on Relator to sue Novartis over those alleged violations. The Legislature lacks authority to confer standing on an unharmed plaintiff to assert a statutory claim and, in any event, the Legislature's authorization of private citizens to initiate and prosecute TMFPA claims for the State violates the Texas Constitution.

In addition to violating the separation-of-powers provision of the Texas Constitution, Texas courts long ago recognized as "beyond controversy . . . that the authority to bring and maintain actions in the courts to enforce the rights of the State [of Texas] is vested by the Constitution *exclusively* in the State's attorneys (General, district and county) and *the legislature is without power to divest that authority or to delegate it to others*." *American Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580, 583 (Tex. App.—Austin 1942), *aff'd* 172 S.W.2d 972 (Tex. 1943) (emphasis added). Because the TMFPA's *qui tam* provisions reflect an unconstitutional delegation of authority to private citizens to initiate and enforce rights of the State of Texas—including those

---

[1] Relator alleges that it is an affiliate of National Health Care Analysis Group, which creates entities "for the purpose of filing qui tam actions alleging instances of fraud in medicine and pharmaceuticals." *United States v. Eli Lilly Co*., 4 F.4th 255, 259 (5th Cir. 2021); *see also* United States of America's Motion to Dismiss Relator's First Amended Complaint at 2, *United States ex rel. Miller v. AbbVie, Inc., et al*., No. 3:16-cv-2111-N (N.D. Tex.) (observing National Health Care Analysis Group affiliate "SAKSF, LLC was established for the sole purpose of serving as a relator in this action").

Copy from re:SearchTX

that the Attorney General has explicitly declined to pursue on behalf of the State—the TMFPA's *qui tam* provisions are void and deprive Relator of any cause of action.

Novartis therefore respectfully asks that the Court dismiss this case in full because Relator lacks standing or a valid cause of action on the face of the First Amended Petition ("Petition").[2] *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008).

## BACKGROUND

Unlike the federal False Claims Act ("FCA"), which dates back to 1863, the TMFPA was not enacted until 1995 by the 74th Legislature. *See Malouf v. State ex rels. Ellis*, 656 S.W.3d 402, 406 (Tex. App.—El Paso 2022, pet. filed) (citing Act of May 26, 1995, 74th Leg., R.S., ch. 824, § 1, 1995 Tex. Gen. Laws 4202, 4203 (codified at Tex. Hum. Res. Code Ann. ch. 36)); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009) (observing FCA was passed at the behest of President Lincoln in 1863 to stem fraud in Civil War defense contracts). As originally enacted, the TMFPA authorized private citizens—referred to as "relators"—to file claims for violations of the TMFPA "for the person and for the state" and, if the State intervened, to share in the proceeds of any recovery. If, however, the State declined to intervene and prosecute the TMFPA claims, then the TMFPA required courts to dismiss the *qui tam* action. *See* Tex. Hum. Res. Code Ann. § 36.104(b) (Vernon 1997) ("If the state declines to take over the [*qui tam*] action, the court shall dismiss the action.").

It was not until 2007 that the Texas Legislature amended the TMFPA to grant relators the ability to proceed with the prosecution of the TMFPA claims *without* the State's intervention. *See*

---

[2] Because "[a] trial court determines its jurisdiction at the time a suit is filed," "[j]urisdiction cannot subsequently be acquired while the suit is pending." *Bell v. Moores*, 832 S.W.2d 749, 754 (Tex. App.—Houston [14th Dist.] 1992, writ denied); *see Sw. Airlines Pilots Ass'n v. Boeing Co.*, 2022 WL 951027, at *3 (Tex. App.—Dallas Mar. 30, 2022, pet. filed). Accordingly, regardless of whether the State may subsequently seek to intervene (upon a showing of good cause), this action must be dismissed because it was initiated by an entity that lacked constitutional standing.

**MR069**

Copy from re:SearchTX

Tex. Res. Code Ann. § 36.104(b) (Vernon 2007). The change was a response to the federal government's amendment of Section 1909 of the Social Security Act, which sought to incentivize states to enact state Medicaid fraud legislation that, among other things, "contained provisions that are at least as effective in rewarding and facilitating *qui tam* actions for false or fraudulent claims as those described in [the FCA]." 42 U.S.C. § 1396h(b). Because the TMFPA that was then in effect did not meet federal requirements, the Texas Legislature passed Senate Bill 362 to "make changes to the Texas statute to comply with the federal requirements," including by "allow[ing] a person bringing the civil action to proceed without the state's participation, rather than requiring the court to dismiss the case, in the event that the state declines to take over the action." Public Health Comm., Bill Analysis, Tex. S.B. 362, 80th Leg. R.S. (2007).

Relator, which describes itself as "an affiliate of the National Healthcare Analysis Group, a research organization based in New Jersey," filed the instant lawsuit against Novartis pursuant to the TMFPA's *qui tam* provisions on May 8, 2020. Pet. ¶¶ 17, 21 (citing Tex. Hum. Res. Code Ann. § 36.101). Relator asserts two claims under the TMFPA that Relator alleges it and its "representatives" "unmask[ed]" through "a rigorous, multi-part investigation" that included "(1) interviews of numerous individuals with knowledge of and involvement in the schemes; (2) examination of Prescriber-specific Medicare data; and (3) examination of product-specific Medicare and Medicaid data." Pet. ¶ 42. On October 1, 2020, the State of Texas filed a notice declining to intervene to prosecute the alleged TMFPA violations asserted by Relator.

## LEGAL STANDARD

A party properly moves for dismissal of a case for lack of subject matter jurisdiction by filing a plea to the jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004); *see also Farmers Tex. Cnty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 241 (Tex. 2020). When a court's subject matter jurisdiction is challenged, "[t]he trial court must determine

Copy from re:SearchTX

at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed." *Miranda*, 133 S.W.3d at 226; *see also id*. at 228 ("We adhere to the fundamental precept that a court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided."). In determining whether the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause, courts "construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent." *Id.* at 226. "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend." *Id*. at 226–27 (cleaned up). If, however, "the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id*. at 227.

Separately, a party may move for dismissal under Texas Rule of Civil Procedure 91a on the ground that a cause of action has no basis in law. "A cause of action has no basis in law if the allegations, taken, as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." Tex. R. Civ. P. 91a.1. In ruling on a Rule 91a motion to dismiss, a court "must decide the motion based solely on the pleading of the cause of action, together with any [permitted] pleading exhibits." Tex. R. Civ. P. 91a.6. When recovery on the plaintiff's claims is foreclosed as a matter of law, dismissal of the claims is required. *See In re Shire PLC*, 633 S.W.3d 1, 26 (Tex. App.—Texarkana 2021, pet. denied); *see also Tex. Medicine Res., LLP v. Molina Healthcare of Tex., Inc*., 659 S.W.3d 424, 441 (Tex. 2023) (indicating whether statute created a private cause of action presented a pure question of law that should have been raised by Rule 91a motion for dismissal or traditional motion for summary judgment).

4

Copy from re:SearchTX

## ARGUMENT

The Petition should be dismissed because Relator does not plead facts demonstrating that Relator suffered any injury from any of the conduct alleged in the Petition. Relator seeks to hold Novartis liable for violating the TMFPA based on allegations that Novartis paid to have nurse educators "white coat market" certain Novartis products to prescribers and Novartis provided free nurse educator and reimbursement support services to prescribers to induce referrals. But Relator does not allege that any of these programs affected it in any unique or personal way. Rather, Relator only asserts a bare violation of state law in seeking to recover civil penalties under the TMFPA's *qui tam* provisions, which does not suffice to confer subject matter jurisdiction for at least two reasons. First, the Legislature cannot confer standing on a plaintiff by merely creating a private cause of action and authorizing the plaintiff to file suit when the plaintiff suffered no concrete harm. And second, the TMFPA's *qui tam* provisions violate the Texas Constitution and thus there is no valid law to confer Relator standing or a valid cause of action.

## I.    Relator Lacks Constitutional Standing To Pursue the TMFPA Claims Absent a Personal, Concrete Harm to Relator.

In Texas, "[s]tanding is a threshold requirement to maintaining a lawsuit," *Beasley*, 598 S.W.3d at 240, that "stems from two constitutional limitations on subject-matter jurisdiction," *Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 700 (Tex. 2021). The first limitation is the separation-of-powers doctrine set forth in Article II, Section 1 of the Texas Constitution, which prohibits courts from issuing advisory opinions because such decisions would invade the function of the executive department. *See id*. "The second constitutional limitation on a court's subject-matter jurisdiction is the open-courts provision," which "states that all courts shall be open, and every person shall have remedy by due course of law, 'for an injury done' to that person." *Id*. (quoting Tex. Const. art. I, § 13). "For these reasons," the Texas Supreme Court has held, "a

Copy from re:SearchTX

challenge to standing turns on the plaintiff's claimed injury," and "'in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal.'" *Id*. at 696, 700 (cleaned up). "The plaintiff must be *personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury" for standing in Texas courts. *Heckman v. Williamson County*, 369 S.W.3d 137, 155 (Tex. 2012) (emphasis added). The Relator fails to do so.

Relator does not seek a remedy for any "injury done" to Relator in its "lands, goods, person or reputation." Tex. Const. art. I, § 13. Relator instead alleges that the TMFPA creates a cause of action that authorizes Relator to sue Novartis for violations of the TMFPA. Pet. ¶ 17. But the Legislature's creation of a statutory cause of action to sue a defendant over a purported violation of state law does not relieve the Court of its obligation to independently determine whether Relator has suffered a concrete harm that satisfies the Texas Constitution's Open Courts provision. *See Heckman*, 369 S.W.3d at 154. Texas standing doctrine parallels "the federal requirements for standing," *Data Foundry*, 620 S.W.3d at 696, and as the U.S. Supreme Court recently held, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation . . . ," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021); *see also Heckman*, 369 S.W.3d at 154 (turning "for guidance to precedent from the U.S. Supreme Court" given "the parallels between [the federal] test [for Article III standing] and our own"); *see also Spokeo, Inc. v. Robbins*, 578 U.S. 330, 341 (2016) (explaining a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right"; rather, "standing requires a concrete injury even in the context of a statutory violation").

6

Copy from re:SearchTX

*TransUnion* concerned a provision of the Fair Credit Reporting Act ("FRCA") that creates a cause of action for consumers to sue consumer reporting agencies for violations of the FCRA to recover actual or statutory damages. *See* 141 S.Ct. at 2000–01. Relying on that statutory authorization, a class of 8,185 individuals sued TransUnion for allegedly failing to use reasonable procedures to ensure the accuracy of their credit files in violation of the FCRA. *See id*. However, the U.S. Supreme Court held that only the 1,853 class members who suffered a cognizable injury from TransUnion's dissemination of misleading credit reports had standing to pursue claims for FCRA violations, and the 6,332 class members whose credit reports were not disseminated had not demonstrated any concrete harm from the alleged violation and thus lacked Article III standing to pursue their FCRA claims. *Id*. at 2209–13. The *TransUnion* Court explained that, for purposes of constitutional standing, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id*. at 2205. "To appreciate how the Article III 'concrete harm' principle operates in practice," the U.S. Supreme Court described two hypothetical plaintiffs: (1) a Maine citizen whose land is polluted by a nearby factory who sues a company, alleging that it violated a federal environmental law and damaged her property and (2) a Hawaii citizen who files a federal lawsuit alleging that the same company in Maine violated the same environmental law by polluting land in Maine. *Id*. "Even if Congress affords both hypothetical plaintiffs a cause of action (with statutory damages available) to sue over the defendant's legal violation," the Court concluded that Article III standing doctrine would allow only the Maine citizen, and not the Hawaii citizen, to proceed with her federal lawsuit because the Hawaii citizen is "not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's 'compliance with regulatory law' (and, of course, obtain some money via

7

Copy from re:SearchTX

statutory damages)." *Id*. at 2206 (citation omitted). In the U.S. Supreme Court's view, "the public interest that private entities comply with the law cannot 'be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue.'" *Id*. (citation omitted).

To conclude otherwise, the U.S. Supreme Court found, would not only contravene Article III but also violate separation-of-powers principles that underlie the federal Constitution. "A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law . . . would infringe on the Executive Branch's Article II authority," because "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)" who "are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id* at 2207. The enforcement of the concrete harm requirement is thus "essential to the Constitution's separation of powers." *Id*.; *see also Spokeo*, 578 U.S. at 347 (Thomas, J., concurring) ("[B]y limiting Congress' ability to delegate law enforcement authority to private plaintiffs and the courts, standing doctrine preserves executive discretion.").

The same reasoning applies with even greater force under the Texas Constitution's plain language. For one, unlike the federal Constitution, the Texas Constitution speaks directly to the requirement that the plaintiff himself must suffer an injury for which he seeks a remedy in Texas court. The Open Courts provision explicitly states that every person shall have remedy by due course of law 'for an injury done' to that person," Tex. Const. art. I, § 13, and Texas courts "presume the language of the Constitution was carefully selected" and "interpret [those] words as they are generally understood." *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148 (Tex. 1995);

8

**MR075**

Copy from re:SearchTX

*see also Spradlin v. Jim Walter Homes*, 34 S.W.3d 578, 580 (Tex. 2000) ("We rely heavily on the plain language of the Constitution's literal text."). The Texas Constitution's literal text thus provides even stronger support than the U.S. Constitution for the conclusion that only a plaintiff who has had "an injury done him" by a defendant's statutory violation may sue the defendant in Texas state court. *See Heckman*, 369 S.W.3d at 155 ("[O]ur Constitution opens the courthouse doors only to those who have or are suffering an injury."); *see also Garcia v. City of Willis*, 593 S.W.3d 201, 206–07 (Tex. 2019) ("We have held standing is implicit in this provision, which 'contemplates access to the courts only for those litigants suffering an injury.'" (citation omitted)).

Secondly, "[t]he Texas Constitution takes Madison['s Federal handiwork] a step further by including, unlike the Federal Constitution, an explicit Separation of Powers provision to curb overreaching and to spur rival branches to guard their prerogatives." *In re State Bd. for Educator Certification*, 452 S.W.3d 802, 808 n.39 (Tex. 2014). Article II, Section 1 of the Texas Constitution "expressly divides the powers of government into three distinct departments— legislative, executive, and judicial—and prohibits the exercise of any power 'properly attached to either of the other[] [branches],' unless that power is grounded in a constitutional provision." *State v. Stephens*, 663 S.W.3d 45, 49 (Tex. Crim. App. 2021) (quoting Tex. Const. art. II, § 1). Texas courts have thus found that the "textual difference between the United States and Texas constitutions suggests that Texas would 'more aggressively enforce separation of powers between its governmental branches than would the federal government.'" *Id*. at 50 (citation omitted). By extension, Texas courts should more aggressively enforce the *TransUnion* Court's reasoning to rebuff legislative attempts to authorize private plaintiffs to sue defendants for conduct that did not affect the plaintiffs personally, as doing so infringes upon the executive by reposing authority for the enforcement of state laws in private plaintiffs who suffered no injury and are not accountable

9

Copy from re:SearchTX

**MR076**

to the people of Texas. *See Stephens*, 664 S.W.3d at 294 (Walker, J., concurring) ("'To assure that the government would be responsive to public will, the [constitutional] convention precisely defined the rights, powers, and prerogatives of the various governmental departments and agencies[.]'" (citation omitted)); *see also Allen v. Fisher*, 9 S.W.2d 731, 732 (Tex. 1928) (Where "plaintiff, as an individual, is not shown to have a justiciable interest" in matters of public concern, "any suit in respect of those matters must be prosecuted by the state" because "the Legislature is impliedly restrained from conferring any such duty and responsibility on the individual citizen.").

Finally, the *TransUnion*'s court's reasoning aligns with recent decisions of the Texas Supreme Court that have emphasized the distinction between (i) whether a plaintiff satisfies constitutional requirements of standing in state court and (ii) whether a plaintiff satisfies some statutory prerequisite to bringing suit or recovering on a claim. *Compare TransUnion*, 141 S. Ct. at 2005, *with Pike*, 610 S.W.3d at 773–74 (explaining the distinction between constitutional *standing* and statutory authorization, i.e., *capacity*, to assert a cause of action); *see also Molina Healthcare*, 659 S.W.3d at 339–40. Regardless of whether Relator satisfies the *statutory* prerequisites for bringing a *qui tam* suit under the latter inquiry, Relator does not meet the *constitutional* requirements for standing in Texas court under the required inquiry. *See Marshall v. City of Lubbock*, 520 S.W.2d 553, 554–55 (Tex. App.—Amarillo 1975, writ ref'd n.r.e.) ("[W]here the sole object of a suit is for the benefit of the public at large and no citizen is to be affected differently from all other citizens by the result of the suit, the public official empowered to do so may, but an individual cannot, institute and maintain such a suit" because "an individual, not being peculiarly damaged or specially sanctioned, does not have any justiciable interest that permits him to institute and prosecute the suit."); *see also Allen,* 9 S.W.2d at 732 (holding statute could not vest an individual plaintiff with authority to maintain a suit over a matter of public

**MR077**

Copy from re:SearchTX

concern in which the plaintiff, as an individual, had no justiciable interest); *City of San Antonio v. Stumburg*, 7 S.W. 754, 755 (Tex. 1888) ("[W]e apprehend that the underlying principle is that individuals have a right to sue for a redress of their own private injuries, but for such as affect all the public alike an individual is not the representative of the public interest" and such suit "must be brought by such officer or officers have been intrusted [sic] by the lawmaking power with this duty.").

Relator here does not allege, and cannot show, that Relator itself suffered *any* injury from the alleged violations advanced in its Petition. Relator is a corporate entity that was formed to initiate *qui tam* litigation to recover *qui tam* bounties, not unlike the "professional" informers that cropped up in England and turned *qui tam* litigation into a profit-making career. *See* J. Randy Beck, *The False Claims Act And The English Eradication of Qui Tam Litigation*, 78 N.C. L. REV. 539, 577–78 (2000). To that end, Relator only conclusorily alleges violations of state law that, at most, reflect a harm to the State's sovereignty interest in the enforcement of laws that the State is charged with prosecuting through "a public official who is properly clothed with that authority."[3] *Allen*, 9 S.W.2d at 732. That is, Relator asserts that Novartis paid nurse educators to market (i.e., refer) Novartis products to prescribers, and that Novartis purportedly provided free nurse educator and reimbursement support services to induce referrals, in violation of the TMFPA and Texas Medicaid anti-kickback statute. Relator does not allege any actual injury to the Texas Medicaid system,[4] let alone assert that any of the alleged programs affected Relator in a personal and

---

[3] For the reasons stated in Novartis's Special Exceptions, the Petition's allegations of a TMFPA violation are wholly conclusory, given that they are unsupported by any factual allegations concerning any Texas-based prescriber or patient that would implicate Texas Medicaid.

[4] Indeed, the federal government has deemed these programs beneficial to the federal healthcare system in seeking dismissal of substantially similar claims brought under the federal False Claims Act. *See, e.g.*, *United States ex rel. SCEF, LLC v. AstraZeneca, Inc.,* 2019 WL 5725182, at *2 (W.D. Wash. Nov. 5, 2019) (dismissing claims based on government's argument "that the federal healthcare programs have a 'strong interest in ensuring that, after a physician has appropriately prescribed a medication, patients have access

**MR078**

Copy from re:SearchTX

concrete way—which Relator must do to establish its standing to challenge those programs under the TMFPA (or any law) in Texas state court.

## II.     The TMFPA's *Qui Tam* Provisions Are Unconstitutional and Void.

Any argument that the TMFPA's *qui tam* provisions provide Relator constitutional standing also must be rejected because the *qui tam* provisions violate Article V, Section 21 and Article IV, Section 22 of the Texas Constitution, which exclusively commit the authority and duty to initiate and prosecute claims in the interest of the State to the State's attorneys. *See* Tex. Const. art. V, § 21; Tex. Const. art. IV, § 22. Because the TMFPA *qui tam* provisions violate these clauses—as well as separation-of-powers principles embodied in the Texas Constitution—no valid law exists to bestow Relator standing or a cause of action in this case.[5] *See Reyes v. State*, 753

---

to basic support relating to their medication, such as access to a toll-free patient-assistance line or instructions on how to properly inject or store their medication'" and "[r]elator's claims would 'undermine common industry practices the federal government has determined are, in this particular case, appropriate and beneficial to the federal healthcare programs and their beneficiaries'"); *United States ex rel. Harris v. EMD Serono, Inc.*, 370 F. Supp. 3d 483, 489 (E.D. Pa. 2019) (government "concluded that educational programs, informational support, medication instruction, and nurse access and support are not 'remuneration' and are programs that are 'appropriate and beneficial to the federal health programs and their beneficiaries'").

[5] Although federal courts have reached a different conclusion with respect to federal *qui tam* actions under the U.S. Constitution, those decisions are irrelevant to whether the TMFPA's *qui tam* provisions violate the Texas Constitution. *See, e.g., Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000); *Riley v. St. Luke's Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *see also City of Dallas v. Stewart*, 361 S.W.3d 562, 574 (Tex. 2012) (observing that "Fifth Circuit cases cited by the City have little relevance to our decision today, which must rely on the Texas Constitution and our precedent"). In addition to addressing characteristics of federal law distinct from Texas law, those federal court decisions heavily rely upon the federal history for *qui tam* actions as "conclusive" in resolving the constitutional questions presented in those cases. *See, e.g., Stevens*, 529 U.S. at 773–74; *Riley*, 252 F.3d at 752. But no equivalent history exists in Texas. To the contrary, and as further explained below, the Texas Supreme Court assiduously interpreted the Texas Legislature's enactments against finding any such delegation of authority in the years following the Texas Constitution's ratification.

Moreover, the continuing vitality of those federal decisions is uncertain following recent decisions of the U.S. Supreme Court. Justices Thomas, Kavanaugh, and Barrett recently raised concerns, *sua sponte*, about the constitutionality of the FCA's *qui tam* provisions under Article II of the U.S. Constitution. *See United States ex rel. Polansky v. Exec. Health Resources, Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting) (cautioning that courts "should be especially careful not to overread the early history of federal qui tam statutes, given that the [federal] Constitution's creation of a separate Executive Branch coequal to the

Copy from re:SearchTX

S.W.2d 382, 383 (Tex. Crim. App. 1988) (en banc) (explaining that, because an unconstitutional statute is void from its inception, it "'imposes no duties, confers no rights, creates no office, bestows no power, affords no protection, and justifies no acts performed under it'" (citation omitted)); *see also Kalke v. City of College Station*, 2023 WL 5617344, at \*1 (Tex. App.—Texarkana Aug. 31, 2023, no pet. h.) ("'Void' is a strong word in constitutional parlance, because '[a]n unconstitutional statute is void from its inception and cannot provide a basis for any right or relief.'" (citation omitted)).

A. The Texas Constitution Commits the Duty and Responsibility Of Representing The State's Interests Exclusively To The Duly-Elected State Attorneys.

In the six years immediately following the Texas Constitution's ratification in 1876, the Texas Supreme Court recognized that "[i]t must be presumed that the constitution, in selecting the depositaries of a given power, unless it be otherwise expressed, intended that the depositary should exercise an *exclusive* power, with which the legislature could not interfere by appointing some other officer to the exercise of the power." *State v. Moore*, 57 Tex. 307, 314 (1882) (emphasis added). And since its ratification in 1876 to present day, the Texas Constitution has reposed the power and duty of representing the State in the State's attorneys. As the Texas Supreme Court observed over a hundred years ago, the Texas Constitution

> by Section 21 of Article 5, lodges with the county attorneys the duty of representing the State in all cases in the district and inferior courts, with the right in the Legislature to regulate by law the respective duties of district and county attorneys where a county is included in a district having a district attorney; and by Section 22 of Article 4 that duty as to suits and pleas in the Supreme Court is confided to the Attorney-General. With the limitation existing in the authority of the Legislature,

---

Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like qui tam were inherited"); *id*. at 442 (Kavanaugh, J., concurring). And the U.S. Supreme Court's reasoning in *TransUnion* suggests that *Stevens*' "theoretical justification" for standing in federal *qui tam* actions should be revisited. *See* 141 S. Ct. at 2006 ("[T]he public interest that private entities comply with the law cannot 'be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue.'" (citation omitted)).

**MR080**

Copy from re:SearchTX

under Section 22 of Article 4, to create additional causes of action in favor of the State and intrust their prosecution, whether in the trial or in the appellate courts, solely to the Attorney-General, *the powers thus conferred by the Constitution upon these officials are exclusive.*

*Maud v. Terrell*, 200 S.W.375, 376 (Tex. 1918) (emphasis added).

Recognizing these constitutional constraints, the Texas Supreme Court in *Maud* and decisions that followed applied the principle of constitutional avoidance to construe the Legislature's enactments to permit only the State's attorneys to file and prosecute the State's claims consistent with Article V, Section 21 and Article IV, section 22 of the Texas Constitution. *See also Nootsie, Ltd. v. Williamston Cnty. Appraisal Dist*., 925 S.W.2d 659, 662 (Tex. 1996) ("[W]e must, if possible, construe statutes to avoid constitutional infirmities.").

In *Maud*, the Texas Attorney General challenged as unconstitutional an act purporting to authorize the Comptroller's agent to "sue for and collect taxes" and "commence an action to recover the amount of such tax." 200 S.W. at 376. But the Texas Supreme Court upheld the constitutionality of the act by construing that language to mean that the Comptroller's agent "should cause the suit to be filed by the official charged with that specific duty" (i.e., the State's attorneys) and not authorization for the agent itself to file suit. *Id*. at 377. In so holding, the Texas Supreme Court stated that it "presumed that the Legislature intended [the Comptroller's agent] should act in that relation under the authority of the county attorney and in such way as not to infringe upon the latter's power, and the language will be so construed." *Id*.

A few years later, the Texas Supreme Court next addressed the right of private citizens to file suit under an act that provided that "'proceedings by quo warranto to enforce the provisions of this section . . . may be instituted at the suit of any citizen in the district court of any county'" to prevent a violator from appearing on an election ballot. *Staples v. State*, 245 S.W. 639, 640 (Tex. 1922) (citation omitted). The plaintiffs there contended that the act "create[d] a legal right in them

Copy from re:SearchTX

. . . and that, regardless of the state and its authorized agents, this private right, thus created, authorized them to bring and prosecute this suit." *Id.* The Texas Supreme Court disagreed, stating:

> To give the section the meaning contended for by [plaintiffs] would be to seriously infringe upon the mandate of section 21, art. 5, of the Constitution, that 'the county attorneys shall represent the state in all cases in their respective counties,' and of section 22, art. 4, relating to the Attorney General. The holding of this court in *Maud v. Terrel*, 109 Tex. 97, 200 S. W. 375, opinion by Chief Justice Phillips, is to the effect that *the Legislature is without authority under the Constitution to restrict the exclusive powers of the county attorneys or district attorneys and the Attorney General to represent the state*.

*Id.* at 642 (emphasis added). Because the Court again "presumed that the Legislature desired and intended to enact a constitutional law," the Court adopted a construction of the act that rendered it valid, finding "it [] clear that section 9 means that at the instance of, or on solicitation of, any citizen, proceedings by information in the nature of quo warrant may be instituted, *through the proper officer of the state*, to determine the right of any candidate charged with a violation of the act to have his name placed on the official ballot." *Id.* at 641 (emphasis added); *see also State v. Starnes*, 246 S.W. 424, 425 (Tex. App.—Fort Worth 1922, no writ) ("If the state is the plaintiff, then, under article 5, § 21, of the Constitution, the county attorney of Eastland county had the exclusive authority to represent the state, which was plaintiff, and *the Legislature did not have the power to delegate that authority to any private citizen or citizens*." (emphasis added)).

Following *Maud* and *Staples*, the Texas Court of Civil Appeals in Austin held that a private citizen could not lawfully maintain a *qui tam* action that the plaintiff had filed in his name and in the name of the State under an act permitting recovery of statutory penalties for alleged discrimination in refusing to purchase oil from the plaintiff.[6] *Agey*, 167 S.W.2d 580. The court

---

[6] Unlike the Relator here, the plaintiff in *Agey* suffered a concrete harm from the statutory violation (the defendant discriminated against the plaintiff in refusing to purchase the plaintiff's oil) that would have satisfied Texas constitutional standing requirements.

**MR082**

Copy from re:SearchTX

said that "such action must be brought by the Attorney General or county attorney; and that to construe the section as authorizing institution and prosecution of the suit by and in the name of the aggrieved party for his own use and that of the State would render it void, to that extent, as contravening the above constitutional provisions." *Id*. at 581. In so holding, the court rejected the plaintiff's contention that his suit constituted "the well established common law *qui tam* action" that "is maintainable by the prosecutor for his own use and for that of the sovereign; *qui tam* actions being 'well known to the jurisprudence of this State.'" *Id*. (citation omitted). The court observed that the plaintiff's "cited cases involving *qui tam* actions arose under constitutions prior to 1876, which did not contain the invoked provisions, and therefore the question here presented was not there in issue." *Id*. at 581–82. Because the action was "one which insures to the State," the court concluded it was "maintainable only in the State's name and by its authorized officials, regardless of the fact that one-half of the recovery may insure to the interested party." *Id*. at 582.

The Texas Supreme Court subsequently affirmed, but avoided the constitutional question on the ground that the statute did not expressly authorize the plaintiff to file suit on behalf of himself and the State. *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974–75 (Tex. 1943). The statute provided that any violations would be subject to a penalty recoverable in the name of the State, and one half of such penalty could be recovered by the victim of the unlawful discrimination in a suit brought in the name of the aggrieved party.[7] *See id*. at 973–74. Strictly construing the penalty statute, the Texas Supreme Court "held that the statute clearly creates a single, indivisible cause of action, which must be prosecuted in a single suit, instituted by the State

_____

[7] The Texas Supreme Court observed, "If the Legislature had intended this Act to authorize an individual to file a suit on behalf of himself and on behalf of the State, without the joinder of the Attorney General or some district or county attorney, it could have expressed such intention in clear language. This it did not do. However, as to whether the Legislature has the power to do this under the Constitution is a question we do not decide." *Id*.

16

Copy from re:SearchTX

through its proper officials; and that [the plaintiff's] rights are limited to sharing in the recovery." *Id.* (quotations omitted). As the Court there explained, "[t]he Attorney General is the chief law officer of the State, and it is incumbent upon him to institute in the proper courts proceedings to enforce or protect any right of the public that is violated. He has the right to investigate the facts and exercise his judgment and discretion regarding the filing of a suit." *Id.* at 974 (citations omitted).

> B.     The *Qui Tam* Provisions Violate the Texas Constitution by Authorizing Private Parties to Represent the State, and by Infringing on the Executive Department.

In contrast to *Maud*, *Staples*, and *Agey*, there is no construction of the TMFPA's *qui tam* provisions that can save it from invalidation under the Texas Constitution. Through the TMFPA's *qui tam* provisions, the Legislature has, in essence, created an office comprised of private attorney generals—who are not elected by or accountable to the people of Texas—and conferred upon those agents the right to initiate and prosecute the State's claims, which rights the Texas Constitution explicitly and exclusively commits to the State's attorneys. Because "the language of [that] particular enactment is unambiguous and the conflict with the Constitution is hence apparent, there is no alternative but to declare the enactment void." *Maud*, 200 S.W. at 376; *see Allen*, 9 S.W.2d at 732 ("The Legislature is impliedly restrained from conferring [the] duty and responsibility [to represent the state's interest in a lawsuit] on the individual citizen").

Indeed, the TMFPA's *qui tam* provisions are fundamentally no different than those the Texas Supreme Court declared unconstitutional when the Legislature sought to create a "Criminal District Attorney . . . separate and distinct from the Constitutional office of District Attorney" that would be compensated out of fees earned and collected in prosecuting the State's claims. *Hill County v. Sheppard,* 178 S.W.2d 261, 262 (Tex. 1944). In voiding the enactment in *Sheppard*, the Texas Supreme Court reiterated, "Where certain duties are imposed or specific powers are

**MR084**

Copy from re:SearchTX

conferred upon a designated officer, the Legislature cannot withdraw them . . . nor confer them upon others nor abridge them or interfere with the officer's right to exercise them unless the Constitution expressly so provides." *Id.* at 264 (quoting 34 Tex. Jur. 445). That is the exact effect of the TMFPA's *qui tam* provisions.

*First*, the TMFPA's *qui tam* provisions confer upon private citizens—even from outside Texas—authority that the Texas Constitution reposes in the Attorney General to "*institute* in the proper courts proceedings to enforce or protect rights" of the State and in contravention of the Attorney General's exclusive right to "exercise his judgment and discretion *regarding the filing of suit*." *Agey*, 172 S.W.2d at 974 (emphasis added); *Bullock v. Tex. Skating Ass'n*, 583 S.W.2d 888, 894 (Tex. App.—Austin 1979, writ ref'd n.r.e.). By authorizing the relator to file suit, *see* Tex. Hum. Res. Code Ann. § 36.101(a), the *qui tam* apparatus undermines the Attorney General's exclusive authority to determine whether a case should be filed, when and where it should be filed, and the allegations and claims that should be included. *See Charles Scribner's Sons v. Marrs*, 262 S.W. 722, 727 (Tex. 1924) ("Even in the matter of bringing suits, the Attorney General must exercise judgment and discretion, which will not be controlled by other authorities."); *Lewright v. Bell*, 63 S.W. 623, 623–24 (Tex. 1901) (concluding courts cannot compel Attorney General to initiate suit, as that decision involves his professional judgment and discretion). Moreover, once suit is instituted, the *qui tam* provisions cabin the Attorney General's determination to prosecute any of the claims to a legislatively-determined time limit of 180 days in which to investigate and make a decision as to intervention. *See* Tex. Hum. Res. Code Ann. § 36.102(c). While the *qui tam* provisions permit the Attorney General to request an extension, any extension is subject to a judicial determination that the Attorney General has shown "good cause" for an extension. *See id.* § 36.102(d). Thus, the *qui tam* provisions not only delegate to relator authority that belongs to the

**MR085**

Copy from re:SearchTX

Attorney General to institute suit, but also reflect interference by the Legislative and Judicial departments in the broad discretionary power of the Executive department to carry out its responsibility to represent Texas's interests.[8] *Cf. Meshell v. State*, 739 S.W.2d 246, 257 (Tex. Crim. App. 1987) (en banc) (holding Speedy Trial Act violated separation-of-powers doctrine by intruding upon prosecutor's discretion in performing his prosecutorial function by mandating dismissal if prosecutor failed to announce ready for trial within 120 days after commencement); *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 485–87 (Tex. 2011) (Willet, J., concurring in part) (arguing legislatively-imposed 120-day time limit for court to rule "raise[d] a constitutional eyebrow" by "setting a hard-and-fast deadline for deciding a case" that "threatens to interfere with our sworn adjudicatory duties under our Constitution").

*Second*, the *qui tam* provisions interfere with the Attorney General's performance of its executive function by providing mechanisms for the relator and court to overrule the Attorney General's determination that the lawsuit should be dismissed or settled. *Cf. Maud*, 200 S.W. at 99 (observing that the Legislature cannot interfere with the right of the State's attorneys to exercise their exclusive powers to represent the State). If the State intervenes and the Attorney General determines that it would be in the State's (and public's) best interest to dismiss the relator-initiated

---

[8] Federal courts have exercised this prerogative to deny the federal government's requests for additional extensions to impose a "final" deadline by which the government must make a decision as to intervention even though the government's investigation may be ongoing. *See, e.g., United States ex rel. Odom v. Southeast Eye Specialists, PLLC*, 586 F. Supp. 3d 787, 790 (M.D. Tenn. 2022) (court refused to grant United States additional extensions and, after United States declined to intervene on "final deadline," denied motion to intervene filed six months later on ground that United States "had remained in the trenches for far too long"); *United States v. Methodist Le Bonheur Healthcare*, 2022 WL 765499, at *1 (M.D. Tenn. Mar. 11, 2022) (after court denied further requests for extension, United States entered notice that it was not intervening, "explaining that it had not completed its investigation and would continue to investigate"); *United States ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 682–83 (E.D. Pa. 2009) (denying government's fourth motion for an extension); *United States ex rel. Law v. Spurlock*, 582 F. Supp. 2d 1350, 1352 (N.D. Ala. 2008) (noting "mere conclusory allegation that more time is needed to investigate the matter, and that discovery may be necessary to see if there is a basis for relator's claims, does not justify an extension" (emphasis deleted)).

Copy from re:SearchTX

action, he cannot simply obtain a dismissal pursuant to Texas Rule of Civil Procedure 162, as he could in an action that he initiated on behalf of the State. The relator may interpose an objection, in which case the TMFPA entitles the relator to notice and an opportunity to be heard on the Attorney General's motion to dismiss—which the court may ultimately deny, over the State's objection, in favor of the relator. *See* Tex. Hum. Res. Code Ann. § 36.107(b), (c). In opining on the standard for ruling on motions to dismiss under a parallel provision in the federal FCA, the U.S. Supreme Court recently held that the federal rules that govern voluntary dismissals continue to apply, but that the FCA *qui tam* provisions require federal courts to consider the relator's interests in moving forward with the action when ruling on the government's motion to dismiss. *See Polansky*, 599 U.S. at 435–37. While the *Polanksy* Court emphasized that the government's views are entitled to "substantial deference," such provisions nevertheless subject the Attorney General's discretionary decisions to judicial review, allowing the court to make the ultimate call about whether claims asserted on behalf of the State should be dismissed, as the Attorney General desires, or proceed, as the relator wishes. *Id*. at 437–38; *see also, e.g., United States v. Academy Mortg. C*o., 2018 WL 3208157, at *2–3 (N.D. Cal. June 29, 2018) (denying government's motion to dismiss on the ground that government did not do a "more complete investigation" that "was well within the Government's ability" and rejecting government's argument that dismissal would further government interest in conserving resources).

Even if the State prevails in obtaining dismissal, such "victories" are not without cost. As one scholar noted, even though a large proportion of *qui tam* cases filed under the federal FCA have been dismissed by courts, they have nevertheless proven expensive and thus, in that sense, also impose considerable costs that are borne by the government and defendant as a result of

**MR087**

Copy from re:SearchTX

bounty-seeking relators bringing cases that the government would not have brought. [9] *See* Beck, *supra* at 11, at 623; *see also id*. at 624 (explaining that "it may be rational for an informer to pursue a claim, even if it seems unlikely to yield a victory on the merits" because "the case could prove to have a nuisance value, causing the defendant to settle to avoid the higher costs of defending a fraud claim"); *id*. at 626-27 (observing *qui tam* cases impose considerable investigative costs on the government, but little on the informer, which matters a great deal to the public because they are funded with tax dollars).

The *qui tam* provisions also restrict the Attorney General's "broad discretionary authority" to settle claims brought in the State's name by granting to the relator and judiciary a check on the Attorney General's "authority to propose a settlement agreement." *Terrazas v. Ramirez*, 829 S.W.2d 712, 722 (Tex. 1991). If the relator objects to the State's proposed settlement agreement, then the settlement must be submitted to the court for approval—that is, the judiciary must once again determine whether the Attorney General has appropriately exercised his discretion to arrive at a settlement that is "fair, adequate, and reasonable."[10] *See* Tex. Hum. Res. Code Ann. § 36.107(c). Accordingly, the Attorney General cannot settle the State's claims absent consent by the relator and the court and thus the TMFPA cedes to both some control over the prosecution of those claims superior to the Attorney General's constitutionally delegated power. *Cf. Maud*, 200

---

[9] For example, even though there was "little evidence to suggest that GE defrauded" the government, the federal district court in South Carolina recognized that GE's "willingness to pay $200,000 to resolve the False Claims Act claims (and $2 Million to resolve all claims and attorney fee issues here) doubtless reflects not a concern about the merits, but a realistic assessment of the costs of litigation and the costs of disruption to GE's Greenville plant while the suit progressed." *United States ex rel. Reynolds v. General Elec. Co*., 2007 WL 3020464, at *3 (D.S.C. Oct. 11, 2007).

[10] Federal courts have concluded that a parallel provision in the FCA affords the relator an opportunity to direct the court's attention to "significant and unexplained discrepancies between the strength of plaintiff's case and the settlement" and, if the government cannot adequately explain its reasoning, provides grounds for ordering limited discovery into the government's decision-making. *See, e.g., United States v. Everglades College, Inc*., 2015 WL 11004888, at *3 (S.D. Fla. Sept. 11, 2015).

Copy from re:SearchTX

S.W. at 376 (finding whenever the legislature provides for the services of other persons to assist the State's attorneys, "the services [must] be rendered in subordination to their authority").

*Third*, even when the Attorney General elects to intervene on behalf of the State to take over the case, the TMFPA contravenes the Texas Constitution by impermissibly "obstrud[ing] other persons upon" the Attorney General by "compel[ling] the acceptance of [the relator's] services." *Maud*, 200 S.W. at 376. Because the TMFPA grants the relator "the right to continue as a party to the action" after State intervention, the relator may seek discovery, file motions, participate in argument, and examine and cross-examine witnesses at trial. *See* Tex. Hum. Res. Code Ann. § 36.107(a). The Attorney General exercises no control over the relator (or its counsel), whose participation and personal financial interest in the case will "inevitably restrict the 'broad discretionary power' attorneys general need to carry out their constitutional duties." *See Farmers Group, Inc. v. Lubin*, 222 S.W.3d 417, 425 (Tex. 2007) (Because "[a]n attorney general's duty is to represent the state, but attorneys for private individuals have a duty of loyalty only to their clients," any requirement that an attorney general recruit individual representatives for a class action "would inevitably restrict the 'broad discretionary power' attorneys general need to carry out their constitutional duties."). If the Attorney General believes the relator's efforts are negatively impacting his litigation strategy (or the public interest), the Attorney General cannot simply terminate the relator (or its counsel) from the case or otherwise restrict their conduct, because the relator and its counsel are not subordinate to the Attorney General. Instead, the Attorney General's sole recourse is to apply to the court for relief limiting the relator's participation in the action (which the court may, again, grant or deny) based on the factors set forth in the *qui tam* statute. *See* Tex. Hum. Res. Code Ann. § 36.107(d).

**MR089**

Copy from re:SearchTX

*Fourth*, the current TMFPA authorizes the relator to prosecute the alleged TMFPA violations even if the State (through its Attorney General) declines to intervene. *See* Tex. Hum. Res. Code Ann. § 36.104(b). Although a prior version of the TMFPA required courts to dismiss a *qui tam* action if the State declined to intervene, the Legislature amended the TMFPA in 2007 to comply with federal requirements for state incentives under Section 1909 of the Social Security Act by allowing a relator to proceed with non-intervened TMFPA claims. The current version of the TMFPA thus delegates full authority for prosecuting violations of state laws to unharmed private citizens and their attorneys, whose principal motivation is obtaining the greatest monetary recovery possible, not representing or protecting the public interest. *See also PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 85 (Tex. 2004) ("It is one thing to place the power of treble damages in the hands of aggrieved parties or the attorney general; it is quite another to place it in the hands of those considering litigation for commercial profit."); *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 949, 952 n.5 (1997) (relators are "motivated primarily by prospects of monetary reward rather than the public good"). A relator and its counsel have "no incentive to consider the public impact of the litigation, the culpability of the defendants, the fairness of a particular litigation strategy, or similar matters that might influence a public prosecutor." Beck, *supra* at 11, at 616. Meanwhile, the Attorney General is only entitled to (i) receive a copy of the pleadings and deposition transcripts, (ii) seek a temporary discovery stay, and (iii) object to dismissal. *See* Tex. Hum. Res. Code Ann. §§ 36.104(b-1), 36.108, 36.102(e).

In all these respects, the TMFPA not only represents an impermissible delegation of executive authority to an unharmed and unknown private party, but also contravenes the separation-of-powers doctrine enshrined in the Texas Constitution by subjecting the "policy

**MR090**

Copy from re:SearchTX

choices and value determinations constitutionally committed for resolution" to the State's attorneys to state-court review. *See Am. K-9 Detection Servs., LLC v. Freeman*, 556 S.W.3d 246, 250 (Tex. 2018); *see also Elliott v. City of College Station*, 2023 WL 5617344, at *13–14 (Tex. App.—Texarkana Aug. 31, 2023, no pet. h.). The Texas Supreme Court has counseled courts to refrain from wading into political questions where (i) there is "a textually demonstrable commitment of the issue to a coordinate political department" or (ii) "a lack of judicially discoverable and manageable standards for resolving it." *Van Dorn Preston v. M1 Support Servs., L.P.*, 642 S.W.3d 452, 458 (Tex. 2022). Here, the Texas Constitution explicitly commits the authority to represent the State to the State's attorneys, which carries with it the prosecutorial discretion to decide whether to institute, maintain, dismiss, or settle a lawsuit based on myriad considerations. *See Terrazas*, 829 S.W.2d at 721; *Marrs*, 262 S.W. at 727; *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (noting enforcement decisions "involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise"). Yet, because the TMFPA also authorizes the relator to prosecute TMFPA claims on behalf of the State, the Legislature requires the judiciary to resolve disagreements between relator and the Attorney General over the dismissal or settlement of the State's TMFPA claims, but provides no "judicially discoverable and manageable standard" for doing so. *See Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003) (noting "presumption that decisions not to prosecute, which is what the government's judgment [to dismiss a *qui tam*] case amounts to, are unreviewable" by judiciary). The TMFPA also judicially checks executive decision-making by interposing a "good cause" requirement on any request for an extension of the 180-day intervention deadline and for a late intervention without providing any guidance concerning what suffices for "good cause" in such

24

Copy from re:SearchTX

circumstances.[11] *See* Tex. Hum. Res. Code Ann. § 36.104(b-1). By requiring judicial review of such decisions and issues, which are committed to the prosecutorial judgment of the State's attorneys and not susceptible to judicial resolution, the TMFPA violates the Constitution in this additional respect. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) (the decision to prosecute is "particularly ill-suited to judicial review" because "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake" and would pose "systemic costs of particular concern . . . by subjecting the prosecutor's motives and decisionmaking to outside inquiry").

For all these reasons, the conclusion that the TMFPA's *qui tam* provisions violate the Texas Constitution cannot be avoided. As the Texas Supreme Court long ago recognized, "It is the duty of courts to see that the Constitution is observed in the enactment of laws, and to fearlessly declare a law void which violates the Constitution." *Maud*, 200 S.W. at 376. Regardless of how well meaning the Legislature's enactment of the *qui tam* provisions may have been, the "vice in [the TMFPA] is that . . . a private citizen, with no personal interest alleged or shown, is authorized, of his own volition, to institute and prosecute a suit in behalf of the state, in violation of a provision of the Constitution vesting that authority exclusively in the county attorney or district attorney or Attorney General" elected by and accountable to the people of Texas. *Starnes*, 246 S.W. at 425. Even if the Attorney General may, in a given case, consent to this delegation of authority, that fact

---

[11] The Tenth Circuit concluded "that to condition the Government's right to move to dismiss an action in which it did not initially intervene upon a requirement of late intervention tied to a showing of good cause would place the FCA on constitutionally unsteady ground." *Ridenour v. Kaiser-Hill Co*., 397 F.3d 925, 934 (10th Cir. 2005). In holding that the FCA imposes such a condition, the *Polansky* Court did not address or consider the constitutional ramifications raised by *Ridenour* but three justices flagged that the constitutionality of the FCA's *qui tam* provision warranted consideration in an appropriate case. 559 U.S. 442–52.

Copy from re:SearchTX

does not render the *qui tam* provisions any less unconstitutional. Just as the Legislature cannot devolve the authority to represent the State upon others, the Attorney General may not cede his duties to a private party whose interests lie in securing as much profit as possible from the case, and not the public interest.[12] *See* Beck, *supra* at 11, at 611 ("Through provision of a bounty to a successful informer, a system of *qui tam* enforcement eliminates the personal and public protections afforded by prosecutorial discretion"). "[E]ither the Attorney General or a county or district attorney may represent the State in a particular situation, *but these are the only choices*." *Hill v. Texas Water Quality Board*, 568 S.W.2d 738, 741 (Tex. App.—Austin 1978, writ ref'd n.r.e.) (emphasis added). Moreover, to the extent the *qui tam* provisions call upon the judiciary to second-guess discretionary decisions of the Executive to institute, participate in, dismiss, or settle an action on behalf of the State, "[t]he Constitution, in its prohibition against conferring on persons in one governmental department power belonging to another, contains no exception of instances wherein the latter department may review the acts of the former. The Constitution making no such exception, the courts should not make it." *Board of Water Engineers v. McKnight*, 229 S.W. 301, 304 (Tex. 1921).

---

[12] Even in the context of a legislative delegation of legislative authority, the Texas Supreme Court has noted that "private delegations clearly raise [] more troubling constitutional issues than public [delegations]." *Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen*, 952 S.W.2d 454, 469 (Tex. 1997). "On a practical basis, the private delegate may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served. More fundamentally, the basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government." *Id.*; *see also Dep't of Trans. v. Ass'n of Am. Railroad*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) (arguing "there is not even a fig leaf of constitutional justification" for delegating government power to private entities).

Copy from re:SearchTX

## CONCLUSION

Because Relator has neither alleged nor suffered any concrete injury of its own, and the TMFPA's *qui tam* provisions are facially unconstitutional, Novartis respectfully requests that the Court dismiss Relator's claims in full for lack of standing or a valid cause of action.

Dated: September 15, 2023

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Danny S. Ashby*

Danny S. Ashby
Texas Bar No. 01370960
dashby@omm.com
Megan Whisler
Texas Bar No. 24079565
mwhisler@omm.com
2501 North Harwood Street, Suite 1700
Dallas, Texas  75201-1663
Telephone:  +1 972 360 1900
Facsimile:  +1 972 360 1901

Ross Galin
(*pro hac vice* pending)
rgalin@omm.com
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000

Meredith Garagiola
(*pro hac vice* pending)
mgaragiola@omm.com
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300

Attorneys for Defendant
Novartis Pharmaceuticals Corporation

**MR094**

Copy from re:SearchTX

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record on this 15th day of September 2023, through the e-filing portal in accordance with the Texas Rules of Civil Procedure.

/s/ Danny S. Ashby

Danny S. Ashby

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 79608533
Filing Code Description: OTHER
Filing Description: DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATIONS SPECIAL EXCEPTIONS
Status as of 9/18/2023 10:15 AM CST

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lynne Kurtz-Citrin | | Lynne.Kurtz-Citrin@oag.texas.gov | 9/15/2023 2:07:36 PM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 9/15/2023 2:07:36 PM | SENT |
| Cynthia Lu | | Cynthia.Lu@oag.texas.gov | 9/15/2023 2:07:36 PM | SENT |

Associated Case Party: HEALTH SELECTION GROUP, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Samuel Baxter | | sbaxter@mckoolsmith.com | 9/15/2023 2:07:36 PM | SENT |
| Jennifer L.Truelove | | jtruelove@mckoolsmith.com | 9/15/2023 2:07:36 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 9/15/2023 2:07:36 PM | SENT |
| Radu A. Lelutiu | | rlelutiu@mckoolsmith.com | 9/15/2023 2:07:36 PM | SENT |
| Mark Lanier | | WML@LanierLawFirm.com | 9/15/2023 2:07:36 PM | SENT |
| Alex J.Brown | | Alex.Brown@LanierLawFirm.com | 9/15/2023 2:07:36 PM | SENT |
| Zeke DeRose | | Zeke.DeRose@LanierLawFirm.com | 9/15/2023 2:07:36 PM | SENT |
| Jonathan Wilkerson | | Jonathan.Wilkerson@LanierLawFirm.com | 9/15/2023 2:07:36 PM | SENT |
| Joel Leach | | jleach@mckoolsmith.com | 9/15/2023 2:07:36 PM | SENT |
| Kim Shoults | | kshoults@mckoolsmith.com | 9/15/2023 2:07:36 PM | SENT |
| Denise Lopez | | dlopez@mckoolsmith.com | 9/15/2023 2:07:36 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kimberly Grotenrath | | kgrotenrath@omm.com | 9/15/2023 2:07:36 PM | SENT |

**MR096**

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 79608533
Filing Code Description: OTHER
Filing Description: DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATIONS SPECIAL EXCEPTIONS
Status as of 9/18/2023 10:15 AM CST

Associated Case Party: NOVARTIS AG

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ross Galin | | rgalin@omm.com | 9/15/2023 2:07:36 PM | SENT |
| Meredith N.Garagiola | | mgaragiola@omm.com | 9/15/2023 2:07:36 PM | SENT |
| Danny S.Ashby | | dashby@omm.com | 9/15/2023 2:07:36 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 9/15/2023 2:07:36 PM | SENT |

**MR097**

Copy from re:SearchTX

| | |
|---|---|
| THE STATE OF TEXAS,<br><br>*ex rel.*<br><br>HEALTH SELECTION GROUP, LLC,<br><br>     Plaintiff-Relator,<br><br>v.<br><br>NOVARTIS PHARMACEUTICALS<br>CORPORATION,<br><br>        Defendant. | IN THE DISTRICT COURT<br><br>71ST JUDICIAL DISTRICT<br><br>HARRISON COUNTY, TEXAS |

## RELATOR'S RESPONSE TO DEFENDANT'S PLEA TO THE JURISDICTION AND MOTION TO DISMISS

**INTRODUCTION**

Defendant Novartis Pharmaceuticals Corporation ("Novartis") is one of the most successful pharmaceutical companies in the world. It is also one of the most egregious repeat offenders of federal and state anti-kickback laws. Over the past 15 years, Novartis has paid nearly $1.5 billion to settle charges that it paid kickbacks to illegally promote its products at the expense of the Medicare and Medicaid programs.[1]

But instead of reforming its conduct, Novartis now claims that it has found an antidote that forever shields its actions from anti-kickback scrutiny. This is because, according to Novartis, (i) Relator Health Selection Group, LLC ("Relator")—and other private whistleblowers—lacks constitutional standing to enforce the Texas Medicaid Fraud Prevention Act ("TMFPA"); and (ii) the TMFPA is unconstitutional because it violates the separation-of-powers of the Texas Constitution. Neither argument passes muster.

Contrary to Novartis's arguments, Relator need not have suffered personal injury to file and pursue claims under the TMFPA. This is because the TMFPA itself authorizes Relator to pursue claims on behalf of the government program it protects, *i.e.*, Texas Medicaid, and Relator

---

[1] *See Novartis Pharmaceuticals Corporation, a US Subsidiary of Novartis AG, Reaches Settlement Agreement with U.S. Attorney's Office* (Sept. 30, 2010), available at https://web.archive.org/web/20131017111251/http://www.novartis.com/ newsroom/media-releases/en/2010/1448151.shtml (announcing $422.5M settlement); *Manhattan U.S. Attorney Announces $370 Million Civil Fraud Settlement Against Novartis Pharmaceuticals For Kickback Scheme Involving High-Priced Prescription Drugs, Along With $20 Million Forfeiture Of Proceeds From The Scheme* (Nov. 20, 2015), available at https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-370-million-civil-fraud-settlement-against-novartis (announcing $370M settlement); *Novartis Pays Over $642 Million to Settle Allegations of Improper Payments to Patients and Physicians* (July 1, 2020), available at https://www.justice.gov/opa/pr/novartis-pays-over-642-million-settle-allegations-improper-payments-patients-and-physicians (announcing $642M settlement); *Novartis Agrees to Pay Over $51 Million to Resolve Allegations that It Paid Kickbacks Through Co-Pay Foundations* (July 1, 2020), available at https://www.justice.gov/usao-ma/pr/novartis-agrees-pay-over-51-million-resolve-allegations-it-paid-kickbacks-through-co-pay (announcing $51M settlement).

1

has alleged that Novartis's conduct has caused injury to that government program. That is all that is required for standing under the Texas Constitution. *Marauder Corp. v. Beall*, 301 S.W.3d 817, 820 (Tex. App.—Dallas [5th Dist.] 2009) ("The Constitution requires standing to maintain suit. ***Standing, however, may be conferred by statute.*** A party suing under a statute must establish standing, or the right to make a claim, under that statute. In these cases, the statute itself provides the framework for the standing analysis.") (citations omitted).[2]

Novartis's arguments that the TMFPA is unconstitutional fare no better. Largely relying on a single, inapposite, decades-old appellate decision—whose reasoning was not adopted on review by the Texas Supreme Court—Novartis asks the Court to upend decades of civil Medicaid fraud enforcement jurisprudence and declare the TMFPA null and void. But the constitutionality of *qui tam* statutes is not an open question in Texas. *Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004) ("[T]his is a penal statute that would in many instances impose a fine far beyond the damages that a purchaser is likely to suffer. As we held long ago in *Agey*, the ***Legislature may grant private standing to bring such actions, but it must do so clearly.***") (citing *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943)). The TMFPA is an example of a civil penalty statute that clearly grants a private right of action to a private plaintiff for the benefit of the State and subject to numerous, overlapping provisions that ensure that, at all times, the Office of the Attorney General ("OAG") keeps tight reins on the plaintiff. *See* Tex. Hum. Res. Code § 36.101 ("ACTION BY PRIVATE PERSON AUTHORIZED"); *In re Xerox Corp.*, 555 S.W.3d 518, 526-27 (Tex. 2018) (describing TMFPA civil remedies as penalties). The TMFPA is plainly constitutional, and the Court should reject Novartis's contrary arguments.

---

[2] Unless otherwise indicated, all emphases herein were supplied by Relator.

4854-4277-2629

**ARGUMENT**

## I.  STATUTORY BACKGROUND

"In conjunction with the federal government, the Texas Medicaid program provides medical coverage to eligible Texans in need. As with all government-funded programs, Medicaid resources are limited, which means fraud, abuse, and waste divert funds that could otherwise be used to provide essential health-care services. But fiscal impact is not the only concern. When services are provided improperly or unnecessarily, Medicaid patients are imperiled." *In re Xerox Corp.*, 555 S.W.3d at 524. "The Medicaid system's size and complexity, the limited time and financial resources of governmental regulators, and the increasing sophistication of Medicaid scams make chicanery difficult to uncover." *Id.* at 524-25. "Similar to the federal [False Claims Act] and the Social Security Act's Civil Monetary Penalties Law, the [TMFPA] is a powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity." *Id.* at 525.

The TMFPA contains a number of provisions that are relevant here. First, it unambiguously confers standing upon "private person[s]" to file suit "for the state." Tex. Hum. Res. Code § 36.101 ("A person may bring a civil action for a violation of Section 36.002 for the person and for the state. The action shall be brought in the name of the person and of the state."). Second, it requires relators to go through specific steps to initiate suit and make specific disclosures to maintain it. Tex. Hum. Res. Code § 36.102(a)-(b) (requiring service of "petition and a written disclosure of substantially all material evidence" on OAG and the sealing of the petition for period of at least 180 days). Third, it gives OAG the right to "proceed with the action" (a procedure colloquially called "intervention") and, in the absence of intervention, authorizes the relator to "proceed without the state's participation." Tex. Hum. Res. Code § 36.104 (a)-(b). Fourth, it requires the

3

relator to keep the State informed, if the State so requires, of developments in the action. Tex. Hum. Res. Code § 36.104(b-1) (mandating that, on request by the State, the relator provide copies of all pleadings and depositions). Fifth, upon a showing of "good cause" and notwithstanding an initial declination decision, it allows the State to intervene and assume the prosecution of the lawsuit at any time. *Id.* Sixth, it prohibits the dismissal of the action unless "the attorney general consent[s] in writing." Tex. Hum. Res. Code § 36.102(e). Finally, it provides certain parameters for how "proceeds of the action" are to be distributed between the State and the relator/"private plaintiff"—with the vast majority of the proceeds going to the State. Tex. Hum. Res. Code § 36.110.

The TMFPA's "carrot-and-stick approach is designed to root out fraud in the system by rewarding those who report unlawful activities and severely punishing those who do not." *In re Xerox Corp.*, 555 S.W.3d at 536.

The TMFPA has been extraordinarily effective in deterring fraud on, and recovering ill-gotten gains to, Texas Medicaid. Since 2000, the State of Texas has recovered approximately $2.5 billion for taxpayers under the TMFPA.[3] One such recovery—$42.7 million—was obtained last year in a lawsuit filed against Shire plc, in this very Court, by an affiliate of Relator.[4]

---

[3]    *See*    https://www.texasattorneygeneral.gov/news/releases/office-attorney-generals-civil-medicaid-fraud-division-recovers-427-million-taxpayer-funds#:~:text=Since%202000%2C%20the%20Texas%20Attorney,Texas%20Medicaid%20Fraud%20Prevention%20Act..

[4]    *See*    https://www.texasattorneygeneral.gov/news/releases/office-attorney-generals-civil-medicaid-fraud-division-recovers-427-million-taxpayer-funds.

4

**MR102**

## II. RELATOR HAS STANDING TO PURSUE THIS ACTION ON BEHALF OF THE STATE

In its Plea to Jurisdiction ("PTJ"), Novartis spends over seven pages of its brief arguing that, consistent with the Texas Constitution and precedent, only a plaintiff who is "*personally injured*" or has a personal stake in the outcome of a suit has standing to file suit. PTJ at 5-11. Not true.

While standing is indeed required before a plaintiff may file and maintain suit, precedent is clear that "standing may be conferred *by statute*." *Marauder*, 301 S.W.3d at 820 (citing *Bland Ind. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *Scott v. Board of Adjustment*, 405 S.W.2d 55, 56 (Tex. 1966)). *See also Children of the Kingdom v. Cent. Appraisal Dist. of Taylor Cty.*, 674 S.W.3d 407, 414 (Tex. App..—Eastland 2023, pet. demied); *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding); *Zaatari v. City of Austin*, 615 S.W.3d 172, 182-83 (Tex. App.—Austin 2019, pet. denied).

And, contrary to Novartis's arguments (*see* PTJ at 6), "when standing is conferred by statute, the common-law criteria regarding standing do[] ***not*** apply." *Id.* Rather, "[i]n statutory standing cases, . . . the analysis is ***a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls in that category***." *Sullivan*, 157 S.W.3d at 915; *Marauder*, 301 S.W.3d at 820 ("[t]he standing analysis begins and ends with the statute itself"); *Nephrology Leaders & Assocs. v. Am. Renal Assocs., LLC*, 573 S.W.3d 912, 915-16 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 850 (Tex. App.—Fort Worth 2005, no pet.) (stating that, "[w]hen standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis").

Here, Novartis has not made a showing that Relator lacks "the right to make a claim" ***under***

***the TMFPA***, and there is no question that it does. As such, Novartis's arguments that Relator has not alleged an injury to itself are legally irrelevant. *Children of the Kingdom*, 674 S.W.3d at 415 ("[The plaintiff] is not required to prove a concrete and particularized injury, as [the defendants] assert, because the common-law criteria does not apply when a statute confers such authority upon an appraisal district to bring suit. Thus, [the plaintiff] has standing to bring suit against [the defendants] for the collection of the delinquent taxes."); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 850 (Tex. App.—Fort Worth 2005, no pet.) ("To establish common law standing, a plaintiff must show a distinct injury to the plaintiff and a real controversy between the parties, which . . . will be actually determined by the judicial declaration sought. In conferring statutory standing, however, the legislature may by statute exempt litigants from proof of the 'special injury' required to establish common law standing."); *Hernandez v. Truck Ins. Exch.*, 553 S.W.3d 689, 698 (Tex. App.—Fort Worth 2018, no pet.) ("the legislature may exempt litigants from the common law injury requirement, making the statute itself the proper analytical framework to determine standing"); *Marauder*, 301 S.W.3d at 820 ("Under the statute, a person may sue for an injunction to 'prevent or restrain' a violation of the TDCA. The statute is broadly written. [The defendant] contends that [the plaintiff] lacks standing because she has no cognizable interest in any bond proceeds. The statute, however, does *not* require that she have such an interest.").

Novartis's cited cases are not to the contrary and irrelevant. *Pike*, *Beasley*, *Data Foundry*, *Heckman*, *Bouillon*, *Spradlin*, *In re State Board for Educator Certification*, *Stephens*, *Garcia*, *Allen*, *Marshall*, and *Stumburg*,[5] do not involve standing conferred by statute, much less the

---

[5]   *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 775 (Tex. 2020); *Farmers Tex. Cty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 239 (Tex. 2020); *Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 702 (Tex. 2021); *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 143 (Tex. 2012); *City of Beaumont v. Bouillon*, 896 S.W.2d 143 (Tex. 1995); *Spradlin v. Jim Walter Homes*, 34 S.W.3d 578 (Tex. 2000); *In re State*

4854-4277-2629

TMFPA. And while *TransUnion*,[6] the U.S. Supreme Court case featured prominently in Novartis's Plea to Jurisdiction, does concern claims arising under a federal statute that creates a private cause of action, the Fair Credit Reporting Act ("FCRA"), Novartis misrepresents it. Liability under the FCRA attaches in connection "the creation and use of consumer reports." *Id.* at 2201. The Supreme Court held that, out of a class of 8,185 members, 1,853 members had standing because their reports had been disseminated to third-party businesses, *id.* at 2208, while the remaining members did not because their information had not been so disseminated, *id.* at 2209. Stated differently, because the FCRA requires injury to the private citizen seeking to enforce it,[7] the Supreme Court held—unremarkably—that certain class members had no standing to sue TransUnion because they had suffered no injury.

Unlike the FCRA, the TMFPA is a *qui tam* statute that authorizes private plaintiffs to sue **on behalf of the State**. To be sure, to plead a TMFPA violation, a private plaintiff must plead injury—but injury to Texas Medicaid on account of defendant's wrongdoing suffices. Here it is uncontested that Relator has pled injury to Texas Medicaid, and thus it has standing to prosecute this lawsuit on behalf of the State.

## III.    THE TMFPA IS CONSTITUTIONAL

The law in Texas is settled. Consistent with the Texas Constitution, "the Legislature may grant [private citizens] standing to bring [*qui tam*] actions, but it must do so clearly." *Brown*, 156

---

*Bd. For Educator* Certification, State *v. Stephens*, 663 S.W.3d 45, 49 (Tex. Crim. App. 2021); *Garcia v. City of Willis*, 593 S.W.3d 201 (Tex. 2019); *Allen v. Fisher*, 118 Tex. 38, 41, 9 S.W.2d 731, 731-32 (1928); *Marshall v. Lubbock*, 520 S.W.2d 553, 554 (Tex. Civ. App. 1975); *City of San Antonio v. Stumburg*, 7 S.W.754 (Tex. 1888).

[6] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).

[7] Novartis's other FCRA case, *Spokeo, Inc. v. Robins*, 578 U. S. 330 (2016), stands for the same proposition.

4854-4277-2629

**MR105**

S.W.3d at 566 (citing *Agey*, 172 S.W. 3d at 974).[8]

The Texas Supreme Court's holding in *Brown* thus plainly permits *qui tam* provisions in penalty statutes, where such private rights of action are clearly articulated. As noted above, the TMFPA is an example of a statute providing for the recovery of penalties, with a clear grant of standing for private whistleblowers to bring suit, either with or without the State's participation. *See* Tex. Hum. Res. Code §§ 36.101, 36.104, 36.052(a)(3). The *Brown* holding affirms the legitimacy of the TMFPA as a *qui tam* statute.

Further, the holding in *Brown*—which eviscerates Novartis's arguments—has been cited repeatedly by both Texas and federal courts for the proposition that, consistent with the Texas Constitution, the Legislature can in fact grant standing for individuals to pursue actions for violations of Texas statutes. *See e.g.*, *Burkett v. City of El Paso*, 513 F. Supp. 2d 800, 824-825 (W.D. Tex. 2007); *Bittakis v. City of El Paso*, 480 F. Supp. 2d 895, 922-923 (W.D. Tex. 2007); *Bickham v. Dallas Co.*, 612 S.W.3d 663, 670 (Tex. App.—Dallas 2020, pet. denied); *Sankaran v. VFS Services (USA) Inc.*, 2023 WL 5543308, at *4 (Tex. App.—Houston [14th Dist.] August 29, 2023, no pet. h.); *Scribner v. Treger*, No. 02-21-00277-CV, 2022 WL 714654, at *10 (Tex. App.—Fort Worth Mar. 10, 2022, no pet.).

---

[8] In large part, Novartis's Plea to Jurisdiction rests on an intermediate appellate ruling in *Agey*, *American Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580 (Tex. App.—Austin 1942). But the Austin appellate decision Novartis cites was superseded by the Texas Supreme Court the following year, and the Court expressly declined to adopt the basis for the appellate decision, noting: "it is not necessary for this Court to here decide whether the Legislature was prohibited by the Constitution from permitting such suit to be filed without joinder of the Attorney General, or some county or district attorney, and we express no opinion upon that question." *Agey*, 172 S.W. 2d at 974. Furthermore, the statute at issue in *Agey* is very much unlike the TMFPA, as it was neither a *qui tam* statute nor did it confer a private right of action. *See id.* ("If the Legislature had intended by this Act to authorize an individual to file a suit on behalf of himself and on behalf of the State, without the joinder of the Attorney General or some district or county attorney, it could have expressed such intention in clear language. This it did not do.").

4854-4277-2629

**MR106**

Novartis's reliance on purportedly contrary precedent—over 100 years old—is unavailing. Novartis cites (PTJ at 13) *State v. Moore*, 57 Tex. 307, 314 (1882), as standing for the proposition that, "the constitution, in selecting the depositaries of a given power . . . intended that the depositary should exercise an *exclusive* power, with which the legislature could not interfere by appointing some other officer to exercise of the power." *Moore*, however, was overruled by *Brady v. Brooks*, 89 S.W. 1052 (Tex. 1905). And even if *Moore* were good law (which it is not), it is distinguishable as it involved a direct conflict between two branches of State government—the powers of the County Attorneys (in the Judicial Branch) and those of the Attorney General (in the Executive Branch). *Moore*, 57 Tex. at 314-15. No such conflict is presented by the TMFPA.

Novartis also cites *Maud v. Terrell*, 200 S.W. 375, 376 (Tex. 1918) (PTJ at 14), but that case supports Relator's position. *Maud* involved a statute authorizing the Texas Comptroller to appoint private individuals to collect inheritance taxes. *Id*. at 375-376. The *Maud* court held that the statute at issue was constitutional and valid. *Id*. at 377-378. After reviewing the statute, the court found that it—similar to the TMFPA—empowered the appointed person, among other things, to: "sue for and collect" inheritance taxes; "aid in every possible way in the collection of such taxes[;]" and "represent the State . . . to enforce the collection" of inheritance taxes. *Id*. at 377. The court found that since "[t]hese provisions do not unequivocally supplant the county attorneys and the Attorney-General in their authority to prosecute the suits of the State for the recovery of the taxes" therefore the statute is constitutional, and "cannot be pronounced invalid." *Id*. at 377-378; *see also El Paso Elec. Co. v. Tex. Dep't of Ins*., 937 S.W.2d 432, 439 (Tex. 1996) (citing *Maud*); *Camp v. Gulf Prod. Co.*, 61 S.W.2d 773, 777-778 (Tex. 1933) (citing *Maud*). The Texas Supreme Court in *Maud* therefore sets a demanding standard for a statute to violate separation of powers: that the legislation must "***unequivocally supplant***" the authority of the OAG.

4854-4277-2629

**MR107**

The TMFPA does no such thing.

Novartis also cites *Staples v. State*, 245 S.W. 639 (Tex. 1922) (PTJ at 14-15) to support its argument. This too is unavailing. *Staples* involved a *quo warranto* suit brought by individuals both "in the name of the state of Texas" and "in their own names" on a ballot for a general election, which was challenged as being unconstitutional for infringing on the exclusive authority of the County Attorneys, District Attorneys, and the Attorney General. *Id.* at 639-40. Citing *Maud* extensively, the *Staples* court found that although the individuals in question did not have the "legal capacity or right to institute and maintain" their suit, the statute itself was "not in violation of section 21, art. 5, and section 22, art. 4, of the [Texas] Constitution." *Id.* at 643.

In an effort to distract attention from the fact that its own cited cases undercut its arguments, Novartis argues that, by authorizing private persons to file and pursue claims under the statute, the TMFPA improperly encroaches on the "authority that the Texas Constitution reposes in the Attorney General." PTD at 18. All of Novartis's arguments miss the mark.

*First*, Novartis asserts that the TMFPA undermines the "Attorney General's exclusive authority to determine whether a case should be filed, when and where it should be filed, and the allegations and claims that should be included." PTJ at 18. But the manner in which the TMFPA authorizes a relator's lawsuit to be initiated does not impermissibly strip OAG of its prosecutorial discretion. As explained above, the TMFPA contains multiple provisions that protect OAG's autonomy to investigate and prosecute (or not prosecute) the suit as it sees fit. The relator must file the petition under seal, it must make extensive disclosure to OAG, and then, while the petition remains sealed, wait for OAG to investigate the claims and decide whether to take over the lawsuit. While the petition remains sealed, nothing precludes OAG from transfering the suit to a different forum, and, upon review of the relator's petition, OAG is free to intervene, decline intervention,

10

or dismiss the action altogether. *See* Tex. Hum. Res. Code §§ 36.102, 36.103, 36.104.[11] This is OAG exercising prosecutorial discretion. That OAG—like any prosecutor who is notified of a potential violation of the law—may choose to expend resources during the investigation to make an informed decision about intervention has no bearing on the TMFPA's constitutionality, and Novartis cites no authority suggesting otherwise.

The bottom line is that, irrespective of how a lawsuit is initiated, OAG retains complete discretion to proceed only with the TMFPA cases that it chooses. To be sure, if OAG deems a TMFPA case unmeritorious, it can dismiss the relator's case even over the objections of the relator. *See* Tex. Hum. Res. Code § 36.107(b). Indeed, the government's power to dismiss and settle a *qui tam* action over the objection of the person who brought it was recently described by an 8-1 majority of the Supreme Court as being "uncommon, even extraordinary." *See United States, ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 430 (2023). Novartis acknowledges OAG's power to unilaterally dismiss a case but fails to explain how intervening to dismiss or settle an action amounts to the State being forced to prosecute the case. To the contrary, when OAG intervenes to dispose of a TMFPA case that is a far cry from usurping OAG's executive decision-making. As such, the TMFPA does not erode OAG's prosecutorial discretion.

*Second*, Novartis asserts that the TMFPA "interfere[s] with the Attorney General's performance of its executive function by providing mechanisms for the relator and the court to overrule the Attorney General's determination that the lawsuit should be dismissed or settled." PTJ at 19. Not true. Where the State has intervened and taken control of the action, it may dismiss the TMFPA action over the objections of the relator so long as the relator is provided notice and the opportunity to be heard. Tex. Hum. Res. Code § 36.107(b). Courts examining the analogous FCA provision of 31 U.S.C. § 3730(c)(2)(A) afford the government significant deference in

11

4854-4277-2629

choosing to dismiss. *See, e.g.*, *Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003) ("Nothing in § 3730(c)(2)(A) purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States."); *Polansky*, 599 U.S. at 437 (noting that, in the context of a 3730(c)(2)(A) motion, the "Government's views are entitled to substantial deference."). Given this degree of deference, it is wrong to suggest that either the TMFPA or FCA impermissibly restricts the government's authority to conduct civil litigation of its choice.

Similarly, where the State has intervened, it may settle the TMFPA action notwithstanding the objections of the relator, "if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." Tex. Hum. Res. Code § 36.107(c). Defendant highlights this requirement of court approval as evidence of the judiciary usurping the executive's exclusive function. Defendant ignores, however, that it is well settled in criminal law to require court approval of pleas and the dismissal of indictments. *See, e.g.*, Riley, 252 F.3d at 756-57:

> [W]hen the Executive has made the decision to initiate the criminal case, its large discretion is narrowed considerably and the power to dispose of the case is shared in part with the Third Branch.
>
> For example, Rule 48(a) of the Federal Rules of Criminal Procedure clearly states that although the Executive has the power to indict an individual, it may not dismiss such an indictment without "leave of court." FED.R.CRIM.P. 48(a). Similarly, Rule 11 of the Federal Rules of Criminal Procedure requires court approval of plea bargains, a judicial check that functions in a manner similar to that of Rule 48. FED.R.CRIM.P. 11(a)(2).

Because court approval of criminal dismissals and settlement-analogues survive constitutional muster, so too should the scheme enumerated in the TMFPA—which in this instance closely

4854-4277-2629

mirrors the FCA.[9]

Finally, that the *Polansky* court recently determined that intervention is required prior to the government dismissing or settling an action under the FCA does not change the analysis. As discussed earlier, such a situation would necessarily only occur where the government had already declined to exercise its prosecutorial discretion to pursue the case and instead allowed the relator to proceed without the State. Novartis cites no authority to suggest that the State needing to show mere "good cause"—a low bar—to intervene after-the-fact prevents the State from carrying out its Executive functions. Federal courts analyzing the FCA have considered and rejected this position. *See, e.g., United States v. SavaSeniorcare LLC*, No. 3:18-CV-01202, 2021 WL 1663579, at *10 (M.D. Tenn. Apr. 28, 2021) (declining to find that the FCA's "good cause" requirement to intervene implicates the separation of powers doctrine); *United States v. UCB, Inc.*, 970 F.3d 835, 848 (7th Cir. 2020) (same). Indeed, Relator is not aware of—and Novartis has not cited—a single case where a court *denied* a motion to intervene filed by the State.

*Third*, Novartis asserts that "even when the Attorney General elects to intervene on behalf of the State to take over the case, the TMFPA contravenes the Texas Constitution by impermissibly 'obstrud[ing] other persons upon' the Attorney General by 'compel[ling] the acceptance of [the relator's] services.'" PTJ at 22. Not so. If OAG exercises the State's right to intervene in a relator-initiated TMFPA action, the TMFPA dictates that "the State has the primary responsibility for prosecuting the action and is not bound by an act of the person bringing the action." Tex. Hum. Res. Code § 36.107(a) (emphasis added). As discussed above, this gives the State full control over

---

[9] As further noted by the Fifth Circuit "Any intrusion by the qui tam relator in the Executive's Article II power is comparatively modest, especially given the control mechanisms inherent in the FCA to mitigate such an intrusion and the civil context in which qui tam suits are pursued." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001).

the case at that point. That the relator may conduct its own discovery (subject to Tex. Hum. Res. Code § 36.107(d)) does not limit the rights of the State as the entity with primary responsibility for prosecuting the case, and Novartis cites no authority to the contrary. Indeed, when describing the similarly broad authority of the federal government in prosecuting actions under the FCA, the Fifth Circuit rejected the very arguments Novartis is making here:

> [T]he powers of a *qui tam* relator to interfere in the Executive's overarching power to prosecute and to control litigation are seen to be slim indeed when the *qui tam* provisions of the FCA are examined in the broad scheme of the American judicial system.

*Riley*, 252 F.3d at 756.[10]

*Fourth*, Novartis's argument that the TMFPA impermissibly "delegates full authority for prosecuting violations of state laws to unharmed private citizens and their attorneys" (PTJ at 23), is unavailing. The State may in its prosecutorial discretion permit the case to go forward without the State's participation by declining to intervene. But even where the State declines to intervene, the TMFPA provides numerous mechanisms by which the State can continue to monitor, influence, and direct the litigation. For instance, the State is entitled to ongoing information about such cases. Tex. Hum. Res. Code § 36.104(b-1). Moreover, the State remains the "real party in interest" despite declining to take over the action. *Polansky*, 599 U.S. at 419. It may submit Statements of Interest and appear at hearings to advocate for its rights separate from the relator. Further, the State may intervene even after initially declining, which allows it to dismiss or to settle the action notwithstanding the objections of the relator.[11] The State may also elect to pursue its claims

---

[10] Conveniently, Novartis invites the Court to ignore *Riley* and other federal court cases that upheld the constitutionality of the federal version of the TMFPA, the FCA. PTJ at 12 n.5. Elsewhere, however, Novartis liberally cites to federal court opinions interpreting the FCA. This inconsistency in Novartis's treatment of federal law is telling.

[11] Tex. Hum. Res. Code §§ 36.104(b-1); 36.107(b), (c).

4854-4277-2629

**MR112**

through an alternate remedy in another proceeding;[12] can stay the relator's ability to conduct certain discovery if it would interfere with other of the State's civil or criminal investigations;[13] and must consent to—and can veto—a proposed settlement.[14]

To be sure, for the benefit of Texas taxpayers, the TMFPA authorizes private relators to further the State's interest and pursue *qui tam* litigation for the State's benefit. But, through numerous, overlapping provisions, the TMFPA makes clear that the State retains ultimate control and decision-making authority over the manner in which litigations under the statute are conducted and ultimately resolved. Thus, Novartis's supposed concerns about hypothetical "disagreements between relator and the Attorney General over the dismissal or settlement of the State's TMFPA claims" (PTJ at 24) are unfounded and certainly not a basis upon which to declare the TMFPA unconstitutional.

## CONCLUSION

As a recidivist offender, Novartis has every interest to have the TMFPA and other *qui tam* statutes declared unconstitutional. At bottom, however, Novartis's purported concerns about the Texas Constitution ring hollow. The Court should see Novartis's efforts for what they are—a cynical attempt to void the very statutes that have brought taxpayers justice for Novartis's long history of unlawful conduct.

The Court should deny Novartis's Plea to Jurisdiction.

---

[12] Tex. Hum. Res. Code § 36.109.

[13] Tex. Hum. Res. Code § 36.108.

[14] Tex. Hum. Res. Code § 36.102(e).

15

Dated:  December 7, 2023    Respectfully submitted,

*/s/ Sam Baxter*
 Samuel F. Baxter (co-lead counsel)
 Jennifer L. Truelove
 MCKOOL SMITH P.C.
 104 East Houston, Suite 300
 Marshall, Texas 75670
 (903) 923-9000
 Fax: (903) 923-9099

 Eric B. Halper (*pro hac vice* forthcoming)
 Radu A. Lelutiu (*pro hac vice* forthcoming)
 MCKOOL SMITH, PC
 One Manhattan West
 395 Ninth Avenue, 50th Floor
 New York, New York 10001
 (212) 402-9400
 Fax: (212) 402-9444

 Mark Lanier (co-lead counsel)
 Alex Brown
 Zeke DeRose
 Jonathan Wilkerson
 Ryan Ellis
 THE LANIER LAW FIRM
 6810 FM 1960 West
 Houston, TX 77069
 (800) 723-3216
 Fax: (713) 659-2204

  ***ATTORNEYS FOR RELATORS***

4854-4277-2629

**MR114**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 7, 2023 to counsel of record.

/s/ Radu A. Lelutiu
Radu A. Lelutiu

4854-4277-2629

**MR115**

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| *ex rel.* | § | |
| HEALTH SELECTION GROUP, LLC | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | 71ST JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| NOVARTIS PHARMACEUTICALS | § | |
| CORPORATION | § | |
| | § | |
| *Defendant.* | § | HARRISON COUNTY, TEXAS |

## THE STATE OF TEXAS'S STATEMENT OF INTEREST IN RESPONSE TO DEFENDANT'S PLEA TO THE JURISDICTION AND MOTION TO DISMISS

**TO THE HONORABLE JUDGE BRAD MORIN:**

The State of Texas ("State") files this Statement of Interest in response to Defendant Novartis Pharmaceuticals Corporation's Plea to the Jurisdiction and Motion to Dismiss ("Motion"), and in support of Relator's legal analysis regarding the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ch. 36 ("TMFPA"),[1] as contained in Relator's Response to Defendant's Plea to the Jurisdiction and Motion to Dismiss. The State retains an interest in this matter, even though it has declined to intervene, because the State is entitled to a portion of any proceeds of the TMFPA causes of action and because the State has an ongoing interest in ensuring the consistent and correct interpretation of the TMFPA.[2]

---

[1] As amended on September 1, 2023, the Texas Medicaid Fraud Prevention Act is now known as the Texas Health Care Program Fraud Prevention Act.

[2] Texas's declination in this matter is not a comment on the merits of the case. *See* Tex. Hum. Res. Code § 36.104 (State's declination is merely notice of the State's decision not to intervene.). The TMFPA

For the reasons below, the State asks this Court to deny Defendant's Plea to the Jurisdiction and Motion to Dismiss.

Texas respectfully submits the following:

## I. SUMMARY

Cobbling together a patchwork of inapposite state and federal case law, Defendant asks this Court to do something remarkable: to overrule centuries of state and federal precedent by declaring the TMFPA and, by extension, all *qui tam* suits unconstitutional. Defendant's request is not only sweeping in scope, but wrong on every count.

Contrary to Defendant's assertions, the constitutionality of the TMFPA is not subject to debate. In 2004, the Texas Supreme Court affirmed the validity of *qui tam* and similar statutes when examining a Property Code provision:

> [T]his is a penal statute that would in many instances impose a fine far beyond the damages that a purchaser is likely to suffer. As we held long ago in *Agey*, the Legislature may grant private standing to bring such actions, but it must do so clearly.

*Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004) (citing *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943)).[3] As a *qui tam* statute that clearly grants a private right of action to a relator, *see* Tex. Hum. Res. Code § 36.101 ("ACTION BY PRIVATE PERSON AUTHORIZED"), the TMFPA fits squarely into this definition as a permissible statute. Accordingly, Defendant's

---

contemplates cases continuing in the event of Texas's non-intervention by conferring rights on relators and permitting relators to pursue TMFPA allegations after Texas declines to intervene. *See*, *e.g.*, Tex. Hum. Res. Code §§ 36.104, 36.110(a-1).

[3] While not itself a TMFPA case, *Brown* has been cited as authority on other issues besides the Texas Constitution in two TMFPA cases: *Nazari v. State*, 497 S.W.3d 169, 180 (Tex. App.—Austin 2016), *aff'd*, 561 S.W.3d 495 (Tex. 2018); and *United States ex rel. Tex. v. Planned Parenthood Gulf Coast*, No. 9-09-CV-124, 2012 WL 13036270, at *3 (E.D. Tex. Aug. 10, 2012). Both cites are for the holding that penalties are "not payable to a private litigant." *See Nazari*, 497 S.W.3d at 180; *U.S. ex. rel. Tex.*, 2012 WL 13036270, at *3.

2

constitutional challenge to the TMFPA is foreclosed by Texas Supreme Court precedence and should be rejected.

Independent of the clear mandate of the Texas Supreme Court in *Brown*, the TMFPA does not run afoul of the Texas Constitution's separation of powers. In pursuing TMFPA cases, the Office of the Attorney General retains full prosecutorial discretion, and the TMFPA does not impermissibly restrict the State's control over actions filed under the *qui tam* provision.

Furthermore, Defendant misconstrues Texas's Open Courts requirement, attempting to use it as an *obstruction* to the courthouse, rather than a guarantee that litigants will have access to the State's courts.[4] Despite Defendant's focus on the word "injury," the Texas Supreme Court has repeatedly interpreted the Open Courts provision to apply exclusively to common law claims—not to statutory causes of action such as those authorized by the TMFPA. Additionally, the Texas Supreme Court, through over a century of clear precedent, recognizes that statutes may confer standing absent a particularized injury. Relator's statutory TMFPA claims are therefore not precluded by the Open Courts provision or constitutional standing doctrine.

Finally, the U.S. Supreme Court has repeatedly ruled that *qui tam* actions are valid under the United States Constitution. *See, e.g.*, *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000); *United States, ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419 (2023).

---

[4] As the Texas Supreme Court has noted, the Open Courts provision is "quite plainly, a due process guarantee." *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983) (citing Hanks v. City of Port Arthur, 121 Tex. 202, 48 S.W.2d 944, 945 (1932); 1 Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 50 (1977)).

3

Thus, Defendant fails to carry the heavy burden of showing that the TMFPA is unconstitutional, and its Plea to the Jurisdiction/Motion to Dismiss should be denied.

## II. STANDARD OF REVIEW

When a defendant asks a court to dismiss a plaintiff's suit, the court must overrule the motion unless the pleadings and the parties' evidence clearly demonstrate that the court lacks jurisdiction. *See Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587-88 (Tex. 2015); *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). In ruling on the motion, a court is required to construe the pleadings in the plaintiff's favor. *See Heckman*, 369 S.W.3d at 150; *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

To find for Defendant on this Motion, the Court would need to determine that the TMFPA is unconstitutional—an extremely high bar. When considering such a question, "[t]he presumption is that the Legislature acted in the light of the Constitution, with the intention to observe it rather than violate it." *Maud v. Terrell*, 109 Tex. 97, 100, 200 S.W. 375, 376 (1918); *see also City of Houston v. Houston Pro. Fire Fighters' Ass'n, Loc. 341*, 664 S.W.3d 790, 798 (Tex. 2023) ("In evaluating whether a statute is constitutionally infirm, we presume at the outset that it is constitutional. A party challenging a statute as unconstitutional bears a heavy burden to overcome this presumption."); *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 754 (Tex. 2020) ("In line with this presumption, if a statute is susceptible to two interpretations—one constitutional and the other unconstitutional—then the constitutional interpretation will prevail."); *Koy v. Schneider*, 221 S.W. 880, 888 (Tex. 1920) ("Every intendment and presumption being in favor of the constitutionality of a statute, it should not be held invalid unless its unconstitutionality be made to appear beyond any reasonable doubt.").

4

# III. ARGUMENT

**A.**    **Relator Has Statutory Standing Under the TMFPA to Bring a *Qui Tam* Action Against Defendant.**

In its Motion, Defendant vacillates between two key arguments: that Relator fails to allege a "concrete" harm under the Texas Constitution's Open Courts provision, and that the Relator does not satisfy the Federal Constitution's Article III standing requirements. Defendant's argument fails on both counts.

### 1.    Texas Supreme Court Precedent Definitively Supports Texas Constitutional Standing in *Qui Tam* Actions.

Defendant both misinterprets and misapplies the Open Courts provision of the Texas Constitution. The purpose of this provision is to ensure *open access* to Texas's courts. It "specifically guarantees all litigants the right to redress their grievances—to use a popular and correct phrase, the right to their day in court." *LeCroy v. Hanlon*, 713 S.W.2d 335, 341 (Tex. 1986) *(citing Nelson v. Krusen,* 678 S.W.2d 918, 923 (Tex. 1984); *Sax v. Votteler,* 648 S.W.2d 661, 665 (Tex.1983); *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944, 947 (1932)).[5]

For example, in one pivotal case, plaintiffs sought to enjoin Texas Governor Ross Sterling's declaration of martial law as a violation of the Federal and Texas Constitutions. *See Constantin v. Smith*, 57 F.2d 227, 239 (E.D. Tex. 1932) (appeal dismissed 53 S.Ct. 190, 287 U.S. 378, 77 L.Ed. 375 (1932)). The court agreed, stating that, "under the Constitution of Texas, courts may not be closed, or their processes interfered with by military orders, that 'courts cannot be ousted by the agencies

---

[5] The Open Courts provision "originates from Chapter 40 of Magna Carta, the great charter of English liberties obtained from King John in 1215: 'To none will we sell, to none deny or delay, right or justice.'" *LeCroy*, 713 S.W.2d at 339 (citing Tex. Const. art. I, sec. 13, interp. commentary (Vernon 1984); 14 Encyclopedia Britannica 576 (1967)).

**MR120**

detailed to aid them; nor can their functions be transferred to tribunals unknown to the Constitution.'" (quoting *Ex parte McDonald*, 49 Mont. 454, 143 P. 947 (1914)).

Ironically, Defendant wishes to use the Open Courts provision as a *barricade* to the courthouse, latching onto the word "injury" in an attempt to deny Relator its day in court. Motion at 5-6. But in its argument, Defendant conflates *common law* causes of action and their accompanying standing requirements with *statutory* causes of action—like those authorized by the TMFPA.

Defendant argues that Relator's statutory causes of action under the TMFPA violate the Texas Open Courts provision (Motion at 6) but the Texas Supreme Court has made clear that the Open Courts provision only applies to common law claims. To establish a violation of the Open Courts provision, plaintiffs must satisfy a two-pronged test: "first, [litigant] must show that he has a well-recognized **common-law** cause of action that is being restricted; and second, he must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the [restricting] statute." *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355 (Tex. 1990) (emphasis added) (citing *Lucas v. United States,* 757 S.W.2d 687, 690 (Tex. 1988); *Sax v. Votteler,* 648 S.W.2d at 666). Critically, in *Moreno*, the Texas Supreme Court held that if "a cause of action was not recognized at common law, but was itself created by the legislature, any legislative abrogation of the cause of action would not be a true abrogation of a constitutional right." *Id.* at 355.

As the Texas Supreme Court further noted in *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 845 (Tex. 1990), "the traditional rule [is] that the open courts provision of our constitution applies only to common law claims." *Rose* turned on a wrongful death claim and, as the Court noted, "there is no common-law cause of action for wrongful death." *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 845 (Tex. 1990) (citing *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348 (1990)). Because the plaintiffs there did "not

6

seek a common law remedy, the open courts provision does not apply to their wrongful death claim."

*Id.*

As is clearly the case here, Relator's claim is based on a statute, rather than a common law cause of action. Further, while common law standing often requires a particularized injury, "the judge-made criteria regarding standing do not apply when the Texas Legislature has conferred standing through a statute." *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001)). Instead, in a case that involves a statutory cause of action, "the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls in that category." *Id.* (citing *Tex. Dep't of Protective and Regulatory Servs. V. Sherry,* 46 S.W.3d 857, 859–61 (Tex. 2001), which considered whether a putative father had standing to maintain a suit affecting the parent-child relationship based solely on construction of a statutory standing provision).

Indeed, the Texas Supreme Court has long recognized the Legislature's right to confer standing by statute. *See Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 602-03 (1915) (upholding a statute providing that the use of any building for "a bawdy or disorderly house shall be enjoined at the suit of either the state or any citizen thereof," where such statute did not require a showing that the complainant was personally injured); *Scott v. Bd. Of Adjustment*, 405 S.W.2d 55, 56 (Tex. 1966) (holding that "[w]ithin constitutional bounds, the Legislature may grant a right to a citizen or to a taxpayer to bring an action against a public body or a right of review on behalf of the public without proof of particular or pecuniary damage peculiar to the person bringing the suit."). This longstanding Texas precedence directly forecloses Defendant's constitutional lack-of-standing challenge to the

7

TMFPA.

Further, the Texas Supreme Court has repeatedly acknowledged that standing can be conferred by statute and that, in those cases, the plaintiff need not demonstrate a particularized injury. *See, e.g., Sneed v. Webre*, 465 S.W.3d 169, 180 (Tex. 2015) ("Generally, **unless standing is conferred by statute**, a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury.") (emphasis added) (citation and internal quotation marks omitted); *Andrade v. Venable*, 372 S.W.3d 134, 137 (Tex. 2012) ("**Unless standing is conferred by statute**, a plaintiff must show that he has suffered a particularized injury distinct from the general public.") (emphasis added); *Williams v. Lara*, 52 S.W.3d 171, 178-79 (Tex. 2001) ("As a general rule of Texas law, to have standing, **unless it is conferred by statute**, a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury.") (emphasis added); *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984) ("Standing consists of some interest peculiar to the person individually and not as a member of the general public. This general rule of standing is applied in all cases **absent a statutory exception to the contrary**.") (emphasis added) (citations omitted). This is well settled law in Texas.

Because this is a statutory case, the proper standing inquiry is to determine whether Relator has satisfied the statutory requirements of the TMFPA when Relator filed its *qui tam* suit. *See PermiaCare v. L.R.H.*, 600 S.W.3d 431, 447 (Tex. App. 2020) ("the TMFPA gives a private party standing to bring a claim for Medicaid fraud, but only if he or she follows the statutory framework. ... When, as here, standing is conferred by statute, we must use that statutory framework to determine whether a particular party has standing.") (citations omitted). However, in its Motion Defendant

8

makes no challenge to Relator's standing as a proper relator under the TMFPA. Defendant has failed to satisfy its burden and Defendant's Motion should be denied.

Lastly, the Texas Constitution is not alone in having an Open Courts provision. Many other state constitutions carry substantially similar provisions.[6] Like Texas, each of these states has at least one *qui tam* statute that allows whistleblowers to assert causes of action for fraud on the states' behalf, in a similar manner to the TMFPA and federal False Claims Act.[7]

---

[6] *See, e.g.* Colorado Constitution Art 2 § 6 ("Courts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character, and right and justice should be administered without sale, denial or delay."); Connecticut Constitution Art 1 § 10 ("All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."); Delaware Constitution Art 1 § 9 ("All courts shall be open; and every man for an injury done him in his reputation, person, moveable or immovable possessions shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense."); Florida Constitution Art 1 § 21 ("The courts shall be open to every person for redress of any injury and justice shall be administered without sale, denial or delay."); Indiana Constitution Art 1 § 12 ("All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."); Louisiana Constitution Art 1 § 22 ("All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation or other rights."); Montana Const. Art. II § 16 ("Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property or character...[r]ight and justice shall be administered without sale, denial or delay."); North Carolina Const. Art 1 § 18 ("All courts shall be open; every person for an injury done him in lands, goods, person, or his reputation shall have remedy by due courts of law, and right and justice shall be administered without favor, denial, or delay."); Oklahoma Const Art II § 6 ("The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation, and right and justice shall be administered without sale, denial, delay, or prejudice."); Tennessee Const. Art 1 § 17 ("That all courts shall be open; and every man, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay.").

[7] *See, e.g.,* the Colorado False Claims Act and Medicaid False Claims Act; Connecticut False Claims Act; Delaware False Claims and Reporting Act; Florida False Claims Act; Indiana False Claims and Whistleblower Protection Act and Indiana Medicaid False Claims and Whistleblower Protection Act; Louisiana Medical Assistance Programs Integrity Law; Montana False Claims Act; North Carolina False Claims Act; Oklahoma Medicaid False Claims Act; Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

**B.     U.S. Supreme Court Precedent Definitively Supports Article III Standing in *Qui Tam* Actions.**[8]

Though Defendant argues for a misguided construal of standing doctrine under the Texas Constitution, much of its Motion is centered on U.S. Supreme Court jurisprudence, which Defendant suggests parallels state requirements. Motion at 6. But in discussing federal precedent, Defendant conveniently chose to handwave[9] the most relevant federal case, *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000).

In *Stevens*, the Court considered **precisely** the question of whether the federal False Claims Act's *qui tam* provision passed muster under the U.S. Constitution's Article III standing doctrine. Justice Scalia delivered the majority opinion,[10] which held that "adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.* at 773. Because the United States suffered an "injury in fact," this was sufficient to "confer standing on respondent Stevens." *Id.* at 774.

The Court also considered the long history of *qui tam* actions in England and the American colonies, which it referenced to confirm its position.[11] *Id.* This historical inquiry was relevant because

---

[8] While courts routinely look to federal precedent in the absence of state precedent, it makes little sense to do so here when there exists a robust body of directly relevant Texas Supreme Court precedent exists. Nonetheless, to comprehensively address Defendant's arguments, this Statement of Interest examines standing requirements under federal law.

[9] *See* Motion at 12 n.5.

[10] *Stevens* was a 7-2 decision (with a concurrence by Justice Ginsberg in which she agreed with the majority's reasoning regarding standing). However, the dissent did not even mention the issue of Article III standing. Rather, the dissenting opinion focused on another aspect of the case: the meaning of the word "person" under 31 U.S.C. § 3729. Justices Stevens and Souter argued for a broader understanding than the majority, such that "person" would encompass the States.

[11] Contrary to Defendant's assertion, the U.S. Supreme Court did not "heavily rely" on the federal history of *qui tam* actions to reach its decision, but rather, used the history to justify the decision that had been reached

"Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S. Ct. 1003, 1016, 140 L. Ed. 2d 210 (1998)). As the Court acknowledged, "[*q*]*ui tam* actions appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf." *Id.*

As *Stevens* clearly demonstrates—and despite Defendant's claims to the contrary—the Supreme Court has affirmatively held that *qui tam* actions satisfy the requirements for Article III standing.[12] Rather than accepting that *Stevens* forecloses its federal argument, Defendant focuses on *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), a case that is **not even about *qui tam* suits**. By largely ignoring *Stevens*, Defendant chooses to argue both that Texas standing doctrine does and *does not* mirror federal doctrine. But Defendant cannot have it both ways. Either *Stevens* controls here[13] or federal standing doctrine, including *TransUnion*, is irrelevant. Thus, if this Court wishes to consider federal precedent, it should reject Defendant's arguments wholesale.

**C.      *Qui Tam* Statutes Do Not Violate Article IV or Article V of the Texas Constitution**

Defendant cites several cases to argue that the TMFPA violates Article IV, Section 22 and Article V, Section 21 of the Texas Constitution, but, contrary to Defendant's position, *Maud, Staples,*

---

independently—that the "injury" was to the government, which was conferred upon the relator through the *qui tam* statute. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. at 774.

[12] Defendant further suggests that the *Stevens* decision should be ignored due to an off-hand comment by a dissenting Justice in the unrelated *Polansky* case. Motion at 12, n.5. This suggestion should be rejected, as a single dissenting Justice does not establish binding precedent.

[13] To the extent that this Court looks to federal precedent, including *Stevens*, Defendant makes no attempt at rebutting the holding of *Stevens*—that the harm to the government is conferred upon the relator in a *qui tam* statute for purposes of constitutional standing.

11

and many other Texas cases support the constitutionality of the TMFPA.[14]

In *Maud v. Terrell*, 200 S.W. 375 (Tex. 1918), the court upheld a statute authorizing the Texas Comptroller to appoint individuals to collect certain taxes. In its decision, the court noted that the statute empowered the appointed individuals to initiate lawsuits; to represent the State to enforce its tax collection efforts; and to aid in the collection of such taxes. *Id*. at 377. In holding the statute valid, the court acknowledged that the Legislature "may provide assistance for the proper discharge by [the Attorney General and county and district attorneys] of their duties" but cannot "obtrude other persons upon them and compel the acceptance of their services." *Id*. at 376. The court further established that for a challenged statute to violate separation of powers under the Texas Constitution, a litigant must meet the high bar of showing that the statute "unequivocally supplant[s] the county attorneys and the Attorney-General in their authority to prosecute the suits of the State." *Id*. at 377-378; *see also El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 439 (Tex. 1996) (citing *Maud*). As explained below, the *qui tam* provisions of the TMFPA do not "unequivocally supplant" the Attorney General in its prosecution of Medicaid fraud.

Another case cited by Defendant, *Staples v. State*, 245 S.W. 639 (Tex. 1922),[15] stemmed from a *quo warranto* suit instituted by litigants "in the name of the state of Texas" and "in their own

---

[14] A Federal Judge recently rejected a similar Motion in another TMFPA case, *U.S. ex rel. Doe v. Planned Parenthood Federation of America Inc. et al.*, No. 2:21-cv-00022-Z, in the U.S. District Court for the Northern District of Texas (Amarillo Division). In that case, Defendants' Motion for Judgment on the Pleadings (filed September 1, 2023) and Memorandum in Support of the Motion (filed September 1, 2023) argued that the TMFPA violated the U.S. Constitution and Texas Constitution. In an Under Seal Memorandum Opinion and Order (filed October 23, 2023) the Honorable Judge Matthew Kacsmaryk denied that Motion for Judgment on the Pleadings (filed September 1, 2023). In another Under Seal Order (filed October 24, 2023), Judge Kacsmaryk clarified that the Memorandum Opinion and Order (filed October 23, 2023) denied the Motion for Judgment on the Pleadings (filed September 1, 2023). Both orders remain under seal.

[15] Motion at 14-15.

MR127

names" to prevent the placement of a Senate candidate's name on a ballot for a general election. The respondents argued that the statute was unconstitutional for infringing upon the exclusive authority of the County Attorneys, District Attorneys, and the Attorney General. *Id.* at 639-40. Citing to *Maud*, the *Staples* court disagreed, holding that the statute was "not in violation of section 21, art. 5, and section 22, art. 4, of the [Texas] Constitution," *Id.* at 643, though the court did note that litigants did not have the "legal capacity or right to institute" their suit. *Id.* Importantly, the Court construed the statute at issue as providing safeguards to the constitutional powers of the Attorney General and county and district attorneys, such that *quo warranto* suits **could** be related through a private citizen as long as the suits were first presented to, and approved by, the State's authorized agents and officers, *e.g.*, the Attorney General or country or district attorney. *Id.*

In 1933, the Texas Supreme Court cited both *Maud* and *Staples* to uphold a statute authorizing an individual to bring suit on behalf of the state. *Camp v. Gulf Prod. Co.*, 122 Tex. 383, 394, 61 S.W.2d 773, 777 (1933). The *Camp* Court held that under *Maud* and *Staples*, "an act will not be held unconstitutional" under Texas Const. Section 22, Art. 4, and Section 21, Art. 5, "unless it, by plain and unambiguous language, deprives the county and district attorneys and the Attorney General of their authority to represent the state in the suits prosecuted under such act." *Id.* The TMFPA does no such thing.

More recently, the Texas Supreme Court in 2004 directly upheld the constitutionality of *qui tam* statutes, when the court wrote: "[a]s we held long ago in *Agey*, the Legislature may grant private standing to bring such [*qui tam*] actions, but it must do so clearly." *Brown v. De La Cruz*, 156 S.W.3d

13

560, 566 (Tex. 2004) (citing *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943)).[16]

Thus, the Texas Supreme Court in *Brown* directly endorsed *qui tam* provisions in penalty statutes, where the private right of action is clearly spelled out. The TMFPA is an example of a such a statute—providing for the recovery of penalties while clearly granting standing for relators to bring suit. *See* Tex. Hum. Res. Code §§ 36.101, 36.104.

As shown below, the TMFPA does not deprive the Attorney General of the authority to represent the State in any TMFPA case, including cases initiated by *qui tam* relators, and therefore, is constitutional.

## D.    The TMFPA Specifically Does Not Run Afoul of the Texas Constitution.

Defendant alleges that the TMFPA's *qui tam* provisions violate the Texas Constitution by authorizing private parties to represent the state and by infringing upon the constitutional duties of the Executive in four key ways: 1) undermining "the Attorney General's exclusive authority to determine whether a case should be filed, when and where it should be filed, and the allegations and claims that should be included;"[17] 2) interfering "with the Attorney General's performance of its executive function by providing mechanisms for the relator and court to overrule the Attorney

---

[16] Defendant cites *Am. Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580 (Tex. App.—Austin 1942) in support of its position. First, this opinion was superseded by the Texas Supreme Court in *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972. Second, the statute at issue in the *Agey* cases are distinguishable from the TMFPA, as the *Agey* statute was not a *qui tam* statute and had no private right of action. *See Agey*, 172 S.W.2d at 974 ("If the Legislature had intended by this Act to authorize an individual to file a suit on behalf of himself and on behalf of the State, without the joinder of the Attorney General or some district or county attorney, it could have expressed such intention in clear language. This it did not do."). This provides important context for the Texas Supreme Court's language in *Agey*, cited by Defendant, that "it is incumbent upon [the Attorney General] to institute in the proper courts proceedings to enforce or protect any right of the public that is violated," Motion at 17; *Agey*, 172 S.W.2d at 974. This necessity arose precisely because *Agey* did not involve a statute with a private right of action.

[17] Motion at 18.

14

General's determination that the lawsuit should be dismissed or settled;"[18] 3) imposing other persons upon the Attorney General when the Attorney General elects to intervene;[19] and 4) authorizing "the relator to prosecute the alleged TMFPA violations even if the State (through its Attorney General) declines to intervene."[20]

As explained below, Defendant's arguments largely misstate the State's authority under the TMFPA. Moreover, none of these arguments even approaches the high bar needed to overcome the TMFPA's presumption of constitutionality. Critically, Defendant's challenges as to the TMFPA's handling of intervened cases is completely irrelevant to the case at hand, since here the State has elected not to intervene.[21] Accordingly, and consistent with the Texas Supreme Court in *Brown*, Defendant's constitutional challenge to the TMFPA should be rejected.

1.      **The TMFPA's *qui tam* provisions do not undermine the Attorney General's authority and prosecutorial discretion.**

The TMFPA's authorization of a relator's lawsuit does not impermissibly strip the State of its prosecutorial discretion regarding whether to file suit and what allegations that suit should contain. Relator-initiated cases are filed under seal, during which time the State may investigate the allegations to determine whether to intervene and take control of the action; to decline and allow relator to proceed with the action; or to dismiss the action. *See* Tex. Hum. Res. Code §§ 36.102-36.104.[22] In

---

[18] *Id*. at 19.

[19] *See id.* at 22.

[20] *Id*. at 23.

[21] *See* Motion at 19-22.

[22] Additionally, upon intervention the State has "primary responsibility for prosecuting the action," including the ability to amend the petition. *See* Tex. Hum. Res. Code § 36.107(a). Thus, if the State elects to intervene and proceed with the case, the State has full control over the scope of its allegations.

making its decision while the case is under seal, the State is exercising its prosecutorial discretion. Thus, the TMFPA does not undermine the State's authority, but rather, complements it by permitting the State a period of time to decide how to handle the related case.

*Meshell v. State,* 739 S.W.2d 246, (Tex. Crim. App. 1987), incorrectly cited by Defendant as supportive of its argument, provides some insight into what courts consider when determining whether the Legislature has infringed upon prosecutorial discretion. In *Meshell*, while the Court found that the Speedy Trial Act was unconstitutional, this Act dealt with a prosecutor's *preparation for a criminal trial*. The *Meshell* Court noted that the Speedy Trial Act was deficient for several reasons, including that it gave no consideration for a prosecutor's "reason for delay," that it treated as "irrelevant whether the appellant actually wanted a speedy trial," and that it did not consider "whether appellant actually suffered any prejudice as a result of the delay in his trial." *Id*. at 256-57. For those reasons, the Court noted that the "Legislature exceeded its authority to protect appellants substantive right to a speedy trial through procedural legislation." *Id*. at 257.

Following *Meshell*, the Department of Family and Protective Services sought to invalidate a statute requiring it to commence a parental rights termination trial within one year of obtaining a temporary order appointing DFPS as temporary managing conservator of a child. *See Texas Dep't of Fam. & Protective Servs. v. Dickensheets,* 274 S.W.3d 150 (Tex. App.—Houston [1st Dist.] 2008, no pet.). The Court rejected DFPS's argument that, like the Speedy Trial Act, the statute represented an unconstitutional legislative encroachment upon prosecutorial discretion. The Court noted that the "one-year deadline for rendition of a final order can be extended by 180 days" and, unlike the Speedy Trial Act, "does not guarantee either party a dismissal if a final order is not rendered" within the one-year time limit to initiate termination proceedings. *Id* at 160.

16

Nothing in the TMFPA is remotely akin to the limitations placed on prosecutorial discretion under the Speedy Trial Act. Contrary to Defendant's claims, the State has complete discretion to proceed only with the TMFPA cases that it chooses and a substantial timeframe in which to investigate while the case is under seal (compare the Federal False Claims Act's ("FCA") 60-day intervention timeframe[23] with the TMFPA's 180-day timeframe[24]). And, if the 180-day timeframe is inadequate, the State can simply request an extension. This is incomparable to the demands the Legislature placed on prosecutors with the Speedy Trial Act, which, notably, dealt with the commencement of a trial, rather than the investigation and subsequent filing of a case.

In sum, the State has full discretion to proceed with a TMFPA case as it chooses, including by intervening and taking control over the case; dismissing the case—including over the objection of the relator;[25] or declining to intervene and allowing the relator to proceed. As such, the TMFPA does not impermissibly undermine the State's prosecutorial discretion.

2. **The TMFPA's *qui tam* provisions do not interfere with the Attorney General's determination that a lawsuit should be dismissed or settled.**

Defendant misstates how much deference the TMFPA gives to relator if the State intervenes and decides to settle or dismiss the case. If the State deems a TMFPA case unmeritorious, the State can dismiss the relator's case even over the objections of the relator. *See* Tex. Hum. Res. Code § 36.107(b). The TMFPA requires only that the State give the relator notice and that the court provides the relator an opportunity for a hearing on the dismissal. *Id*. Courts examining the similar provision

---

[23] 31 U.S. Code § 3730(b)(2).

[24] Tex. Hum. Res. Code § 36.102(c).

[25] Tex. Hum. Res. Code § 36.107(b).

within the Federal False Claims Act[26] have given significant deference to the government's decision to dismiss an FCA action. *See Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003) ("Nothing in § 3730(c)(2)(A) purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States."); *see also Polansky*, 599 U.S. at 437. Indeed, in *Swift*, the court found that "the function of [the dismissal] hearing when the relator requests one is simply to give the relator a formal opportunity to convince the government not to end the case," and does not even involve an element of judicial review. *Swift*, 318 F.3d at 253. Similarly, nothing in Tex. Hum. Res. Code § 36.107(b) deprives the Office of the Texas Attorney General, in the Executive Branch, its prerogative to dismiss a TMFPA case.

The same is true for a settlement. Defendant erroneously claims that the "Attorney General cannot settle the State's claims absent consent by the relator."[27] This is patently false. As delineated in the TMFPA, the government can choose to settle a case over the relator's objection so long as the court holds a hearing and determines "that the proposed settlement is fair, adequate, and reasonable under all the circumstances." Tex. Hum. Res. Code § 36.107(c). Court approval of settlements is a common procedure in civil cases—as well as the analogous plea agreement in criminal cases—so Defendant's contention that a requirement for court approval of a settlement in a *qui tam* action is uniquely burdensome on the State is unfounded. Unsurprisingly, Defendant cites no authority to support this broad assertion. On the contrary, the government's power to dismiss or settle an FCA *qui tam* action over the objection of a relator was described by the U.S. Supreme Court as being

---

[26] 31 U.S.C. § 3730(c)(2)(A).

[27] Motion at 21.

**MR133**

"uncommon, even extraordinary." *See Polansky*, 599 U.S. at 430.[28] The TMFPA therefore does not interfere with the State's performance of its executive function.

> ### 3. The TMFPA does not unlawfully impose other persons upon the Attorney General.

Defendant also wrongly claims that when the State intervenes in a *qui tam* action, the TMFPA contravenes the Texas Constitution by compelling the Attorney General to accept the relator's services.[29] Once again, Defendant misunderstands and misapplies the TMFPA. First, as previously discussed, if the State in its discretion intervenes in a relator-initiated TMFPA action, then it cannot be said that the relator is being compelled upon the State, because the State at that point has **chosen** to accept the relator. Second, the TMFPA spells out that the "state has **the primary responsibility** for prosecuting the action and **is not bound by an act of the person bringing the action**." Tex. Hum. Res. Code § 36.107(a) (emphasis added). This gives the State full control over the case, including the right to amend or drop allegations initially asserted by relator.[30] That the relator may conduct its own discovery does not limit the rights of the State as the entity with **primary responsibility** for prosecuting the case and Defendant cites no authority to the contrary.

Defendant also concedes that where the State has elected to intervene in a relator's TMFPA

---

[28] While the *Polansky* opinion relates to the Federal FCA, which is different from the TMFPA in many ways, certain procedural aspects of the FCA closely mirror the TMFPA, including the government's ability to dismiss a lawsuit notwithstanding the objections of the relator. *Compare* 31 U.S.C. § 3730(c)(2)(A) *with* Tex. Hum. Res. Code § 36.107(b).

[29] Motion at 22.

[30] This opinion is further bolstered by Tex. Hum. Res. Code § 36.104(a), which provides two options for the State at the conclusion of its under seal investigation: 1) intervention, where the State "proceed[s] with the action," and 2) "declin[ing] to take over the action." Thus, the language of 2) suggests that when the State intervenes, it is "tak[ing] over the action." *See also Polansky*, 599 U.S. at 425 ("If the Government, during that so-called seal period, elects to intervene, **the relator loses control** … though the relator can continue as a party in a secondary role.") (emphasis added).

**MR134**

action, the State may severely restrict a relator's participation in the suit. This fact directly contradicts Defendant's claim that "[t]he Attorney General exercises no control over the relator (or its counsel)." Motion at 22; Tex. Hum. Res. Code § 36.107(d). Defendant cites no authority to support the idea that this provision, along with the TMFPA's other safeguards, is insufficient to protect the interests of the State.

4.    **The TMFPA does not delegate to the relator full authority for prosecuting TMFPA violations when the State declines to intervene.**

Finally, Defendant alleges, with no support from relevant cases, that the TMFPA "delegates full authority for prosecuting violations of state law to unharmed citizens and their attorneys…" where the State declines to intervene.[31] This is incorrect. Rather, the TMFPA provides numerous mechanisms by which the State can remain engaged in the litigation. By way of example, Tex. Hum. Res. Code § 36.104(b-1) permits the State to receive ongoing information about such cases. The State also remains the "real party in interest" in the case and may submit Statements of Interest—such as this Statement—and appear at hearings to advocate for its rights as the real party in interest.

Likewise, the State may elect to pursue its claims through an alternate remedy in a separate proceeding;[32] can stay the relator's ability to conduct discovery that would interfere with the State's other civil or criminal investigations;[33] and retains the ultimate authority to consent to—or veto—any proposed settlement.[34] The State may also intervene in a TMFPA case even if it initially declines,

---

[31] Motion at 23.

[32] Tex. Hum. Res. Code § 36.109.

[33] Tex. Hum. Res. Code § 36.108.

[34] Tex. Hum. Res. Code § 36.102(e).

**MR135**

allowing the State to prosecute, dismiss, or settle the action over the objections of the relator.[35] Most importantly, as discussed above, a relator may only proceed with a TMFPA action without the State's participation when the State, at its discretion, permits the relator to do so. For these reasons, Defendant is wrong to claim that the TMFPA impermissibly restricts the State's control over relator-initiated actions.

## IV. CONCLUSION

Defendant disregards the wealth of authority undercutting its arguments that the TMFPA is unconstitutional. Defendant's assertions dismiss the long history of *qui tam* actions in the United States and the equally long line of court opinions upholding the validity of *qui tam* statutes. As noted throughout this Statement of Interest, suits initiated by private parties on behalf of the State have long been a common feature of Texas's governance. More critically, the TMFPA does not "unequivocally supplant" the State's constitutional authority to bring and conduct civil litigation. *See Maud v. Terrell*, 109 Tex. 97 at 377. The State agrees with the Texas Supreme Court that the TMFPA "is a powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity," which "imbues the attorney general with broad investigative and enforcement authority." *In re Xerox*, 555 S.W.3d at 525.

## V. PRAYER

For the foregoing reasons, the State of Texas asks the Court to deny Defendant's Plea to the Jurisdiction and Motion to Dismiss and to retain Plaintiffs' suit on the Court's docket.

---

[35] Tex. Hum. Res. Code §§ 36.104(b-1); 36.107(b), (c).

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**ELIZABETH J. BROWN FORE**
Chief for Civil Medicaid Fraud Division


_____/s/ Jordan Underhill_____
JORDAN UNDERHILL
State Bar No. 24102586
(512) 936-1410 direct dial

JONATHAN D. BONILLA
State Bar No. 24073939

LYNNE KURTZ-CITRIN
State Bar No. 24081425

Office of the Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4196
Facsimile: (512) 320-0667
Jordan.Underhill@oag.texas.gov
Jonathan.Bonilla@oag.texas.gov
Lynne.Curtz-Citrin@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

22

**MR137**

# CERTIFICATE OF SERVICE

I hereby certify that, on December 7, 2023 a true and correct copy of the foregoing document was electronically filed with the Clerk of this Court and served electronically on all counsel of record listed below, in compliance with Rule 205.3 of the Texas Rules of Civil Procedure.

Samuel F. Baxter
Jennifer L. Truelove
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
sbaxter@mckoolsmith.com
jtruelove@mckoolsmith.com

Eric B. Halper
Radu A. Lelutiu
MCKOOL SMITH P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
ehalper@mckoolsmith.com
rlelutiu@mckoolsmith.com

W. Mark Lanier
Alex J. Brown
Zeke DeRose III
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N, Suite 100
Houston, Texas 77064
WML@LanierLawFirm.com
Alex.Brown@LanierLawFirm.com
Zeke.DeRose@LanierLawFirm.com
Jonathan.Wilkerson@LanierLawFirm.com

**ATTORNEYS FOR RELATOR
HEALTH SELECTION GROUP, LLC**

Danny S. Ashby
Megan Whisler
O'MELVENY & MYERS LLP
2501 North Harwood Street, Suite 1700
Dallas, Texas 75201-1663
dashby@omm.com
mwhisler@omm.com

Ross Galin
(pro hac vice pending)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
1625 Eye Street, N.W.
Washington, D.C. 20006
rgalin@omm.com

Meredith Garagiola
(pro hac vice pending)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
mgaragiola@omm.com

Deron R. Dacus
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
ddacus@dacusfirm.com

**ATTORNEY FOR DEFENDANT
NOVARTIS PHARMACEUTICALS
CORPORATION**

/s/ Jordan Underhill
JORDAN UNDERHILL
Assistant Attorney General

23

Filed 12/11/2023 7:16 PM
Sherry Griffis
District Clerk
Harrison County, Texas
Robyn Nielsen

Deputy

## CAUSE NO. 23-0276

| | | |
|---|---|---|
| THE STATE OF TEXAS *ex rel.* HEALTH SELECTION GROUP, LLC, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § | |
| v. | § § § | 71st JUDICIAL DISTRICT |
| NOVARTIS PHARMACEUTICALS CORPORATION, | § § § | |
| *Defendant.* | § | OF HARRISON COUNTY, TEXAS |

## DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S
## REPLY IN SUPPORT OF PLEA TO THE JURISDICTION AND MOTION TO DISMISS

**MR139**

Copy from re:SearchTX

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I. The Court Lacks Subject Matter Jurisdiction Over Relator's Claims Because Relator Does Not Satisfy Constitutional Standing Requirements. ........................ 3

    A. Statutory Authorization To Sue Is Distinct From—And Does Not Satisfy— Constitutional Standing Requirements. ..................................... 3

    B. The State's Standing Arguments Are Also Unavailing. ............................ 8

        1. *The State's "Statutory Standing" Cases Are Inapposite.* ............... 8

        2. *The U.S. Supreme Court's Holding in* Stevens *Is Not Controlling and Readily Distinguishable Based on Numerous Distinctions Between the FCA and TMFPA and the Federal and Texas Constitution.* ................................................................................. 9

II. Relator Lacks A Valid Cause of Action ("Statutory Standing") Because The TMFPA's *Qui Tam* Provisions Are Unconstitutional and Void. ........................ 13

    A. The Texas Supreme Court's Decision in *Brown v. De La Cruz* is Not Relevant, Let Alone Controlling. ................................................................ 13

    B. Relator and The State Misconstrue Texas Supreme Court Precedent. ..... 14

    C. The TMFPA Facially Interferes With The Attorney General's Constitutionally-Assigned Duty and Authority To File And Prosecute Claims For The State. ................................................................................. 17

CONCLUSION ................................................................................................. 22

Copy from re:SearchTX

Defendant respectfully submits this Reply in support of its Plea to the Jurisdiction and Motion to Dismiss ("Motion"), which jointly responds to Relator's Response to the Motion and the State of Texas's Statement of Interest ("SOI").

## INTRODUCTION

The Court need not decide whether the TMFPA's *qui tam* provisions violate Articles IV and V of the Texas Constitution if the Court concludes that it does not have subject matter jurisdiction over Relator's claims. And it does not because Relator concedes that it did not suffer any personal injury from the alleged violations to satisfy Texas's constitutional standing requirements. Instead, Relator and the State rely on "statutory standing" cases to argue that Relator "need not have suffered personal injury" because "the TMFPA itself authorizes Relator to pursue claims on behalf of the government program it protects." Resp. at 1. But their arguments confuse "statutory standing" with "constitutional standing." The Texas Supreme Court has clarified that "statutory standing" is a misnomer because it does not concern "standing" at all in the jurisdictional sense. Regardless of whether the Legislature grants a plaintiff a statutory cause of action, the plaintiff must still satisfy constitutional standing requirements (by showing a personal injury) to grant the court subject matter jurisdiction over the plaintiff's claims. The State, but not Relator, separately asserts (without analysis) that the U.S. Supreme Court's holding that federal courts have jurisdiction over *qui tam* actions under the federal False Claims Act is somehow controlling here. *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000). It is not for myriad reasons discussed below, including, but not limited to, the fact that the TMFPA does not give rise to an assignable damages claim and, even if it did, the legislative assignment would be unconstitutional and void under the Texas Constitution.

Because the Texas Constitution explicitly imposes the duty and confers the power upon

1

Copy from re:SearchTX

the State's attorneys to bring and maintain suits in the name of the State, Texas Supreme Court authority is clear: "the Legislature cannot withdraw [those duties or powers] nor confer them upon others nor abridge them or interfere with the officer's right to exercise them *unless the Constitution expressly so provides*." *Hill County v. Sheppard*, 178 S.W.2d 261, 264 (Tex. 1944) (emphasis added). Tellingly, neither Relator nor the State identifies an express provision in the Texas Constitution that authorizes the Legislature to confer that power on a private party.

Nor do Relator or the State identify any authority that would otherwise support that result. They argue (rather emphatically, and incorrectly) that the Texas Supreme Court's decision in *Brown v. De La Cruz*, 156 S.W.3d 560 (Tex. 2004), "directly upheld the constitutionality of *qui tam* statutes." SOI at 2. But *Brown* did not concern a *qui tam* statute, nor for that matter did it address the constitutionality of *any* statute. And Relator's and the State's misrepresentation and misinterpretations of the Texas Supreme Court decisions do not stop at *Brown*. They continue through their discussion of Defendant's cases in an attempt to erroneously suggest that they undercut Defendant's argument. They do not. Nor do their attempts to minimize the consequence of the TMFPA's *qui tam* provisions on the Attorney General's broad, discretionary authority withstand scrutiny.

Relator lacks constitutional standing and a valid cause of action. Any claim that Defendant violated the TMFPA must be brought, if at all, by those to whom the Texas Constitution has assigned that duty and power: the Attorney General. This case should be dismissed.

Copy from re:SearchTX

Copy from re:SearchTX

**ARGUMENT**

I. **The Court Lacks Subject Matter Jurisdiction Over Relator's Claims Because Relator Does Not Satisfy Constitutional Standing Requirements.**

  A. Statutory Authorization To Sue Is Distinct From—And Does Not Satisfy— Constitutional Standing Requirements.

Relator does not dispute its failure to "plead facts demonstrating that [Relator], [itself] (rather than a third party or the public at large), suffered [an] injury" from the alleged TMFPA violations. *Heckman v. Williamson County*, 369 S.W.3d 137, 155 (Tex. 2012). Instead, Relator (at 6) contends that it need not do so—that alleging an "injury to itself [is] legally irrelevant"— because it has "statutory standing" to bring suit under the TMFPA. In doing so, however, Relator confuses constitutional standing with statutory standing, which—as the Texas Supreme Court has recently reiterated—are separate and distinct inquiries. Constitutional standing goes to the court's subject-matter jurisdiction to resolve a claim between the parties, while statutory standing concerns whether the plaintiff falls within the class of persons authorized by statute to sue. In short, and as Defendant's Motion explained at length, "statutory standing" does not constitute "standing" at all in the jurisdictional sense and does not suffice to grant the court subject-matter jurisdiction over a claim.[1] *See* Mot. at 10 (noting "recent decisions of the Texas Supreme Court [] have emphasized the distinction between (i) whether a plaintiff satisfies constitutional requirements of standing in state court and (ii) whether a plaintiff satisfies some statutory prerequisite to bringing suit or recovering on a claim" (citing *Pike v. Texas EMC Management*, LLC, 610 S.W.3d 763 (Tex. 2020); *Texas Medicine Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 439–40 (Tex. 2023)).

---

[1] Even if "statutory standing" sufficed, Relator also lacks "statutory standing" because the TMFPA's qui tam provisions—in authorizing private citizens to file suit for and in the name of the State—are unconstitutional and void. *See infra* Section II; *see also Reyes v. State*, 753 S.W.2d 382, 383 (Tex. Crim. App. 1988) (en banc) (explaining that, because an unconstitutional statute is void from its inception, it "'imposes no duties, confers no rights, creates no office, bestows no power, affords no protection, and justifies no acts performed under it'" (citation omitted))

**MR143**

The Texas Supreme Court specifically called out this distinction in *Pike*, remarking that "Texas courts, having drawn upon the standing doctrine of our federal counterparts, sometimes apply the label 'standing' to statutory or prudential considerations that 'do not implicate subject-matter jurisdiction' but determine whether a plaintiff 'falls within the class of [persons] . . . authorized to sue' or otherwise has 'a valid . . . cause of action.'" 610 S.W.3d at 773–74 (quoting *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 128 & n.4 (2014)). The Texas Supreme Court clarified that "the question of whether a plaintiff has established his right 'to go forward with his suit' or 'satisfied the prerequisites of a particular statute' pertains 'in reality to the right of the plaintiff to relief rather than to the subject matter jurisdiction of the court to afford it.'" *Id*. (cleaned up, citation omitted).

In demarcating this distinction, the *Pike* Court cited with approval a Court of Appeals decision that rejected the very argument (and authorities) that Relator advances here in arguing that "statutory standing" displaces "constitutional standing" requirements. *Id*. at 774 (citing *Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*, 573 S.W.3d 912, 915–17 & n.5 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). Like Relator, the appellant in *Nephrology Leaders* argued that its lack of injury was "immaterial" to the court's subject matter jurisdiction to hear the appeal because, the appellant contended, it had "statutory standing" and "statutory standing" displaced the "judge-made criteria' of injury and redressability." *Id*. at 915–16. The court disagreed, explaining that a statute "cannot set a lower standard than that set by the general doctrine of standing because 'courts' constitutional jurisdiction cannot be enlarged by statute.'" *Id*. at 915 (quoting *Finance Com'n of Tex. v. Norwood*, 418 S.W.3d 566, 582 n.83 (Tex. 2013)); *see also In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 544 (Tex. 2016) (orig. proceeding) ("For the Legislature to attempt to authorize a court to act without subject matter jurisdiction would violate the

Copy from re:SearchTX

constitutional separation of powers."). Courts thus construe legislative enactments "'to extend no farther than what the Texas Constitution allows—to presume or incorporate the jurisdictional requirement" that the plaintiff demonstrate an injury redressable by the court; to do otherwise, the court held, "would be to render it unenforceable." *Id*. at 915–16 (quoting *Tex. Quarter Horse Ass'n v. Am. Legion Dept of Tex*., 496 S.W.3d 175, 185 (Tex. 2016)).

The appellant's argument, the court explained, rested on a misunderstanding of two "statutory standing" cases also relied upon by Relator here: *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding) and *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 851 (Tex. App.—Fort Worth 2005, no pet.).[2] Like the *Pike* Court, the *Nephrology* court noted that the use of the term "statutory standing" "has been criticized for contributing to the erroneous assumption that statutory authority to bring an action or appeal includes a *per se* grant of constitutional standing." *Nephrology Leaders*, 573 S.W.3d at 916 n.5 (collecting cases). The court explained that it does not:

> [I]n statutory standing cases such as *Sullivan* and *Everett*, the proper analysis is to determine whether the claimant falls within the category of claimants upon whom the Legislature conferred standing. In other words, courts must determine whether a particular plaintiff has established that he has been injured or wronged within the parameters of the statutory language. ***But it does not follow that [courts] disregard the Texas Constitution's standing requirements of injury and redressability***. These requirements are not "judge-made"; they stem from the Texas Constitution's open courts provision, "which contemplates access to the courts only for those litigants suffering an injury,"[3] and cannot be discarded.

---

[2] Relator also cites several other cases that fall into the same category of "statutory standing" as *In re Sullivan* and *Everett* that pre-date the Texas Supreme Court's clarification of "constitutional standing" distinct from "statutory standing." *See* Resp. at 5–6 (citing *Marauder Corp. v. Beall*, 301 S.W.3d 817 (Tex. App.—Dallas 2009); *Zaatari v. City of Austin*, 615 S.W.3d 172 (Tex. App.—Austin 2019, pet. denied). Relator cites one 2023 case that post-dates, but does not mention, *Pike* in continuing to follow *In re Sullivan* and *Everett* in perpetuating confusion over the separate concepts of statutory standing and constitutional standing. *See Children of the Kingdom v. Central Appraisal Dist. of Taylor Cty*., 674 S.W.3d 407 (Tex. App.—Eastland 2023, pet. denied.).

[3] The State separately asserts that Defendant's argument concerning Relator's lack of injury and, by extension, constitutional standing "misinterprets and misapplies the Open Courts provision." But the Texas Supreme Court has repeatedly grounded the constitutional standing requirements in that provision, as well as the separation-of-powers provision. *See Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 700 (Tex. 2021); *Meyers v. JDC/Firethorne, Ltd*., 548 S.W.3d 477, 484 (Tex. 2018). The State's arguments regarding a different aspect of the Open Courts

Copy from re:SearchTX

*Id.* at 916–17 (emphasis added); *see also Larkins-Ruby v. Austin County*, 2022 WL 17981564, at *2 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022) ("Statutory standing . . . does not supplant constitutional standing, and a plaintiff must have constitutional standing even if standing has been conferred by statute."); *Interest of P.R.*, 615 S.W.3d 474, 480 (Tex. App.—Texarkana 2020, pet. denied) (following *Nephrology Leaders* in holding that, "while a right of appeal may be granted by statute, standing is mandated by the Texas Constitution's open courts provision, which contemplates access to the courts only for those litigants suffering an injury" (cleaned up)).

Given the confusion wrought by the term "statutory standing," the Texas Supreme Court has, since *Pike*, further discouraged "the use of the term *standing* to describe extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit." *Tex. Bd. of Chiropractic v. Tex. Medical Ass'n,* 616 S.W.3d 558, 567 (Tex. 2021). The Texas Supreme Court recognized that "[s]ome of [its] older opinions use standing as a short-hand reference for a plaintiff's ability to fulfill some statutory prerequisites to bring suit or recovering on a claim," which the Court characterized as "regrettable" because it "has tangled the line demarcating issues that truly implicate a trial court's subject-matter jurisdiction from those pertaining to the merits. The integrity of that line is fundamental to the working of the civil justice system because a court without subject-matter jurisdiction cannot decide the case at all." *Texas Medicine Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 439–40 (Tex. 2023); *see also, e.g.*, *In re Morris*, 663 S.W.3d 589, 598 n.47 (Tex. 2023) ("The Election Code authorizes injunctive relief, but we have held that provision itself does not create standing. A plaintiff must show injury or damage 'other than as a member of the general public.'").

---

provision—i.e., that it guarantees that citizens bringing common law causes of action (as opposed to statutory causes of action) will not unreasonably be denied access to the courts—are inapposite.

**MR146**

Copy from re:SearchTX

The U.S. Supreme Court has recognized the same distinction in holding federal courts lacked subject matter jurisdiction over an unharmed plaintiff's statutory cause of action because statutory authorization to sue does not satisfy constitutional standing requirements under Article III. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Relator (at 7) charges Defendant with "misrepresenting" *TransUnion*, but it is Relator who misrepresents the case by suggesting that the Supreme Court's holding turned on an *FCRA* requirement that the plaintiff show injury from the FCRA violation. It did not. The Court's decision turned on whether the class members suffered a "concrete harm for purposes of Article III" because the Court there recognized that "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *Id*. at 2205, 2209. Because 6,332 of the class members alleging a FCRA violation had not suffered a concrete harm for purposes of Article III, the Court held it had no subject-matter jurisdiction over their claims.

Likewise, Relator's reliance on the Legislature's creation of a statutory cause of action does not itself satisfy constitutional standing requirements to grant the court subject matter jurisdiction over Relator's claims. Standing in the jurisdictional sense requires Relator to show that Relator itself suffered a concrete, particularized injury in fact. *Berry v. Berry*, 646 S.W.3d 516, 527 (Tex. 2022); *see also Herbig, Trustee of Welch Family Trust C. v. Welch, Trustee of Welch Manry Family Trust*, 2023 WL 4188074, at *4–5 (Tex. App.—Houston [1st Dist.] June 27, 2023, no pet. h.) (distinguishing constitutional standing and statutory standing following *Pike* and *Berry*). Relator's unelaborated assertion (at 7) that it pleads an injury to Texas Medicaid does not suffice. Even assuming it had pled such an injury (and it does not), "[u]nder Texas law, as under federal law, the standing inquiry begins with the plaintiff's alleged injury. The plaintiff must be

**MR147**

Copy from re:SearchTX

*personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury." *Heckman v. Williamson County*, 369 S.W.3d 137, 155 (Tex. 2012); *see also In re Abbott*, 601 S.W.3d 802, 809 (Tex. 2020) ("Our standing jurisprudence ensures that the executive branches and judicial branches resolve matters of public importance through the adversary system of justice in particular cases involving parties who are genuinely, personally affected."); *Bellamy v. City of Brownsville*, No. 13-22-00087-CV, 2023 WL 413583, at *3 (Tex. App.—Corpus Christi–Edinburg Jan. 26, 2023, no pet.) (holding plaintiff's "allegations about harm to the City and its citizens could not support a finding that *he* would suffer an irreparable injury"). Because Relator fails to allege that Relator itself suffered a concrete harm for purposes of constitutional standing, the court is without subject matter jurisdiction to hear Relator's claims and they should be dismissed.

B. The State's Standing Arguments Are Also Unavailing.

1. *The State's "Statutory Standing" Cases Are Inapposite.*

Like Relator, the State erroneously relies on cases addressing "statutory standing" to argue that the Legislature can, by statute, confer jurisdictional standing on an unharmed private citizen to sue. *See* SOI at 7 (citing *Spence v. Fenchler*, 180 S.W.597 (Tex. 1915); *Scott v. Bd. of Adjustment*, 405 S.W.55 (Tex. 1966)). *Spence*, *Scott*, and their progeny fall within the class of "statutory standing" cases that address whether a plaintiff falls within the class of persons authorized to sue or otherwise has a valid cause of action, not the court's jurisdiction to hear the plaintiffs' claims. *Spence* involved a statutory cause of action that authorized individuals to bring an injunction to enjoin the maintenance of bawdy and disorderly houses. 180 S.W. 597. In holding that the statute did not require plaintiffs to prove damages to obtain an injunction, the court there addressed a merits question concerning the plaintiffs' right to the relief requested (i.e., whether the statute required proof of property damage to obtain an injunction), *id*. at 461, and not the plaintiffs'

**MR148**

Copy from re:SearchTX

standing in a jurisdictional sense, which was indisputable given their allegations that the houses were "standing near real property of plaintiffs . . . constituting nuisances resulting in damages to the property of plaintiffs," *id*. at 442. Citing *Spence*, the *Scott* Court merely recognized that, "*within constitutional bounds*, the Legislature may grant a right to a citizen or to a taxpayer to bring an action against a public body or a right of review on behalf of the public without proof of particular or pecuniary damage peculiar to the person bringing the suit." 405 S.W. 2d at 56.

The State's cases simply stand for the proposition that the Legislature may create a statutory cause of action "within constitutional bounds." And as the Texas Supreme Court held over a century ago and has since reiterated, the Texas Constitution does not permit the Legislature to invest a plaintiff, who is "not shown to have a justiciable interest in the matter," with the authority to maintain suit. *Allen v. Fisher*, 9 S.W.2d 731, 732 (Tex. 1928). "For the Legislature to attempt to authorize a court to act without subject matter jurisdiction would violate the constitutional separation of powers." *In re Lazy W Dist. No. 1*, 493 S.W.3d at 544.

> 2. *The U.S. Supreme Court's Holding in* Stevens *Is Not Controlling and Readily Distinguishable Based on Numerous Distinctions Between the FCA and TMFPA and the Federal and Texas Constitution.*

The State also makes an "all or nothing" argument regarding federal standing jurisprudence in contending that either the U.S. Supreme Court's decision in "*Stevens* controls here or, federal standing doctrine, including *TransUnion*, is irrelevant." SOI at 11. The State is wrong on both counts.

In the first instance, Defendant has never suggested that *TransUnion* is controlling. Rather, Defendant referred to *TransUnion*'s reasoning for guidance in resolving the standing issue presented here and, in doing so, explained how the reasoning in that decision was consistent both with the text of the Texas Constitution and the Texas Supreme Court's recent efforts to clarify and distinguish the Legislature's creation of a statutory cause of action from constitutional standing

9

Copy from re:SearchTX

**MR149**

requirements. *See* Mot. at 10. Regardless of whether the Legislature creates a statutory cause of action (and provides a statutory penalty), the plaintiff must still meet constitutional standing requirements by alleging a concrete injury from the violation to satisfy jurisdictional requirements.

The State, by contrast, simply asserts that *Stevens*' holding "controls" here.[4] The State makes no effort to explain how *Stevens*' holding that a federal court has subject matter jurisdiction over a *qui tam* action under the federal False Claims Act ("FCA") applies to a TMFPA *qui tam* action or supports state court subject matter jurisdiction under the Texas Constitution and precedent. *See* SOI at 10–11. Tellingly, Relator made no such argument despite having the burden to prove standing—by assignment or otherwise. *See Heckman*, 369 S.W.3d at 150 ("The burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction."). Nor could it.

First, the federal FCA, unlike the TMFPA, gives rise to a damages claim, which was critical to the *Stevens* Court's holding that the "FCA can reasonably be regarded as effecting a partial assignment of the Government's *damages claim*." 529 U.S. at 773 (emphasis added). The TMFPA, by contrast, cannot "reasonably [be] regarded as effecting a partial assignment of the State's damages claim," *id*., because the Texas Supreme Court has held that "the TMFPA employs a penalty scheme and ***is not an 'action for the recovery of damages*.'"** *In re Xerox*, 555 S.W.3d 518, 534 (Tex. 2018) (emphasis added); *compare id*. at 533 (explaining the TMFPA "does not use the terms 'harm,' 'damages,' 'overpayment,' 'loss,' 'actual damages,' 'unauthorized amount,' 'compensation,' or any other words that imply a loss measure or require the State to prove an actual loss") *with* 31 U.S.C. § 3729(a) (person who violates FCA is liable for civil penalty "plus 3

---

[4] Whether *Stevens*' reasoning and holding still prevails following subsequent amendments to the FCA—which fundamentally changed the nature of that statute (and are mirrored in the TMFPA)—has also been questioned. *See, e.g.,* A.G. Harmon, Bounty Hunters and Whistleblowers: Constitutional Concerns for False Claims Actions After Passage of the Patient Protection and Affordable Care Act of 2010, 2 Am. U. Lab. & Emp. L.F. 1, 16 (2011) (observing the FCA "is no longer, in fact, an informer statute").

Copy from re:SearchTX

times the amount of damages which the Government sustains because of the act of that person"). Thus, even assuming the Texas Legislature had constitutional authority to make an assignment of the State's damages claims—a matter that the State also does not address—the TMFPA does not give rise to a damages claim assignable by the Legislature.

Second, assuming, *arguendo*, that the TMFPA gave rise to an assignable damages claim, the assignment would be void because it is contingent on relator performing an act that violates the Texas Constitution—that is, filing a civil action for the State and in the name of the State. Because Article 5, Section 21, and Article 4, Section 21 of the Texas Constitution "mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court," "[t]he Legislature is impliedly restrained from conferring such duty and responsibility on the individual citizen."[5] *Allen*, 9 S.W.2d at 732 (citing *Maud*, 200 S.W. 375). Accordingly, the TMFPA cannot be reasonably regarded as conferring standing by assignment for this additional reason.

Third, *Stevens* relied on a unique aspect of federal standing jurisprudence in concluding that "the long tradition of *qui tam* actions in England and the American Colonies" "well nigh conclusive" of the federal standing inquiry in that case. 529 U.S. at 775, 777. Unlike Texas's standing jurisprudence, the federal standing inquiry dictates that special attention be paid to historical practice given the U.S. Supreme Court's interpretation of Article III's "Cases" and "Controversies" requirement to mean "'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Id*. at 774 (citation omitted). But the Texas Supreme

---

[5] Relator and the State also understate the constitutional stakes of their defense of the TMFPA. If one were to accept that the Legislature can constitutionally assign to unharmed private citizens law enforcement powers under the TMFPA, then nothing would prevent the Legislature from granting private citizens the ability to enforce hundreds or thousands of state statutes and thereby subject the "executive power to death by a thousand cuts." Saikrishna Prakash, The Chief Prosecutor, 73 Geo. Wash. L. Rev. 521, 582 (2005) ("one ought not to believe that independent popular actions are but a minor invasion of the executive power, because if independent popular actions are constitutional, Congress can subject the president's executive power to death by a thousand cuts").

11

Copy from re:SearchTX

Court has never adopted nor endorsed the U.S. Supreme Court's reference to historical practice in resolving questions concerning the subject matter jurisdiction of Texas courts. Nor should it.

The Texas Constitution does not contain language equivalent to the federal Constitution's "Cases" and "Controversies" language. Nor does the fact that *qui tam* actions may have been permitted under a different system of government say anything about a Texas court's jurisdiction under the current Texas Constitution, which includes an explicit Separation of Powers clause from which Texas constitutional standing requirements are derived. *See, e.g.*, *American Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580, 583 (Tex. App.—Austin 1942) (rejecting as irrelevant the plaintiff's contention that *qui tam* actions had been permitted prior to the 1876 Constitution). Unlike Texas, England and Colonial America did not operate under a republican form of government that was divided into three separate and distinct departments. Indeed, the Texas Court of Criminal Appeals long ago recognized:

> [T]hat our legislative department has all the power possessed by the English parliament, as stated by some courts, cannot be maintained under the Constitution of this state. The powers of the English government . . . have never been divided into three separate and distinct departments, with the limitation that no one of the departments should exercise the power attached to the other department.

*Ex parte Wolters*, 144 S.W. 531, 587 (Tex. Crim. App. 1911).[6] In addition, Texas and its Constitution share no ties to England and Colonial America like the federal Constitution. "Texas was never a British colony nor an American territory." *Southern Pac Co. v. Porter*, 331 S.W.2d 42, 45 (Tex. 1960). Texas only made the "common law, so far as it is consistent with our constitutional and legislative enactments, the rule of decision in Texas." *Id*. "No English

---

[6] *See also United States ex rel. Polansky v. Exec. Health Resources, Inc*., 599 U.S. 419, 449 (2023) (Thomas, J., dissenting) (cautioning that courts "should be especially careful not to overread the early history of federal *qui tam* statutes, given that the [federal] Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited"); Prakash, 73 Geo. Wash. L. Rev. at 589 ("we ought to be cautious about importing English constraints or exceptions to the executive power, when those limitations might be based on the principle of parliamentary supremacy").

Copy from re:SearchTX

statutes"—including the English Parliament's *qui tam* action—"were adopted." *Id*.

## II. Relator Lacks A Valid Cause of Action ("Statutory Standing") Because The TMFPA's *Qui Tam* Provisions Are Unconstitutional and Void.

### A. The Texas Supreme Court's Decision in *Brown v. De La Cruz* is Not Relevant, Let Alone Controlling.

Both Relator and the State employ strong rhetoric in their effort to convince the Court that the constitutionality of the TMFPA's *qui tam* provisions was settled in *Brown*, 156 S.W.3d 560. According to Relator (at 8), the Texas Supreme Court's decision in *Brown* "eviscerates" Novartis's constitutional challenge. The State no less emphatically asserts that "the constitutionality of the TMFPA is not subject to debate," because *Brown* "affirmed the validity of *qui tam* and similar statutes." SOI at 2. Relator and the State misread *Brown* because that case says nothing about the Legislature's authority to grant an unharmed private citizen the power to file a case for and in the name of the State.

*Brown* did not even involve a *qui tam* statute. *Brown* involved provisions of the Texas Property Code that "required that sellers . . . of certain residential property in Texas must record and transfer a deed within thirty days of final payment" and stated that the failure to comply was "subject to a penalty" of up to $500 a day. *See* 156 S.W.3d at 561–62. The question presented in *Brown* was whether the statute provided the purchaser a private cause of action to sue the seller for a violation to recover the $500-per-day penalty.[7] *See id*. at 562. The Texas Supreme Court concluded that the statute did not create a private cause of action because the statute was silent about who may collect the statutory penalty and, "[g]enerally, a statutory penalty or fine is not payable to a private litigant." *Id*. at 563–64. In reaching that conclusion, the Court recognized

---

[7] The Texas Supreme Court noted that a 2001 amendment to the Property Code made the seller "liable to the purchaser for . . . liquidated damages" of $500 per day and thus "clearly provide[d] a private cause of action for purchasers." *Brown*, 156 S.W.3d at 561–62 (the question is "whether the original statute . . . did as well").

13

Copy from re:SearchTX

that the Legislature had the authority to create a private cause of action for a purchaser to recover a statutory penalty "beyond the damages that purchaser is likely to suffer," but if the Legislature intends to create a private cause of action, "it must do so clearly." *Id*. at 566. In short, *Brown* stands for the unremarkable proposition that the Legislature may, by statute, create a private cause of action for an individual harmed by a defendant's violation to recover a statutory penalty.

The TMFPA, by contrast, is a civil-enforcement statute that purports to authorize an unharmed private citizen to file suit and prosecute violations for and in the name of the State and, in that respect, squarely contravenes the Texas Constitution's assignment of that duty and power to the State attorneys elected by Texas voters.

B.      Relator and The State Misconstrue Texas Supreme Court Precedent.

In an effort to save the TMFPA *qui tam* structure from invalidation, Relator and the State attempt to sow confusion by misinterpreting the import of the Texas Supreme Court precedent cited by Defendant. Those efforts should be rejected.

To start, Relator (at 9) incorrectly suggests that *Brady v. Brooks*, 89 S.W. 1052 (Tex. 1905) overruled *State v. Moore*'s pronouncement that "the constitution, in selecting the depositaries of a given power . . . intended that depositary should exercise an *exclusive* power, with which the legislature could not interfere by appointing some other officer to exercise of the power," 57 Tex. 307, 314 (1882). "The *Moore* case has not been regarded as being overruled, through the years. It has been cited with approval many times since *Brady v. Brooks*." *State v. Walker-Texas Inv. Co.*, 325 S.W.2d 209, 212 (Tex. App.—San Antonio 1959), *writ ref'd n.r.e. sub nom. Smith v. State*, 328 S.W.2d 294 (Tex. 1959) (collecting cases).

Relator (at 10–11) and the State (at 12–13) also misconstrue the Texas Supreme Court's decisions in *Maud v. Terrell*, 200 S.W. 375 (Tex. 1918) and *Staples v. State*, 245 S.W. 639 (Tex. 1922). Far from undercutting Defendant's argument, the cases cited by Defendant establish that a

Copy from re:SearchTX

statutory grant of authority to bring suit for the State to anyone other than the State's attorneys "seriously infringe[s] upon the mandate of section 21, art. 5 of the Constitution, that 'the county attorneys shall represent the state in all cases in their respective counties,' and of section 22, art. 4, relating to the Attorney General." *Staples*, 245 S.W. at 642. That is because the powers "conferred by the Constitution upon those officials are *exclusive*" and "[t]he Legislature cannot devolve them upon others."[8] *Maud*, 200 S.W. at 376.

In construing the statute in *Maud*, the Court recognized that the statute would violate the Texas Constitution if it were construed to authorize the tax collector to bring suit for the State, because the Constitution conferred that power exclusively on the State's attorneys. *See* 200 S.W. at 376 (expressing that such a construction would be "condemned by the Constitution"). The Court thus invoked the principle that, where the language of a statute "is of doubtful meaning, reasonably susceptible to different constructions, rendering the act valid if construed in one sense and invalid if construed in another, that construction will be adopted which sustains the act rather than destroys it." *Id*. So, rather than construe the statute to "authorize the collector to file the suit," the *Maud* Court adopted a construction of the statute that did not "supplant the authority of the State attorneys to prosecute" the suits of the State by construing the statute to provide that the tax collector "should

---

[8] Unlike the Texas Constitution, the U.S. Constitution does not include an explicit provision assigning to a particular government actor the duty and power to represent the State's interest in litigation. Litigants have instead grounded federal constitutional challenges to the FCA *qui tam* procedure on the federal Constitution's "take care" clause and "appointments" clause. Those efforts have failed because, as constitutional scholar, Evan Caminker, noted, federal courts have viewed the "take care" clause more "as a mandate to follow the will of Congress than as a grant of exogenously defined power," and the federal Constitution "fails to specify when litigants representing the United Stated must be 'officers of the United States' to whom the specified appointment procedures apply." Evan Caminker, The Constitutionality of *Qui Tam* Actions, 99 Yale L.J. 341, 356 (1989); *see also id*. (explaining that applying separation-of-powers doctrine under the *federal* Constitution means that "[w]hile Congress cannot itself 'execute' the laws it has enacted, it may structure the operations of the executive branch as it finds 'necessary and proper' to ensure the executive's ability to execute the laws in a manner faithful to congressional will"). Even if "no Article II values appear to prohibit Congress from defining the United States' litigation interests through privately prosecuted civil suits," *id*. at 380, the Texas Constitution does so by expressly conferring that duty and power on the State attorneys elected by Texas voters. And it is for that reason that federal case law challenging or upholding federal *qui tam* statutes under the federal Constitution are simply not persuasive here. *Cf*. Resp. at 14 n.10 (criticizing Defendant for "ignoring" federal cases upholding the constitutionality of the federal FCA under the U.S. Constitution).

Copy from re:SearchTX

cause the suit to be filed by the official charged by law with that specific duty" (i.e., the Attorney General).[9] *See id*. at 377; *see also Am. Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580, 583 (Tex. App.—Austin 1942) (explaining *Maud* construed the statute "as not so vesting that power in such party, under the established presumption of validity," and "[t]hus clearly in effect holding that it would have been invalid if given the construction contended for by respondent"). To the extent Relator and the State mean to suggest that the *Maud* Court upheld a statute empowering the collector to itself file suit for the State, they are incorrect.

Their reliance on and interpretation of *Staples* is unavailing for much the same reason. The *Staples* Court held that the statute there did not violate Section 21, Article 5 and Section 22, Article 4 of the Texas Constitution because the statute *didn't* grant the plaintiffs the "legal capacity or right to institute and maintain" a suit in the name of the State of Texas and their own names. In other words, the Texas Supreme Court recognized that if the statute *had* authorized the plaintiffs to file suit "in the name of the State" (as the plaintiffs contended there, and Relator contends here), the statute would violate the Texas Constitution by "seriously infring[ing] upon the mandate of section 21, art. 5 of the Constitution, that 'the county attorneys shall represent the state in all cases in their respective counties,' and of section 22, art. 4, relating to the Attorney General." 245 S.W. at 642. That is the precise effect of the TMFPA *qui tam*. In contrast to the statute in *Staples*, the TMFPA purports to confer "legal capacity" on private citizens (relators) "to institute and maintain" a suit in the name of the State of Texas "in violation of a provision of the Constitution vesting that authority *exclusively* in the county attorney or district attorney or Attorney General." *State v. Starnes*, 246 S.W. 424, 425 (Tex. App.—Fort Worth 1922, no writ) (emphasis added).

---

[9] Relator's contention (at 9) that the TMFPA is "similar" to the statute in *Maud* does not save its case, but rather undermines it because *Maud* would require that the Court construe the TMFPA to provide that the relator should cause suit to be filed *by the Attorney General*, and *not* authorization for the relator itself to file suit.

Copy from re:SearchTX

Contrary to the State's argument, *Camp v. Gulf Product Company*, 61 S.W.2d 773 (Tex. 1933), does not suggest a contrary conclusion. As the Court of Appeals explained in addressing a similar argument in *Agey*, the *Camp* case was in the nature of a mandamus proceeding involving a suit by "an applicant to purchase alleged unsurveyed school land . . . to compel the county surveyor to make an official survey of the land," and "was written under discussion of the question whether [the statute] made the State a party to the suit." 167 S.W.2d at 583–84.

In discussing Defendant's cases, it is telling that neither Relator nor the State mentions (let alone responds to) *Hill County v. Sheppard*, 178 S.W.2d 261 (Tex. 1944), which invalidated a legislative enactment that purported to create an extra-constitutional office of "Criminal District Attorney" (not unlike the extra-constitutional office of private attorney generals created by the TMFPA). In holding that enactment unconstitutional, the Texas Supreme Court there stated:

> We think it is well settled that since the Constitution imposed certain duties upon the county attorney, the Legislature, in the absence of other constitutional authority therefor, could not create a statutory office with power to take over and exercise such functions. The rule is thus stated in Texas Jurisprudence:
>
> "Where certain duties are imposed or specific powers are conferred upon a designated officer, the Legislature cannot withdraw them nor confer them upon other nor abridge them or interfere with the officer's right to exercise them unless the Constitution expressly so provides."

*Id*. at 264 (citation omitted). The Court found the "above rule [] abundantly supported by" *Moore*, *Maud*, and *Staples*, among others, in holding that "the Legislature could not create a statutory office with authority to take over the duties of county attorney." *Id*. at 364–65.

C.   The TMFPA Facially Interferes With The Attorney General's Constitutionally-Assigned Duty and Authority To File And Prosecute Claims For The State.

The TMFPA unquestionably violates Articles IV and V of the Texas Constitution by conferring on unaccountable and self-interested relators a power that the Texas Constitution exclusively assigns to the State attorneys elected by Texas voters. And it also violates Article II's

Copy from re:SearchTX

separation-of-powers clause by (i) interfering with the State attorneys' performance of their constitutionally-assigned duties and (ii) subjecting the exercise of that discretion to relator and state-court approval.

Neither Relator nor Texas dispute the fact that the TMFPA grants the relator the unfettered discretion and authority to file a *qui tam* action in the name of the State without any review or involvement of the Attorney General. Nor could they. In this respect, then, it is indisputable that the TMFPA "wholly supplants"[10] the Attorney General's authority to investigate the facts and exercise his judgment *regarding the filing of suit*" in the name of the State. *Agey v. American Liberty Pipe Line Co.*, 172 S.W.2d 972 (Tex. 1943) (emphasis added). Despite the Texas Supreme Court's recognition that, "in the matter of bringing suits, the Attorney General must exercise judgment and discretion, which will not be controlled by other authorities," the TMFPA impermissibly grants such control to *qui tam* relators. *Charles Scribner's Sons v. Marrs*, 262 S.W. 722, 727 (Tex. 1924). "Even if the Attorney General determines that there are 'no reasonable grounds' for the fraud action, the relator may override that judgment and initiate a lawsuit." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 764 (5th Cir. 2001) (Smith, J., dissenting).[11]

Relator and the State try to avoid this fact by arguing that, "irrespective of how a lawsuit

---

[10] The Texas Court of Criminal Appeals recently rejected the contention (made by Relator and the State here) that a constitutional violation only occurs if the TMFPA "wholly supplants" the Attorney General's authority to represent the State: "[T]he Constitution provides that an official of one branch of government may only exercise functions of another branch if 'expressly permitted' by the Constitution itself. The explicit separation of powers provision does not say that another branch can abridge a duty from another branch so long as he does not 'destroy' that branch." 663 S.W.3d 45, 54 (Tex. Crim. App. 2021). Thus, to the extent the TMFPA abridges or interferes with the duty and discretionary authority of the Attorney General (in addition to "wholly supplanting" him), it violates the Texas Constitution. *See also Hill County*, 178 S.W.2d at 264 (holding Legislature may not "abridge or interfere" with the State attorneys' constitutional duties and powers).

[11] *See also, e.g., State v. Stephens*, 664 S.W.3d 293, 297 (Tex. Crim. App. 2022) (Walker, J., concurring in denial of rehearing) ("The power given to district and county attorneys includes the power not only to prosecute cases but also to decide which cases should not be prosecuted. When the district or county attorney chooses not to prosecute a case, they are permissibly exercising their prosecutorial discretion; it is their prerogative to file or not file charges. If the Attorney General files criminal charges when the prosecutor has specifically chosen not to, the Attorney General unduly interferes with—he usurps—the district or county attorneys' exercise of their prosecutorial power.").

18

Copy from re:SearchTX

is initiated, OAG retains complete discretion to proceed with the TMFPA cases that it chooses" because "it can dismiss the relator's case even over the objections of the relator." Resp. at 11. But such dismissal is far from automatic. It requires court approval of the Attorney General's non-enforcement decision.[12] In granting the relator the unilateral right to file suit, the TMFPA did not grant the Attorney General a like ability to "unilaterally" terminate the suit. Even if the State's views are entitled to "substantial deference," as Relator and the State argue, "substantial deference" is not *absolute* deference.[13] The court must make a determination whether claims asserted on behalf of the State should be dismissed, as the Attorney General desires, or proceed, as the relator wishes. At one time, the State possessed the ability to obtain unilateral termination of a *qui tam* action under a prior version of the TMFPA that mandated dismissal of the action if the State declined to intervene. In amending the TMFPA to meet federal requirements to obtain state incentives, however, the Texas Legislature altered the *qui tam* structure and, in doing so, not only permitted relators to initiate suit but also subjected the Attorney General's decision to dismiss

---

[12] *See Lewright v. Bell*, 63 S.W. 623, 679 (Tex. 1901) (holding "courts cannot control [the attorney general's] judgment in the matter [of bringing suit] and determine his action"); *see also, e.g.*, *United States v. Texas*, 599 U.S. 670 (2023) (discussing "article II problems raised by judicial review of the Executive Branch's . . . prosecution policies" including lack of any meaningful standard for assessing those policies); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (recognizing the "general unsuitability for judicial review of agency decision to refuse enforcement"); *ICC v. Locomotive Engineers*, 482 U.S. 270, 283 (1987) ("it is entirely clear that the refusal to prosecute cannot be the subject of judicial review"); *In re Int'l Bus. Machs. Corp.*, 687 F.2d 591, 602 (2d Cir.1982) (recognizing "[t]he district court's involvement in the executive branch's decision to abandon litigation might impinge upon the doctrine of separation of powers").

[13] Likewise, the TMFPA purports to dictate how and when the Attorney General must perform his prosecutorial duties, by ordering the Attorney General to decide whether to take over the case within 180 days of relator's filing and, if he does not, he will have to show "good cause" to intervene at a later date. *Cf. In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 488 (Tex. 2011) (Willet, J., concurring). The State (at 15–16) suggests that this scheme passes constitutional muster, and the holding in *Meshell v. State*, 739 S.W.2d 246 (Tex. Crim. App. 1987), is distinguishable, because Texas courts have upheld procedural rules imposing deadlines in other cases, *see, e.g., Tex. Dep't of Fam. & Protective Servs. v. Dickensheets*, 274 S.W.3d 150 (Tex. App.—Houston [1st Dist.] 2008, no pet.). But the State's argument misses the mark, because, as both those cases demonstrate and Justice Willet points out, the analysis depends on two questions: (i) "is the law grounded in the Legislature's *own* constitutionally assigned powers" and (ii) "if so, does the law unduly interfere, or even threaten to unduly interfere, with the judiciary's [or executive's] exercise of *its* constitutionally assigned powers?" *Allcat,* 356 S.W.3d at 488. In contrast to *Dickensheets*, the State does not identify a constitutional provision that permits the legislature to impose a 180-day deadline on the Attorney General's decision to bring a claim; but even if it did, it fails at the next step, by unconstitutionally encroaching on one of the Attorney General's core functions: deciding whether and when to bring suit for the State.

**MR159**

Copy from re:SearchTX

(or settle) such suits to relator and state-court review.

Relator attempts to minimize these restraints on executive discretion by reference to the criminal context. Relator (at 12) asserts that "Defendant ignores . . . that it is well settled in criminal law to require court approval of pleas and the dismissal of indictments," and if "court approval of criminal dismissals and settlement-analogues survive constitutional muster, so too should the scheme enumerated in the TMFPA." But it is Relator who overlooks the critical fact that permits such judicial review of executive action in criminal cases: "'*[W]hen the Executive has made the decision to initiate the criminal case*, its large discretion is narrowed considerably and the power to dispose of the case is shared in part with the Third Branch.'" *Id*. (quoting *Riley*, 252 F.3d at 756) (emphasis added). In a TMFPA *qui tam* action, it is the *relator*, not the Attorney General, who "has made the decision to initiate the [] case." *Id*.

Relator's and the State's protestations that the TMFPA does not force the relator's services on the Attorney General similarly fall flat. Even if the State has the "primary responsibility for prosecuting the action and is not bound by an act of the person bringing the action," that fact hardly grants the Attorney General "full control over the case," as Relator contends (at 14). Neither Texas nor Relator deny that the relator's right to continue as a party, to participate in discovery and trial in the pursuit of its own litigation strategy, necessarily affects the State's litigation of the case. *In Farmers Group, Inc. v. Lubin*, the Texas Supreme Court refused to require the attorney general to recruit a policyholder as class representative when prosecuting a class action under the Texas Insurance Code because (i) "an attorney general's duty is to represent the state, but attorneys for private individuals have a duty of loyalty only to their clients," and (ii) "[i]mposing such recruitment would inevitably restrict the 'broad discretionary power' attorneys general need to carry out their constitutional duties." 222 S.W.3d 417, 425 (Tex. 2007) (citation omitted). The

Copy from re:SearchTX

same reasoning applies here.[14]

Although Relator characterizes the State's non-intervention decision as an exercise of "prosecutorial discretion," it would be more accurate to describe it as an "abdication" of a constitutionally-assigned duty and power. The Attorney General in such cases essentially hands over the prosecution of a civil-enforcement statute for civil penalties to a relator and its counsel who (Relator and the State do not dispute) are primarily motivated by profit and owe no duty to the State or the public interest.[15] However, the Texas Supreme Court has specifically noted that "private delegations clearly raise [] troubling constitutional issues" precisely because "the private delegate may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served." *Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen*, 952 S.W.2d 454, 469 (Tex. 1997). "[T]he basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government." *Id.* The Texas Supreme Court also has remarked in another context, "[i]t is one thing to place the power of treble damages in the hands of aggrieved parties or the attorney general; it is quite another to place it in the hands of those considering litigation for commercial profit." *PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 85 (Tex. 2004). Yet Relator and the State try to diminish this aberration in Texas's republican form of government (which

---

[14] The indisputable fact remains that the relator and its counsel are not hired by the Attorney General, do not serve under his direction or at his discretion, and exercise independent discretion in litigating the case. Imagine if the Legislature enacted a statute granting a private citizen the right to participate in a criminal trial to call, examine, and cross-examine witnesses in pursuit of a criminal conviction. Even if the prosecutor exercises "full control" over the indictment, the private citizen's participation would nevertheless interfere with the State attorney's broad discretionary authority in prosecuting the case for the State.

[15] To the extent the TMFPA purports to delegate enforcement power to non-Texans, like Relator, it also abdicates a sovereign power to strangers with no conceivable interest in proper Texas governance or enforcement of Texas law; their presence can only be explained by a generalized desire to litigate the State's claims for their own commercial profit.

21

Copy from re:SearchTX

contemplates that the State attorneys elected by Texas voters will represent its interest in litigation) by pointing to the State's ability to monitor the case, file statements of interest, seek an alternative remedy in administrative proceedings, obtain a stay of discovery (for a period not to exceed 60 days), and object to dismissal. *See* Resp. at 14–15. But none disprove the single fact that renders the TMFPA unconstitutional: the relator represents the State and controls its interests in non-intervened actions.[16] The Texas Supreme Court has held that "[t]he Legislature is impliedly restrained from conferring such duty and responsibility on the individual citizen." *Allen*, 9 S.W.2d at 732. So, too, is the Attorney General.

As the Texas Court of Criminal Appeals recognized well over a century ago: "A casual inspection of our Constitution makes it patent that everywhere the election of officers—that is, the elective system—is the paramount idea; i.e., they are elected by the people." *Ex Parte Anderson*, 81 S.W. 973 (Tex. Crim. App. 1904). The Legislature does not have an "omnipotent" power "to divest the people of the right to select their local officers, and confer power of appointing them on the executive"; "[i]t would take no reasoning to comprehend that by this means our representative form of government could be easily destroyed." *Id*. The theory of the Texas Constitution is that the people of Texas are entitled to choose who represents the State (and, by extension, the public interest) in the courts, and this right cannot be taken from them and appointed to another by any act of the Legislature, with or without the consent of the Executive.

## CONCLUSION

Because Relator has neither alleged nor suffered any concrete injury of its own, and the TMFPA's *qui tam* provisions are facially unconstitutional, Novartis respectfully requests that the

---

[16] Indeed, it is because "the United states has little control over the conduct of the action" in non-intervened cases that federal courts have refused to allow relators to proceed *pro se* under the federal FCA. *Stoner v. Santa Clara Cty Office of Educ*. 502 F.3d 1116, 1128 (9th Cir. 2007).

**MR162**

Copy from re:SearchTX

Court grant its Motion and dismiss Relator's claims in full for lack of standing or a valid cause of action.

Dated: December 11, 2023

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Danny S. Ashby*

Danny S. Ashby
Texas Bar No. 01370960
dashby@omm.com
Megan Whisler
Texas Bar No. 24079565
mwhisler@omm.com
2501 North Harwood Street, Suite 1700
Dallas, Texas  75201-1663
Telephone:  +1 972 360 1900
Facsimile:  +1 972 360 1901

Ross Galin
(*pro hac vice* pending)
rgalin@omm.com
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000

Meredith Garagiola
(*pro hac vice* pending)
mgaragiola@omm.com
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300

Attorneys for Defendant
Novartis Pharmaceuticals Corporation

23

**MR163**

Copy from re:SearchTX

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record on this 11th day of December 2023, through the e-filing portal in accordance with the Texas Rules of Civil Procedure.

*/s/ Danny S. Ashby*
Danny S. Ashby

**MR164**

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 82463700
Filing Code Description: No Fee Documents
Filing Description: Defendant Novartis Pharmaceuticals Corporation's Reply in Support of Plea to the Jurisdiction and Motion to Dismiss
Status as of 12/12/2023 8:15 AM CST

Associated Case Party: HEALTH SELECTION GROUP, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Samuel Baxter | | sbaxter@mckoolsmith.com | 12/11/2023 7:16:46 PM | SENT |
| Jennifer L.Truelove | | jtruelove@mckoolsmith.com | 12/11/2023 7:16:46 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 12/11/2023 7:16:46 PM | SENT |
| Radu A. Lelutiu | | rlelutiu@mckoolsmith.com | 12/11/2023 7:16:46 PM | SENT |
| Mark Lanier | | WML@LanierLawFirm.com | 12/11/2023 7:16:46 PM | SENT |
| Alex J.Brown | | Alex.Brown@LanierLawFirm.com | 12/11/2023 7:16:46 PM | SENT |
| Joel Leach | | jleach@mckoolsmith.com | 12/11/2023 7:16:46 PM | SENT |
| Kim Shoults | | kshoults@mckoolsmith.com | 12/11/2023 7:16:46 PM | SENT |
| Denise Lopez | | dlopez@mckoolsmith.com | 12/11/2023 7:16:46 PM | SENT |
| Zeke DeRose | | Zeke.DeRose@LanierLawFirm.com | 12/11/2023 7:16:46 PM | SENT |
| Jonathan Wilkerson | | Jonathan.Wilkerson@LanierLawFirm.com | 12/11/2023 7:16:46 PM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lynne Kurtz-Citrin | | Lynne.Kurtz-Citrin@oag.texas.gov | 12/11/2023 7:16:46 PM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 12/11/2023 7:16:46 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 12/11/2023 7:16:46 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kimberly Grotenrath | | kgrotenrath@omm.com | 12/11/2023 7:16:46 PM | SENT |

**MR165**

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 82463700
Filing Code Description: No Fee Documents
Filing Description: Defendant Novartis Pharmaceuticals Corporation's Reply in Support of Plea to the Jurisdiction and Motion to Dismiss
Status as of 12/12/2023 8:15 AM CST

Case Contacts

| Kimberly Grotenrath | | kgrotenrath@omm.com | 12/11/2023 7:16:46 PM | SENT |
| --- | --- | --- | --- | --- |
| Dianne Adams | | dadams@dacusfirm.com | 12/11/2023 7:16:46 PM | SENT |

Associated Case Party: NOVARTIS AG

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Ross Galin | | rgalin@omm.com | 12/11/2023 7:16:46 PM | SENT |
| Danny S.Ashby | | dashby@omm.com | 12/11/2023 7:16:46 PM | SENT |
| Meredith N.Garagiola | | mgaragiola@omm.com | 12/11/2023 7:16:46 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 12/11/2023 7:16:46 PM | SENT |
| Deron Dacus | | ddacus@dacusfirm.com | 12/11/2023 7:16:46 PM | SENT |

**MR166**

Copy from re:SearchTX

Filed 12/15/2023 9:01 PM
Sherry Griffis
District Clerk
Harrison County, Texas

Heather Henigan

Deputy

**CAUSE NO. 23-0276**

| | |
|---|---|
| THE STATE OF TEXAS, | IN THE DISTRICT COURT |
| *ex rel.* | |
| | 71ST JUDICIAL DISTRICT |
| HEALTH SELECTION GROUP, LLC | |
| Plaintiff, | HARRISON COUNTY, TEXAS |
| v. | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| Defendant. | |

## ORDER DENYING DEFENDANT'S PLEA TO JURISDICTION AND MOTION TO DISMISS

Before the Court is Defendant's Plea to Jurisdiction and Motion to Dismiss Pursuant to Rule 91a (the "Motion").

Upon consideration of the parties' briefs and oral argument, the Court is of opinion that the Motion should be **DENIED**.

IT IS SO ORDERED.

SIGNED this ___15___ day of ___Dec___, 2023.

_____
Hon. Brad Morin
Judge Presiding

4871-9059-1383

**MR167**

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 82601915
Filing Code Description: Proposed Order
Filing Description: ORDER DENYING DEFENDANT'S PLEA TO JURISDICTION AND MOTION TO DISMISS
Status as of 12/15/2023 10:28 AM CST

Associated Case Party: HEALTH SELECTION GROUP, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Samuel Baxter | | sbaxter@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Jennifer L.Truelove | | jtruelove@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Radu A. Lelutiu | | rlelutiu@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Mark Lanier | | WML@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |
| Alex J.Brown | | Alex.Brown@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |
| Joel Leach | | jleach@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Kim Shoults | | kshoults@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Denise Lopez | | dlopez@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Zeke DeRose | | Zeke.DeRose@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |
| Jonathan Wilkerson | | Jonathan.Wilkerson@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lynne Kurtz-Citrin | | Lynne.Kurtz-Citrin@oag.texas.gov | 12/14/2023 9:01:09 PM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 12/14/2023 9:01:09 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 12/14/2023 9:01:09 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kimberly Grotenrath | | kgrotenrath@omm.com | 12/14/2023 9:01:09 PM | SENT |

**MR168**

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 82601915
Filing Code Description: Proposed Order
Filing Description: ORDER DENYING DEFENDANT'S PLEA TO JURISDICTION AND MOTION TO DISMISS
Status as of 12/15/2023 10:28 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Kimberly Grotenrath | | kgrotenrath@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Dianne Adams | | dadams@dacusfirm.com | 12/14/2023 9:01:09 PM | SENT |

Associated Case Party: NOVARTIS AG

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ross Galin | | rgalin@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Danny S.Ashby | | dashby@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Meredith N.Garagiola | | mgaragiola@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Deron Dacus | | ddacus@dacusfirm.com | 12/14/2023 9:01:09 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 12/14/2023 9:01:09 PM | SENT |

**MR169**

Copy from re:SearchTX

ACCEPTED
06-24-00005-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
2/2/2024 12:30 PM
DEBBIE AUTREY
CLERK

NO. _____

## IN THE COURT OF APPEALS
## FOR THE SIXTH DISTRICT OF TEXAS
## AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
2/2/2024 12:30:22 PM
DEBBIE AUTREY
Clerk

## IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

*Relator*.

**Original Proceeding From The 71st District Court
in Harrison County, Texas
The Honorable Brad Morin Presiding**

## PETITION FOR WRIT OF MANDAMUS

## TEMPORARY STAY REQUESTED
## ORAL ARGUMENT REQUESTED

**DANNY S. ASHBY**
Texas Bar No. 01370960
**MEGAN WHISLER**
Texas Bar No. 24079565
**O'MELVENY & MYERS LLP**
2801 N. Harwood Street, Suite 1600
Dallas, Texas 75201
Telephone: +1 972 360 1900

**DERON R. DACUS**
Texas Bar No. 00790553
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

**ROSS GALIN**
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000
(Application for *pro hac vice* admission pending)

**MEREDITH GARAGIOLA**
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
(Application for *pro hac vice* admission pending)

*Counsel for Relator
Novartis Pharmaceuticals Corporation*

**MR170**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 52.3(a), Relator Novartis Pharmaceuticals Corporation certifies that the following is a complete list of all parties and the names and firms of all counsel appearing in the trial or appellate courts, as well as the mailing address, telephone number, and email address for counsel currently appearing.

| | |
|---|---|
| **Relator**<br><br>Defendant Novartis Pharmaceuticals Corporation | Danny S. Ashby<br>dashby@omm.com<br>Megan Whisler<br>mwhisler@omm.com<br>O'MELVENY & MYERS LLP<br>2801 N. Harwood Street, Suite 1600<br>Dallas, Texas 75201<br>Telephone:  +1 972 360 1900<br><br>Ross Galin<br>rgalin@omm.com<br>O'MELVENY & MYERS LLP<br>7 Times Square<br>New York, New York 10036<br>Telephone: +1 212 326 2000<br><br>Meredith Garagiola<br>mgaragiola@omm.com<br>O'MELVENY & MYERS LLP<br>1625 Eye Street, N.W.<br>Washington, D.C. 20006<br>Telephone: +1 202 383 5300<br><br>Deron R. Dacus<br>ddacus@dacusfirm.com<br>THE DACUS FIRM, P.C.<br>821 ESE Loop 323, Suite 430<br>Tyler, Texas 75701<br>Telephone: +1 903 705 1117 |

| | |
|---|---|
| **Real Party in Interest**<br><br>Plaintiff Health Selection Group, LLC | Samuel F. Baxter<br>sbaxter@mckoolsmith.com<br>Jennifer L. Truelove<br>jtruelove@mckoolsmith.com<br>MCKOOL SMITH P.C.<br>104 East Houston, Suite 300<br>Marshall, Texas 75670<br><br>Eric B. Halper<br>ehalper@mckoolsmith.com<br>Radu A. Lelutiu<br>rlelutiu@mckoolsmith.com<br>MCKOOL SMITH P.C.<br>One Manhattan West<br>395 Ninth Avenue, 50th Floor<br>New York, New York 10001<br><br>W. Mark Lanier<br>WML@LanierLawFirm.com<br>Alex J. Brown<br>Alex.Brown@LanierLawFirm.com<br>Zeke DeRose III<br>Zeke.DeRose@LanierLawFirm.com<br>Jonathan Wilkerson<br>Jonathan.Wilkerson@LanierLawFirm.com<br>THE LANIER FIRM<br>10940 W. Sam Houston Pkwy N, Suite 100<br>Houston, Texas 77064<br><br>Kenneth W. Starr<br>Chris Gadoury<br>Ryan Ellis<br>THE LANIER FIRM<br>10940 W. Sam. Houston Pkwy N, Suite 100<br>Houston, Texas 77064 |
| **Real Party in Interest**<br><br>State of Texas | Jordan Underhill<br>Jordan.Underhill@oag.texas.gov<br>Jonathan D. Bonilla<br>Jonathan.Bonilla@oag.texas.gov<br>Lynn Kurtz-Citrin |

ii

| | Lynne.Kurtz-Citrin@oag.texas.gov<br>Cynthia Lu<br>Cynthia.Lu@oag.texas.gov<br>OFFICE OF THE<br>TEXAS ATTORNEY GENERAL<br>Civil Medicaid Fraud Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711<br>Telephone: (512) 475-4196 |
|---|---|
| **Respondent**<br><br>The Hon. Brad Morin, 71st District Court, Harrison County | |

**MR173**

**TABLE OF CONTENTS**

Page

IDENTITY OF PARTIES AND COUNSEL..........................................................i

STATEMENT OF THE CASE..........................................................................1

STATEMENT OF JURISDICTION..................................................................2

STATEMENT REGARDING ORAL ARGUMENT..........................................2

ISSUES PRESENTED....................................................................................3

THE MANDAMUS RECORD AND APPENDIX................................................3

STATEMENT OF FACTS..............................................................................4

SUMMARY OF THE ARGUMENT................................................................8

ARGUMENT...............................................................................................12

I.      **HSG Does Not Have Constitutional Standing to Maintain Its Lawsuit.**................................................................................13

        A.    Texas's Constitutional Standing Doctrine Requires a Personal Injury to the Plaintiff to Demonstrate the Court's Subject-Matter Jurisdiction to Hear Its Claims. .........13

        B.    The Legislature Cannot, By Statute, Supplant or Displace Texas's "Constitutional Standing" Requirement That the Plaintiff Allege a Personal Injury. ...........................................15

        C.    The Legislature Cannot Authorize Private Parties to Bring Suit on a Matter of Public Concern; Such Actions Must Be Brought By The State.................................................21

        D.    The U.S. Supreme Court's Holding in *Stevens* Does Not Provide Grounds for Disregarding Texas's Constitutional Standing Doctrine and Precedent...........................................24

II.     **The TMFPA's *Qui Tam* Provisions Are Unconstitutional and Void.** .............................................................................30

        A.    The Texas Constitution Exclusively Assigns the Power to Bring and Maintain Suits For the State to the State Attorneys Chosen by the People of Texas. ..............................31

**MR174**

B. The TMFPA *Qui Tam* Provisions Usurp the State Attorneys' Constitutional Duty and Authority By Authorizing Private Parties to Bring and Maintain Suit For and In the Name of the State. ...........................38

C. The TMFPA *Qui Tam* Provisions Unduly Interfere With the Attorney General's Broad Discretionary Authority to Litigate and Resolve the State's Claims. ...............................43

D. The Texas Supreme Court's Decision in *Brown v. De La Cruz* Did Not Address—Let Alone "Settle"—the Constitutionality of Texas *Qui Tam* Statutes...........................47

E. Federal Decisions Upholding Federal *Qui Tam* Statutes Under the U.S. Constitution Are Inapposite............................48

F. Appeals To Policy Cannot Sustain An Unconstitutional Statute.............................52

III. **Novartis Lacks An Adequate Appellate Remedy To Correct the District Court's Clear Abuse of Discretion.** ...........................56

A. Mandamus Relief is Warranted to Avoid Waste of Party and Public Resources. ...............................57

B. Mandamus Relief is Warranted to Resolve A Significant Issue of First Impression That Is Likely to Recur and Necessary to Preserve Executive Jurisdiction. ........................59

**PRAYER** ...............................................61

**CERTIFICATE OF COMPLIANCE** ...............................63

**CERTIFICATION** ...............................................63

**CERTIFICATE OF SERVICE** ...............................64

## Cases

*Agey v. Am. Liberty Pipe Line Co.*,
  172 S.W.2d 972 (Tex. 1943) .......................................................................... 36, 37, 40

*Allen v. Fisher*,
  9 S.W.2d 731 (Tex. 1928) ............................................................................. passim

*Am. K-9 Detection Servs., LLC v. Freeman*,
  556 S.W.3d 246 (Tex. 2018) .............................................................................47

*Am. Liberty Pipe Line Co. v. Agey*,
  167 S.W.2d 580 (Tex. App.—Austin 1942) ................................................. passim

*APM Enterprises, LLC v. Nat'l Loan Acquisitions Co.*,
  2014 WL 5317753 (Tex. App.—Texarkana Oct. 17, 2014, no pet.) ............ 25, 27

*Bellamy v. City of Brownsville*,
  2023 WL 413583 (Tex. App.—Corpus Christi–Edinburg Jan. 26, 2023, no pet.).........21

*Berry v. Berry*,
  646 S.W.3d 516 (Tex. 2022) .............................................................................17

*Brown v. De La Cruz*,
  156 S.W.3d 560 (Tex. 2004) ................................................................... 10, 47, 48

*Busbee v. County of Medina*,
  2023 WL 8655878 (Tex. Dec. 15, 2023) ....................................................... 9, 17

*Cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ..............................................................................................51

*Charles Scribner's Sons v. Marrs*,
  262 S.W. 722 (Tex. 1924) ..................................................................................39

*City of Dallas v. Stewart*,
  361 S.W.3d 562 (Tex. 2012) ..............................................................................49

*City of San Antonio v. Stumburg*,
  7 S.W. 754 (Tex. 1888) ......................................................................................21

*Data Foundry, Inc. v. City of Austin*,
  620 S.W.3d 692 (Tex. 2021) .......................................................... 13, 14, 19, 28

*Davenport v. Garcia*,
  834 S.W.2d 4 (Tex. 1992) ..................................................................................49

*Dep't of Trans. v. Ass'n of Am. Railroad*,
  575 U.S. 43 (2015) .............................................................................................41

*Elliott v. City of Coll. Station*,
674 S.W.3d 653 (Tex. App.—Texarkana 2023, pet. filed) ................................30

*Ex parte Anderson*,
81 S.W. 973 (Tex. Crim. App. 1904) ........................................................ 42, 43

*Ex parte Myer*,
207 S.W. 100 (Tex. Crim. App. 1918) ..............................................................19

*Ex parte Perry*,
483 S.W.3d 884 (Tex. Crim. App. 2016) ........................................................43

*Ex parte Wolters*,
144 S.W. 531 (Tex. Crim. App. 1911). ............................................................29

*Farmers Group, Inc. v. Lubin*,
222 S.W.3d 417 (Tex. 2007) ...........................................................................44

*Fin. Comm'n of Tex. v. Norwood*,
418 S.W.3d 566 (Tex. 2013) ...........................................................................18

*Fleet Transp., Inc. v. Butler & Binion, L.L.P.*,
2000 WL 963671 (Tex. App.—Houston [14th Dist.] July 13, 2000, pet. denied).........27

*Garcia v. Laughlin*,
285 S.W.2d 191 (Tex. 1955) ...........................................................................31

*Good Shepherd Med. Ctr., Inc. v. State*,
306 S.W.3d 825 (Tex. App.—Austin 2010, no pet.) .........................................59

*Green v. Tex. Comptroller of Pub. Accounts*,
2023 WL 8100236 (Tex. App.—El Paso Nov. 21, 2023, no pet. h.)...................16

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........................................................................................46

*Heckman v. Williamson County*,
369 S.W.3d 137 (Tex. 2012) ................................................................... passim

*Herbig, Tr. of Welch Family Trust C. v. Welch, Tr. of Welch Manry Family Trust*,
2023 WL 4188074 (Tex. App.—Houston [1ˢᵗ Dist.] June 27, 2023, no pet. h.) ...........17

*Hill County v. Sheppard*,
178 S.W.2d 261 (Tex. 1944) ................................................................... passim

*Hill v. Tex. Water Quality Bd.*,
568 S.W.2d 738 (Tex. App.—Austin 1978, writ ref'd n.r.e.) .............................43

**MR177**

*Houston Nat'l Gas Corp. v. Wyatt,*
359 S.W.2d 257 (Tex. App.—Eastland 1962, no writ)........................................23

*Hughes Aircraft Co. v. United States ex rel. Schumer,*
520 U.S. 939 (1997) ........................................................................................41

*Huie v. DeShazo,*
922 S.W.2d 920 (Tex. 1996) ...........................................................................60

*ICC v. Brotherhood of Locomotive Eng'rs,*
482 U.S. 270 (1987) ........................................................................................46

*In re Abbott,*
601 S.W.3d 802 (Tex. 2020) ...........................................................................23

*In re Allcat Claims Serv., L.P.,*
356 S.W.3d 455 (Tex. 2011) ...........................................................................19

*In re Butt,*
495 S.W.3d 455 (Tex. App.—Corpus Christi-Edinburg 2016, orig. proceeding) .........58

*In re Entergy Corp.,*
142 S.W.3d 316 (Tex. 2004) ...........................................................................61

*In re Episcopal Sch. of Dallas, Inc.,*
556 S.W.3d 347 (Tex. App.—Dallas 2017, orig. proceeding)............................58

*In re Essex Ins. Co.,*
450 S.W.3d 524 (Tex. 2014) ................................................................... 13, 57

*In re Farmers Tex. Cty. Mutual Ins. Co.,*
621 S.W.3d 261 (Tex. 2021) ...........................................................................57

*In re Footman,*
2015 WL 7164170 (Tex. App.—Austin Nov. 10, 2015, orig. proceeding).........59

*In re Gilead Sciences,*
2021 WL 4466006 (Tex. App.—Texarkana Sept. 30, 2021, orig. proceeding) ..60

*In re Houston Specialty Ins. Co.,*
569 S.W.3d 138 (Tex. 2019) ...........................................................................61

*In re J.B. Hunt Transport, Inc.,*
492 S.W.3d 287 (Tex. 2016) ................................................................... 56, 57

*In re John G. & Marie Stella Kenedy Mem'l Found.,*
315 S.W.3d 519 (Tex. 2010) ...........................................................................59

**MR178**

*In re Kappmeyer*,
668 S.W.3d 651 (Tex. 2023) ...............................................................12

*In re Lazy W Dist. No. 1*,
493 S.W.3d 538 (Tex. 2016) ........................................................... 9, 18

*In re Morris*,
663 S.W.3d 589 (Tex. 2023) ...............................................................20

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124 (Tex. 2004) ................................................... 56, 57, 60

*In re Shire PLC*,
633 S.W.3d 1 (Tex. App.—Texarkana 2021, orig. proceeding)............. 13, 57, 58

*In re Springs Condos., L.L.C.*,
2021 WL 5814292 (Tex. App.—Austin Dec. 8, 2021, orig. proceeding) ...........58

*In re State*,
390 S.W.3d 439 (Tex. App.—El Paso 2012, orig. proceeding)...........................45

*In re Sw. Bell Tel. Co., L.P.*,
235 S.W.3d 619 (Tex. 2007) ...............................................................61

*In re Xerox Corp.*,
555 S.W.3d 518 (Tex. 2018) ........................................................... 25, 26

*In re YRC Inc.*,
646 S.W.3d 805 (Tex. 2022) ...............................................................12

*Interest of P.R.*,
615 S.W.3d 474 (Tex. App.—Texarkana 2020, pet. denied)........................ 18, 20

*Larkins-Ruby v. Austin Cty.*,
2022 WL 17981564 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied).......18

*Lemons v. Wylie*,
563 S.W.2d 882 (Tex. App.—Amarillo 1978, no writ) ......................................22

*Lewright v. Bell*,
63 S.W. 623 (Tex. 1901) ...............................................................39

*Magill v. Watson*,
409 S.W.3d 673 (Tex. App.—Houston [1st Dist.] 2013, no pet.) .......................25

*Maud v. Terrell*,
200 S.W. 375 (Tex. 1918) ........................................................... passim

**MR179**

*Meshell v. State,*
739 S.W.2d 246 (Tex. Crim. App. 1987) ...............................................45

*Mosaic Baybrook One, L.P. v. Simien,*
674 S.W.3d 234 (Tex. 2023) ...............................................20

*Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC,*
573 S.W.3d 912 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ............... 17, 20

*OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.,*
234 S.W.3d 726 (Tex. App.—Dallas 2007, no pet.) ...........................27

*Perry v. Del Rio,*
67 S.W.3d 85 (Tex. 2001) ...............................................40

*Pike v. Tex. EMC Mgmt., LLC,*
610 S.W.3d 763 (Tex. 2020) ............................................... 16, 17

*PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship,*
146 S.W.3d 79 (Tex. 2004) ...............................................40

*Riley v. St. Luke's Episcopal Hosp.,*
252 F.3d 749 (5th Cir. 2001) ............................................... 39, 49, 50

*S.C. v. M.B.,*
650 S.W.3d 428 (Tex. 2022) ...............................................59

*Saldano v. State,*
70 S.W.3d 873 (Tex. Crim. App. 2002) ...............................................52

*Southern Pac Co. v. Porter,*
331 S.W.2d 42 (Tex. 1960) ...............................................29

*Staples v. State ex rel. King,*
245 S.W. 639 (Tex. 1922) ............................................... passim

*State v. Moore,*
57 Tex. 307 (Tex. 1882) ............................................... 31, 51

*State v. Starnes,*
246 S.W. 424 (Tex. App.—Fort Worth 1922, no writ)...............................................35, 54

*State v. Stephens,*
663 S.W.3d 45 (Tex. Crim. App. 2021)...............................................43

*State v. Stephens,*
664 S.W.3d 293 (Tex. Crim. App. 2022)............................................... 40, 42

**MR180**

*State v. Thomas*,
766 S.W.2d 217 (Tex. 1989) ...............................................................54

*Swayne v. Chase*,
30 S.W. 1049 (Tex. 1895) ...................................................................54

*Terrazas v. Ramirez*,
829 S.W.2d 712 (Tex. 1991) ...............................................................46

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*,
852 S.W.2d 440 (Tex. 1993) ........................................................ 13, 14

*Tex. Boll Weevil Eradication Foundation, Inc. v. Lewellen*,
952 S.W.2d 454 (Tex. 1997) ........................................................ 41, 42

*Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*,
659 S.W.3d 424 (Tex. 2023) ...............................................................17

*Texas Board of Chiropractic Examiners v. Texas Medical Association*,
616 S.W.3d 558 (Tex. 2021) ...............................................................19

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...........................................................................26

*Tri Cty. Citizens Rights Org. v. Johnson*,
498 S.W.2d 227 (Tex. App.—Austin 1973, writ ref'd n.r.e.) ............23

*United States ex rel. Health Choice Alliance LLC v. Eli Lilly & Co.*,
2019 WL 4727422 (E.D. Tex. Sept. 27, 2019) ....................................6

*United States ex rel. Health Choice Alliance, LLC v. Eli Lilly & Co.*,
4 F.4th 255 (5th Cir. 2021) .............................................................5, 6

*United States ex rel. Health Choice Alliance, LLC v. Eli Lilly & Co.*,
No. 5:17-cv-123 (E.D. Tex.) .............................................................4, 6

*United States ex rel. Health Selection Grp., LLC v. Novartis AG, et al.*,
No. 5:18-cv-60 (E.D. Tex.) ...............................................................5, 6

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) ...................................................................... 29, 49

*US Fax L. Ctr. Inc. v. iHire, Inc.*,
476 F.3d 1112 (10th Cir. 2007) ..........................................................27

*Van Dorn Preston v. M1 Support Servs., L.P.*,
642 S.W.3d 452 (Tex. 2022) ...............................................................46

*Vandyke v. State,*
538 S.W.3d 561 (Tex. Crim. App. 2017) .................................................. 32, 43, 47

*Vermont Agency of Nat'l Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) ........................................................................ 24, 25, 28

*Wayte v. United States,*
470 U.S. 598 (1985) ..................................................................................46

**Statutes**

31 U.S.C. § 3729(a) ................................................................................19

31 U.S.C. § 3730(e)(4) ...........................................................................18

42 U.S.C. § 1396h(b) ..............................................................................39

Tex. Const. art. I, § 13 ............................................................................21

Tex. Const. art. II, § 1 .............................................................................21

Tex. Const. art. IV, § 22 ............................................................... 16, 23, 39

Tex. Const. art. V, § 21 ...................................................................... 16, 23

Tex. Hum. Res. Code § 36.052(e) .............................................................39

Tex. Hum. Res. Code § 36.101 ........................................................... 28, 29

Tex. Hum. Res. Code § 36.101(a) ......................................................... 1, 19

Tex. Hum. Res. Code § 36.104(b) ........................................... 28, 30, 38, 39

Tex. Hum. Res. Code § 36.107(a) .............................................................33

Tex. Hum. Res. Code § 36.107(b) .............................................................34

Tex. Hum. Res. Code § 36.107(c) ....................................................... 34, 35

Tex. Hum. Res. Code § 36.107(d) .............................................................33

Tex. Hum. Res. Code § 36.107(e) .............................................................33

Tex. Hum. Res. Code § 36.113 .................................................................18

**Other Authorities**

Evan Caminker, *The Constitutionality of* Qui Tam *Actions,*
99 Yale L.J. 341 (1989).........................................................................37

J. Randy Beck, *The False Claims Act And The English Eradication of Qui Tam
Litigation,* 78 N.C. L. Rev. 539 (2000) ...............................................30

**Page(s)**

Kaz Kikkawa, Note, *Medicare Fraud and Abuse and Qui Tam: The Dynamic Duo or the Odd Couple?*,
8 Health Matrix 83 (1998)..................................................................45

Saikrishna Prakash, *The Chief Prosecutor*,
73 Geo. Wash. L. Rev. 521 (2005)......................................................41

**Rules**

Tex. R. App. P. 52.3(k) ........................................................................3

Tex. R. App. P. 52.7(a) ........................................................................3

MR183

## STATEMENT OF THE CASE

**Nature of the Case:** Health Selection Group, LLC ("HSG") filed this *qui tam* action against Novartis Pharmaceuticals Corporation ("Novartis") pursuant to the Texas Medicaid Fraud Prevention Act ("TMFPA")[1], which provides that "a person may bring a civil action for a violation of Section 36.002 for the person and for the state" and such "action shall be brought in the name of the person and of the state." Tex. Hum. Res. Code § 36.101(a). Novartis filed a Plea to the Jurisdiction and Motion to Dismiss pursuant to Texas Rule of Civil Procedure 91a arguing that (i) the district court lacked subject-matter jurisdiction over the action because HSG did not allege that it personally suffered any injury from the conduct alleged in the First Amended Petition and (ii) the TMFPA's *qui tam* provisions are void—and thus deprive HSG of any valid cause of action—because they violate Article IV, Section 22 and Article V, Section 21 of the Texas Constitution. The district court summarily denied the Plea to the Jurisdiction and Motion to Dismiss.

**Respondent:** The Honorable Brad Morin, Presiding Judge of the 71st District Court, Harrison County, Texas; Cause No. 23-0276.

---

[1] The Texas Medicaid Fraud Prevention Act was amended effective September 1, 2023, and is now known as the Texas Health Care Program Fraud Prevention Act. However, Novartis here refers to the prior TMFPA which forms the basis for HSG's claims and this *qui tam* action against Novartis.

1

**Ruling at Issue:** The Order Denying Defendant's Plea to Jurisdiction and Motion to Dismiss, signed on the 15th day of December 2023.

**Relief Requested:** An order directing the district court to grant Novartis's Plea to the Jurisdiction and dismiss the petition without prejudice for lack of subject-matter jurisdiction or, in the alternative, an order directing the district court to grant the Motion to Dismiss and dismiss the petition with prejudice as to HSG for lack of a legally valid cause of action.

## STATEMENT OF JURISDICTION

The Court has jurisdiction over this original proceeding pursuant to Texas Government Code § 22.221(b) and Article V, Section 6 of the Texas Constitution.

## STATEMENT REGARDING ORAL ARGUMENT

Novartis respectfully requests oral argument. Novartis believes oral argument will aid the Court in deciding the important constitutional issues presented by this original proceeding, including (i) whether the Legislature has the power to authorize a private plaintiff to file suit for a statutory violation that did not personally injure the plaintiff and (ii) whether the Legislature can authorize a private plaintiff to file suit for and in the name of the State of Texas when the Texas Supreme Court has consistently held that the Texas Constitution delegates that authority exclusively to the State attorneys elected by the people of Texas.

2

## ISSUES PRESENTED

1.      Whether the district court has subject-matter jurisdiction to hear a plaintiff's statutory cause of action when it is undisputed that the plaintiff itself suffered no injury from the alleged statutory violation.

2.      Whether the Texas Medicaid Fraud Prevention Act's *qui tam* provisions, authorizing any "person" to initiate and maintain a civil action for and in the name of the State, violate Article IV, Section 22 and Article V, Section 21, which the Texas Supreme Court has held "mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court." *Allen v. Fisher*, 9 S.W.2d 731, 732 (Tex. 1928).

3.      Whether the district court clearly abused its discretion by failing to correctly apply binding Texas Supreme Court precedent in resolving the foregoing issues of law and denying Novartis's Plea to the Jurisdiction and Motion to Dismiss.

## THE MANDAMUS RECORD AND APPENDIX

Novartis has prepared a Mandamus Record consisting of sworn copies of documents filed in the underlying proceeding that are material to its claim for relief and hereby states that no testimony or evidence was adduced at the hearing on its Plea to the Jurisdiction and Motion to Dismiss. *See* Tex. R. App. P. 52.7(a). The Mandamus Record will be cited as follows: (MR__).

3

In addition, Novartis has prepared an Appendix containing a sworn copy of the order complained of and the text of the relevant constitutional provisions and statutes on which its argument is based. *See* Tex. R. App. P. 52.3(k). The Appendix will be cited as follows: (APP__).

## STATEMENT OF FACTS

Plaintiff HSG is an affiliate of National Health Care Analysis Group ("NHCAG"), a "research organization" based in New Jersey that was created to monetize federal and state *qui tam* statutes that permit private parties to file civil actions on behalf of the government in return for a percentage of the government's recovery. *See* First Am. Pet. ¶ 21 (MR009); U.S. Mot. to Dismiss at 1-2, *United States ex rel. Health Choice Alliance, LLC v. Eli Lilly & Co.*, No. 5:17-cv-123 (E.D. Tex. Dec. 17, 2018) (Dkt. 192) (explaining NHCAG is a "professional relator" "comprised of member limited liability companies formed by investors and former Wall Street investment bankers"). NHCAG acts like a private investigator (or a private attorney general) that mines publicly-available Medicaid and Medicare data and conducts witness interviews to identify broad-ranging theories of anti-kickback liability and then creates entities, like HSG, to file *qui tam* actions, seeking astronomical penalties, against pharmaceutical companies. *See* First Am. Pet. ¶ 42 (MR014–015); *see also* U.S. Mot. to Dismiss at 5–6, *Eli Lilly*, No. 5:17-cv-123 (describing NHCAG's business model); *United States ex rel. Health Choice*

*Alliance, LLC v. Eli Lilly & Co.*, 4 F.4th 255, 259 (5th Cir. 2021) (entities created by NHCAG brought 11 *qui tam* actions under the federal False Claims Act against a total of 38 defendants alleging violations of the Anti-Kickback Statute[2]).

In April 2018, HSG filed a sealed *qui tam* action against Novartis AG in the United States District Court for the Eastern District of Texas, alleging that Novartis AG violated the federal False Claims Act ("FCA") and the false claim analogues for 31 states, including the Texas Medicaid Fraud Prevention Act, by engaging in three business practices: (i) providing free "nurse educator" services to patients to educate them about the proper use and administration of six Novartis medications; (ii) providing free "reimbursement support" services to assist patients with navigating coverage issues to obtain coverage for certain Novartis prescriptions; and (iii) contracting with third parties to employ nurses to market and educate prescribers about the six medications. *See generally* Compl., *United States ex rel. Health Selection Grp., LLC v. Novartis AG, et al.*, No. 5:18-cv-60 (E.D. Tex. Apr. 20, 2018) (Dkt. 1). HSG's theories largely mirrored those brought by other NHCAG affiliates that the federal government moved to dismiss because they lacked sufficient merit and the federal government deemed the practices lawful and beneficial to the federal

---

[2] The Fifth Circuit decision notes that the nine other federal *qui tam* actions not addressed in *Eli Lilly* were dismissed for various reasons. *See* 4 F.4th at 259 n.1 (four cases dismissed on government's motion to dismiss; four cases dismissed on voluntary consent of the relator and the government; and one court granted defendant's unopposed motion to dismiss for failure to state a claim).

**MR188**

healthcare programs. *See, e.g., Eli Lilly & Co.*, 4 F.4th at 260, 267–68 & n.1; U.S. Mot. to Dismiss at 2–3, 14–16, *Eli Lilly*, No. 5:17-cv-123 (arguing that "federal healthcare programs have a strong interest in ensuring that, after a physician has appropriately prescribed a medication, patients have access to basic product support relating to their medication" and "HHS-OIG has advised that the provision of educational materials or informational programs to patients, without more, does not constitute 'remuneration.'"). After the Eastern District of Texas granted the United States's motion to dismiss a substantially similar case against other pharmaceutical defendants, *see United States ex rel. Health Choice Alliance LLC v. Eli Lilly & Co.*, 2019 WL 4727422 (E.D. Tex. Sept. 27, 2019), *aff'd* 4 F.4th 255, HSG voluntarily dismissed its federal lawsuit against Novartis AG in favor of pursuing its TMFPA claims in Texas state court. *See* HSG Mot. to Dismiss, *Health Selection Grp.*, No. 5:18-cv-60 (E.D. Tex. Mar. 9, 2020) (Dkt. 21).

On May 8, 2020, HSG filed its Original Petition against Novartis AG under seal in Travis County District Court pursuant to Texas Human Resources Code § 36.101. The Original Petition substantially tracked HSG's prior federal complaint in alleging that the three above-described business practices violate the Texas anti-kickback statute and, by extension, Section 36.002(13) of the TMFPA. After the State of Texas ("State") filed its notice declining to intervene in the action on October 1, 2020, the case was unsealed but remained dormant for several years until

6

the case was transferred to the 71st Judicial District Court in Harrison County in March 2023.

The next month, HSG filed a First Amended Petition to drop Novartis AG and add Novartis Pharmaceuticals Corporation as defendant. *See generally* First Am. Pet. (MR114). On September 15, 2023, Novartis timely filed a Plea to the Jurisdiction and Motion to Dismiss the First Amended Petition, arguing that the district court should dismiss HSG's *qui tam* action for two reasons.[3] (MR064). First, Novartis argued that the district court should grant its Plea to the Jurisdiction to dismiss the case for lack of subject-matter jurisdiction, because HSG does not have constitutional standing to sue Novartis for a statutory violation that did not personally injure HSG. *See id*. at 5–12 (MR075–082). In addition, Novartis argued that HSG's *qui tam* action should be dismissed under Texas Rule of Civil Procedure 91a because the TMFPA *qui tam* statute violates the Texas Constitution—which, the Texas Supreme Court has held, exclusively assigns the authority to file suits for the State to the State attorneys—and thus HSG lacks a valid cause of action. *See id*. at 12–26 (MR082–096). On December 7, 2023, HSG filed a Response to Defendant's Plea to the Jurisdiction and Motion to Dismiss ("Resp.," MR101), and the State filed

---

[3] Novartis also concurrently filed Special Exceptions to the First Amended Petition, arguing that the First Amended Petition was deficient in several material respects. In response, HSG agreed to amend the First Amended Petition to resolve several of the issues raised in the Special Exceptions, and the district court orally denied the remaining grounds at the December 14, 2023 hearing. As of this filing, HSG has not yet filed a second amended petition.

**MR190**

a Statement of Interest in Response to Defendant's Plea to the Jurisdiction and Motion to Dismiss ("SOI," MR119). On December 11, 2023, Novartis filed a Reply in Support of its Plea to the Jurisdiction and Motion to Dismiss (MR142). The district court heard oral argument on the Plea to the Jurisdiction and Motion to Dismiss on December 14 and summarily denied it the following day, on December 15, 2023. *See* Order Denying Def.'s Plea to Jur. & Mot. to Dismiss ("Order," MR001; APP001).

## SUMMARY OF THE ARGUMENT

The Texas Constitution and Texas Supreme Court precedent preclude HSG's *qui tam* action twice over: first, for lack of standing, and second, for want of a legally valid cause of action. In concluding otherwise, the district court failed to analyze or correctly apply binding precedent.

It is well-settled that a plaintiff "must be *personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury" to have standing to bring its claim under the Texas Constitution. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 155 (Tex. 2012). And HSG does not dispute that it personally suffered no injury from the conduct alleged in the First Amended Petition. HSG and the State instead argued that HSG need not satisfy the personal injury requirement for constitutional standing because HSG has statutory standing to vindicate an injury to the Texas Medicaid program. But that position is

wrong for several reasons. First, even if a plaintiff has statutory authority to bring a cause of action, the plaintiff must still show a personal injury to satisfy constitutional standing requirements. The Legislature cannot enact a statute that relieves a plaintiff from satisfying the personal injury requirement for constitutional standing because doing so would violate the Texas Constitution. *See In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 544 (Tex. 2016) (orig. proceeding) ("For the Legislature to attempt to authorize a court to act without subject matter jurisdiction would violate the constitutional separation of powers."). In arguing otherwise, HSG and the State misinterpreted cases addressing a plaintiff's "statutory standing" to sue, which the Texas Supreme Court has explained "go to the merits of the plaintiff's claim, not the plaintiff's standing to sue in the jurisdictional sense." *Busbee v. County of Medina*, No. 22-0751, 2023 WL 8655878, at *3 (Tex. Dec. 15, 2023). Second, and by extension, the Texas Supreme Court has held that a "statute cannot confer a right upon private individuals to act for all where it is shown they have no interest different from all others" because the State alone has standing to bring suits respecting matters of public concern. *Staples v. State ex rel. King*, 245 S.W. 639, 641 (Tex. 1922); *see also Allen v. Fisher*, 9 S.W.2d 731, 732 (Tex. 1928). Because HSG's allegations of harm to the Texas Medicaid program do not support a finding that HSG itself suffered an injury to satisfy constitutional standing requirements, the district court

9

does not have subject-matter jurisdiction over the claims alleged in the First Amended Petition.

HSG's claims also should have been dismissed because HSG lacks a legally valid cause of action. For almost 150 years, the Texas Supreme Court has consistently held that Article IV, Section 22 and Article V, Section 21 of the Texas Constitution exclusively assign the duty and authority to bring and maintain a suit for the State to the State attorneys, and "'the Legislature cannot withdraw them nor confer them upon others nor abridge them or interfere with the officer's right to exercise them unless the Constitution expressly so provides.'" *Hill County v. Sheppard,* 178 S.W.2d 261, 264 (Tex. 1944) (quoting 34 Tex. Jur. 445). Neither HSG nor the State have identified an express constitutional provision that authorizes the Legislature to enact a *qui tam* statute that (i) permits any "person" to bring suit for and in the name of the State and (ii) circumscribes the Attorney General's duty and authority to terminate, settle, and prosecute the State's claims in the public interest. HSG and the State instead misconstrued decisions of the Texas Supreme Court and relied on inapposite federal court decisions in urging the district court to deny the Motion to Dismiss. They told the district court that the Texas Supreme Court had "directly upheld the constitutionality of *qui tam* statutes" in *Brown v. De La Cruz*, 156 S.W.3d 560 (Tex. 2004), *see* SOI at 13 (MR131), even though *Brown* does not address a *qui tam* statute or the constitutionality of *any* statute under the

10

Texas Constitution. They also argued that the district court should uphold the TMFPA *qui tam* statute because federal courts have upheld federal *qui tam* statutes under the U.S. Constitution. But the fact that a statute may pass muster under a different constitution—one that contains no provision equivalent to Article IV, Section 22 or Article V, Section 21—is irrelevant to whether a Texas statute does so under the Texas Constitution. The Texas Supreme Court has made clear that Article IV, Section 22 and Article V, Section 21 "mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court." *Allen*, 9 S.W.2d at 732. Because the TMFPA *qui tam* statute facially exceeds those limits, HSG's statutory cause of action is void under the Texas Constitution.

HSG does not have constitutional standing or a legally valid cause of action to bring this *qui tam* action under the Texas Constitution and Texas Supreme Court precedent. And Novartis lacks an adequate remedy by appeal to correct the district court's erroneous decision to the contrary. Novartis therefore respectfully requests that the Court issue a writ of mandamus directing the district court to vacate its Order and dismiss this action for want of jurisdiction or, alternatively, a valid cause of action, as doing so is necessary to avoid wasting time and resources litigating a fatally flawed proceeding and essential to preserving the separation of powers under the Texas Constitution.

11

**ARGUMENT**

A party is entitled to mandamus relief when a trial court commits a clear abuse of discretion and the party lacks an adequate remedy by appeal to correct the district court's error. *In re YRC Inc.*, 646 S.W.3d 805, 808 (Tex. 2022) (orig. proceeding). Both requirements are met here to warrant this Court's intervention. In summarily denying the Plea and Motion, the district court abused its discretion by failing to correctly analyze or apply the law. *In re Kappmeyer*, 668 S.W.3d 651, 655 (Tex. 2023) (orig. proceeding) ("A trial court's 'failure to analyze or apply the law correctly is an abuse of discretion.'" (citation omitted)). The Texas Supreme Court has long held that Texas courts do not have subject-matter jurisdiction over claims brought by unharmed plaintiffs, and it is undisputed that HSG itself suffered no harm from the conduct alleged in the First Amended Petition to satisfy constitutional standing requirements. *See Heckman*, 369 S.W.3d at 150, 155; *Staples*, 245 S.W. at 641, 643; *Allen*, 9 S.W.2d at 732. Moreover, Texas Supreme Court precedent is clear that the Legislature cannot enact a statute to authorize a private plaintiff, like HSG, to bring suit for the State because Article IV, Section 22 and Article V, Section 21 of the Texas Constitution explicitly and exclusively assign that duty to the State attorneys. *See Staples*, 245 S.W. at 641; *Allen*, 9 S.W.2d at 732; *Sheppard,* 178 S.W.2d at 264. Mandamus relief is thus necessary to prevent the waste of time and resources litigating a doomed proceeding and to preserve the Executive department's

12

jurisdiction from interference. *See In re Essex Ins. Co*., 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding); *In re Shire PLC*, 633 S.W.3d 1, 27 (Tex. App.—Texarkana 2021, orig. proceeding [mand. denied]).

**I.      HSG Does Not Have Constitutional Standing to Maintain Its Lawsuit.**

The district court committed a clear abuse of discretion by denying the Plea to the Jurisdiction, when HSG alleges no personal injury in connection with its claims to maintain its lawsuit under the Texas Constitution. *See Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 700 (Tex. 2021) ("A challenge to a party's standing is an attack on the party's ability under the Texas Constitution[] to assert a claim."); *Heckman*, 369 S.W.3d at 150, 154–55.

A.      Texas's Constitutional Standing Doctrine Requires a Personal Injury to the Plaintiff to Demonstrate the Court's Subject-Matter Jurisdiction to Hear Its Claims.

"Standing is a constitutional prerequisite to suit," *Heckman*, 369 S.W.3d at 150, that, the Texas Supreme Court has held, "stems from two constitutional limitations on subject-matter jurisdiction," *Data Foundry*, 620 S.W.3d at 700. "The first limitation is the separation-of-powers doctrine" enshrined in Article II, Section 1 of the Texas Constitution, which prohibits courts "from issuing advisory opinions, because doing so invades the function of the executive rather than judicial department." *Id*.; *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd*., 852 S.W.2d 440, 444 (Tex. 1993) ("An opinion issued in a case brought by a party without

13

standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury."). "The second constitutional limitation on a court's subject-matter jurisdiction is the open-courts provision of the Texas Constitution," *Data Foundry*, 620 S.W.3d at 700, which "opens the courthouse doors only to those who have or are suffering an injury,"[4] *Heckman*, 369 S.W.3d at 155; *see also Tex. Ass'n of Bus.*, 852 S.W.2d at 444 ("Under the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to the courts only for those litigants suffering an injury."). From these two constitutional provisions, the Texas Supreme Court has defined Texas standing doctrine to "require[] a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman*, 369 S.W.3d at 154. This test, the Texas Supreme Court has held, limits the category of litigants empowered to maintain a lawsuit in Texas state court to those litigants who allege: (1) an "injury in fact"; (2) that is "fairly traceable" to the defendant's conduct; and (3) that is "likely to be redressed by the requested relief." *See id.* at 154–55. The burden falls on the

---

[4] Even though the Texas Supreme Court explicitly grounds the personal-injury requirement in the Open Courts provision, the State criticized Novartis for "misinterpret[ing] and misappl[ying] the Open Courts provision" in advancing that very point below. SOI at 5 (MR123). In doing so, the State focused on a different aspect of the Open Courts provision—i.e., that it guarantees that citizens bringing common law causes of action (as opposed to statutory causes of action) will not unreasonably be denied access to the courts—that is irrelevant to the question presented here and does not eliminate the need for HSG to demonstrate a personal injury. *See id.* at 5–7 (MR123–125).

14

plaintiff to affirmatively demonstrate the trial court's jurisdiction by satisfying each of the three standing elements. *Id*. at 150.

HSG's inability to satisfy this burden is evident at the first step. In elaborating on the "injury in fact" requirement for standing, the Texas Supreme Court held that "[t]he plaintiff must be *personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury." *Id*. at 155. And here, HSG does not dispute that HSG itself suffered no injury from the conduct alleged in its petition. Because HSG lacks standing under the Texas Constitution to assert its claims, dismissal for lack of subject-matter jurisdiction is required. *See id*. at 153 ("[A] plaintiff must demonstrate that he, himself, has standing to present his claims; the court must dismiss a plaintiff who lacks standing."). HSG and the State nevertheless urged the district court to ignore this fatal defect in the court's constitutional jurisdiction based on erroneous arguments that contravene both the Texas Constitution and Texas Supreme Court precedent.

B.     The Legislature Cannot, By Statute, Supplant or Displace Texas's "Constitutional Standing" Requirement that the Plaintiff Allege a Personal Injury.

HSG and the State contended below that HSG need not show a personal injury to bring its lawsuit—that "injury to itself [is] legally irrelevant" to the court's subject-matter jurisdiction—because HSG has "statutory standing" under the TMFPA to sue for violations of that statute. Resp. at 5–6 (MR106–107); SOI at 8

15

(MR126).  In other words, they argued that because HSG meets the TMFPA's requirements to bring suit for statutory violations, HSG is relieved of the burden of showing that the TMFPA violations adversely affected it.  But Texas Supreme Court precedent squarely forecloses their argument, which, at bottom, reflects a fundamental misunderstanding of the distinction between a plaintiff's statutory *right* to sue and a plaintiff's constitutional *standing* to sue.

Whether a plaintiff has a statutory right to sue—i.e., "statutory standing"—is not determinative of a court's subject matter jurisdiction.  *See, e.g.*, *Green v. Tex. Comptroller of Pub. Accounts*, No. 08-23-99986-CV, 2023 WL 8100236, at *5 (Tex. App.—El Paso Nov. 21, 2023, no pet. h.) (holding plaintiffs' "argument that they have standing to sue under the PRPRPA because they meet its statutory merits requirements is inapposite to the extent that it ignores the standing requirements, as '[t]hese elements make up the irreducible constitution minimum of standing, and must all be present'" (cleaned up; citation omitted)).  As the Texas Supreme Court clarified in a recent line of cases, the term "statutory *standing*" is a misnomer because a plaintiff's "statutory standing" to sue has nothing to do with a Texas court's subject-matter jurisdiction to hear a claim under the Texas Constitution.  *See Pike v. Tex. EMC Mgmt.*, *LLC*, 610 S.W.3d 763, 773–74 & n.4 (Tex. 2020) ("Texas courts, having drawn upon the standing doctrine of our federal counterparts, sometimes apply the label 'standing' to statutory or prudential considerations that

16

'do not implicate subject-matter jurisdiction.'" (citation omitted)); *Berry v. Berry*, 646 S.W.3d 516, 527 & n.3 (Tex. 2022); *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 439–41 (Tex. 2023); *Busbee*, 2023 WL 8655878, at *2–3. Rather, it concerns whether a particular plaintiff "falls within the class of persons authorized to sue or otherwise has a valid cause of action." *Pike*, 610 S.W.3d at 774 (cleaned up); *see also id*. ("[T]he question of whether a plaintiff has established his right 'to go forward with his suit' or 'satisfied the prerequisites of a particular statute' pertains 'in reality to the right of the plaintiff to relief rather than to the subject matter jurisdiction of the court to afford it.'").

In fact, the Texas Supreme Court has expressed regret for its own use of the "statutory standing" label for "tangl[ing] the line demarcating issues that truly implicate a trial court's subject-matter jurisdiction from those pertaining to the merits. The integrity of that line is fundamental to the working of the civil justice system because a court without subject-matter jurisdiction cannot decide the case at all." *Tex. Med. Res.*, 659 S.W.3d at 439–40*; see also Herbig, Tr. of Welch Family Trust C. v. Welch, Tr. of Welch Manry Family Trust*, No. 01-22-00080-CV, 2023 WL 4188074, at *4–5 (Tex. App.—Houston [1st Dist.] June 27, 2023, no pet. h.) (distinguishing constitutional standing and statutory standing following *Pike* and *Berry*); *Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*, 573 S.W.3d 912, 915–17 & n.5 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (noting term "statutory

17

standing" "has been criticized for contributing to the erroneous assumption that statutory authority to bring an action or appeal includes a *per se* grant of constitutional standing" (collecting cases)). While the Legislature may grant a private party a *right* to sue for a statutory violation, that statutory right of action does not create or confer *standing* to sue. *See Larkins-Ruby v. Austin Cty.*, No. 01-21-00496-CV, 2022 WL 17981564, at *2 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) ("Statutory standing . . . does not supplant constitutional standing, and a plaintiff must have constitutional standing even if standing has been conferred by statute."); *Interest of P.R.*, 615 S.W.3d 474, 480 (Tex. App.—Texarkana 2020, pet. denied).

What's more, even had it intended to do so, the Legislature does not have the power to render the personal injury requirement—which is derived from the Texas Constitution—"legally irrelevant" to a court's subject-matter jurisdiction to hear a claim. While the Legislature may enact a statute that "sets a *higher* standard than that set by the general doctrine of standing," the Texas Supreme Court has made clear that "it cannot be lower, since courts' constitutional jurisdiction cannot be enlarged by statute." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 582 n.83 (Tex. 2013) (emphasis added). "For the Legislature to attempt to authorize a court to act without subject matter jurisdiction," the Court has held, "would violate the constitutional separation of powers." *In re Lazy W. Dist. No. 1*, 493 S.W.3d at 544.

18

Accordingly, "[i]f the grant of jurisdiction or relief authorized [by] statute" exceeds constitutional limits, Texas courts construe the Legislature's enactments to "exercise as much jurisdiction over the case as the Constitution allows." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 462 (Tex. 2011) (orig. proceeding). Because the requirement that the plaintiff show personal injury-in-fact stems from "constitutional limitations on [courts'] subject-matter jurisdiction," *Data Foundry*, 620 S.W.3d at 700, the TMFPA cannot render that constitutional requirement "legally irrelevant," as HSG and the State argued below. *See Ex parte Myer*, 207 S.W. 100, 110 (Tex. Crim. App. 1918) ("[T]he Constitution is the superior and supreme law, and laws or acts of the legislative body in conflict with it or its provisions are void.").

Even if a plaintiff has statutory authority to bring a cause of action, the plaintiff must satisfy constitutional standing requirements to bring its claims within the court's subject-matter jurisdiction. In *Texas Board of Chiropractic Examiners v. Texas Medical Association*, for example, the Texas Supreme Court acknowledged that the plaintiff there had statutory standing—i.e., that "[the plaintiff's] allegation satisfie[d] § 2001.038(a)" to bring suit under Texas's Administrative Procedures Act—but nevertheless recognized the Court's additional "obligation to examine our jurisdiction" to confirm that the plaintiff "sufficiently alleges the concrete injury required for standing" under the Texas Constitution. 616 S.W.3d 558, 567 (Tex. 2021). And in *Mosaic Baybrook One, L.P. v. Simien*, the Texas Supreme Court

19

similarly referred to the three constitutional standing elements (injury, traceability, and redressability) in resolving whether the Court had subject-matter jurisdiction over the plaintiff's statutory cause of action under the Texas Water Code. 674 S.W.3d 234, 250–51 (Tex. 2023) (holding plaintiff "alleged that he suffered direct economic harm from" defendant's alleged statutory violation); *see also In re Morris*, 663 S.W.3d 589, 598 n.47 (Tex. 2023) (orig. proceeding) (noting Texas Election Code's authorization of injunctive relief "does not create standing" and thus "plaintiff must show injury or damages 'other than as a member of the general public'" (citation omitted)).

Likewise, this Court concluded that the fact that the Legislature has granted "a party [] a right to appeal does not mean that he has standing to appeal," because "'statutes granting appellate jurisdiction do not supplant the Texas Constitution's standing requirement for subject-matter jurisdiction.'" *Interest of P.R.*, 615 S.W.3d at 480 (quoting *Nephrology Leaders*, 573 S.W.3d at 915). "[E]ven where an appellant has a *right* to appeal," this Court held that the appellant "must also demonstrate that he has *standing* to do so," which "turns on whether the appellant was injuriously affected by [the] judgment" appealed from. *Id*. at 480 (emphasis added). Because the appellant there lacked an injury in fact, this Court did not have jurisdiction to hear his appeal. *Id*. at 482. So, too, here: even assuming HSG had a

20

valid statutory *right* to sue, it does not have *standing* to do so because HSG does not allege that it was injuriously affected by the alleged TMFPA violations.

C. The Legislature Cannot Authorize Private Parties to Bring Suit on a Matter of Public Concern; Such Actions Must Be Brought By The State.

Nor does HSG's argument that it alleges an injury to the Texas Medicaid program suffice to confer standing on HSG. Again, the Texas Supreme Court has made clear that "[t]he plaintiff must be *personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury" to have standing. *Heckman*, 369 S.W.3d at 155; *see, e.g.*, *Bellamy v. City of Brownsville*, No. 13-22-00087-CV, 2023 WL 413583, at *3 (Tex. App.—Corpus Christi–Edinburg Jan. 26, 2023, no pet.) (plaintiff's "allegations about harm to the City and its citizens could not support a finding that *he* would suffer an irreparable injury" for standing). For well over a century, the Texas Supreme Court has held, time and again, that a private party lacks standing to vindicate a matter of public concern unless he can show an injury particular to himself. *See Allen*, 9 S.W.2d at 732; *Staples*, 245 S.W. at 641. In elaborating on the underlying principle for this rule, the Texas Supreme Court explained "that individuals have a right to sue for a redress of their own private injuries, but for such as affect all the public alike an individual is not the representative of the public interest." *City of San Antonio v. Stumburg*, 7 S.W. 754, 755 (Tex. 1888). Rather,

21

MR204

"[w]here the suit is for the benefit of the public at large, and no citizen is affected differently from all other citizens, the state as agent of all is properly interested for the benefit of all its citizens." *Staples*, 245 S.W. at 641. And because "[i]t is necessary for the state to be a party where the action is for the benefit of the public at large," the Texas Supreme Court has held that the Legislature cannot enact a statute to "confer a right upon private individuals to act for all where it is shown they have no interest different from all others." *Id*. (citing Tex. Const. art. IV, § 22; Tex. Const. art. V, § 21); *see also Lemons v. Wylie*, 563 S.W.2d 882, 883 (Tex. App.—Amarillo 1978, no writ) ("Our courts have held that, regardless of statutory language, a voter having no special interest cannot alone maintain suit in district court to enjoin the placing of the name of an ineligible candidate on the ballot. Such a provision would be unconstitutional.").

Following the Texas Supreme Court decision in *Staples*, the Court in *Allen* concluded that an individual plaintiff, who was "not shown to have a justiciable interest in the matter," could not maintain suit under a statute that purported to authorize "any voter" to restrain the placing of an ineligible candidate on an election ballot. 9 S.W.2d at 732. "Whatever be the true import of [that] statutory provision," the Court said, "that provision cannot have effect to invest the plaintiff, simply because he is a voter, with the authority to maintain this suit." *Id*. Because his suit concerned "matters of public concern exclusively," the Court held that "any suit in

22

respect of those matters must be prosecuted by the state." *Id*. (citing *Staples*, 245 S.W. 639); *see also Tri Cty. Citizens Rights Org. v. Johnson*, 498 S.W.2d 227, 229 (Tex. App.—Austin 1973, writ ref'd n.r.e.). In so holding, Texas's "standing jurisprudence ensures that the executive branches and judicial branches resolve matters of public importance through the adversary system of justice in particular cases involving parties *who are genuinely, personally affected*." *In re Abbott*, 601 S.W.3d 802, 809 (Tex. 2020) (orig. proceeding) (emphasis added).

Because HSG is not a party that was "genuinely, personally affected" by the alleged TMFPA violations, Texas standing doctrine precludes Texas courts from hearing HSG's claims. *See Heckman*, 369 S.W.3d at 150 ("A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it."). Absent a personal interest in the matter to be litigated, HSG's lawsuit merely seeks to vindicate a matter of public concern and only the State, as representative of the public interest, has standing to bring such claims. *See Houston Nat'l Gas Corp. v. Wyatt*, 359 S.W.2d 257, 258–60 (Tex. App.—Eastland 1962, no writ) (recounting string of Texas cases holding that, regardless of statutory grant of authority, statute could not have the effect of authorizing a suit by a private citizen in respect of matters which concern the public exclusively); *Tri Cty. Citizens*, 498 S.W.2d at 230 ("Appellants having no justiciable interest in this controversy apart and different

23

from the public, redress for their character of injury may be maintained only by lawfully constituted guardians of the public interest.").

D. The U.S. Supreme Court's Holding in *Stevens* Does Not Provide Grounds for Disregarding Texas's Constitutional Standing Doctrine and Precedent.

Finding no support for HSG's constitutional standing under Texas law, the State nevertheless argued (without analysis) that Texas courts have jurisdiction to hear HSG's claims because the U.S. Supreme Court has held that federal courts have Article III jurisdiction over a relator's *qui tam* action under the federal False Claims Act ("FCA"). *See* SOI at 10–11 (MR128–129) (arguing *Vermont Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000), is controlling). But neither of the two rationales adopted by the *Stevens* Court for Article III jurisdiction find support in the TMFPA or Texas's constitutional standing jurisprudence.[5] Far from supplying a jurisdictional hook, the State's reliance on *Stevens* ignored unique

---

[5] Whether *Stevens'* reasoning and holding still prevails following subsequent amendments to the FCA—which fundamentally changed the nature of that statute (and are mirrored in the TMFPA)—is also questionable. *See, e.g.,* A.G. Harmon, *Bounty Hunters and Whistleblowers: Constitutional Concerns for False Claims Actions After Passage of the Patient Protection and Affordable Care Act of 2010*, 2 Am. U. Lab. & Emp. L.F. 1, 16 (2011) (observing the FCA "is no longer, in fact, an informer statute"). While the public disclosure bar was jurisdictional under the FCA statute in *Stevens* (and thus only authorized *qui tam* actions by true informers), the current FCA and TMFPA treat the public disclosure bar as an affirmative defense and grant the government the ability to veto the bar. *See* Tex. Hum. Res. Code § 36.113; 31 U.S.C. § 3730(e)(4). In other words, both statutes contemplate that any person—whether informer or non-informer—may file and prosecute a *qui tam* action. So to the extent *Stevens* found the history of "*qui tam* suits by *informers*" and the First Congress's "enact[ment] of a considerable number of *informer* statutes" "well nigh conclusive" of the Article III question under the prior version of the FCA, 529 U.S. at 775–78 (emphasis added), that reasoning does not apply to the TMFPA, which permits *qui tam* suits by informers and non-informers alike.

24

aspects of the Texas *qui tam* statute, the Texas Constitution, and over a century of Texas Supreme Court precedent in urging the district court to exercise jurisdiction when there is none.

First, Texas Supreme Court precedent forecloses the standing-by-assignment theory that the U.S. Supreme Court adopted for FCA *qui tam* actions.[6] The *Stevens* Court concluded that an FCA relator's standing could "be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor" because "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's *damages claim*." 529 U.S. at 773 (emphasis added). But the TMFPA cannot "reasonably be regarded as effecting a partial assignment of the [State's] damages claim," *id*., because the Texas Supreme Court has held that the TMFPA "*is not an 'action for the recovery of damages.'*" *In re Xerox Corp.*, 555 S.W.3d 518, 534 (Tex. 2018) (orig. proceeding) (emphasis added; citation omitted). In contrast to the FCA, the TMFPA "does not use the terms 'harm,' 'damages,' 'overpayment,' 'loss,' 'actual damages,' 'unauthorized amount,' 'compensation,' or any other words that imply a loss measure or require the State to prove an actual loss." *Id*. at 533; *see also id*. at 535 (explaining that, while the FCA

---

[6] The burden falls on HSG to prove that it has standing as assignee, which requires that HSG establish "(1) a cause of action existed that was capable of assignment and (2) the cause was in fact assigned to the party seeking recovery." *Magill v. Watson*, 409 S.W.3d 673, 678 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see APM Enterprises, LLC v. Nat'l Loan Acquisitions Co*., No. 06-14-00027-CV, 2014 WL 5317753, at *6 (Tex. App.—Texarkana Oct. 17, 2014, no pet.)

25

and other state analogues are "similar in aim and tactic" to the TMFPA, those statutes "employ materially different language and the language of our statutes controls the outcome here"); *cf.* 31 U.S.C. § 3729(a) (person who violates FCA is liable for civil penalty "plus 3 times the amount of damages which the Government sustains because of the act of that person"). The TMFPA is simply a civil enforcement statute that imposes civil penalties for a defendant's violations of state law. *See In re Xerox*, 555 S.W.3d at 527, 533–34. And even the U.S. Supreme Court has acknowledged that "the public interest that private entities comply with the law cannot 'be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 428–29 (2021) (citation omitted); *see also id.* at 429 ("A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority.").

*Stevens'* theoretical justification for standing-by-assignment also fails under Texas law for another reason: a legislative assignment that is contingent on the party's performance of an act that violates the Texas Constitution—that is, filing a civil action for and in the name of the State, *see* Tex. Hum. Res. Code § 36.101(a) (APP008)—would be invalid and cannot confer standing. *See, e.g., OAIC*

26

*Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 746 (Tex. App.—Dallas 2007, no pet.) (holding plaintiff lacked standing absent evidence it was a valid assignee); *APM Enterprises, LLC*, 2014 WL 5317753, at *6 (same); *Fleet Transp., Inc. v. Butler & Binion, L.L.P.*, No. 14-99-00500-CV, 2000 WL 963671, at *2 (Tex. App.—Houston [14th Dist.] July 13, 2000, pet. denied) (not designated for publication) ("Because the assignment of the malpractice claim was invalid, Fleet had no standing to assert Swiftsea's legal malpractice claim."); *see also US Fax L. Ctr. Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007) ("If a valid assignment confers standing, an invalid assignment defeats standing if the assignee has suffered no injury in fact himself."). The Texas Supreme Court has repeatedly held that the Legislature cannot enact a statute authorizing a private plaintiff to maintain a suit that solely seeks to vindicate a matter of public concern; that right only inheres in the State, as representative of the public interest. *See Allen*, 9 S.W.2d at 732; *Staples*, 245 S.W. at 641. And, as explained in more detail below, the Texas Constitution lodges with the State attorneys the exclusive authority to bring and maintain a suit for and in the name of the State. *See Allen*, 9 S.W.2d at 732; *Staples*, 245 S.W. at 642.

The State's reliance on *Stevens*' second rationale for Article III jurisdiction, based on the historical pedigree of federal *qui tam* actions, is similarly unavailing under the Texas Constitution. SOI at 10–11 (MR128–129). That portion of the U.S.

27

Supreme Court's opinion is grounded in a unique aspect of federal standing jurisprudence, which dictates that special attention be paid to historical practices in defining federal court's Article III jurisdiction under the U.S. Constitution. *See Stevens*, 529 U.S. at 774. Because the U.S. Supreme Court has interpreted Article III's "Cases" and "Controversies" requirement to encompass "'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process,'" the *Stevens* Court concluded that the tradition of *qui tam* informer statutes in English and Colonial courts dating back to the 13th century was "well nigh conclusive" of federal courts' Article III jurisdiction to hear such claims. *Id*. at 774–77 (citation omitted). But the Texas Supreme Court has never adopted that aspect of federal standing jurisprudence to determine Texas courts' jurisdiction under the Texas Constitution—and for good reason.[7]

For one, the Texas Constitution does not contain the "Cases" and "Controversies" language from which that particular federal test for Article III jurisdiction is derived. Instead, Texas courts' subject-matter jurisdiction is grounded in the Texas Constitution's Open Courts provision and explicit Separation of Powers provision. *See Data Foundry*, 620 S.W.3d at 700; Tex. Const. art. I, § 13 (APP004);

---

[7] While Texas courts frequently refer to federal standing jurisprudence for guidance in applying the three constitutional standing elements (injury, traceability, and redressability) consistent with Texas's constitutional standing requirements, *see, e.g*., *Heckman*, 369 S.W.3d at 154, Novartis has not identified a single reported case in Texas that employed the federal test to resolve its subject-matter jurisdiction by reference to whether the case before it was "of the sort traditionally amenable to, and resolved by, the judicial process."

MR211

Tex. Const. art. II, § 1 (APP005). And it would make little sense to resolve a question of Texas courts' constitutional jurisdiction based on the historical practices and jurisdiction of courts under a different government charter. *See Am. Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580, 581–82 (Tex. App.—Austin 1942), *aff'd* 172 S.W.2d 972 (Tex. 1943) (rejecting as irrelevant plaintiff's contention that *qui tam* actions had been permitted prior to the 1876 Texas Constitution). As the Texas Court of Criminal Appeals observed over a hundred years ago, "[t]he powers of the English government by no law, decree of the king, Parliament, or any other body authorized to speak for the English people, have ever been divided into three separate and distinct departments, with the limitation that no one of the departments should exercise the power attached to the other department." *Ex parte Wolters*, 144 S.W. 531, 587 (Tex. Crim. App. 1911). That courts in England and Colonial America may have had jurisdiction over an informer's *qui tam* action says nothing about whether a Texas court has jurisdiction to hear such claims under the current Texas Constitution, *see id.*—particularly when "Texas was never a British colony nor an American territory," *Southern Pac Co. v. Porter*, 331 S.W.2d 42, 45 (Tex. 1960); *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 450 (2023) (Thomas, J., dissenting) ("We should be especially careful not to overread the early history of federal *qui tam* statutes given that the [federal] Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural

29

departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited").

*    *    *    *    *

HSG bears the burden to affirmatively demonstrate the district court's constitutional jurisdiction to hear its claims, and it failed to do so. HSG does not dispute that it personally suffered no injury from any conduct alleged in the First Amended Petition, and Texas Supreme Court precedent bars HSG's standing-by-assignment theory. Because the public interest that a private entity comply with Texas's anti-kickback statute is a matter of public concern exclusively, Texas Supreme Court precedent is clear that "any suit in respect of those matters must be prosecuted by the [S]tate" through "a public official who is properly clothed with that authority." *Allen*, 9 S.W.2d at 732. Accordingly, HSG's claims should have been dismissed for lack of standing. That the district court did not do so constitutes a clear error of law and abuse of discretion that requires this Court's correction.

## II. The TMFPA's *Qui Tam* Provisions Are Unconstitutional and Void.

The district court also abused its discretion by denying the Motion to Dismiss because the TMFPA *qui tam* provisions facially violate Article IV, Section 22 and Article V, Section 21 of the Texas Constitution, and an unconstitutional statute cannot provide a basis for any right or relief. *See Elliott v. City of Coll. Station*, 674 S.W.3d 653, 656 (Tex. App.—Texarkana 2023, pet. filed). For well over a century,

30

the Texas Supreme Court has recognized that those two constitutional provisions confer an "exclusive" power on the Attorney General and District and County Attorneys to represent the State and thus "mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court." *Allen*, 9 S.W.2d at 732. "The Legislature cannot devolve them upon others. Nor can it interfere with the right to exercise them." *Maud v. Terrell*, 200 S.W. 375, 376 (Tex. 1918). Yet the TMFPA's *qui tam* provisions directly contravene this longstanding precedent by authorizing any "person" to bring a civil action for the State and unduly interfering with the Attorney General's constitutional power to represent the State's litigation interests. Since "the conflict with the [Texas] Constitution is hence apparent, there is no alternative but to declare" the TMFPA's *qui tam* provisions "void" and dismiss HSG's *qui tam* action. *Id*.

A. The Texas Constitution Exclusively Assigns the Power to Bring and Maintain Suits For the State to the State Attorneys Chosen by the People of Texas.

For almost 150 years, the Texas Supreme Court has consistently held that, where the Texas Constitution selects the depositaries of a given power, the Legislature may not delegate that power to another unless authorized by an express constitutional provision. *State v. Moore*, 57 Tex. 307, 314 (Tex. 1882); *Garcia v. Laughlin*, 285 S.W.2d 191, 194 (Tex. 1955) ("The powers conferred upon the state officials are generally held to be exclusive, and except in a manner authorized by the

31

Constitution, these powers cannot be enlarged or restricted."); *see also Vandyke v. State*, 538 S.W.3d 561, 572–73 (Tex. Crim. App. 2017) ("[W]ithout an express limitation within the Constitution, we presume that a delegation of authority to one branch of government is exclusive."). Article IV, Section 22 and Article V, Section 21 of the Texas Constitution assign to the duly-elected State attorneys—the Attorney General and District and County Attorneys—the power to bring and maintain actions for the State. *See* Tex. Const. art. IV, § 22 (APP006); Tex. Const. art. V, § 21 (APP007). In light of that explicit constitutional assignment, the Texas Supreme Court has, through an unbroken line of authority dating back to 1897, repeatedly recognized that power cannot be conferred on another and the Legislature cannot interfere in the State attorneys' exercise of that power. *See Harris Cty. v. Stewart*, 41 S.W. 650, 657 (Tex. 1897) (holding city charter that "authorized the city attorney to exercise the powers conferred upon the county attorney" "is contrary to the provision of the constitution" that "vests in the county attorney the authority, and imposes upon him the duty, of representing the state in the district and inferior courts"). To do so violates the Texas Constitution's preeminent separation-of-powers doctrine and deprives the people of Texas of their constitutional right to select who will represent the State's (and, by extension, their) interests in court.

In recognition of these constitutional constraints, the Texas Supreme Court in *Maud* and decisions that followed construed the Legislature's enactments to permit

32

only the State's attorneys to prosecute the State's claims consistent with Article V, Section 21 and Article IV, Section 22. The Texas Supreme Court recognized that it would violate the Texas Constitution if the statute in *Maud* were construed to authorize a tax collector to bring suit for the State, because the Texas Constitution

> by Section 21 of Article 5, lodges with the county attorneys the duty of representing the State in all cases in the district and inferior courts, with the right in the Legislature to regulate by law the respective duties of district and county attorneys where a county is included in a district having a district attorney; and by Section 22 of Article 4 that duty as to suits and pleas in the Supreme Court is confided to the Attorney-General.

> With the limitation existing in the authority of the Legislature, under Section 22 of Article 4, to create additional causes of action in favor of the State and intrust their prosecution, whether in the trial or in the appellate courts, solely to the Attorney-General, the powers thus conferred by the Constitution upon these officials are exclusive. The Legislature cannot devolve them upon others. Nor can it interfere with the right to exercise them.

200 S.W. at 376. The *Maud* Court thus upheld the statute by adopting a construction that saved it from invalidation based on the principle that, if language of a statute "is of doubtful meaning, reasonably susceptible to different constructions, rendering the act valid if construed in one sense and invalid if construed in another, that construction will be adopted which sustains the act rather than destroys it." *Id*. Rather than construe the statute to authorize the tax collector to file suit himself, which would render the act invalid under the Texas Constitution, the Court construed the statute to provide that the tax collector "should cause the suit to be filed by the

33

MR216

official charged by law with that specific duty" (i.e., the Attorney General). *Id.* at 377; *see also Agey*, 167 S.W.2d at 583 (explaining *Maud* construed the statute "as not so vesting that power in such party, under the established presumption of validity," and "[t]hus clearly in effect holding that it would have been invalid if given the construction contended for by respondent").

A few years later, the Texas Supreme Court followed *Maud* in rejecting the plaintiffs' contention that the Legislature could enact a statute authorizing private citizens to bring and prosecute a suit in the name of the State. *See Staples*, 245 S.W. at 640–42.

> To give the section the meaning contended for by [plaintiffs] would be to seriously infringe upon the mandate of section 21, art. 5, of the Constitution, that 'the county attorneys shall represent the state in all cases in their respective counties,' and of section 22, art. 4, relating to the Attorney General.
>
> The holding of this court in *Maud v. Terrel*, 109 Tex. 97, 200 S. W. 375, opinion by Chief Justice Phillips, is to the effect that the Legislature is without authority under the Constitution to restrict the exclusive powers of the county attorneys or district attorneys and the Attorney General to represent the state.

*Id.* at 642. Because the Court again "presumed that the Legislature desired and intended to enact a constitutional law," the *Staples* Court adopted a construction that would render the act valid. *Id.* at 641. Rather than authorize private citizens to themselves bring suit for the State regarding a matter of public concern, the Court construed the statute to mean that, "at the instance of, or on solicitation of, any

34

citizen, proceedings by information in the nature of quo warranto may be instituted, *through the proper officer of the state*, to determine the right of any candidate charged with a violation of the act to have his name placed on the official ballot." *Id*. (emphasis added); *see also State ex rel. Owen v. Starnes*, 246 S.W. 424, 425 (Tex. App.—Fort Worth 1922, no writ) ("If the state is the plaintiff, then, under article 5, § 21, of the Constitution, the county attorney of Eastland county had the exclusive authority to represent the state, which was plaintiff, and the Legislature did not have the power to delegate that authority to any private citizen or citizens.").

Following *Maud* and *Staples*, a Texas Court of Civil Appeals held that a private citizen could not lawfully maintain a statutory cause of action that the plaintiff had filed in his name and in the name of the State to recover penalties against the defendant for discriminating against the plaintiff in the purchase of oil.[8] *Agey*, 167 S.W.2d 580. The court observed that "such action must be brought by the Attorney General or county attorney; and that to construe the section as authorizing institution and prosecution of the suit by and in the name of the aggrieved party for

---

[8] Unlike HSG, the plaintiff in *Agey* suffered a concrete harm from the statutory violation (the defendant discriminated against the plaintiff in refusing to purchase the plaintiff's oil) that would have satisfied Texas constitutional standing requirements. As the U.S. Supreme Court has noted, there are two types of *qui tam* actions: "those that allow[] injured parties to sue in vindication of their own interests (as well as the Crown's)" and "those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves." *Stevens*, 529 U.S. at 775. The *Agey* plaintiff contended that he had a *qui tam* action of the first type. However, the TMFPA *qui tam* statute does not fall into either category; because the TMFPA permits any "person" to bring a *qui tam* action, the person need not be "aggrieved" or be an "informer" to file suit.

MR218

his own use and that of the State would render it void, to that extent, as contravening" Article IV, Section 22 and Article V, Section 21 of the Texas Constitution. *Id*. at 581. In so holding, the court rejected the plaintiff's contention that his suit constituted "the well established [sic] common law *qui tam* action" that "is maintainable by the prosecutor for his own use and for that of the sovereign." *Id*. (citation omitted). The court observed that the plaintiff's "cited cases involving *qui tam* actions arose under constitutions prior to 1876, which did not contain the invoked provisions, and therefore the question here presented was not there in issue." *Id*. at 581–82. Because the action was "one which insures to the State," the court concluded it was "maintainable only in the State's name and by its authorized officials, regardless of the fact that one-half of the recovery may insure to the interested party." *Id*. at 582.

The Texas Supreme Court subsequently affirmed "that the statute clearly creates a single, indivisible cause of action, which must be prosecuted in a single suit, instituted by the State through its proper officials; and that [the plaintiff's] rights are limited to sharing in the recovery." *Agey v. Am. Liberty Pipe Line Co*., 172 S.W.2d 972, 975 (Tex. 1943) (quotations omitted). Since the statute did not purport to grant the aggrieved party a right to file suit on behalf of himself and on behalf of the State, without joinder of a State attorney, the Court declined to decide whether the Legislature had the power to do so. *See id*. at 974. But the Court reaffirmed that,

36

under the Texas Constitution, "[t]he Attorney General is the chief law officer of the State, and it is incumbent upon him to institute in the proper courts proceedings to enforce or protect any right of the public that is violated. He has the right to investigate the facts and exercise his judgment and discretion regarding the filing of a suit." *Id.* (citations omitted).

The Texas Supreme Court in *Maud*, *Staples,* and *Agey* thus construed the Legislature's enactments to avoid an unconstitutional assignment of the power to bring suit for the State to anyone other than the duly-elected State attorneys. And when the Texas Supreme Court was confronted with a statute that unambiguously conferred such power on someone other than the State attorneys selected by the Texas Constitution, the Court did not hesitate to declare the enactment unconstitutional. In *Hill County v. Sheppard*, the Texas Supreme Court addressed a statute that purported to create an extra-constitutional office for a "Criminal District Attorney" for Hill County, who would be elected by county citizens and receive his fees out of the claims he prosecuted for the State. 178 S.W.2d at 261–62. While Hill County argued that the Court should construe the enactment to create a constitutional office for a "Criminal District Attorney" consistent with Article V, Section 21, the Court concluded that the statutory language "positively refute[d] any such intention" and declared the act invalid. *Id.* at 263–64. Because Article V, Section 21 of the Constitution "carefully apportions the duties of representing the

37

State in district and inferior courts (other than those conferred upon the Attorney General by Article IV, Section 22) among the constitutional officers of district attorney . . . and county attorney," the Court held it "well settled" that "the Legislature, in the absence of other constitutional authority therefor, could not create a statutory office with power to take over and exercise such functions." *Id*. at 264.

> "Where certain duties are imposed or specific powers are conferred upon a designated officer, the Legislature cannot withdraw them nor confer them upon others nor abridge them or interfere with the officer's right to exercise them unless the Constitution expressly so provides."

*Id*. (quoting 34 Tex. Jur. 445). The Court found the "above rule [] abundantly supported by" *Moore*, *Maud*, and *Staples*, among others, in holding that "the Legislature could not create a statutory office with authority to take over the duties of county attorney." *Id*. at 264. Yet that is the precise effect of the TMFPA *qui tam* statute vis-à-vis the Attorney General.

B. <u>The TMFPA *Qui Tam* Provisions Usurp the State Attorneys' Constitutional Duty and Authority By Authorizing Private Parties to Bring and Maintain Suit For and In the Name of the State.</u>

The Legislature's enactment of a *qui tam* action, authorizing any "person" to bring and maintain a suit "for the state" and "in the name . . . of the state" for a violation of the TMFPA, cannot be sustained under the Texas Constitution. *See* Tex. Hum. Res. Code § 36.101 (APP008); Tex. Hum. Res. Code § 36.104(b) (APP011). Because Article IV, Section 22 and Article V, Section 21 "mark the limits of legislative authority to prescribe who shall represent the state and control its interests

38

MR221

in a lawsuit in the district court," the Legislature cannot confer that power on a private "person." *Allen*, 9 S.W.2d at 732; *see Maud*, 200 S.W. at 376; *Sheppard*, 178 S.W.2d at 264.

By authorizing any "person" to bring suit for the State, the Legislature has essentially created an extra-constitutional office comprised of self-appointed private attorney generals who exercise a power that the Texas Constitution explicitly and exclusively confers on the duly-elected State attorneys. "[I]n the matter of bringing suits," the Texas Supreme Court has held, "the Attorney General must exercise judgment and discretion, which will not be controlled by other authorities." *Charles Scribner's Sons v. Marrs*, 262 S.W. 722, 727 (Tex. 1924); *see also Lewright v. Bell*, 63 S.W. 623, 623–24 (Tex. 1901) (concluding courts cannot compel Attorney General to initiate suit because that decision involves his professional judgment and discretion). Yet, the TMFPA purports to grant such control to *qui tam* relators to file suit for the State without the involvement or approval of the Attorney General. *See* Tex. Hum. Res. Code § 36.101 (APP008). "Even if the Attorney General determines that there are 'no reasonable grounds' for the fraud action, the relator may override that judgment and initiate a lawsuit." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 764 (5th Cir. 2001) (Smith, J., dissenting). The *qui tam* relator thus usurps the Attorney General in the performance of his duty to "investigate the facts and exercise his judgment regarding the filing of suit" for the State. *Agey*, 172

39

S.W.2d at 974; *see also State v. Stephens*, 664 S.W.3d 293, 297 (Tex. Crim. App. 2022) (Walker, J., concurring in denial of motion for rehearing) ("If the Attorney General files criminal charges when the prosecutor has specifically chosen not to, the Attorney General unduly interferes with—he usurps—the district or county attorneys' exercise of their prosecutorial power.").

And if the State (through its Attorney General) declines to intervene to prosecute the TMFPA violations, the TMFPA impermissibly authorizes an unharmed private party and its attorney to prosecute violations of state law in place of the Attorney General, whose primary duty is to represent the State in civil litigation. *See* Tex. Hum. Res. Code § 36.104(b) (APP011); *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001) (Attorney General's "primary duties are to render legal advice in opinions to various political agencies and to represent the State in civil litigation."). As the Texas Supreme Court remarked, consistent with the Texas Constitution, "[i]t is one thing to place the power of treble damages in the hands of aggrieved parties or the attorney general; it is quite another to place it in the hands of those considering litigation for commercial profit." *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 85 (Tex. 2004). Yet, the TMFPA purports to grant such power to a private party and its counsel, who owe no duty of loyalty to the State and are "motivated primarily by prospects of monetary reward rather than public good." *Hughes Aircraft Co. v. United States ex rel.*

40

MR223

*Schumer*, 520 U.S. 939, 949, 952 (1997); *see also* J. Randy Beck, *The False Claims Act And The English Eradication of Qui Tam Litigation*, 78 N.C. L. Rev. 539, 616 (2000) (*qui tam* relators have "no incentive to consider the public impact of the litigation, the culpability of the defendants, the fairness of a particular litigation strategy, or similar matters that might influence a public prosecutor").

In the proceedings below, HSG suggested that the Attorney General's non-intervention decision should be viewed as an implicit delegation of power to the relator and its counsel to prosecute the case without his participation. Resp. at 14 (MR115). But even if that were the Attorney General's intent, that does not render the relator's prosecution of the State's claims any less unconstitutional. To the contrary, the Texas Supreme Court has remarked that "private delegations clearly raise [] troubling constitutional issues" precisely because "the private delegate may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served." *Tex. Boll Weevil Eradication Foundation, Inc. v. Lewellen*, 952 S.W.2d 454, 469 (Tex. 1997); *see also id.* at 474 ( "authority to impose penal sanctions strongly suggests an improper private delegation," as does the lack of any special qualification or training requirements); *see also Dep't of Trans. v. Ass'n of Am. Railroad*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) (arguing "there is not even a fig leaf of constitutional justification" for delegating government power to private entities). "More fundamentally," the Texas Supreme Court observed that

41

"the basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government." *Tex. Boll Weevil*, 952 S.W.2d at 469.

If "[t]he Legislature is impliedly restrained from conferring [the] duty and responsibility [to represent the State] on the individual citizen," *Allen*, 9 S.W.2d at 732, then so too is the Attorney General. The Texas Constitution represents and protects the will of the people and cannot be ignored—even with the agreement of the Legislative and Executive departments. The turmoil of the Reconstruction era prompted the framers of the 1876 Texas Constitution to enact provisions to "decentralize the state government" and to "assure that the government would be responsive to public will" by "precisely defining the rights, powers, and prerogatives of the various governmental departments and agencies." *Stephens*, 664 S.W.3d at 294 (cleaned up). "A casual inspection of our Constitution makes it patent that everywhere the election of officers—that is, the elective system—is the paramount idea; i.e., they are elected by the people." *Ex parte Anderson*, 81 S.W. 973, 982 (Tex. Crim. App. 1904). The Texas Constitution thus grants to the people of Texas the right to choose who represents the State (and, by extension, their interests) in court, and that right cannot be taken from them and appointed to another by any act of the Legislature, with or without the consent of the Attorney General. The

42

Legislature does not have an "omnipotent" power "to divest the people of the right to select their local officers, and confer power of appointing them on the executive," and "[i]t would take no reasoning to comprehend that by [that] means our representative form of government could be easily destroyed." *Id*.

Just as "the governor cannot by agreement, on his own or through legislation, limit his veto power in any manner that is not provided in the Texas Constitution," the Attorney General cannot by agreement, on his own or with the consent of the Legislature, delegate or limit his constitutional duty to represent the State—and the public interest—in a manner not provided in the Texas Constitution. *Ex parte Perry*, 483 S.W.3d 884, 901 (Tex. Crim. App. 2016); *see also Vandyke*, 538 S.W.3d at 572–73. Under the Texas Constitution, "either the Attorney General or a county or district attorney may represent the State in a particular situation, but these are the only choices." *Hill v. Tex. Water Quality Bd.*, 568 S.W.2d 738, 741 (Tex. App.—Austin 1978, writ ref'd n.r.e.).

C. The TMFPA *Qui Tam* Provisions Unduly Interfere With the Attorney General's Broad Discretionary Authority to Litigate and Resolve the State's Claims.

In addition to granting private parties unconstitutional authority to file and prosecute a suit for the State, the TMFPA *qui tam* provisions unduly interfere with the broad discretionary authority of the Attorney General in violation of the Texas Constitution. *See State v. Stephens*, 663 S.W.3d 45, 51 (Tex. Crim. App. 2021)

43

MR226

(Texas Constitution separation of powers provision "is violated when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers.").

First, the TMFPA circumscribes the Attorney General's discretion by granting the relator the right to participate as a party even when the Attorney General elects to intervene to take over the action. *See* Tex. Hum. Res. Code § 36.107(a) (APP012). While the State has "primary responsibility for prosecuting the action and is not bound by an act of the [relator]," the TMFPA grants the relator the right to engage in discovery, file motions, and participate at trial by calling, examining, and cross-examining witnesses. *Id*. In *Farmers Group, Inc. v. Lubin*, the Texas Supreme Court recognized that it "would inevitably restrict the 'broad discretionary power' attorneys general need to carry out their constitutional duties" if the Court required the attorney general to recruit an individual representative to maintain a class action because "[a]n attorney general's duty is to represent the state, but attorneys for private individuals have a duty of loyalty only to their clients." 222 S.W.3d 417, 425 (Tex. 2007). The same reasoning applies here. Because the self-interested relator and its counsel are not hired by the Attorney General, do not serve under his direction or at his discretion, and may act independent of the Attorney General's litigation strategy, the relator's statutory right to participate inevitably hinders the Attorney General's ability to prosecute the State's claims free from the relator's

44

interference and influence.[9]  *See Maud*, 200 S.W. at 376 (holding Legislature may not "obtrude other persons upon [the State attorneys] and compel the acceptance of their services"); *Meshell v. State*, 739 S.W.2d 246, 254–55 (Tex. Crim. App. 1987) (holding Legislature may not abridge district attorneys' prosecutorial discretion in the preparation of the State's cases absent authorization by an express constitutional provision); *In re State*, 390 S.W.3d 439, 443 (Tex. App.—El Paso 2012, orig. proceeding) (holding trial court exceeded its constitutional authority by interfering with state attorney's "decision to call a particular witness [which] is a matter of trial strategy").

The TMFPA *qui tam* provisions also require the Attorney General to obtain relator or state-court approval for his discretionary decisions to dismiss or settle the State's claims.  Once a relator initiates a *qui tam* action, the Attorney General cannot simply intervene and non-suit the case.  He must obtain the relator's consent to the dismissal; otherwise, if the relator objects, then the relator is entitled to a hearing on the Attorney General's request for dismissal—which the court may ultimately deny, over the State's objection, in favor of the relator.  *See* Tex. Hum. Res. Code

---

[9] If the Attorney General believes the relator's efforts are negatively impacting the State's litigation strategy, he cannot unilaterally terminate the relator (or its counsel) or otherwise control their conduct.  Instead, the Attorney General's sole recourse is to apply to the court for relief limiting the relator's participation in the action (which the court may grant or deny) based on the factors set forth in the *qui tam* statute.  *See* Tex. Hum. Res. Code § 36.107(d) (APP012).  The TMFPA also grants defendants a similar right to seek relief from the court to limit a *qui tam* relator's participation in an intervened action.  *See id*. § 36.107(e) (APP013).

45

§ 36.107(b), (c) (APP012). While HSG and the State argued below that the State's views regarding dismissal are entitled to "substantial deference," (MR112–113), their argument simply misses the point. "Substantial deference" is not absolute deference, and it violates separation-of-powers principles to subject decisions that have been constitutionally committed to the Executive department—such as the Attorney General's non-enforcement decisions—to review by the Judicial department.[10] *See Van Dorn Preston v. M1 Support Servs., L.P.*, 642 S.W.3d 452, 457–58 (Tex. 2022).

The same is true of the Attorney General's discretionary "authority to propose a settlement agreement." *Terrazas v. Ramirez*, 829 S.W.2d 712, 722 (Tex. 1991). The TMFPA effectively requires the Attorney General to obtain the relator's consent to settle the State's claim; otherwise, if the relator objects, then the settlement must be submitted to the court to determine whether the proposal is "fair, adequate, and reasonable." *See* Tex. Hum. Res. Code § 36.107(c) (APP012). By requiring relator

---

[10] *See also Wayte v. United States*, 470 U.S. 598, 607 (1985) (the decision to prosecute is "particularly ill-suited to judicial review" because "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake" and would pose "systemic costs of particular concern . . . by subjecting the prosecutor's motives and decisionmaking to outside inquiry"); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (recognizing the "general unsuitability for judicial review of agency decisions to refuse enforcement" because they "involve[] a complicated balancing of a number of factors which are peculiarly within its expertise"); *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("[I]t is entirely clear that the refusal to prosecute cannot be the subject of judicial review.").

46

or state-court approval of "'policy choices and value determinations constitutionally committed for resolution'" to the Attorney General, the TMFPA violates the Texas Constitution by ceding to both a measure of control over the resolution of the State's claims superior to the Attorney General's own judgment. *See Am. K-9 Detection Servs., LLC v. Freeman*, 556 S.W.3d 246, 250 (Tex. 2018) (citation omitted); *Vandyke*, 538 S.W.3d at 572 ("Consistent with the constitutional provision that prohibits any one branch of the government from exercising control over any other branch, we have long recognized that this Court has no power to control nor right to review the Governor's exercise of his clemency power.").

D. The Texas Supreme Court's Decision in *Brown v. De La Cruz* Did Not Address—Let Alone "Settle"—the Constitutionality of Texas *Qui Tam* Statutes.

In the proceedings below, HSG and the State argued rather emphatically (and incorrectly) that the Texas Supreme Court's decision in *Brown*, 156 S.W.3d 560, already "settled" the constitutionality of the TMFPA *qui tam* statute by "affirming the validity of *qui tam* and similar statutes." SOI at 2, 13–14 (MR120, MR131–132); Resp. at 2, 7–8 (MR103, MR109–110). But *Brown* did nothing of the sort. *Brown* did not involve a *qui tam* statute or, for that matter, address the constitutionality of *any* statute. Rather, the question presented in *Brown* was whether the Texas Property Code granted a purchaser of residential property a private cause of action to recover a $500-per-day penalty for a seller's failure to

47

record and transfer a property deed within thirty days of payment. 156 S.W.3d at 561–62. The Texas Supreme Court concluded that the statute did not create a private cause of action because the statute was silent about who may collect the statutory penalty and, "[g]enerally, a statutory penalty or fine is not payable to a private litigant." *Id*. at 563–64. In reaching that conclusion, the Court recognized that the Legislature can create a private cause of action for a purchaser to recover a statutory penalty "beyond the damages that purchaser is likely to suffer," but if the Legislature intends to create a private cause of action, "it must do so clearly." *Id*. at 566. *Brown* thus stands for the unremarkable proposition that the Legislature may create a private cause of action for an individual harmed by a defendant's violation to recover a statutory penalty. It says nothing about the constitutionality of a statute that purports to authorize an unharmed private party to bring suit. Nor does it say anything about the constitutionality of a statute that purports to authorize a private party—whether harmed or not—to maintain a suit for and in the name of the State. The Texas Supreme Court's decisions in *Maud*, *Allen*, *Staples*, and *Sheppard* are controlling on those questions.

E. Federal Decisions Upholding Federal *Qui Tam* Statutes Under the U.S. Constitution Are Inapposite.

HSG and the State also argued that interference with the Attorney General's constitutional duty and authority to represent the State should be tolerated because federal courts have upheld federal *qui tam* statutes under the U.S. Constitution. But

48

whether a federal *qui tam* statute is constitutional under the U.S. Constitution is immaterial to whether a Texas *qui tam* statute is constitutional under the Texas Constitution's unique provisions.[11] *See City of Dallas v. Stewart*, 361 S.W.3d 562, 573–74 (Tex. 2012) (Because "separation of powers principles are ingrained in the Texas Constitution, while they are merely implied in the United States Constitution," "Fifth Circuit cases cited by the City have little relevance to our decision today, which must rely on the Texas Constitution and our precedent."); *Davenport v. Garcia*, 834 S.W.2d 4, 12 (Tex. 1992) ("When a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights.").

First, unlike the Texas Constitution, the U.S. Constitution does not include an explicit provision that assigns to a specific government actor the duty and power to represent the government's interest in litigation. Litigants have instead grounded federal constitutional challenges to the FCA *qui tam* procedure on the U.S. Constitution's Take Care Clause and Appointments Clause in Article II. *See, e.g.*, *Riley*, 252 F.3d 749. And those efforts have failed because federal courts have

---

[11] Moreover, the continuing vitality of those federal decisions is uncertain given that Justices Thomas, Kavanaugh, and Barrett recently raised concerns, *sua sponte*, about the constitutionality of the FCA's *qui tam* provisions under Article II of the U.S. Constitution. *See Polansky*, 599 U.S. at 449 (Thomas, J., dissenting); *id*. at 442 (Kavanaugh, J., concurring).

49

viewed the federal Take Care Clause more as a mandate that the President "follow the will of Congress than as a grant of exogenously defined power," and the U.S. Constitution "fails to specify when litigants representing the United States must be 'officers of the United States' to whom the specified appointment procedures apply." Evan Caminker, *The Constitutionality of* Qui Tam *Actions*, 99 Yale L.J. 341, 356 (1989); *see, e.g., Riley*, 252 F.3d at 753 (Take Care Clause "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law" and Appointments Clause does not apply to *qui tam* relators who do not qualify as "officers" under U.S. Supreme Court precedent). Even if "no Article II values appear to prohibit Congress from defining the United States' litigation interests through privately prosecuted civil suits," Caminker, *supra*, at 380, the Texas Supreme Court has held that the Texas Constitution does by conferring the duty and authority to represent the State's litigation interests on the State attorneys identified in Article IV, Section 22 and Article V, Section 21. *See Sheppard*, 178 S.W.2d at 264; *Allen*, 9 S.W.2d at 732; *Staples*, 245 S.W. at 641–43; *Maud*, 200 S.W. at 376.

Second, federal courts have cited the history of federal *qui tam* statutes as a "touchstone illuminating" their constitutionality under the U.S. Constitution because "[t]he Founding Fathers and First Congress enacted a number of statutes authorizing *qui tam* actions." *Riley*, 252 F.3d at 752–53. Even if post-ratification adoption of

50

MR233

laws were a valid consideration here,[12] HSG's reliance on the history of federal *qui tam* statutes is irrelevant to the constitutionality of *Texas qui tam* statutes under the *Texas* Constitution. HSG and the State have not identified anything in Texas's constitutional or legislative history that suggests that the framers of the 1876 Texas Constitution considered *qui tam* statutes consistent with Article IV, Section 22 and Article V, Section 21. As the Texas Supreme Court observed in 1882, in "looking to past legislation, under all the constitutions of this state," "none [have] defined the duties of the attorney general or of district or county attorneys so specifically as does" the current Texas Constitution. *Moore*, 57 Tex. at 316; *see also Agey*, 167 S.W.2d at 581–82. And for almost 150 years, the Texas Supreme Court has consistently held that the duties conferred by the Texas Constitution upon the State attorneys—to bring and maintain suits for the State—are "exclusive" and "[t]he Legislature cannot devolve them upon others." *Maud*, 200 S.W. at 376; *see Moore*, 57 Tex. at 314–16.

The Legislature's relatively recent enactment of the TMFPA *qui tam* statute does not provide grounds for overruling a century of Texas Supreme Court precedent. Even if the FCA *qui tam* statute can be traced back to the Civil War Era, the same cannot be said of the TMFPA *qui tam* statute. The Texas statute was not

---

[12] *Cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 35 (2022) ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (quotations and citation omitted)).

51

enacted until 1995 and, even then, the TMFPA only authorized the relator to file suit and required courts to dismiss the action if the Attorney General did not take over the action. *See* Tex. Res. Code § 36.104(b) (Vernon 1997) (APP017). It was not until 2007 that the Legislature amended the TMFPA to allow the relator itself to prosecute the TMFPA claims without the State and its Attorney General.[13] *See* Tex. Hum. Res. Code § 36.104(b) (Vernon 2007) (APP018). Thus, even assuming a statute's vintage were a persuasive ground for resolving its constitutionality—and it is not, *see Saldano v. State*, 70 S.W.3d 873, 883 (Tex. Crim. App. 2002) (a long tradition "cannot provide authority that the law does not")—HSG and the State have not identified any history of *qui tam* statutes in Texas prior to 1995 that warrants ignoring the Texas Constitution's plain language.

F.  Appeals To Policy Cannot Sustain An Unconstitutional Statute.

Despite HSG's and the State's arguments to the contrary, a parade of horribles will not follow from a decision invalidating the TMFPA *qui tam* statute under the Texas Constitution. HSG and the State argued that not only would a decision in

---

[13] The 2007 amendments were made in response to the federal government's amendment of Section 1909 of the Social Security Act, which sought to incentivize states to enact state Medicaid fraud legislation that, among other things, "contained provisions that are at least as effective in rewarding and facilitating *qui tam* actions for false or fraudulent claims as those described in [the FCA]." 42 U.S.C. § 1396h(b); *see* Public Health Comm., Bill Analysis, Tex. S.B. 362, 80th Leg. R.S. (2007) (Texas Senate Bill 362 intended to "make changes to the Texas statute to comply with the federal requirements" by "allow[ing] a person bringing the civil action to proceed without the state's participation, rather than requiring the court to dismiss the case, in the event that the state declines to take over the action.").

52

Novartis's favor allow Novartis to avoid liability under the TMFPA, but also compromise the State's ability to root out Medicaid fraud. Neither of these arguments withstand scrutiny, let alone provide a basis for upholding a facially invalid statute.

First, a decision invalidating the TMFPA *qui tam* statute would not "forever shield" Novartis's (or anyone else's) "actions from anti-kickback scrutiny," and HSG was wrong to suggest otherwise to the district court. Resp. at 1 (MR102). The Attorney General has the constitutional and statutory authority to bring a civil action against Novartis if he believes (contrary to the federal government) that Novartis engaged in conduct that violates the TMFPA. *See* Tex. Const. art. IV, § 22 (APP006); Tex. Hum. Res. Code § 36.052(e) (APP016).

Second, the State's suggestion that the "ends" justify the "means" also does not suffice for constitutionality. If the Legislature wishes to incentivize individuals to come forward with information to assist the State in combatting fraud on the Texas Medicaid program, it may do so within the constraints of the Texas Constitution by, for example, implementing a program similar to the federal SEC Whistleblower Program. The Legislature could incentivize individuals to report potential TMFPA violations to the State in return for a percentage of the recovery in an action brought by the State and its Attorney General. Such a program would not transgress the Attorney General's constitutional duty to bring and maintain suits for the State and

53

would provide a "'powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity.'" SOI at 21 (MR139) (citation omitted). But the Legislature cannot achieve the same ends through an unconstitutional means of a *qui tam* statute that authorizes private parties to themselves bring and maintain suits for the State in place of the Attorney General. *See State v. Thomas*, 766 S.W.2d 217, 219 (Tex. 1989) ("The legislature cannot by statute abrogate the Attorney General's constitutional grant of power. Only by constitutional amendment can the legislature alter the constitutional balance of powers; it cannot do so by legislation."). "The people of Texas made the constitution, and they have a right to change it if it is found to work harshly and unjustly, but the courts have no choice but to enforce and obey its mandates." *Swayne v. Chase,* 30 S.W. 1049, 1053 (Tex. 1895). Regardless of how well meaning the Legislature's enactment of the *qui tam* provisions may have been, the "vice in [the TMFPA] is that . . . a private citizen, with no personal interest alleged or shown, is authorized, of his own volition, to institute and prosecute a suit in behalf of the state, in violation of a provision of the Constitution vesting that authority exclusively in the county attorney or district attorney or Attorney General" elected by and accountable to the people of Texas. *Starnes*, 246 S.W. at 425.

A parade of horribles would not follow from a decision invalidating the Texas *qui tam* statute, but rather from one erroneously upholding it contrary to the Texas

54

Constitution. If one accepts that the Legislature can assign to unharmed private parties—even from outside Texas or the United States—the power to prosecute violations of the TMFPA, then nothing would prevent the Legislature from granting private parties the ability to prosecute *every* violation of state law and thereby subject the "executive power to death by a thousand cuts." Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 582 (2005). And if the Legislature can validly delegate that power to self-appointed relators, what prevents the Legislature from delegating that power to a specific individual or association of individuals of its choosing? A decision upholding the TMFPA *qui tam* statute would mean that the Legislature not only has the power to enact laws but also the power to enforce the laws it enacts by delegating prosecutorial power to any agent of its choosing. The Texas Constitution does not permit this to be done.

*　　*　　*　　*　　*

The Texas Constitution and Texas Supreme Court precedent make clear that the State attorneys' duty and authority to bring and maintain suit for the State is exclusive. The Texas Constitution expresses no authority for a private party to represent the State in a civil case and thus gives only one answer to the question before the district court: the TMFPA's *qui tam* provisions exceed the Legislature's "authority to prescribe who shall represent the state and control its interests in a lawsuit." *Allen*, 9 S.W.2d at 732. The TMFPA *qui tam* provisions unduly interfere

55

MR238

with the Attorney General's core constitutional duties and authority to initiate (or not initiate) suit for the State, terminate or settle the State's claims (without relator or court approval), and exclusively control the preparation and presentation of the State's case for trial. As the Texas Supreme Court recognized over a century ago, "[i]t is the duty of courts to see that the Constitution is observed in the enactment of laws, and to fearlessly declare a law void which violates the Constitution." *Maud*, 200 S.W. at 376. The district court's failure to do so here constitutes a clear abuse of discretion. Because HSG's *qui tam* action cannot be sustained under the Texas Constitution, this case must be dismissed for want of a legally valid cause of action.

## III. Novartis Lacks An Adequate Appellate Remedy To Correct the District Court's Clear Abuse of Discretion.

The Court should grant mandamus relief because Novartis lacks an adequate appellate remedy to correct the district court's errors. The Texas Supreme Court has held that "[a]n appellate remedy is 'adequate' when any benefits to mandamus review are outweighed by the detriments," which requires a "careful balanc[ing] of jurisprudential considerations." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding); *see In re J.B. Hunt Transport, Inc*., 492 S.W.3d 287, 298–99 (Tex. 2016) (orig. proceeding). In conducting this balancing test, Texas courts have concluded that mandamus relief is warranted to (i) "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings" and (ii) resolve significant issues of first

56

impression that are likely to recur. *In re Prudential*, 148 S.W.3d at 136–38. Because

both factors are present here, the balance heavily tips in favor of mandamus review.

    A.    <u>Mandamus Relief is Warranted to Avoid Waste of Party and Public</u>
                <u>Resources.</u>

To deny mandamus relief would result in a "gross and unnecessary waste of

economic and judicial resources" if this case is tried to judgment only to be reversed

on appeal for lack of subject-matter jurisdiction or a valid cause of action. *In re J.B.*

*Hunt Transport, Inc*., 492 S.W.3d at 298; *see In re Prudential*, 148 S.W.3d at 137

("We simply could not justify putting the civil justice system itself to the trouble of

grinding through proceedings that were certain to be 'little more than a fiction.'").

For that reason, the Texas Supreme Court and this Court have held that

mandamus relief is available to review and correct an erroneous denial of a Rule 91a

motion to dismiss. *See In re Farmers Tex. Cty. Mutual Ins. Co*., 621 S.W.3d 261,

266 (Tex. 2021) (orig. proceeding) ("Mandamus relief is appropriate when the trial

court abuses its discretion in denying a Rule 91a motion to dismiss."); *In re Essex*

*Ins. Co*., 450 S.W.3d at 528 (conditionally granting mandamus from erroneous

denial of Rule 91a motion to dismiss; "[W]e have previously held that mandamus

relief is appropriate to spare private parties and the public the time and money utterly

wasted enduring eventual reversal of improperly conducted proceedings." (cleaned

up; citations omitted)); *In re Shire PLC*, 633 S.W.3d at 27; *see also In re Springs*

*Condos., L.L.C*., No. 03-21-00493-CV, 2021 WL 5814292, at *2 (Tex. App.—

57

MR240

Austin Dec. 8, 2021, orig. proceeding [mand. denied]) ("A traditional appeal after final judgment is an inadequate remedy when a 'legally invalid lawsuit' is not dismissed under Rule 91a."); *In re Butt*, 495 S.W.3d 455, 460 (Tex. App.—Corpus Christi-Edinburg 2016, orig. proceeding) ("[M]andamus review of orders denying Rule 91a motions comports with the Legislature's requirement for an early and speedy resolution of baseless claims."). When the plaintiff's claim is foreclosed as a matter of law, this Court has recognized that "a defendant will never have an adequate remedy at law where dismissal was improperly denied" because it "expose[s] the defendant to the time and resources necessary to defend a claim that can only end in a defense verdict." *In re Shire*, 633 S.W.3d at 27. Because HSG's *qui tam* action violates the Texas Constitution, "it is legally impossible for [it] to recover on the claims in its petition" and "mandamus should be granted to correct" the district court's erroneous ruling. *Id.*

The same is true of an erroneous denial of a plea to the jurisdiction challenging the court's subject-matter jurisdiction. Because "a trial court lacks discretion and must dismiss the case as a ministerial act when it lacks subject matter jurisdiction," Texas courts have held "mandamus is [] proper when a trial court acts without subject matter jurisdiction." *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d 347, 352 (Tex. App.—Dallas 2017, orig. proceeding) (conditionally granting petition for writ of mandamus from order denying plea to the jurisdiction); *see also In re John*

58

*G. & Marie Stella Kenedy Mem'l Found.*, 315 S.W.3d 519, 522 (Tex. 2010) (orig. proceeding) ("Mandamus is proper if a trial court issues an order that exceeds its jurisdictional authority."); *In re Footman*, No. 03-15-00477-CV, 2015 WL 7164170, at *2 n.1 (Tex. App.—Austin Nov. 10, 2015, orig. proceeding) ("Mandamus is generally proper if a trial court lacks subject matter jurisdiction over the underlying proceeding, and in such a case, a relator need not establish that she lacks an adequate remedy by appeal."). Moreover, this Court should grant mandamus relief because it would have to address the subject-matter-jurisdiction question in any event to ensure its own jurisdiction to reach the merits of the Rule 91a motion to dismiss. *See S.C. v. M.B.*, 650 S.W.3d 428, 449 (Tex. 2022) ("Courts always have the duty to ensure that subject-matter jurisdiction—their own and that of the lower courts—is secure."); *Good Shepherd Med. Ctr., Inc. v. State*, 306 S.W.3d 825, 837 (Tex. App.—Austin 2010, no pet.) (appellate courts have "a duty to consider a question of subject-matter jurisdiction sua sponte because the district court's power to decide the merits, as well as our own, rests upon it").

B.    Mandamus Relief is Warranted to Resolve A Significant Issue of First Impression That Is Likely to Recur and Necessary to Preserve Executive Jurisdiction.

While the law that precludes HSG's lawsuit is well-settled, its specific application to the TMFPA *qui tam* statute presents a significant issue of first impression that also favors mandamus review of the district court's order. "A trial

MR242

court's erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion." *Huie v. DeShazo*, 922 S.W.2d 920, 927–928 (Tex. 1996); *see also In re Gilead Sciences*, No. 06-21-00030-CV, 2021 WL 4466006, at *6 (Tex. App.—Texarkana Sept. 30, 2021, orig. proceeding).  And, as the Texas Supreme Court has recognized, "an issue of law, one of first impression [], but likely to recur" "fits well within the types of issues for which mandamus review is not only appropriate but necessary." *In re Prudential*, 148 S.W.3d at 138.  The instant petition presents such a situation.

Whether an unharmed private plaintiff has constitutional standing and a valid cause of action to bring this TMFPA *qui tam* action is a pure issue of law, and one of first impression, that is likely to recur and may evade review since most *qui tam* actions are dismissed or settled pursuant to the unconstitutional *qui tam* procedures. *See, e.g.*, Kaz Kikkawa, Note, *Medicare Fraud and Abuse and Qui Tam: The Dynamic Duo or the Odd Couple?*, 8 Health Matrix 83, 122 (1998) ("[N]egative publicity, the large potential penalties involved, and availability of reimbursement of attorneys fees all encourage the settlement of claims.  Few cases are litigated to completion, thus creating little judicial precedent.").  Moreover, immediate resolution of the issues presented here are important to preserving separation of powers and the orderly processes of government—specifically, the jurisdiction of the Executive department and the Attorney General's constitutional duty to

60

determine when and where to file suit for the State. When, as here, the plaintiff lacks constitutional standing or a legally valid lawsuit, this Court's immediate intervention is warranted to prevent the district court from proceeding with a matter that falls within the Executive department's jurisdiction. *See In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 624 (Tex. 2007) (orig. proceeding) (conditionally granting mandamus to require dismissal of claims because "[a]llowing the trial court to proceed if the PUC has exclusive jurisdiction would disrupt the orderly processes of government"); *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004) (orig. proceeding) (similar); *In re Houston Specialty Ins. Co.*, 569 S.W.3d 138, 142 (Tex. 2019) (orig. proceeding) ("A legally invalid lawsuit that deprives the real plaintiff of the traditional right to choose the time and place of suit satisfies [the no-adequate-remedy] test." (cleaned up)).

## PRAYER

Novartis respectfully requests that this Court conditionally grant this Petition for Writ of Mandamus, instruct the district court to vacate its December 15, 2023 order denying Novartis's Plea to the Jurisdiction and Motion to Dismiss, and direct the district court to dismiss HSG's *qui tam* action for lack of subject matter jurisdiction or, alternatively, a valid cause of action, and grant Novartis any other relief to which it may be entitled.

61

Dated:  February 2, 2024        Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Danny S. Ashby*
Danny S. Ashby
Texas Bar No. 01370960
dashby@omm.com
Megan Whisler
Texas Bar No. 24079565
mwhisler@omm.com
2801 North Harwood Street, Suite 1600
Dallas, Texas  75201
Telephone:  +1 972 360 1900
Facsimile:  +1 972 360 1901

Ross Galin
rgalin@omm.com
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000
(Application for *pro hac vice* admission pending)

Meredith Garagiola
mgaragiola@omm.com
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
(Application for *pro hac vice* admission pending)

THE DACUS FIRM, P.C.

Deron R. Dacus
Texas Bar No. 00790553
ddacus@dacusfirm.com
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

*Counsel for Relator*
*Novartis Pharmaceuticals Corporation*

62

## CERTIFICATE OF COMPLIANCE

Based on a word count run in Microsoft Word for Microsoft 365, this Petition for Writ of Mandamus contains 14,313 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Danny S. Ashby*
Danny S. Ashby

## CERTIFICATION

I certify that I have reviewed the Petition and concluded that every factual statement in the Petition is supported by competent evidence included in the Appendix or Mandamus Record.

*/s/ Danny S. Ashby*
Danny S. Ashby

**MR246**

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the foregoing Petition for Writ of Mandamus has been forwarded this 2nd day of February 2024, to the following attorneys of record via electronic service:

Samuel F. Baxter
Jennifer L. Truelove
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
sbaxter@mckoolsmith.com
jtruelove@mckoolsmith.com

Eric B. Halper
Radu A. Lelutiu
MCKOOL SMITH P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
ehalper@mckoolsmith.com
rlelutiu@mckoolsmith.com

W. Mark Lanier
Alex J. Brown
Zeke DeRose III
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
WML@LanierLawFirm.com
Alex.Brown@LanierLawFirm.com
Zeke.DeRose@LanierLawFirm.com
Jonathan.Wilkerson@LanierLawFirm.com

*Counsel for Health Selection Group, LLC*

Jordan Underhill
Jonathan D. Bonilla
Lynne Kurtz-Citrin
Office of the Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Jordan.Underhill@oag.texas.gov
Jonathan.Bonilla@oag.texas.gov
Lynne.Kurtz-Citrin@oag.texas.gov

*Counsel for the State of Texas*

*/s/ Danny S. Ashby*
Danny S. Ashby

64

**NO. _____**

---

## IN THE COURT OF APPEALS
## FOR THE SIXTH DISTRICT OF TEXAS
## AT TEXARKANA

---

## IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

### *Relator*.

---

### Original Proceeding From The 71st District Court
### in Harrison County, Texas
### The Honorable Brad Morin Presiding

---

### APPENDIX

---

| DOCUMENT | PAGE |
|---|---|
| Order Denying Defendant's Plea to Jurisdiction and Motion to Dismiss | 001 |
| Tex. Const. Art. I, § 13 | 004 |
| Tex. Const. Art. II, § 1 | 005 |
| Tex. Const. Art. IV, § 22 | 006 |
| Tex. Const. Art. V, § 21 | 007 |
| Tex. Hum. Res. Code § 36.101 | 008 |
| Tex. Hum. Res. Code § 36.102 | 009 |
| Tex. Hum. Res. Code § 36.104 | 011 |
| Tex. Hum. Res. Code § 36.107 | 012 |
| Tex. Hum. Res. Code § 36.113 | 014 |
| Tex. Hum. Res. Code § 36.052 | 015 |
| Tex. Res. Code § 36.104 (1997) | 017 |
| Tex. Hum. Res. Code § 36.104 (2007) | 018 |

## DECLARATION OF DANNY S. ASHBY

I, Danny S. Ashby, hereby declare under penalty of perjury the following:

5.     I am counsel of record for Relator Novartis Pharmaceuticals Corporation ("Novartis") in connection with the Petition for Writ of Mandamus styled *In re Novartis Pharmaceuticals Corporation*, filed concurrently herewith, in the Court of Appeals for the Sixth District of Texas.

6.     In compliance with Texas Rule of Appellate Procedure 52.3(k), I have reviewed and hereby verify that the Order Denying Defendant's Plea to Jurisdiction and Motion to Dismiss in this Appendix is a true and correct copy of the Order Denying Defendant's Plea to Jurisdiction and Motion to Dismiss filed on December 15, 2023, in the underlying district court proceeding, Case No. 23-0276, in the 71st Judicial District Court, Harrison County, Texas, the Honorable Brad Morin presiding.

7.     My birthdate is October 1, 1964, and my firm address is 2801 North Harwood Street, Suite 1600, Dallas, Texas 75201.

Executed in Dallas County, Texas on January 31, 2024.

_____
Danny S. Ashby

Filed 12/15/2023 9:01 PM
Sherry Griffis
District Clerk
Harrison County, Texas

Heather Henigan

Deputy

**CAUSE NO. 23-0276**

| | |
|---|---|
| THE STATE OF TEXAS, | IN THE DISTRICT COURT |
| *ex rel.* | |
| | 71ST JUDICIAL DISTRICT |
| HEALTH SELECTION GROUP, LLC | |
| Plaintiff, | HARRISON COUNTY, TEXAS |
| v. | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| Defendant. | |

## ORDER DENYING DEFENDANT'S PLEA TO JURISDICTION AND MOTION TO DISMISS

Before the Court is Defendant's Plea to Jurisdiction and Motion to Dismiss Pursuant to

Rule 91a (the "Motion").

Upon consideration of the parties' briefs and oral argument, the Court is of opinion that the

Motion should be **DENIED**.

IT IS SO ORDERED.

SIGNED this _____15_____ day of _____Dec_____, 2023.

_____
Hon. Brad Morin
Judge Presiding

4871-9059-1383

001

**MR250**

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 82601915
Filing Code Description: Proposed Order
Filing Description: ORDER DENYING DEFENDANT'S PLEA TO JURISDICTION AND MOTION TO DISMISS
Status as of 12/15/2023 10:28 AM CST

Associated Case Party: HEALTH SELECTION GROUP, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Samuel Baxter | | sbaxter@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Jennifer L.Truelove | | jtruelove@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Radu A. Lelutiu | | rlelutiu@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Mark Lanier | | WML@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |
| Alex J.Brown | | Alex.Brown@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |
| Joel Leach | | jleach@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Kim Shoults | | kshoults@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Denise Lopez | | dlopez@mckoolsmith.com | 12/14/2023 9:01:09 PM | SENT |
| Zeke DeRose | | Zeke.DeRose@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |
| Jonathan Wilkerson | | Jonathan.Wilkerson@LanierLawFirm.com | 12/14/2023 9:01:09 PM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lynne Kurtz-Citrin | | Lynne.Kurtz-Citrin@oag.texas.gov | 12/14/2023 9:01:09 PM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 12/14/2023 9:01:09 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 12/14/2023 9:01:09 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kimberly Grotenrath | | kgrotenrath@omm.com | 12/14/2023 9:01:09 PM | SENT |

002

**MR251**

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 82601915
Filing Code Description: Proposed Order
Filing Description: ORDER DENYING DEFENDANT'S PLEA TO JURISDICTION AND MOTION TO DISMISS
Status as of 12/15/2023 10:28 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Kimberly Grotenrath | | kgrotenrath@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Dianne Adams | | dadams@dacusfirm.com | 12/14/2023 9:01:09 PM | SENT |

Associated Case Party: NOVARTIS AG

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ross Galin | | rgalin@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Danny S.Ashby | | dashby@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Meredith N.Garagiola | | mgaragiola@omm.com | 12/14/2023 9:01:09 PM | SENT |
| Deron Dacus | | ddacus@dacusfirm.com | 12/14/2023 9:01:09 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 12/14/2023 9:01:09 PM | SENT |

Copy from re:SearchTX

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article I. Bill of Rights (Refs & Annos)

Vernon's Ann.Texas Const. Art. 1, § 13

§ 13. Excessive bail or fines; cruel or unusual punishment; open courts; remedy by due course of law

Currentness

Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

**Credits**
Adopted Feb. 15, 1876.

Vernon's Ann. Texas Const. Art. 1, § 13, TX CONST Art. 1, § 13
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Constitution of the State of Texas 1876 (Refs & Annos)
     Article II. The Powers of Government

Vernon's Ann.Texas Const. Art. 2, § 1

§ 1. Separation of powers of government among three departments

Currentness

The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

**Credits**
Adopted Feb. 15, 1876.

Vernon's Ann. Texas Const. Art. 2, § 1, TX CONST Art. 2, § 1
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article IV. Executive Department

Vernon's Ann.Texas Const. Art. 4, § 22

§ 22. Attorney General

Currentness

The Attorney General shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers, when requested by them, and perform such other duties as may be required by law.

**Credits**
Adopted Feb. 15, 1876. Amended Nov. 3, 1936; Nov. 2, 1954; Nov. 7, 1972; Nov. 2, 1999.

Vernon's Ann. Texas Const. Art. 4, § 22, TX CONST Art. 4, § 22
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article V. Judicial Department

Vernon's Ann.Texas Const. Art. 5, § 21

§ 21. County attorneys; district attorneys

Currentness

A County Attorney, for counties in which there is not a resident Criminal District Attorney, shall be elected by the qualified voters of each county, who shall be commissioned by the Governor, and hold his office for the term of four years. In case of vacancy the Commissioners Court of the county shall have the power to appoint a County Attorney until the next general election. The County Attorneys shall represent the State in all cases in the District and inferior courts in their respective counties; but if any county shall be included in a district in which there shall be a District Attorney, the respective duties of District Attorneys and County Attorneys shall in such counties be regulated by the Legislature. The Legislature may provide for the election of District Attorneys in such districts, as may be deemed necessary, and make provision for the compensation of District Attorneys and County Attorneys. District Attorneys shall hold office for a term of four years, and until their successors have qualified.

**Credits**
Adopted Feb. 15, 1876. Amended Nov. 2, 1954.

Vernon's Ann. Texas Const. Art. 5, § 21, TX CONST Art. 5, § 21
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Human Resources Code (Refs & Annos)
    Title 2. Human Services and Protective Services in General
      Subtitle C. Assistance Programs
        Chapter 36. Health Care Program Fraud Prevention (Refs & Annos)
          Subchapter C. Action by Private Persons

V.T.C.A., Human Resources Code § 36.101

§ 36.101. Action by Private Person Authorized

Currentness

(a) A person may bring a civil action for a violation of Section 36.002 for the person and for the state. The action shall be brought in the name of the person and of the state.

(b) In an action brought under this subchapter, a person who violates Section 36.002 is liable as provided by Section 36.052.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1153, § 4.08, eff. Sept. 1, 1997.

V. T. C. A., Human Resources Code § 36.101, TX HUM RES § 36.101
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Human Resources Code (Refs & Annos)
    Title 2. Human Services and Protective Services in General
      Subtitle C. Assistance Programs
        Chapter 36. Health Care Program Fraud Prevention (Refs & Annos)
          Subchapter C. Action by Private Persons

V.T.C.A., Human Resources Code § 36.102

§ 36.102. Initiation of Action; Consent Required for Dismissal

Effective: September 1, 2019
Currentness

(a) A person bringing an action under this subchapter shall serve a copy of the petition and a written disclosure of substantially all material evidence and information the person possesses on the attorney general in compliance with the Texas Rules of Civil Procedure.

(b) The petition shall be filed in camera and, except as provided by Subsection (c-1) or (d), shall remain under seal until at least the 180th day after the date the petition is filed or the date on which the state elects to intervene, whichever is earlier. The petition may not be served on the defendant until the court orders service on the defendant.

(c) The state may elect to intervene and proceed with the action not later than the 180th day after the date the attorney general receives the petition and the material evidence and information.

(c-1) At the time the state intervenes, the attorney general may file a motion with the court requesting that the petition remain under seal for an extended period.

(d) The state may, for good cause shown, move the court to extend the 180-day deadline under Subsection (b) or (c). A motion under this subsection may be supported by affidavits or other submissions in camera.

(e) An action under this subchapter may be dismissed only if the court and the attorney general consent in writing to the dismissal and state their reasons for consenting.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1153, § 4.08, eff. Sept. 1, 1997. Amended by Acts 2005, 79th Leg., ch. 806, § 10, eff. Sept. 1, 2005; Acts 2019, 86th Leg., ch. 97 (H.B. 2004), §§ 1, 2, eff. Sept. 1, 2019.

V. T. C. A., Human Resources Code § 36.102, TX HUM RES § 36.102
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Human Resources Code (Refs & Annos)
        Title 2. Human Services and Protective Services in General
            Subtitle C. Assistance Programs
                Chapter 36. Health Care Program Fraud Prevention (Refs & Annos)
                    Subchapter C. Action by Private Persons

V.T.C.A., Human Resources Code § 36.104

§ 36.104. State Decision; Continuation of Action

Effective: September 1, 2013
Currentness

(a) Not later than the last day of the period prescribed by Section 36.102(c) or an extension of that period as provided by Section 36.102(d), the state shall:

  (1) proceed with the action; or

  (2) notify the court that the state declines to take over the action.

(b) If the state declines to take over the action, the person bringing the action may proceed without the state's participation. A person proceeding under this subsection may recover for an unlawful act for a period of up to six years before the date the lawsuit was filed, or for a period beginning when the unlawful act occurred until up to three years from the date the state knows or reasonably should have known facts material to the unlawful act, whichever of these two periods is longer, regardless of whether the unlawful act occurred more than six years before the date the lawsuit was filed. Notwithstanding the preceding sentence, in no event shall a person proceeding under this subsection recover for an unlawful act that occurred more than 10 years before the date the lawsuit was filed.

(b-1) On request by the state, the state is entitled to be served with copies of all pleadings filed in the action and be provided at the state's expense with copies of all deposition transcripts. If the person bringing the action proceeds without the state's participation, the court, without limiting the status and right of that person, may permit the state to intervene at a later date on a showing of good cause.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1153, § 4.08, eff. Sept. 1, 1997. Amended by Acts 2005, 79th Leg., ch. 806, § 12, eff. Sept. 1, 2005; Acts 2007, 80th Leg., ch. 29, §§ 3, 4, eff. May 4, 2007; Acts 2013, 83rd Leg., ch. 572 (S.B. 746), § 2, eff. Sept. 1, 2013.

V. T. C. A., Human Resources Code § 36.104, TX HUM RES § 36.104
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Human Resources Code (Refs & Annos)
    Title 2. Human Services and Protective Services in General
      Subtitle C. Assistance Programs
        Chapter 36. Health Care Program Fraud Prevention (Refs & Annos)
          Subchapter C. Action by Private Persons

V.T.C.A., Human Resources Code § 36.107

§ 36.107. Rights of Parties if State Continues Action

Currentness

(a) If the state proceeds with the action, the state has the primary responsibility for prosecuting the action and is not bound by an act of the person bringing the action. The person bringing the action has the right to continue as a party to the action, subject to the limitations set forth by this section.

(b) The state may dismiss the action notwithstanding the objections of the person bringing the action if:

(1) the attorney general notifies the person that the state has filed a motion to dismiss; and

(2) the court provides the person with an opportunity for a hearing on the motion.

(c) The state may settle the action with the defendant notwithstanding the objections of the person bringing the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. On a showing of good cause, the hearing may be held in camera.

(d) On a showing by the state that unrestricted participation during the course of the litigation by the person bringing the action would interfere with or unduly delay the state's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may impose limitations on the person's participation, including:

(1) limiting the number of witnesses the person may call;

(2) limiting the length of the testimony of witnesses called by the person;

(3) limiting the person's cross-examination of witnesses; or

(4) otherwise limiting the participation by the person in the litigation.

(e) On a showing by the defendant that unrestricted participation during the course of the litigation by the person bringing the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

**Credits**

Added by Acts 1997, 75th Leg., ch. 1153, § 4.08, eff. Sept. 1, 1997.

V. T. C. A., Human Resources Code § 36.107, TX HUM RES § 36.107

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Human Resources Code (Refs & Annos)
      Title 2. Human Services and Protective Services in General
         Subtitle C. Assistance Programs
            Chapter 36. Health Care Program Fraud Prevention (Refs & Annos)
               Subchapter C. Action by Private Persons

V.T.C.A., Human Resources Code § 36.113

§ 36.113. Certain Actions Barred

Effective: September 1, 2013
Currentness

(a) A person may not bring an action under this subchapter that is based on allegations or transactions that are the subject of a civil suit or an administrative penalty proceeding in which the state is already a party.

(b) The court shall dismiss an action or claim under this subchapter, unless opposed by the attorney general, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed in a Texas or federal criminal or civil hearing in which the state or an agent of the state is a party, in a Texas legislative or administrative report, or other Texas hearing, audit, or investigation, or from the news media, unless the person bringing the action is an original source of the information. In this subsection, "original source" means an individual who:

(1) prior to a public disclosure under this subsection, has voluntarily disclosed to the state the information on which allegations or transactions in a claim are based; or

(2) has knowledge that is independent of and materially adds to the publicly disclosed allegation or transactions and who has voluntarily provided the information to the state before filing an action under this subchapter.

(c) Repealed by Acts 2013, 83rd Leg., ch. 572 (S.B. 746), § 6.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1153, § 4.08, eff. Sept. 1, 1997. Amended by Acts 2011, 82nd Leg., ch. 398 (S.B. 544), § 5, eff. Sept. 1, 2011; Acts 2013, 83rd Leg., ch. 572 (S.B. 746), §§ 4, 6, eff. Sept. 1, 2013.

V. T. C. A., Human Resources Code § 36.113, TX HUM RES § 36.113
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

Vernon's Texas Statutes and Codes Annotated
  Human Resources Code (Refs & Annos)
    Title 2. Human Services and Protective Services in General
      Subtitle C. Assistance Programs
        Chapter 36. Health Care Program Fraud Prevention (Refs & Annos)
          Subchapter B. Action by Attorney General (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Human Resources Code § 36.052

§ 36.052. Civil Remedies

Effective: April 2, 2015 to August 31, 2023

(a) Except as provided by Subsection (c), a person who commits an unlawful act is liable to the state for:

(1) the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party;

(2) interest on the amount of the payment or the value of the benefit described by Subdivision (1) at the prejudgment interest rate in effect on the day the payment or benefit was received or paid, for the period from the date the benefit was received or paid to the date that the state recovers the amount of the payment or value of the benefit;

(3) a civil penalty of:

(A) not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a person with a disability, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or

(B) not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A); and

(4) two times the amount of the payment or the value of the benefit described by Subdivision (1).

(b) In determining the amount of the civil penalty described by Subsection (a)(3), the trier of fact shall consider:

(1) whether the person has previously violated the provisions of this chapter;

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(2) the seriousness of the unlawful act committed by the person, including the nature, circumstances, extent, and gravity of the unlawful act;

(3) whether the health and safety of the public or an individual was threatened by the unlawful act;

(4) whether the person acted in bad faith when the person engaged in the conduct that formed the basis of the unlawful act; and

(5) the amount necessary to deter future unlawful acts.

(c) The trier of fact may assess a total of not more than two times the amount of a payment or the value of a benefit described by Subsection (a)(1) if the trier of fact finds that:

(1) the person furnished the attorney general with all information known to the person about the unlawful act not later than the 30th day after the date on which the person first obtained the information; and

(2) at the time the person furnished all the information to the attorney general, the attorney general had not yet begun an investigation under this chapter.

(d) An action under this section shall be brought in Travis County or in a county in which any part of the unlawful act occurred.

(e) The attorney general may:

(1) bring an action for civil remedies under this section together with a suit for injunctive relief under Section 36.051; or

(2) institute an action for civil remedies independently of an action for injunctive relief.

**Credits**
Added by Acts 1995, 74th Leg., ch. 824, § 1, eff. Sept. 1, 1995. Redesignated from V.T.C.A., Human Resources Code § 36.004 by Acts 1997, 75th Leg., ch. 1153, § 4.01(b), eff. Sept. 1, 1997. Amended by Acts 1997, 75th Leg., ch. 1153, § 4.04, eff. Sept. 1, 1997; Acts 2005, 79th Leg., ch. 806, § 7, eff. Sept. 1, 2005; Acts 2007, 80th Leg., ch. 29, § 1, eff. May 4, 2007; Acts 2011, 82nd Leg., ch. 398 (S.B. 544), § 3, eff. Sept. 1, 2011; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 4.183, eff. April 2, 2015.

V. T. C. A., Human Resources Code § 36.052, TX HUM RES § 36.052
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document**                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Human Resources Code (Refs & Annos)
    Title 2. Human Services and Protective Services in General
      Subtitle C. Assistance Programs
        Chapter 36. Medicaid Fraud Prevention (Refs & Annos)
          Subchapter C. Action by Private Persons

This section has been updated. Click here for the updated version.

V.T.C.A., Human Resources Code § 36.104

§ 36.104. Continuation or Dismissal of Action Based on State Decision

Effective: [See Text Amendments] to August 31, 2005

(a) Not later than the last day of the period prescribed by Section 36.102(c), the state shall:

  (1) proceed with the action; or

  (2) notify the court that the state declines to take over the action.

(b) If the state declines to take over the action, the court shall dismiss the action.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1153, § 4.08, eff. Sept. 1, 1997.

V. T. C. A., Human Resources Code § 36.104, TX HUM RES § 36.104
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**　　　　　　　　　　　　　　　　© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Statutes and Codes Annotated
　Human Resources Code (Refs & Annos)
　　Title 2. Human Services and Protective Services in General
　　　Subtitle C. Assistance Programs
　　　　Chapter 36. Health Care Program Fraud Prevention (Refs & Annos)
　　　　　Subchapter C. Action by Private Persons

This section has been updated. Click here for the updated version.

V.T.C.A., Human Resources Code § 36.104

§ 36.104. State Decision; Continuation of Action

Effective: May 4, 2007 to August 31, 2013

(a) Not later than the last day of the period prescribed by Section 36.102(c) or an extension of that period as provided by Section 36.102(d), the state shall:

　(1) proceed with the action; or

　(2) notify the court that the state declines to take over the action.

(b) If the state declines to take over the action, the person bringing the action may proceed without the state's participation. On request by the state, the state is entitled to be served with copies of all pleadings filed in the action and be provided at the state's expense with copies of all deposition transcripts. If the person bringing the action proceeds without the state's participation, the court, without limiting the status and right of that person, may permit the state to intervene at a later date on a showing of good cause.

**Credits**
Added by Acts 1997, 75th Leg., ch. 1153, § 4.08, eff. Sept. 1, 1997. Amended by Acts 2005, 79th Leg., ch. 806, § 12, eff. Sept. 1, 2005; Acts 2007, 80th Leg., ch. 29, §§ 3, 4, eff. May 4, 2007.

V. T. C. A., Human Resources Code § 36.104, TX HUM RES § 36.104
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84089375
Filing Code Description: Original Proceeding Petition
Filing Description: PETITION FOR WRIT OF MANDAMUS
Status as of 2/2/2024 12:49 PM CST

Associated Case Party: Novartis Pharmaceuticals Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Meredith Garagiola | | mgaragiola@omm.com | 2/2/2024 12:30:22 PM | SENT |
| Ross Galin | | rgalin@omm.com | 2/2/2024 12:30:22 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 2/2/2024 12:30:22 PM | SENT |
| Danny S.Ashby | | dashby@omm.com | 2/2/2024 12:30:22 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lynne Kurtz-Citrin | 24081425 | lynne.kurtz-citrin@oag.texas.gov | 2/2/2024 12:30:22 PM | SENT |
| Jonathan Bonilla | 24073939 | Jonathan.Bonilla@oag.texas.gov | 2/2/2024 12:30:22 PM | SENT |
| Jordan Underhill | 24102586 | jordan.underhill@oag.texas.gov | 2/2/2024 12:30:22 PM | SENT |
| Cynthia Lu | | Cynthia.Lu@oag.texas.gov | 2/2/2024 12:30:22 PM | ERROR |

Associated Case Party: Health Selection Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jonathan Wilkerson | 24050162 | jonathan.wilkerson@lanierlawfirm.com | 2/2/2024 12:30:22 PM | SENT |
| Zeke DeRose | 24057421 | zeke.derose@lanierlawfirm.com | 2/2/2024 12:30:22 PM | SENT |
| W. Mark Lanier | | WML@LanierLawFirm.com | 2/2/2024 12:30:22 PM | SENT |
| Radu A.Lelutiu | | rlelutiu@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |
| Alex Jerome Brown | 24026964 | alex.brown@lanierlawfirm.com | 2/2/2024 12:30:22 PM | SENT |
| Jennifer Leigh Truelove | 24012906 | jtruelove@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84089375
Filing Code Description: Original Proceeding Petition
Filing Description: PETITION FOR WRIT OF MANDAMUS
Status as of 2/2/2024 12:49 PM CST

Associated Case Party: Health Selection Group, LLC

| Jennifer Leigh Truelove | 24012906 | jtruelove@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |
|---|---|---|---|---|
| Samuel F. Baxter | 1938000 | sbaxter@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |

MR269

ACCEPTED
06-24-00005-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
2/2/2024 12:30 PM
DEBBIE AUTREY
CLERK

NO. _____

**IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS
AT TEXARKANA**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
2/2/2024 12:30:22 PM
DEBBIE AUTREY
Clerk

**IN RE NOVARTIS PHARMACEUTICALS CORPORATION,**

*Relator*.

**Original Proceeding From The 71st District Court
in Harrison County, Texas
The Honorable Brad Morin Presiding**

**RELATOR'S MOTION FOR TEMPORARY STAY**

**DANNY S. ASHBY**
Texas Bar No. 01370960
**MEGAN WHISLER**
Texas Bar No. 24079565
**O'MELVENY & MYERS LLP**
2801 N. Harwood Street, Suite 1600
Dallas, Texas 75201
Telephone: +1 972 360 1900

**DERON R. DACUS**
Texas Bar No. 00790553
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

**ROSS GALIN**
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000
(Application for *pro hac vice*
admission pending)

**MEREDITH GARAGIOLA**
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
(Application for *pro hac vice*
admission pending)

*Counsel for Relator*
*Novartis Pharmaceuticals Corporation*

MR270

Pursuant to Texas Rule of Appellate Procedure 52.10, Relator Novartis Pharmaceuticals Corporation ("Novartis") respectfully requests that the Court temporarily stay all proceedings in the district court during the pendency of its Petition for Writ of Mandamus, filed concurrently herewith.  As shown by the certificate of compliance below, Novartis notified Real Parties in Interest, Health Selection Group, LLC ("HSG") and the State of Texas, via e-mail that it would be filing a motion for a temporary stay and, simultaneously with this filing, notified Respondent, the Honorable Brad Morin, 71st District Court, Harrison County, via electronic filing in the underlying proceedings, that a stay motion had been filed. *See* Tex. R. App. P. 52.10(a).

**INTRODUCTION**

Novartis has filed a Petition for Writ of Mandamus ("Petition"), concurrently with this Motion, requesting that the Court review and correct the district court's erroneous denial of Novartis's Plea to the Jurisdiction and Motion to Dismiss under Texas Rule of Civil Procedure 91a.  The Petition advances two principal arguments, either of which would result in full dismissal of the case, for lack of subject-matter jurisdiction or a legally valid cause of action, if sustained.  As this Court and other Texas courts have held, mandamus relief is warranted in such cases in order to spare the parties and public from wasting time and resources litigating fatally flawed proceedings.  It is also necessary when, as here, HSG's continued prosecution of a

1

*qui tam* action, for and in the name of the State of Texas, intrudes upon the Executive department's jurisdiction in violation of the Separation of Powers Clause in Article II, Section 1 of the Texas Constitution. Because the benefits of mandamus review would be lost if litigation were permitted to proceed during the pendency of this original proceeding, Novartis respectfully requests that the Court enter a temporary stay of the district court proceedings to maintain the *status quo* and preserve its jurisdiction pending review and resolution of the Petition.

## ARGUMENT

The Court should temporarily stay proceedings in the district court to preserve the *status quo* and the Court's jurisdiction to review the merits of the Petition. *In re Kelleher*, 999 S.W.2d 51, 52 (Tex. App.—Amarillo 1999, orig. proceeding) ("Simply put, Rule 52.10 exists to afford the court opportunity to address the dispute encompassed within a petition for mandamus . . . by maintaining the status quo until it can address that dispute."). Texas Rule of Appellate Procedure 52.10(b) provides that the "court—on motion of any party or on its own initiative—may without notice grant any just relief pending the court's action on the petition." Tex. R. App. P. 52.10(b). A temporary stay during the pendency of this mandamus proceeding is necessary and just for at least the following three reasons.

*First*, the Petition involves two issues of law and a negative answer to either would require a complete dismissal of the action: (1) whether the district court has

2

subject-matter jurisdiction over a statutory cause of action brought by a plaintiff that suffered no harm from the alleged violations and (2) whether a private plaintiff can bring a *qui tam* action, for and in the name of the State, when the Texas Constitution exclusively confers the power to represent the State on the State attorneys identified in Article IV, Section 22 and Article V, Section 21. Although the likelihood of dismissal is not a requirement for a stay,[1] the fact that Novartis's arguments for dismissal are grounded on long-standing and binding Texas Supreme Court precedent supports entry of a stay pending resolution of the Petition. The Texas Supreme Court has held that Texas standing doctrine—and thus Texas courts' subject-matter jurisdiction—requires that the plaintiff "be *personally* injured" in order to seek judicial relief. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 155 (Tex. 2012). That is, the plaintiff "must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury" because "our Constitution opens the courthouse doors only to those who have or are suffering an injury." *Id*. And here, it is undisputed that plaintiff HSG did not suffer any injury from the conduct alleged in the First Amended Petition. In addition, the Texas Supreme Court has long held that a private party cannot represent the State's (or

---

[1] Texas appellate courts have stayed proceedings even when mandamus relief was ultimately denied. *See, e.g., In re State ex rel. Tharp*, No. 03-16-00827-CV, 2017 WL 562702, at *1 (Tex. App.—Austin Feb. 10, 2017, orig. proceeding) ("[W]e deny the petition for writ of mandamus and lift the stay of the underlying proceedings."); *In re Bonifay*, No. 03-16-00316-CV, 2016 WL 4980131, at *1 (Tex. App.—Austin Sept. 14, 2016, orig. proceeding) (same).

3

public's) interest in court because Article IV, Section 22 and Article V, Section 21 of the Texas Constitution exclusively confer that power on the State attorneys (the Attorney General and the District and County Attorneys) elected by the people of Texas. *See Staples v. State ex rel. King*, 245 S.W. 639, 642 (Tex. 1922); *Allen v. Fisher*, 9 S.W.2d 731, 732 (Tex. 1928); *Hill Cty. v. Sheppard,* 178 S.W.2d 261, 264 (Tex. 1944). Because "th[o]se constitutional provisions mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court," *Allen*, 9 S.W.2d at 732, HSG's *qui tam* action is legally invalid under the Texas Constitution and should be dismissed in its entirety. There is thus no reason to allow the parties to proceed with the district court litigation when a ruling in Novartis's favor on either question would result in a dismissal of all claims.

*Second*, if the district court proceedings are not stayed pending resolution of the Petition, the parties will be forced to engage in burdensome, expensive, and time-consuming discovery. Right now, the parties are in the very early stages of discovery. Novartis and HSG served Requests for Initial Disclosures on January 22 and January 23, 2024, respectively, and Novartis served its Objections and Responses to HSG's First Set of Requests for Production on January 16, 2024. No documents have been produced; no depositions have been conducted (or scheduled); no discovery dispute has been presented to the district court. But the Docket Control

4

Order sets a May 17, 2024 deadline for the substantial completion of document production and a September 20, 2024 deadline for the completion of all fact discovery. *See* Exhibit A, Docket Control Order.

If the district court proceedings are permitted to continue unabated, then the parties will have to move forward with discovery over the coming weeks and months to meet those deadlines, and the volume of that discovery will likely be substantial, expensive, and generate discovery disputes that will, in turn, involve extensive motion practice and use of judicial resources. For example, HSG has already served broad-ranging discovery requests—including a request for "all documents concerning" the three business practices outlined in the First Amended Petition and requests for documents concerning several Novartis products not named in the First Amended Petition—to which Novartis raised several objections based on relevancy, overbreadth, and undue burden, among other things. *See* Exhibit B, Def's Objs. & Resps. to 1st Set of RFPs at 7. Given the looming document-production deadline, Novartis is also preparing requests for documents that it will soon serve on HSG.

In addition, the parties will need to pursue third-party discovery that will likely be extensive. Subpoenas will likely be issued to the prescribers, patients, vendors, and nurses implicated by the business practices (the alleged "kickbacks") alleged in the First Amended Petition, which itself names six vendors and twelve individual witnesses. The state agency that oversees the Texas Medicaid program—

5

Texas Health and Human Services—will also be a likely subject of discovery to ascertain its knowledge, understanding, and guidance, if any, concerning the practices alleged in the First Amended Petition. And Novartis has raised a federal preemption defense—based on the federal government's determination that the challenged practices are lawful and beneficial to the federal healthcare program— that will require discovery from the federal government.

A temporary stay should thus be granted to maintain the *status quo* and ensure that the parties, the district court, and numerous other third parties do not waste their time, money, and resources engaging in discovery for a case that should be dismissed. *See In re Grossman*, No. 03-19-00001-CV, 2019 WL 102284, at *1 (Tex. App.—Austin Jan. 3, 2019, orig. proceeding) (granting stay "[t]o preserve the status quo while the Court considers whether the petition for writ of injunction is necessary"); *In re Collier*, No. 07-12-00336-CV, 2012 WL 3114597, at *1 (Tex. App.—Amarillo Aug. 1, 2012, orig. proceeding) (similar); *Oryx Capital Int'l, Inc. v. Sage Apts., LLC*, 167 S.W.3d 432, 437 (Tex. App.—San Antonio 2005, no pet.) (defendant "should not be required to submit to the expense and inconvenience of discovery pending the resolution of this appeal").

*Third*, the issues presented in the Petition are fundamental to preserving the separation-of-powers under the Texas Constitution and thus merit a stay for this additional reason. To allow the parties and the district court to proceed with the

6

litigation of claims that are constitutionally committed to the Executive department contravenes the Texas Constitution's Separation of Powers Clause in at least two respects. *See* Tex. Const. art. II, § 1. First, as the Texas Supreme Court has recognized, Texas's constitutional standing requirement that the plaintiff demonstrate a personal injury prevents district courts "from issuing advisory opinions, because doing so invades the function of the executive." *Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 700 (Tex. 2021); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993) ("An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury."). Because HSG does not satisfy the personal-injury requirement, any further action in the district court necessarily intrudes upon the jurisdiction of the Executive department in contravention of Article II, Section 1. Second, HSG's continued prosecution of the State's claims in place of the Attorney General contravenes the Texas Constitution's assignment of that power to the Attorney General in the Executive department. The people of Texas have twice decided who shall act as the State's representative in court. They did so first by ratifying a Texas Constitution that assigns that power to a specific government official and grants *them*—the people of Texas—the right to select that government official. *See* Tex. Const. art. IV, §22. And then they exercised that constitutional right in the November 2022 election to

7

select the Attorney General who they believed would best represent the State's (and by extension, their) interests in court. To allow a private agent chosen by the Legislature to engage in a prosecutorial function that the Texas Constitution assigns to the duly-elected Attorney General violates the Separation of Powers Clause. Accordingly, a stay should be entered to maintain the *status quo* pending this Court's resolution of these fundamental issues of Judicial, Legislative, and Executive jurisdiction under our Constitution.

## PRAYER

Novartis respectfully requests that the Court order a temporary stay of the district court proceedings to maintain the *status quo* and preserve the Court's jurisdiction to address the merits of Novartis's Petition for Writ of Mandamus.

8

Dated:  February 2, 2024

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Danny S. Ashby*

Danny S. Ashby
Texas Bar No. 01370960
dashby@omm.com
Megan Whisler
Texas Bar No. 24079565
mwhisler@omm.com
2801 North Harwood Street, Suite 1600
Dallas, Texas  75201
Telephone:  +1 972 360 1900
Facsimile:  +1 972 360 1901

Ross Galin
rgalin@omm.com
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000
(Application for *pro hac vice* admission pending)

Meredith Garagiola
mgaragiola@omm.com
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
(Application for *pro hac vice* admission pending)

THE DACUS FIRM, P.C.

Deron R. Dacus
Texas Bar No. 00790553
ddacus@dacusfirm.com
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

*Counsel for Relator*
*Novartis Pharmaceuticals Corporation*

9

## CERTIFICATE OF COMPLIANCE

As required by Texas Rule of Appellate Procedure 52.10(a), I certify that, on February 1, 2024, I notified Real Parties in Interest, Health Selection Group, LLC and the State of Texas, via expedited means (i.e., by email) that this motion for temporary relief would be filed. I also certify that Respondent, the Honorable Brad Morin, was notified simultaneously with this filing by electronically filing a copy of this motion in the underlying proceedings.

/s/ Danny S. Ashby
Danny S. Ashby

## CERTIFICATE OF CONFERENCE

As required by Texas Rule of Appellate Procedure 10.1(a)(5), I certify that I have conferred, or made a reasonable attempt to confer, with all other parties about the merits of this motion. Health Selection Group, LLC and the State of Texas oppose the motion.

/s/ Danny S. Ashby
Danny S. Ashby

MR280

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of the foregoing Motion has been forwarded this 2nd day of February 2024, to the following attorneys of record via electronic service:

Samuel F. Baxter
Jennifer L. Truelove
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
sbaxter@mckoolsmith.com
jtruelove@mckoolsmith.com

Eric B. Halper
Radu A. Lelutiu
MCKOOL SMITH P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
ehalper@mckoolsmith.com
rlelutiu@mckoolsmith.com

W. Mark Lanier
Alex J. Brown
Zeke DeRose III
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
WML@LanierLawFirm.com
Alex.Brown@LanierLawFirm.com
Zeke.DeRose@LanierLawFirm.com
Jonathan.Wilkerson@LanierLawFirm.com

*Counsel for Health Selection Group, LLC*

Jordan Underhill
Jonathan D. Bonilla
Lynne Kurtz-Citrin
Office of the Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Jordan.Underhill@oag.texas.gov
Jonathan.Bonilla@oag.texas.gov
Lynne.Kurtz-Citrin@oag.texas.gov

*Counsel for the State of Texas*

/s/ *Danny S. Ashby*
Danny S. Ashby

11

**MR281**

# EXHIBIT A

MR282

Filed 11/6/2023 11:49 AM
Sherry Griffis
District Clerk
Harrison County, Texas

Lori Hightower

Deputy

**CAUSE NO. 23-0276**

| | |
|---|---|
| THE STATE OF TEXAS *ex rel.* HEALTH SELECTION GROUP, LLC, | IN THE DISTRICT COURT |
| Plaintiff, | 71ST JUDICIAL DISTRICT |
| v. | HARRISON COUNTY, TEXAS |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| Defendant. | |

## <u>DOCKET CONTROL ORDER</u>

Pursuant to the Texas Rules of Civil Procedure 190.4, the Court makes the following Order and sets the following dates. The trial in this matter will be held on April 21, 2025. Further, the below Docket Control Order will not be shortened without leave of Court.

It is hereby **ORDERED** that the following schedule of deadlines is in effect until further order of this Court:

| | |
|---|---|
| **April 21, 2025 (pending Court's calendar)** | **JURY TRIAL before Judge Brad Morin, Marshall, Texas.** |
| **April 21, 2025** | **JURY SELECTION 8:30 am** |
| **April__, 2025** | **PRETRIAL HEARING**<br><br>**Parties submit charge in Word format, noting provisions of the Pattern Jury Charges that apply to each instruction and question, if any.**<br><br>Furnish two hard copies of active trial pleadings, exhibits lists, witness lists, motions in *limine*, and proposed orders on the motions in *limine*. |
| **March 21, 2025** | **File and serve on other party Proposed Jury Charge, including questions, definitions, and instructions (including citations to the Texas Pattern Jury Charge and other authority).** |
| **March 14, 2025** | **Parties meet and confer to resolve objections to deposition** |

4817-0758-0628

**MR283**

Copy from re:SearchTX

| | designations and exhibits, disputed motions in limine. |
|---|---|
| March 7, 2025 | Exchange objections to exhibit lists.<br><br>Submit written statement of page and line references to cross-designations on which evidentiary rulings are sought. |
| February 28, 2025 | File Responses to Motions *in Limine*<br><br>Exchange cross-designations of deposition designations and written statement of all page and line references to designations on which evidentiary rulings are sought. |
| February 14, 2025 | File Motions *in Limine*<br><br>Exchange Pretrial Disclosures: Witness Lists (fact and expert witnesses) (including rebuttal witnesses), Deposition Designations, and Exhibit Lists |
| February 14, 2025 | File Replies to Dispositive Motions<br><br>File Replies to *Robinson* motions |
| January 31, 2025 | File Responses to Dispositive Motions<br><br>File Responses to *Robinson* motions |
| January 17, 2025 | File Dispositive Motions<br><br>File *Robinson* motions |
| December 6, 2024 | Deadline to Complete Expert Discovery. |
| November 8, 2024 | Parties Designate Rebuttal Expert Witnesses, Rebuttal Expert Witness Reports Due.<br><br>(Deadline for party without the burden of proof on an issue shall disclose all the materials and information required under Tex. R. Civ. P. 194.2(f) and serve a report fully disclosing the substance of and basis for the expert's opinions, *see* Tex. R. Civ. P. 195.5.)<br><br>If, without agreement, a party serves a supplemental expert report after the rebuttal expert report deadline has passed, the serving party must file notice with the Court stating service has occurred and the reason why a supplemental report is necessary under the circumstances. |
| October 4, 2024 | Parties with Burden of Proof Designate Expert Witnesses. Expert Witness Reports Due. |

4817-0758-0628

MR284

Copy from re:SearchTX

| | (Disclose all material and information required under Tex. R. Civ. P. 194.2(f) and serve a report fully disclosing the substance of and basis for the expert's opinions, *see* Tex. R. Civ. P. 195.5.) |
|---|---|
| **September 20, 2024** | **Deadline to Complete Fact Discovery.** |
| **May 17, 2024** | **Deadline for Substantial Completion of Documents.** **Deadline to Exchange Privilege Logs.** Counsel are expected to make good faith efforts to produce all required documents as soon as they are available and not wait until the substantial completion deadline. |
| **April 26, 2024** | **Deadline for Novartis to disclose whether it will rely on advice of counsel defense.** |
| **10 days** | **EXPECTED LENGTH OF TRIAL** |

IT IS SO ORDERED.

**SIGNED this** 6 **day of** Nov **, 2023**

_____
HON. BRAD MORIN, JUDGE PRESIDING

4817-0758-0628

**MR285**

Copy from re:SearchTX

# EXHIBIT B

MR286

| | | |
|---|---|---|
| THE STATE OF TEXAS *ex rel*. HEALTH SELECTION GROUP, LLC, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| v. | § § § | 71st JUDICIAL DISTRICT |
| NOVARTIS PHARMACEUTICALS CORPORATION, | § § § | |
| *Defendant.* | § § | OF HARRISON COUNTY, TEXAS |

**DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S OBJECTIONS AND RESPONSES TO RELATOR'S FIRST SET OF REQUESTS FOR PRODUCTION**

TO:    Relator Health Selection Group, LLC, by and through its attorney of record, Samuel F. Baxter and Jennifer L. Truelove of McKool Smith P.C., 104 East Houston, Suite 300, Marshall, Texas 75670; Eric B. Halper and Radu A. Lelutiu of McKool Smith P.C., 395 Ninth Avenue, 50th Floor, New York, New York 10001; and Mark Lanier, Alex Brown, Zeke DeRose, Jonathan Wilkerson, and Ryan Ellis of The Lanier Law Firm, 6810 FM 1960 West, Houston, Texas 77096.

Pursuant to the applicable Texas Rules of Civil Procedure, Defendant Novartis Pharmaceuticals Corporation hereby serves the attached Objections and Responses to Relator's First Set of Requests for Production.

Respectfully submitted,

O'MELVENY & MYERS, LLP

/s/ Danny Ashby

Danny S. Ashby
Texas Bar No. 10370960
dashby@omm.com
Megan Whisler
Texas Bar No. 24079565
mwhisler@omm.com
2501 North Harwood Street, Suite 1700
Dallas, Texas  75201
Telephone:  +1 972 360 1900

1

Facsimile:  +1 972 360 1901

Ross Galin
(pro hac vice pending)
rgalin@omm.com
7 Times Square
New York, NY 10036
Telephone:  +1 212 326 2000

Meredith Garagiola
(pro hac vice pending)
mgaragiola@omm.com
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
Attorneys for Defendant
Novartis Pharmaceuticals Corporation

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record on this 16th day of January 2024, via electronic mail in accordance with the Texas Rules of Civil Procedure.

*/s/* Danny Ashby
Danny S. Ashby

**MR289**

## DEFENDANT'S OBJECTIONS AND RESPONSES TO RELATOR'S FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Tex. R. Civ. P. 196, Defendant Novartis Pharmaceuticals Corporation ("Defendant" or "Novartis") objects and responds to Relator's First Set of Requests for Production (collectively, "Requests," and individually, "Request") as set forth below.

### PRELIMINARY STATEMENT

The following Objections and Responses to Relator's Requests are based solely on Novartis's knowledge as of the date of these Objections and Responses and are provided without prejudice to Novartis's right to produce evidence of any subsequently discovered facts. Novartis reserves the right to supplement and/or amend these Objections and Responses. No Objection or Response is an admission regarding relevance or admissibility.

By these Objections and Responses, Novartis does not intend to waive, and does not waive, in whole or in part, any objection to admitting these Responses into evidence. Rather, Novartis intends to preserve, and does preserve, all such Objections including, without limitation, Objections based on relevance, foundation, authenticity, or privilege.

### OBJECTIONS APPLICABLE TO EACH REQUEST FOR PRODUCTION

In addition to Novartis's Specific Objections and Responses to each Request as provided below, Novartis makes the following Objections with respect to each and every Request:

1. Novartis objects to these Requests to the extent they seek material that is neither relevant to any issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

2. Novartis will not knowingly disclose privileged information. Any disclosure of privileged information in response to any Request is inadvertent and is not intended to waive any privileges or protections. Novartis reserves the right to demand that Relator or any other entity

4

return or destroy any privileged information inadvertently produced, including all copies and summaries thereof.

3. Novartis will produce documents based on a good-faith and reasonable review of information and sources, document repositories, and ESI custodian files likely to contain responsive, non-privileged documents.

4. Novartis responds to the Requests based on its good-faith understanding of the documents requested.

5. Novartis objects to each and every Request to the extent it seeks information that is not within Novartis's possession, custody, or control.

6. Novartis objects to the scope and volume of the Requests as overbroad, unduly burdensome, and disproportionate to the needs of the case.

7. Novartis's responses to these Requests do not in any way constitute an adoption of Relator's purported Definitions of words or phrases contained in these Requests, including the Definitions that Novartis objects to more specifically below.

## OBJECTIONS TO INSTRUCTIONS

1. Novartis objects to the Instructions as overbroad and unduly burdensome to the extent they call for the production of Documents prior to January 1, 2013.

2. Novartis objects to Relator's Instruction that "[t]he following requests seek the production of Documents through the date of your response. The requests are of a continuing nature and supplemental productions are required." Novartis will produce Documents from January 1, 2013 through the date on which Relator filed the Original Petition on May 8, 2020 (the "Relevant Period").

5

**MR291**

3.     Novartis objects to Relator's Instruction that "[i]f any Documents are withheld on the basis of a claim of privilege or work product, then the response should: generally Identify the Documents withheld by subject matter, author, addresses, and carbon copy recipient(s); and state the basis for withholding the Documents," to the extent that it imposes obligations on Novartis that exceed those described in the Texas Rules of Civil Procedure and the operative Discovery Order.

4.     Novartis objects to Relator's Instruction which states: "If any Documents responsive to these requests were, but are no longer in your possession custody, or control, state what disposition was made of them and when.  If any Documents responsive to these requests have been lost or destroyed, describe in detail the circumstances of such loss or destruction and Identify each lost or destroyed Document (and all files that contained such Documents)." Novartis's Responses are limited to those materials that are presently in its own possession, custody, or control, and it has no obligation to specifically identify Documents that are no longer in its possession, custody, or control, or that have been lost or destroyed.  Imposing any such obligation on Novartis would render each Request overly broad and unduly burdensome.

**OBJECTIONS TO DEFINITIONS**

1.     Novartis objects to Relator's Definition of "Defendant," "Novartis," and "You," to the extent that it would require Novartis to respond to these Requests on behalf of entities that Novartis does not control and within which Novartis is not able to search for materials responsive to these Requests.

2.     Novartis objects to Relator's Definition of "Identify," given that it requires Novartis to "provide *all* of the information known to You."  Such an expansive definition is

6

**MR292**

overly broad, unduly burdensome, and oppressive, and it could result in the production of largely irrelevant material.

3. Novartis objects to Relator's Definition of "Nurse Services" because it is overly broad, unduly burdensome, and oppressive, and it could result in the production of largely irrelevant material.

4. Novartis objects to Relator's Definition of "Products" to the extent it includes drugs not identified in the current Petition. Novartis will produce material relating to the "Covered Drugs," as that term is defined in the Amended Petition that Relator filed on April 5, 2023.

5. Novartis objects to Relator's Definition of "Support Services" because it is overly broad, unduly burdensome, and oppressive, and it could result in the production of largely irrelevant material.

6. As of the date of these Responses, the Court has not entered a Protective Order. Novartis objects to any Request that calls for Novartis to provide confidential or sensitive documents before entry of an adequate Protective Order.

**SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION**

<u>**REQUEST FOR PRODUCTION 1**</u>:

All Documents concerning Services.

**OBJECTIONS:**

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses.

7

Novartis also objects to the Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final contracts, amendments, task orders, training materials, healthcare provider and patient education materials, reimbursement support materials, auditing materials, and compliance materials regarding Novartis's patient support programs for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 2**:

All Documents concerning Your decision to provide Services with respect to any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects because the Request is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to the Request because the use of the phrase "concerning Your decision"

8

**MR294**

is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents identifying or explaining any decision by Novartis to provide patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

<u>**REQUEST FOR PRODUCTION 3**</u>:

All Documents concerning Your decision to discontinue providing Services with respect to any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to the Request because the use of the phrase "concerning Your decision" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

9

**MR295**

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents identifying or explaining any decision by Novartis discontinue providing patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 4**:

All Documents concerning Your decision not to provide Services with respect to any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the phrase "concerning Your decision" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents identifying or explaining any decision by Novartis not to provide patient support

10

**MR296**

services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 5**:

All marketing and promotion Documents You have used to promote Products.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects because the Request is not subject to any time-limit restrictions, and the burden of producing "All . . . Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the words "marketing" and "promotion" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final marketing or promotional materials provided to Prescribers or patients in Texas relating to patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

11

**REQUEST FOR PRODUCTION 6**:

Documents sufficient to show the identity of any Texas Patient or Prescriber who used Novartis' patient support program(s), the purpose for each such use, and the dates of each such use.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this request to the extent it seeks that Novartis produce patient-identifiable information in violation of any federal or state privacy laws. Novartis further objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing the Documents this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the term "patient support program(s)" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the identity of Texas Prescribers who used Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**MR298**

**REQUEST FOR PRODUCTION 7**:

Documents sufficient to show the identity of any Texas Prescriber who was offered the Services and the dates when such offers were made.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects because the Request is not subject to any time-limit restrictions, and the burden of producing the Documents this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the term "patient support program(s)" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the identify of Texas Prescribers who were offered Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.


**REQUEST FOR PRODUCTION 8**:

All Documents evidencing the offer of Services with respect to any Product.

**OBJECTIONS**:

13

**MR299**

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis objects because the Request is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting Novartis's offers to Prescribers in Texas of Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 9a**:

All Documents evidencing the provision of Services with respect to any Product, including: the identity of the individuals who provided Services; and their employers and/or entities that contracted them to provide Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in

**MR300**

this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final contracts, amendments, and task orders documents reflecting the entities and/or individuals engaged to provide Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 9b**:

All Documents evidencing the provision of Services with respect to any Product, including: the Prescribers who received Services; the address of the Prescriber and Healthcare Facility for whom the Prescriber works or with whom the Prescriber is affiliated; the Prescriber National Provider Identifier (NPI) and any other identifiers, unique and otherwise, You or any third party have assigned to the Prescriber; the date(s) when each such Prescriber received

15

Services; and the nature, quantity, value, volume, or amount of Services provided to each Prescriber.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the names and identifying information of Prescribers in Texas who received Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

16

**REQUEST FOR PRODUCTION 9c**:

All Documents evidencing the provision of Services with respect to any Product, including: the Patients who received Services; the location where each Patient received Services; other identifiers, unique and otherwise, You or any third party have assigned to the Patients; the date(s) when each such Patient received Services; and the nature, quantity, value, volume, or amount of Services provided to each Patient.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the names and identifying information of patients in Texas who received

17

Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period and the dates upon which they received these services, to the extent such documents exist.

**REQUEST FOR PRODUCTION 9d**:

All Documents evidencing the provision of Services with respect to any Product, including: Any Agreements pursuant to which Services were provided to, offered to, or received by Prescribers or Patients.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final contracts, service agreements, task orders, and acknowledgement forms reflecting Novartis's

**MR304**

provision of Novartis's patient support services to Prescribers or patients in Texas for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 9e**:

All Documents evidencing the provision of Services with respect to any Product, including: any Documents or materials that were used in connection with the provision of Services to Prescribers or Patients.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the words "evidencing" and "materials" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce any education materials provided to Prescribers or patients in Texas in connection with Novartis's patient

19

**MR305**

support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 9f**:

All Documents evidencing the provision of Services with respect to any Product, including: any Document concerning prescriptions for any Product written by the Prescribers who received Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents identifying prescriptions for the Covered Drugs written by Prescribers in Texas who

20

**MR306**

received Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 9g**:

All Documents evidencing the provision of Services with respect to any Product, including: any Documents concerning the Healthcare Program that paid, in whole or in part, for prescriptions for any Product written by the Prescribers who received Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents identifying prescriptions paid for by Texas Medicaid for prescriptions written by

21

Texas Prescribers who received Novartis's patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 10**:

All Documents evidencing the cost of providing or receiving Services with respect to any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting payments made to third-party entities who provided patient support

22

**MR308**

services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 11**:

All Documents evidencing payments You have made for providing Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the payments made to third-party entities who provided patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

23

**MR309**

**REQUEST FOR PRODUCTION 12**:

All Documents concerning or evidencing the training any Person has received to provide Services with respect to any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the words "concerning" and "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting training materials provided to individuals who provided patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

24

**REQUEST FOR PRODUCTION 13**:

All Documents evidencing the identity of any Person who has trained others to provide Services with respect to any Product, and such Person's employer.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 and Request 12 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the names of current or former Novartis employees who provided training to individuals providing patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

25

**REQUEST FOR PRODUCTION 14**:

All Documents evidencing the identity of any Person who was trained to provide Services with respect to any Product and the dates and locations where such training was provided.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis further objects to this Request to the extent that it requires the production of Documents that are not within Novartis's possession, custody, or control. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis also objects to this Request because the use of the word "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 and Request 12 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the names of individuals who were trained by Novartis employees to provide patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

26

**MR312**

**REQUEST FOR PRODUCTION 15**:

All Documents concerning the effect Services were projected or expected to have on prescriptions for any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the phrase "concerning the effect . . . on prescription" is vague and ambiguous such that Novartis cannot properly identify responsive material. Novartis also objects to this Request to the extent that is assumes that Novartis has performed projections or analyses regarding the effect of any patient support services upon prescriptions for the drugs at issue. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the potential impact that providing patient support services for the Covered Drugs in Texas during the Relevant Period could have on prescriptions in Texas for the Covered Drugs during the Relevant Period, to the extent such documents exist.

27

**MR313**

**REQUEST FOR PRODUCTION 16**:

All Documents concerning the effect Services have had on prescriptions for any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the term "concerning the effect . . . on prescription" is vague and ambiguous such that Novartis cannot properly identify responsive material. Novartis also objects to this Request to the extent that is assumes that Novartis has performed analyses regarding the effect of any patient support services upon prescriptions for the drugs at issue. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the impact that providing patient support services for the Covered Drugs in Texas during the Relevant Period had on prescriptions in Texas for the Covered Drugs during the Relevant Period, to the extent such documents exist.

28

**MR314**

**REQUEST FOR PRODUCTION 17**:

All Documents that evidence the volume of prescriptions for any Product for which Services were provided.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the word "evidence" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting prescriptions written by Prescribers in Texas who received patient support services for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 18**:

All Documents that evidence prescription patterns for any Product for which Services were provided.

**OBJECTIONS**:

29

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of word "evidence" and the term "prescription patterns" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting prescriptions written by Prescribers in Texas who received patient support services for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 19**:

All Documents that evidence claims submitted to insurance programs, including any Healthcare Program, for any Product for which Services were provided.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses,

30

**MR316**

and because it seeks all claims submitted to private insurance carriers, which are in no way related to Relator's allegations against Novartis. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the word "evidence" and the terms "insurance programs" and "Healthcare Programs" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting claims submitted to Texas Medicaid for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 20**:

All Documents that benchmark or compare prescription volumes or patterns for any Product for which Services were provided against any pharmaceutical product for which Services were not provided.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and

31

**MR317**

the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the word "benchmark" and the terms "prescription volumes or patterns" and "pharmaceutical product" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting analysis of the decision to offer patient support services in Texas for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 21**:

All Documents you have received from IMS Health or other market intelligence or market analysis companies concerning any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit.

**RESPONSE**:

32

**MR318**

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents it has received from third parties reflecting market analysis regarding sales of the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 22**:

All Documents concerning the effect the discontinuation of Services has had or is expected to have on any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the words "effect" and "discontinuation" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting any impact that discontinuing patient support services for the Covered

33

**MR319**

Drugs in Texas during the Relevant Period had on prescriptions in Texas for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 23**:

All Documents concerning or evidencing the amount of money You have invested in or paid for Services or programs related to Services, including training for or monitoring Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the words "concerning" and "evidencing" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 and Request 11 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting payments made for the provision of patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

34

**MR320**

**REQUEST FOR PRODUCTION 24**:

Documents sufficient to show payments made to any Person who has provided Services for Products.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing the Documents that this Request requires far exceeds their likely benefit. Novartis further objects to this Request to the extent it requires the production of material that is not within Novartis's possession, custody, or control. Additionally, Request 1, Request 11, and Request 23 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting payments made to the third-party entities and/or individuals who provided patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**MR321**

**REQUEST FOR PRODUCTION 25**:

All Documents concerning Prescribers or Healthcare Facilities who have received or have been targeted with Services, including the criteria for selection and lists of such Prescribers or Healthcare Facilities.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the word "targeted" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the process by which Novartis engaged with Prescribers in Texas regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

36

**MR322**

**REQUEST FOR PRODUCTION 26**:

All Documents you have received from IMS Health or other market intelligence or analysis companies concerning any Prescriber for Products.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Additionally, Request 21 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents it has received from third parties reflecting market analysis of Prescribers in Texas with whom Novartis engaged regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 27**:

All Documents that evidence prescription patterns for Prescribers who have been offered or received Services.

**OBJECTIONS**:

37

**MR323**

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the term "prescription patterns" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 and Request 18 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting prescriptions written by Prescribers in Texas with whom Novartis has engaged regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**<u>REQUEST FOR PRODUCTION 28</u>**:

All Documents that benchmark or compare prescription patterns for Prescribers who have been offered or received Services against Prescribers who have not been offered or received Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in

**MR324**

this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this request because the use of the word "benchmark" and the term "prescription patterns" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 and Request 20 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting prescriptions written by Prescribers in Texas who did or did not receive patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 29**:

All Documents you have received from the Centers for Medicare & Medicaid Services with respect to any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and

39

MR325

the burden of producing "All Documents" that this Request requires far exceeds their likely benefit.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents provided to Novartis by the Centers for Medicare & Medicaid Services regarding patient support services for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 30**:

All Documents you have provided to the Centers for Medicare & Medicaid Services with respect to any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final

**MR326**

documents provided by Novartis to the Centers for Medicare & Medicaid Services regarding patient support services for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 31**:

All Documents concerning interactions between any individual who has marketed the Products and any Prescriber who was offered or received Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request to the extent it requires the production of material that is not within Novartis's possession, custody, or control. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting interactions between Novartis sales representatives and Prescribers in Texas who received patient support services for the Covered Drugs during the Relevant Period, to the extent such documents exist.

41

**MR327**

**REQUEST FOR PRODUCTION 32**:

All Documents concerning interactions between any individual who has marketed the Products and any Person who has provided Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request to the extent it requires the production of material that is not within Novartis's possession, custody, or control. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting interactions between Novartis sales representatives in Texas and individuals who provided any patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

42

**MR328**

**REQUEST FOR PRODUCTION 33**:

All Documents concerning or analyzing the rationale or reasoning for offering Services for any Product.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Additionally, Request 1 and Request 2 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the decision to offer patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 34**:

All Documents evidencing comparisons between the Products and other pharmaceutical products with which the Products compete, including with respect to efficacy, cost, or side effects.

**OBJECTIONS**:

**MR329**

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the words "evidencing" and "comparisons," and the phrase "other pharmaceutical products with which the Products compete," is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Novartis will not search for documents responsive to request. Novartis is, however, willing to meet and confer with the Relator regarding the purpose of this Request and whether it is better addressed, if at all, through less burdensome discovery devices.

**REQUEST FOR PRODUCTION 35**:

All Documents concerning or evidencing legal advice You have received concerning Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly

**MR330**

burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the term "legal advice" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting legal advice regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 36**:

All communications between You and any third party concerning the legality or illegality of Services or Legal Authorities that concern Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses, and because it seeks communications between any Novartis employee and any non-Novartis entity or individual. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds

45

**MR331**

their likely benefit.  Novartis further objects to this Request because the use of the term "third party" is vague and ambiguous such that Novartis cannot properly identify responsive material. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting discussions with federal or Texas officials regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 37**:

All Documents evidencing approvals You may have received—whether internal or external—to offer or deliver Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection.  Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit.  Novartis further objects to this Request because the use of the words "evidencing," "approvals," "internal," and "external" is vague and ambiguous such that Novartis cannot properly identify responsive material.  Additionally, Request 1 is cumulative of this Request.

46

**MR332**

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Given the Request is vague and ambiguous, Novartis is willing to meet and confer with the Relator regarding the purpose of this Request.

**REQUEST FOR PRODUCTION 38**:

All Documents concerning Your decision to seek or not to seek guidance from a Healthcare Regulator concerning Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Additionally, Request 1 is cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting decisions within Novartis regarding whether or not to seek guidance from a Healthcare Regulator regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

47

**MR333**

**REQUEST FOR PRODUCTION 39**:

All communications You have had with any Healthcare Regulator with respect to any Service.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "[a]ll communications" that this Request requires far exceeds their likely benefit. Novartis further objects because the use of the word "communications" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting communications with a Healthcare Regulator regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 40**:

All communications You have had with any Healthcare Regulator with respect to any Product.

**OBJECTIONS**:

48

**MR334**

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses, and because it seeks all communications that any person at Novartis had with any Healthcare Regulator regarding any topic having to do with any Covered Drug. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "[a]ll communications" that this Request requires far exceeds their likely benefit. Novartis further objects because the use of the word "communications" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting communications with a Healthcare Regulator regarding patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 41**:

Documents sufficient to show the organization of Your sales and marketing, compliance, and legal departments for the past 10 years, and all individuals working in those departments.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in

**MR335**

this Objection.  Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses and because it seeks the disclosure of the identifies of thousands of current and former global employees who have worked on any Novartis product, program, or initiative in the areas of sales, marketing, compliance, or legal.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting the names of current and former Novartis employees with knowledge of Novartis's sales, marketing, compliance, and legal departments' involvement with the patient support services for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 42**:

Strategic plans for each of the Products or any business unit or corporate division that includes the Products. As used herein, "strategic plan" includes any Document that concerns Your strategy for marketing and selling the Products.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection.  Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses and because it seeks any document that refers to any marketing or sales strategy in any location

50

**MR336**

for any of the Covered Drugs. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "any Document" that this Request requires far exceeds their likely benefit. Novartis further objects because the use of the terms "business unit" and "corporate division" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting marketing or sales strategies that include Texas involving patient support services for the Covered Drugs during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 43**:

Profit and loss statements and revenue for or including each of the Products.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final

51

**MR337**

documents reflecting sales revenue of the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**REQUEST FOR PRODUCTION 44**:

Documents sufficient to show Novartis' profit margins on each of the Products.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Documents regarding Novartis's profit margins are not relevant to the allegations in this case. Novartis also objects to this Request because it is not subject to any time-limit restrictions.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Novartis will not search for any documents in response to this Request.

**REQUEST FOR PRODUCTION 45**:

All communications with or submissions to any Person, including, but not limited to federal or state agencies, concerning safe harbors to the federal or Texas anti-kickback statutes, including all information or comment provided by Defendant or on behalf of Defendant in response to the Request for information published in volume 83, No. 166 of the Federal Register.

**OBJECTIONS**:

52

**MR338**

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "[a]ll communications" from "any Person" that this Request requires far exceeds their likely benefit. Novartis further objects to this Request because the use of the word "communications," "submissions," "information," and "comment" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final Novartis communications concerning safe harbors to the federal or Texas anti-kickback statutes, and regarding information provided in response to the Request for information published in volume 83, No. 166 of the Federal Register, to the extent such documents exist.

**REQUEST FOR PRODUCTION 46**:

All indemnity or insurance agreements that may cover, in whole or in part, losses Novartis may incur in connection with the conduct at issue in the Amended Petition.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly

53

burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "[a]ll . . . agreements" that this Request requires far exceeds their likely benefit.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows:  To the extent any responsive documents exist and following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final indemnity or insurance agreements.

**REQUEST FOR PRODUCTION 47**:

All communications with any insurance carrier concerning the conduct at issue in the Amended Petition.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection.  Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "[a]ll communications" from "any insurance carrier" that this Request requires far exceeds their likely benefit.  Novartis further objects to the Request because the use of the word "communications" and the term "insurance carrier" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

**MR340**

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged communications with any insurance carrier concerning the contents of the Amended Petition, to the extent such documents exist.

**REQUEST FOR PRODUCTION 48**:

All communications with Novartis' accountants or auditors concerning the conduct at issue in the Amended Petition.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and the burden of producing "[a]ll communications" that this Request requires far exceeds their likely benefit. Novartis further objects to the Request because the use of the word "communications" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Novartis will not search for documents responsive to request. Novartis is, however, willing to meet and confer with the Relator regarding the purpose of this Request and whether it is better addressed, if at all, through less burdensome discovery devices.

**MR341**

**REQUEST FOR PRODUCTION 49**:

Documents sufficient to show any reserves Novartis has booked or considered booking on account of the conduct at issue in the Amended Petition.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection.  Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to the Request because the use of the word "reserves" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Novartis will not search for documents responsive to request.  Novartis is, however, willing to meet and confer with the Relator regarding the purpose of this Request and whether it is better addressed, if at all, through less burdensome discovery devices.


**REQUEST FOR PRODUCTION 50**:

All communications with or presentations to Novartis' Board of Directors or any committees or subcommittees of the Board of Directors, concerning the conduct at issue in the Amended Petition.

**OBJECTIONS**:

56

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks materials unrelated to the parties' claims and defenses. Novartis also objects to the Request because the use of the words "communications" and "presentations" is vague and ambiguous such that Novartis cannot properly identify responsive material.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged communications with Novartis' Board of Directors or any committees or subcommittees of the Board of Directors concerning the content of the Amended Petition, to the extent such documents exist.

**REQUEST FOR PRODUCTION 51**:

All Documents relating to payments to any Person or third party who provided Services.

**OBJECTIONS**:

Novartis refers to and incorporates its Preliminary Statement, Objections Applicable to Each Request, and Objections to Instructions and Definitions as though they are set forth fully in this Objection. Novartis objects to this Request because it is overly broad and unduly burdensome to the extent that it seeks Documents unrelated to the parties' claims and defenses. Novartis also objects to this Request because it is not subject to any time-limit restrictions, and

57

the burden of producing "All Documents" that this Request requires far exceeds their likely benefit. Additionally, Request 11 and Request 24 are cumulative of this Request.

**RESPONSE**:

Subject to and without waiving its Objections herein, Novartis responds as follows: Following a reasonable inquiry and diligent search, Novartis will produce non-privileged, final documents reflecting payments made by Novartis to third-party entities and/or individuals for the provision of patient support services for the Covered Drugs in Texas during the Relevant Period, to the extent such documents exist.

**MR344**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84089375
Filing Code Description: Original Proceeding Petition
Filing Description: PETITION FOR WRIT OF MANDAMUS
Status as of 2/2/2024 12:49 PM CST

Associated Case Party: Health Selection Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jonathan Wilkerson | 24050162 | jonathan.wilkerson@lanierlawfirm.com | 2/2/2024 12:30:22 PM | SENT |
| Zeke DeRose | 24057421 | zeke.derose@lanierlawfirm.com | 2/2/2024 12:30:22 PM | SENT |
| W. Mark Lanier | | WML@LanierLawFirm.com | 2/2/2024 12:30:22 PM | SENT |
| Radu A.Lelutiu | | rlelutiu@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |
| Alex Jerome Brown | 24026964 | alex.brown@lanierlawfirm.com | 2/2/2024 12:30:22 PM | SENT |
| Jennifer Leigh Truelove | 24012906 | jtruelove@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |
| Samuel F. Baxter | 1938000 | sbaxter@mckoolsmith.com | 2/2/2024 12:30:22 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lynne Kurtz-Citrin | 24081425 | lynne.kurtz-citrin@oag.texas.gov | 2/2/2024 12:30:22 PM | SENT |
| Jonathan Bonilla | 24073939 | Jonathan.Bonilla@oag.texas.gov | 2/2/2024 12:30:22 PM | SENT |
| Jordan Underhill | 24102586 | jordan.underhill@oag.texas.gov | 2/2/2024 12:30:22 PM | SENT |
| Cynthia Lu | | Cynthia.Lu@oag.texas.gov | 2/2/2024 12:30:22 PM | ERROR |

Associated Case Party: Novartis Pharmaceuticals Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Meredith Garagiola | | mgaragiola@omm.com | 2/2/2024 12:30:22 PM | SENT |
| Ross Galin | | rgalin@omm.com | 2/2/2024 12:30:22 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 2/2/2024 12:30:22 PM | SENT |

**MR345**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84089375
Filing Code Description: Original Proceeding Petition
Filing Description: PETITION FOR WRIT OF MANDAMUS
Status as of 2/2/2024 12:49 PM CST

Associated Case Party: Novartis Pharmaceuticals Corporation

| Megan Whisler | | mwhisler@omm.com | 2/2/2024 12:30:22 PM | SENT |
| Danny S.Ashby | | dashby@omm.com | 2/2/2024 12:30:22 PM | SENT |

No. 06-24-00005-CV

IN THE COURT OF APPEALS
FOR THE SIXTH COURT OF APPEALS DISTRICT
TEXARKANA, TEXAS

IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

*Relator*

Original Proceeding from the 71st Judicial District Court
in Harrison County, Texas
The Honorable Brad Morin, Presiding

COMBINED RESPONSE TO PETITION FOR WRIT OF MANDAMUS AND MOTION FOR
TEMPORARY STAY

Samuel F. Baxter
Jennifer L. Truelove
McKool Smith, P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
(903) 923-9000
Fax: (903) 923-9099

Mark Lanier
Zeke DeRose
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N, Suite 100
Houston, TX 77064
(800) 723-3216
Fax: (713) 659-2204

***Attorneys for Plaintiff and Real-Party-in-Interest Health Selection Group, LLC***

4819-9393-4558

MR347

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

RELEVANT STATUTORY BACKGROUND ........................................6

ARGUMENT .........................................................................................7

    I.     THE PETITION SHOULD BE DENIED
           BECAUSE THE ERROR ALLEGED BY
           NOVARTIS DOES NOT WARRANT
           MANDAMUS REVIEW..............................................................7

    II.    NOVARTIS'S PETITION FAILS ON THE
           MERITS. ..................................................................................11

           A.     HSG Has Standing to Pursue Claims on
                  Behalf of the State.........................................................11

           B.     The TMFPA Is Constitutional. .....................................15

    III.   THERE IS NO BASIS FOR A STAY. .................................25

CONCLUSION ...................................................................................25

ii

**Page(s)**

**CASES**

*Agey v. Am. Liberty Pipe Line Co.*,
172 S.W.2d 972 (Tex. 1943)..............................................................................................16

*Agey*, *American Liberty Pipe Line Co. v. Agey*,
167 S.W.2d 580 (Tex. App.—Austin 1942) .......................................................................15

*Allen v. Fisher*,
118 Tex. 38, 9 S.W.2d 731 (1928).....................................................................................14

*Berry v. Berry*,
646 S.W.3d 516 (Tex. 2022)..............................................................................................14

*Bickham v. Dallas Co.*,
612 S.W.3d 663 (Tex. App.—Dallas 2020, pet. denied) ...................................................16

*Bittakis v. City of El Paso*,
480 F. Supp. 2d 895 (W.D. Tex. 2007)...............................................................................16

*Brady v. Brooks*,
89 S.W. 1052 (Tex. 1905)..................................................................................................17

*Brown v. De La Cruz*,
156 S.W.3d 560 (Tex. 2004)...........................................................................................5, 15

*Burkett v. City of El Paso*,
513 F. Supp. 2d 800 (W.D. Tex. 2007)...............................................................................16

*Busbee v. County of Medina*,
2023 WL 8655878 (Tex. Dec. 15, 2023) ...........................................................................14

*Camp v. Gulf Prod. Co.*,
61 S.W.2d 773 (Tex. 1933).................................................................................................18

*Children of the Kingdom v. Cent. Appraisal Dist. of Taylor Cty.*,
674 S.W.3d 407 (Tex. App.—Eastland 2023, pet. denied) ...........................................11, 12

*City of Beaumont v. Bouillon*,
896 S.W.2d 143 (Tex. 1995)..............................................................................................14

*City of San Antonio v. Stumburg*,
7 S.W.754 (Tex. 1888).......................................................................................................14

iii

*Data Foundry, Inc. v. City of Austin*,
620 S.W.3d 692 (Tex. 2021)..........................................................................................14

*El Paso Elec. Co. v. Tex. Dep't of Ins.*,
937 S.W.2d 432 (Tex. 1996)..........................................................................................18

*Everett v. TK-Taito, L.L.C.*,
178 S.W.3d 844 (Tex. App.—Fort Worth 2005, no pet.).............................................12

*Ex parte Villa Lobos*,
2023 Tex. App. LEXIS 6745 (Tex. App.—San Antonio
Aug. 30, 2023, no pet.) ..................................................................................................10

*Farmers Tex. Cty. Mut. Ins. Co. v. Beasley*,
598 S.W.3d 237 (Tex. 2020)..........................................................................................14

*Ferreira v. Butler*,
575 S.W.3d 331 (Tex. 2019)..........................................................................................13

*Garcia v. City of Willis*,
593 S.W.3d 201 (Tex. 2019)..........................................................................................14

*Green v. Tex. Comptroller of Pub. Accounts*,
2023 Tex. App. LEXIS 8754 (Tex. App.—El Paso Nov. 21, 2023, no pet. h.) ......................14

*Heckman v. Williamson Cty.*,
369 S.W.3d 137 (Tex. 2012)..........................................................................................14

*Hernandez v. Truck Ins. Exch.*,
553 S.W.3d 689 (Tex. App.—Fort Worth 2018, no pet.).............................................12

*Hill County v. Sheppard*,
178 S.W.2d 261 (Tex. 1944)....................................................................................18, 19

*In re Gibson*,
533 S.W.3d 916 (Tex. App.—Texarkana 2017, no pet.)........................................4, 7, 9

*In re Lazy W Dist. No. 1*,
493 S.W.3d 538 (Tex. 2016) (orig. proceeding).........................................................14

*In re Shire PLC*,
633 S.W.3d 1 (Tex. App.—Texarkana, 2021, no pet.)...........................................3, 7, 8, 9

*In re Sullivan*,
157 S.W.3d 911 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding)...........................11

iv

*In re Van Waters & Rogers, Inc.*,
    145 S.W.3d 203 (Tex. 2004) (orig. proceeding)..............................................................8

*In re Xerox Corp.*,
    555 S.W.3d 518 (Tex. 2018)..............................................................................2, 3, 5

*In the Interest of C.J.N.-S*,
    540 S.W.3d 589 (Tex. 2018)...............................................................................13

*In the Interest of P.R.*,
    615 S.W.3d 474 (Tex. App.—Texarkana 2020, pet. denied) ...................................14

*Larkins-Ruby v. Austin Cty.*,
    2022 Tex. App. LEXIS 9550 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022,
    pet. denied)..................................................................................................14

*Marauder Corp. v. Beall*,
    301 S.W.3d 817 (Tex. App.—Dallas [5th Dist.] 2009) ..............................4, 11, 13

*Marshall v. Lubbock*,
    520 S.W.2d 553 (Tex. Civ. App. 1975) ................................................................14

*Maud v. Terrell*,
    200 S.W. 375 (Tex. 1918)...........................................................................17, 18

*Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*,
    236 S.W.3d 765 (Tex. 2007)...............................................................................13

*Mosaic Baybrook One, L.P. v. Simien*,
    674 S.W.3d 234 (Tex. 2023)...............................................................................15

*Nephrology Leaders & Assocs. v. Am. Renal Assocs., LLC*,
    573 S.W.3d 912 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ...........................12

*Pike v. Tex. EMC Mgmt., LLC*,
    610 S.W.3d 763 (Tex. 2020)...............................................................................14

*Riley v. St. Luke's Episcopal Hosp.*,
    252 F.3d 749 (5th Cir. 2001) ...........................................................19, 20, 22, 23

*Sankaran v. VFS Services (USA) Inc.*,
    2023 WL 5543308 (Tex. App.—Houston [14th Dist.]
    August 29, 2023, no pet. h.)................................................................................16

v

*Scribner v. Treger*,
No. 02-21-00277-CV, 2022 WL 714654 (Tex. App.—Fort Worth
Mar. 10, 2022, no pet.) ........................................................................................16

*Spradlin v. Jim Walter Homes*,
34 S.W.3d 578 (Tex. 2000) ...................................................................................14

*Staples v. State*,
245 S.W. 639 (Tex. 1922) .....................................................................................18

*State v. Moore*,
57 Tex. 307 (1882) ...............................................................................................17

*Swift v. United States*,
318 F.3d 250 (D.C. Cir. 2003) .............................................................................23

*Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*,
616 S.W.3d 558 (Tex. 2021) ................................................................................15

*Thompson v. City of Austin*,
979 S.W.2d 676 (Tex. App.—Austin 1998) .........................................................24

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .................................................................................1

*United States, ex rel. Polansky v. Executive Health Res., Inc.*,
599 U.S. 419 (2023) ........................................................................................21, 23

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) ..................................................................................4

*Zaatari v. City of Austin*,
615 S.W.3d 172 (Tex. App.—Austin 2019, pet. denied) .....................................11

vi

**STATEMENT OF THE CASE**

**Nature of the case:** This is a case filed by Health Selection Group, LLC ("HSG") on behalf of the State of Texas under the Texas *qui tam* statute, the Texas Health Program Fraud Prevention Act, fka Texas Medicaid Fraud Prevention Act ("TMFPA").[1] It concerns three illegal marketing programs defendant Novartis Pharmaceuticals Corporation ("Novartis") has used to drive prescription for certain of its products.

On December 15, 2023, after extensive briefing and a Zoom hearing, the District Court denied defendant Novartis's plea to jurisdiction and motion to dismiss pursuant to Rule 91a, rejecting arguments that (i) HSG lacks standing; and (ii) the TMFPA is unconstitutional. The District Court declined to certify an interlocutory appeal pursuant to Texas Rule of Civil Procedure 168. Novartis thereafter filed its mandamus petition and motion to stay.

**Respondent:** The Honorable Brad Morin, Presiding Judge of the 71st Judicial District Court, Harrison County; Case No. 23-0276.

---

[1] The Texas *qui tam* statute is now known as the Texas Health Care Program Fraud Prevention Act. In the briefing below, the parties referred to the statute using its previously, commonly-used acronym—the TMFPA, and Novartis's mandamus petition continues the same nomenclature. For the sake of simplicity, HSG does the same here.

vii

4819-9393-4558

**MR353**

**Rulings at issue:** The District Court's order dated December 15, 2023.

**Relief sought:** An order denying Novartis's petition and motion for stay.

## STATEMENT REGARDING ORAL ARGUMENT

Because, on its face, Novartis's petition lacks merit, HSG does not believe that oral argument is necessary. If the Court nevertheless determines that oral argument would be helpful, HSG respectfully requests an opportunity to participate.

## STATEMENT OF JURISDICTION

HSG agrees that the Court has jurisdiction over Novartis's petition, but disputes that Novartis is entitled to the extraordinary writ it has requested.

## QUESTIONS PRESENTED

1.     Whether a private citizen like HSG—who is expressly authorized to enforce the TMFPA—has constitutional standing to prosecute this lawsuit on behalf of and for the benefit of the State of Texas.

2.     Whether the TMFPA is constitutional.

## MANDAMUS RECORD

With one exception, HSG agrees that the record presented with Novartis's petition (cited herein using the prefix MR) includes all of the materials that are pertinent here. HSG believes that the proposed order Novartis submitted to the District Court asking for permission to pursue an interlocutory appeal is also

4819-9393-4558

pertinent. HSG is providing that document in a supplemental appendix (cited herein using the prefix SMR).

ii

4819-9393-4558

## INTRODUCTION

In 1863, at the behest of President Lincoln, the United States Congress enacted legislation to combat fraud by government contractors. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009). Originally referred to as "Mr. Lincoln's Law," that legislation—which has since undergone various revisions—is now known as the False Claims Act ("FCA"). Since the FCA's enactment, more than two dozen states have adopted analogous statutes[2]—including the TMFPA, which was enacted by the Texas Legislature in 1995. *Malouf v. State ex rels. Ellis*, 656 S.W.3d 402, 406 (Tex. App.—El Paso 2022, pet. filed) (citations omitted).

While there are differences between the FCA and TMFPA, the two statutes largely mirror each other. Of relevance here, both statutes provide financial incentives for private citizens, *i.e.*, whistleblowers, to come forward and hold fraudulent actors to account in federal and state courts. *See generally* 31 U.S.C. § 3730 *et seq.* (FCA); Tex. Hum. Res. Code § 36.101 *et seq.* (TMFPA).

Because lawsuits filed under the FCA and TMFPA vindicate government programs, not private rights, the whistleblowers filing these suits will <u>*never*</u> have suffered the type of personal injury plaintiffs generally suffer when they seek redress in court. But because both the FCA and TMFPA "deputize private citizens to pursue

---

[2] *See* https://oig.hhs.gov/fraud/state-false-claims-act-reviews/.

4819-9393-4558

[claims] *on the government's behalf*,"[3] *In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018), the whistleblowers' standing to file suit is statutorily-provided and derivative of that of the victim(s) of the fraud—the government programs that have been defrauded. Stated differently, because whistleblowers enforcing the FCA and TMFPA stand in the shoes of the government, the injury sustained by government-sponsored programs like Medicare or Medicaid is sufficient to confer standing. *See* 31 U.S.C. § 3730 ("A person may bring a civil action for a violation of [the FCA] for the person and *for the United States Government*."); Tex. Hum. Res. Code § 36.101 ("A person may bring a civil action for a violation of [the TMFPA] for the person and *for the state*.").

The FCA and TMFPA allow federal and state law enforcers, *i.e.*, the respective offices of the Attorney General ("OAG"), to assume prosecution of lawsuits alleging fraud on government programs—an event colloquially referred to as "intervention." If OAG declines intervention, however, the statutes also permit whistleblowers to continue prosecuting claims on the government's behalf. For intervened and non-intervened cases alike, ultimate control over the litigation remains at all times with the government, and the statutes contain multiple, overlapping provisions that ensure precisely that. Most relevantly here, the government retains the right to intervene at any time; move to dismiss over the whistleblower's objection; and, subject to certain

---

[3] Unless otherwise indicated, all emphases herein were supplied by HSG.

4819-9393-4558

**MR357**

formalities, dictate the parameters under which *qui tam* lawsuits are settled or discontinued.

The FCA is now "the primary vehicle by the [federal] Government for recouping losses suffered through fraud." H.R. Rep. No. 99–660, p. 18 (1986). So too is the TMFPA, which the Texas Supreme Court has recognized as "a powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity." *In re Xerox Corp.*, 555 S.W.3d at 525. Indeed, since 2000, the State of Texas has recovered approximately $2.5 billion for taxpayers under the TMFPA. MR105 n.3. One such recovery—$42.7 million—was obtained last year in a lawsuit filed against Shire PLC, by an affiliate of HSG. MR105 n.4.[4]

Novartis is one of the largest pharmaceutical companies in the world; it also is one of the most egregious repeat offenders of the FCA and TMFPA. MR102. Over the past 15 years, Novartis has paid nearly $1.5 billion to resolve lawsuits involving allegations that it paid kickbacks to illegally promote its products at the expense of the Medicare and Medicaid programs. *Id.* & n.1. But rather than reform its conduct, Novartis now purports to have found an antidote that forever shields its actions from TMFPA scrutiny—and presumably _any_ anti-kickback scrutiny under federal law and the laws of other states. This is because, according to Novartis, (i) private

---

[4] Novartis's petition includes certain veiled attacks on HSG and the merits of its claims. Suffice it to say that this Court reviewed and rejected similar arguments in *In re Shire PLC*, 633 S.W.3d 1 (Tex. App.—Texarkana, 2021, no pet.).

4819-9393-4558

**MR358**

whistleblowers—like HSG—lack constitutional standing to enforce the TMFPA; and (ii) the TMFPA is unconstitutional because it violates separation-of-powers principles enshrined in the Texas Constitution.

The District Court was correct to summarily reject these arguments, which, as far HSG is aware, have never been raised in state court by another defendant facing TMFPA liability. Novartis's attempt to obtain mandamus relief and a stay order from this Court fails.

*First*, mandamus review is not appropriate here. Novartis can present its constitutional challenges in due course, and it stands to lose no substantive rights if this Court does not hear them now. *In re Gibson*, 533 S.W.3d 916, 917 (Tex. App.—Texarkana 2017, no pet.); *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992).

*Second*, if the Court is inclined to delve into the substance of Novartis's arguments, it should reject them. Contrary to Novartis's arguments, HSG need not have suffered personal injury to file and pursue claims under the TMFPA. This is because the TMFPA itself authorizes HSG to pursue claims on behalf of the government program it protects, *i.e.*, Texas Medicaid, and HSG has alleged that Novartis's conduct has caused injury to that government program. That is all that is required for standing under the Texas Constitution. *Marauder Corp. v. Beall*, 301 S.W.3d 817, 820 (Tex. App.—Dallas [5th Dist.] 2009) ("The Constitution requires standing to maintain suit. Standing however, *may be conferred by statute*. A party

4

suing under a statute must establish standing, or the right to make a claim under that statute. In these cases, the statute itself provides the framework for the standing analysis.") (citations omitted).

Novartis's arguments that the TMFPA itself is unconstitutional fare no better. Relying on wholly inapposite case-law, Novartis asks the Court to upend decades of civil Medicaid fraud enforcement jurisprudence and declare the TMFPA null and void. But the constitutionality of *qui tam* statutes is not an open question in Texas. *Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004) ("[T]his is a penal statute that would in many instances impose a fine far beyond the damages that a purchaser is likely to suffer. As we held long ago in *Agey*, the <u>Legislature may grant private standing to bring such actions, but it must do so clearly</u>.") (citing *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943)). The TMFPA is an example of a civil penalty statute that clearly grants a private right of action to a private plaintiff <u>for the benefit of the State</u> and subject to numerous, overlapping provisions that ensure that, at all times, OAG maintains tight reins on the plaintiff. *See* Tex. Hum. Res. Code § 36.101 ("ACTION BY PRIVATE PERSON AUTHORIZED"); *In re Xerox Corp.*, 555 S.W.3d at 526-27 (describing TMFPA civil remedies as penalties). The TMFPA is constitutional, and there is no basis upon which this Court should conclude otherwise and deliver Novartis—and myriad other fraudulent actors—a free pass to plunder the Texas Medicaid program.

5

*Third*, because Novartis's mandamus petition lacks merit, there is no basis for a stay.

## RELEVANT STATUTORY BACKGROUND

The TMFPA contains a number of provisions that are relevant here. First, it unambiguously confers standing upon "private person[s]"—aka "relators"—to file suit "for the state." Tex. Hum. Res. Code § 36.101 ("A person may bring a civil action for a violation of Section 36.002 for the person and for the state. The action shall be brought in the name of the person and of the state."). Second, it requires relators to go through specific steps to initiate suit and make specific disclosures to maintain it. Tex. Hum. Res. Code § 36.102(a)-(b) (requiring service of "petition and a written disclosure of substantially all material evidence" on OAG and the sealing of the petition for period of at least 180 days). Third, it gives OAG the right to "proceed with the action" and, in the absence of intervention, authorizes the relator to "proceed without the state's participation." Tex. Hum. Res. Code § 36.104 (a)-(b). Fourth, it requires the relator to keep the State informed, if the State so requires, of developments in the action. Tex. Hum. Res. Code § 36.104(b-1) (mandating that, on request by the State, the relator provide copies of all pleadings and depositions). Fifth, upon a showing of "good cause" and notwithstanding an initial declination decision, it allows the State to intervene and assume the prosecution of the lawsuit at any time. *Id.* Sixth, it prohibits the dismissal of the action unless "the attorney

6

general consent[s] in writing." Tex. Hum. Res. Code § 36.102(e). Finally, it provides certain parameters for how "proceeds of the action" are to be distributed between the State and the relator/"private plaintiff"—with the vast majority of the proceeds going to the State. Tex. Hum. Res. Code § 36.110.

## ARGUMENT

Novartis's mandamus petition fails for both procedural and substantive reasons. It fails because even if the District Court had committed error (and it decidedly did not), mandamus review is not available here. And it fails because the District Court was correct to reject Novartis's unsupportable arguments. Furthermore, because Novartis's petition lacks merit, there is no basis for a stay order.

## I. THE PETITION SHOULD BE DENIED BECAUSE THE ERROR ALLEGED BY NOVARTIS DOES NOT WARRANT MANDAMUS REVIEW.

Mandamus is an extraordinary writ and "[a]bsent extraordinary circumstances . . . , a denial of a motion to dismiss or a plea in abatement is a ruling incident to the ordinary trial process which will not be corrected by mandamus, but by the legal remedy of the ordinary appellate process." *In re Gibson*, 533 S.W.3d at 920 (quoting *Hooks*, 808 S.W.2d at 59).

"A party is entitled to a writ of mandamus when it demonstrates that the trial court abused its discretion and that it does not have an adequate remedy at law." *In*

7

*re Shire*, 633 S.W.3d at 10 (citing *Walker v. Packer*, 827 S.W.2d 833, 840-41 (Tex. 1992)). "A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a *clear and prejudicial error of law*." *Id.* (cleaned up). The mere fact that "an appellate remedy . . . may involve more expense or delay than obtaining an extraordinary writ does not establish that the appellate remedy is inadequate." *Id.* Rather, "[t]he most frequent use we have made of mandamus relief involves cases in which *the very act of proceeding to trial—regardless of the outcome—would defeat the substantive right involved*." *Id.* at 11 (quoting *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008) (orig. proceeding)). "The failure to establish either element will defeat a petitioner's request for mandamus relief." *Id.*

Aware of the high burden it carries to invoke this Court's mandamus jurisdiction, Novartis asserts that (i) it "lacks an adequate appellate remedy to correct the district court's errors;" and (ii) a ruling in its favor will (a) "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings;" and (b) "resolve significant issues of first impression that are likely to recur." Mandamus at 56-57. None of this passes muster.

There is no merit to Novartis's assertion that the District Court's alleged errors cannot be remedied through the normal appellate process. "An appeal is inadequate [only] when the parties are in danger of permanently losing *substantial* rights." *In re*

8

MR363

*Van Waters & Rogers, Inc.*, 145 S.W.3d 203, 211 (Tex. 2004) (orig. proceeding). Novartis does not stand to lose any substantive rights if it pursues its claims of error during the normal appellate process.[5]

Similarly unpersuasive is Novartis's assertion that the Court should exercise its mandamus jurisdiction to spare the parties and District Court "time and money" that would otherwise be "utterly wasted." "An appellate remedy is not inadequate because it may involve more expense or delay than obtaining an extraordinary writ." *In re Gibson*, 533 S.W.3d at 920 (quoting *In re Lumbermen's Underwriting All.*, 421 S.W.3d 289, 295 (Tex. App.—Texarkana 2014, no pet.); *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992)).[6]

---

[5] Citing a law review article, Novartis asserts that defendants facing FCA and TMFPA claims are likely to settle. Mandamus at 60. To the extent it may be suggesting that a strategic choice to relinquish its appellate rights entitles it to mandamus here, Novartis is obviously mistaken.

[6] Citing several cases involving mandamus challenges to motions denying dismissal under Rule 91a, Novartis asserts (Mandamus at 57-58) that mandamus relief is appropriate here because the motion below was filed under Rule 91a. But as this Court held in *In re Shire*, to meet Rule 91a's "no basis in law" requirement, "the defendant must demonstrate that recovery by the plaintiff is foreclosed as a matter of law . . . because either (1) the causes of action in the petition are not recognized by Texas law or (2) the plaintiff has alleged facts that defeat those causes of action under settled law (i.e., the plaintiff has pleaded itself out of court)." 633 S.W.3d at 20. Neither circumstance is present here, as HSG's claims are indisputably recognized under Texas law and Novartis has not asserted that HSG's pleading is self-defeating. Novartis's reliance on cases involving mandamus relief from denials of pleas to jurisdiction is equally unavailing because it is undisputed that the District Court has jurisdiction over HSG's TMFPA claims.

9

Finally, Novartis's assertion—that, by exercising its mandamus jurisdiction, this Court will "resolve significant issues of first impression that are likely to recur" (Mandamus at 58)—fails for two distinct reasons. First, it simply is not true. HSG is not aware of a single TMFPA defendant who has previously pressed Novartis's arguments in Texas court. Second, while mandamus relief may be "available for a novel issue or one of first impression," that is only true where "the law points to *but one clear result*." *Ex parte Villa Lobos*, 2023 Tex. App. LEXIS 6745, *2 (Tex. App.—San Antonio Aug. 30, 2023, no pet.) (citing *In re City of Lubbock*, 665 S.W.3d 546, 554 (Tex. Crim. App. 2023) (orig. proceeding)). While the parties' legal dispute is indeed one sided, it is one sided *in favor of HSG*, not Novartis. Novartis cannot credibly contend otherwise because it requested an interlocutory appeal and, in the proposed order it asked the District Court to enter, it represented, with respect to both issues now presented in its mandamus petition, there was "substantial ground for *difference of opinion*." SMR003. By definition, a lively legal debate (and, to be clear, HSG disputes Novartis's characterization) is the opposite of a situation where "the law points to *but one clear result*."

At bottom, because Novartis has not established that it would be appropriate for this Court to exercise its mandamus jurisdiction here, the petition should be summarily denied.

4819-9393-4558

## II.     NOVARTIS'S PETITION FAILS ON THE MERITS.

Novartis's arguments also fail on the merits.

### A.     HSG Has Standing to Pursue Claims on Behalf of the State.

Novartis asserts that, consistent with the Texas Constitution and precedent, only a plaintiff who is "*personally* injured" or has a personal stake in the outcome of a suit has standing to file suit.

While standing is indeed required before a plaintiff may file and maintain suit, precedent is clear that "standing may be conferred *by statute*." *Marauder*, 301 S.W.3d at 820 (citing *Bland Ind. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *Scott v. Board of Adjustment*, 405 S.W.2d 55, 56 (Tex. 1966)). *See also Children of the Kingdom v. Cent. Appraisal Dist. of Taylor Cty.*, 674 S.W.3d 407, 414 (Tex. App.—Eastland 2023, pet. denied); *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding); *Zaatari v. City of Austin*, 615 S.W.3d 172, 182-83 (Tex. App.—Austin 2019, pet. denied).

And, contrary to Novartis's arguments, "when standing is conferred by statute, the common-law criteria regarding standing do[] *not* apply." *Id.* Rather, "[i]n statutory standing cases, . . . the analysis is *a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls in that category*." *Sullivan*, 157 S.W.3d at 915; *Marauder*, 301 S.W.3d at 820 ("[t]he standing analysis begins and ends with

11

4819-9393-4558

**MR366**

the statute itself"); *Nephrology Leaders & Assocs. v. Am. Renal Assocs., LLC*, 573 S.W.3d 912, 915-16 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 850 (Tex. App.—Fort Worth 2005, no pet.) (stating that, "[w]hen standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis").

Here, Novartis has not made a showing that HSG lacks "the right to make a claim" <u>under the TMFPA</u>, and there is no question that it does. As such, Novartis's arguments that HSG has not alleged an injury to itself are legally irrelevant. *Children of the Kingdom*, 674 S.W.3d at 415 ("[The plaintiff] is not required to prove a concrete and particularized injury, as [the defendants] assert, because the common-law criteria does not apply when a statute confers such authority upon an appraisal district to bring suit. Thus, [the plaintiff] has standing to bring suit against [the defendants] for the collection of the delinquent taxes."); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 850 (Tex. App.—Fort Worth 2005, no pet.) ("To establish common law standing, a plaintiff must show a distinct injury to the plaintiff and a real controversy between the parties, which . . . will be actually determined by the judicial declaration sought. In conferring statutory standing, however, the legislature may by statute exempt litigants from proof of the 'special injury' required to establish common law standing."); *Hernandez v. Truck Ins. Exch.*, 553 S.W.3d 689, 698 (Tex. App.—Fort Worth 2018, no pet.) ("the legislature may exempt litigants from the

12

common law injury requirement, making the statute itself the proper analytical framework to determine standing"); *Marauder*, 301 S.W.3d at 820 ("Under the statute, a person may sue for an injunction to 'prevent or restrain' a violation of the TDCA. The statute is broadly written. [The defendant] contends that [the plaintiff] lacks standing because she has no cognizable interest in any bond proceeds. The statute, however, does <u>not</u> require that she have such an interest.").

The fact that an uninjured party has standing to enforce the rights of another, injured party is hardly controversial. Parents sue on behalf of children; executors sue on behalf of estates; and insurers sue on behalf of insureds. *See generally In the Interest of C.J.N.-S*, 540 S.W.3d 589 (Tex. 2018) (parents have standing to sue on behalf of children); *Ferreira v. Butler*, 575 S.W.3d 331, 334 (Tex. 2019) ("the common law is clear: an executor 'stands in the shoes' of the decedent."); *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007) ("the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party").

Novartis's cited cases are not to the contrary. The vast majority of these cases—*Pike, Beasley, Busbee, In re Lazy W Dist. No. 1, Data Foundry, Heckman, Bouillon, Spradlin, In re State Board for Educator Certification, Stephens, Garcia,*

4819-9393-4558

**MR368**

*Allen*, *Marshall*, and *Stumburg*[7]—do not involve statutory standing and are thus irrelevant. And the handful of (arguably) statutory standing cases Novartis has cited—*Green*,[8] *Berry*,[9] *Larkins-Ruby*,[10] *In the Interest of P.R.*,[11] *Texas Board of*

---

[7] *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 775 (Tex. 2020); *Farmers Tex. Cty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 239 (Tex. 2020); *Busbee v. County of Medina*, 2023 WL 8655878 (Tex. Dec. 15, 2023); *In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 544 (Tex. 2016) (orig. proceeding); *Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 702 (Tex. 2021); *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 143 (Tex. 2012); *City of Beaumont v. Bouillon*, 896 S.W.2d 143 (Tex. 1995); *Spradlin v. Jim Walter Homes*, 34 S.W.3d 578 (Tex. 2000); *In re State Bd. For Educator* Certification, State *v. Stephens*, 663 S.W.3d 45, 49 (Tex. Crim. App. 2021); *Garcia v. City of Willis*, 593 S.W.3d 201 (Tex. 2019); *Allen v. Fisher*, 118 Tex. 38, 41, 9 S.W.2d 731, 731-32 (1928); *Marshall v. Lubbock*, 520 S.W.2d 553, 554 (Tex. Civ. App. 1975); *City of San Antonio v. Stumburg*, 7 S.W.754 (Tex. 1888).

[8] In *Green v. Tex. Comptroller of Pub. Accounts*, 2023 Tex. App. LEXIS 8754, at *14 (Tex. App.—El Paso Nov. 21, 2023, no pet. h.), standing was found lacking because of the taxpayers filing suit did not show that their alleged injuries were "fairly traceable" to the alleged wrongdoing.

[9] In *Berry v. Berry*, 646 S.W.3d 516, 527 & n.3 (Tex. 2022), the relevant issue was whether one of the plaintiffs (Chelsea) was an "interested person" within the meaning of the Texas Property Code. The Supreme Court held that she was and that the lower courts had erred in concluding otherwise.

[10] In *Larkins-Ruby v. Austin Cty.*, 2022 Tex. App. LEXIS 9550, at *6-7 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied), involved a tax collection matter and its holding has nothing to do with the issue before this Court.

[11] The issue in *In the Interest of P.R.*, 615 S.W.3d 474, 480 (Tex. App.—Texarkana 2020, pet. denied), was whether a litigant who had prevailed in litigation had standing to appeal absent injury stemming from the trial court's judgment.

14

*Chiropractic Examiners,*[12] *Mosaic Baybrook One*[13]—are inapposite and do not support Novartis's position that HSG lacks standing under the TMFPA.

To be sure, to plead a TMFPA violation, a private plaintiff must plead injury—but injury to Texas Medicaid on account of the defendant's wrongdoing suffices. Here it is uncontested that HSG has pled injury to Texas Medicaid, and thus it has standing to prosecute this lawsuit on behalf of the State.

## B. The TMFPA Is Constitutional.

The law in Texas is settled. Consistent with the Texas Constitution, "the Legislature may grant [private citizens] standing to bring [*qui tam*] actions, but it must do so clearly." *Brown*, 156 S.W.3d at 566 (citing *Agey*, 172 S.W. 3d at 974).[14]

---

[12] *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021), involved claims by an association suing on behalf of its members. The Supreme Court found that the association did have standing because it was seeking to redress economic harm to its members.

[13] *Mosaic Baybrook One, L.P. v. Simien,* 674 S.W.3d 234 (Tex. 2023), involved a dispute concerning a "Water/Sewer Base Fee." The defendant argued that the plaintiff lacked standing because its claims alleged a "bare procedural violation" that would not be redressed by the relief the plaintiff had requested (money damages). The Supreme Court disagreed, holding that the plaintiff had "suffered direct economic loss," which was sufficient to confer standing. *Id.* at 250-251. The Supreme Court's holding does not speak to the issue before the Court.

[14] In large part, Novartis's mandamus petition (and its Plea to Jurisdiction below) rests on an intermediate appellate ruling in *Agey, American Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580 (Tex. App.—Austin 1942). But the Austin appellate decision Novartis cites was superseded by the Texas Supreme Court the following year, and the Court expressly declined to adopt the basis for the appellate decision, noting: "it is not necessary for this Court to here decide whether the Legislature was prohibited by the Constitution from permitting such suit to be filed without joinder of the

4819-9393-4558

**MR370**

The Texas Supreme Court's holding in *Brown* thus plainly permits *qui tam* provisions in penalty statutes, where such private rights of action are clearly articulated. As noted above, the TMFPA is an example of a statute providing for the recovery of penalties, with a clear grant of standing for private whistleblowers to bring suit, either with or without the State's active participation, and subject to control by OAG. *See* Tex. Hum. Res. Code §§ 36.101, 36.104, 36.052(a)(3). The *Brown* holding affirms the legitimacy of the TMFPA as a *qui tam* statute.

Further, the holding in *Brown*—which eviscerates Novartis's arguments—has been cited repeatedly by both Texas and federal courts for the proposition that, consistent with the Texas Constitution, the Legislature can in fact grant standing for individuals to pursue actions for violations of Texas statutes. *See e.g.*, *Burkett v. City of El Paso*, 513 F. Supp. 2d 800, 824-825 (W.D. Tex. 2007); *Bittakis v. City of El Paso*, 480 F. Supp. 2d 895, 922-923 (W.D. Tex. 2007); *Bickham v. Dallas Co.*, 612 S.W.3d 663, 670 (Tex. App.—Dallas 2020, pet. denied); *Sankaran v. VFS Services (USA) Inc.*, 2023 WL 5543308, at *4 (Tex. App.—Houston [14th Dist.] August 29, 2023, no pet. h.); *Scribner v. Treger*, No. 02-21-00277-CV, 2022 WL 714654, at

---

Attorney General, or some county or district attorney, and we express no opinion upon that question." *Agey*, 172 S.W. 2d at 974. Furthermore, the statute at issue in *Agey* is very much unlike the TMFPA, as it was neither a *qui tam* statute nor did it confer a private right of action. *See id.* ("If the Legislature had intended by this Act to authorize an individual to file a suit on behalf of himself and on behalf of the State, without the joinder of the Attorney General or some district or county attorney, it could have expressed such intention in clear language. This it did not do.").

16

4819-9393-4558

*10 (Tex. App.—Fort Worth Mar. 10, 2022, no pet.).

Novartis's reliance on purportedly contrary precedent—some of it over 100 years old—is unavailing. Novartis cites (Mandamus at 31) *State v. Moore*, 57 Tex. 307, 314 (1882), as standing for the proposition that, "where the Texas Constitution selects the depositaries of a given power, the Legislature may not delegate that power to another unless authorized by an express constitutional provision." *Moore*, however, was overruled by *Brady v. Brooks*, 89 S.W. 1052 (Tex. 1905). And even if *Moore* were good law (which it is not), it is distinguishable as it involved a direct conflict between two branches of State government—the powers of the County Attorneys (in the Judicial Branch) and those of the Attorney General (in the Executive Branch). *Moore*, 57 Tex. at 314-15. No such conflict is presented by the TMFPA.

Novartis also cites (Mandamus at 32-33) *Maud v. Terrell*, 200 S.W. 375, 376 (Tex. 1918), but that case supports HSG's position. *Maud* involved a statute authorizing the Texas Comptroller to appoint private individuals to collect inheritance taxes. *Id*. at 375-376. The *Maud* court held that the statute at issue was constitutional and valid. *Id*. at 377-378. After reviewing the statute, the court found that it—similar to the TMFPA—empowered the appointed person, among other things, to: "sue for and collect" inheritance taxes; "aid in every possible way in the collection of such taxes[;]" and "represent the State . . . to enforce the collection" of

17

4819-9393-4558

MR372

inheritance taxes. *Id*. at 377. The court found that since "[t]hese provisions do not unequivocally supplant the county attorneys and the Attorney-General in their authority to prosecute the suits of the State for the recovery of the taxes" therefore the statute is constitutional, and "cannot be pronounced invalid." *Id*. at 377-378; *see also El Paso Elec. Co. v. Tex. Dep't of Ins*., 937 S.W.2d 432, 439 (Tex. 1996) (citing *Maud*); *Camp v. Gulf Prod. Co.*, 61 S.W.2d 773, 777-778 (Tex. 1933) (citing *Maud*). The Texas Supreme Court in *Maud* therefore sets a demanding standard for a statute to violate separation of powers: that the legislation must "*unequivocally supplant*" the authority of the OAG. The TMFPA does no such thing.

Novartis also cites (Mandamus at 34) *Staples v. State*, 245 S.W. 639 (Tex. 1922). This too is unavailing. *Staples* involved a *quo warranto* suit brought by individuals both "in the name of the state of Texas" and "in their own names" on a ballot for a general election, which was challenged as being unconstitutional for infringing on the exclusive authority of the County Attorneys, District Attorneys, and the Attorney General. *Id.* at 639-40. Citing *Maud* extensively, the *Staples* court found that although the individuals in question did not have the "legal capacity or right to institute and maintain" their suit, the statute itself was "not in violation of section 21, art. 5, and section 22, art. 4, of the [Texas] Constitution." *Id.* at 643.

Novartis also cites (Mandamus at 37) *Hill County v. Sheppard*, 178 S.W.2d 261, 264 (Tex. 1944), but that case involved an effort by the Legislature to create a

18

statutory office to "take over" the duties of county attorneys. The Supreme Court held, unremarkably, that "since the Constitution imposed certain duties upon the county attorney, the Legislature, in the absence of other constitutional authority therefor, could not create a statutory office with power to take over and exercise such functions." *Id.* at 264. Nothing in the TMFPA authorizes private citizens to "take over" OAG's prerogative to enforce the TMFPA.

In an effort to distract attention from the fact that its own cited cases undercut its arguments, Novartis argues that, by authorizing private persons to file and pursue claims under the statute, the TMFPA improperly encroaches on OAG's "constitutional duty and authority by authorizing private parties to bring and maintain suit for and in the name of the State." Mandamus at 38. All of Novartis's arguments miss the mark.

*First*, Novartis asserts that, through the TMFPA, "the Legislature has essentially created an extra-constitutional office comprised of self-appointed private attorney generals who exercise a power that the Texas Constitution explicitly and exclusively confers on the duly-elected State attorneys." Mandamus at 39. According to Novartis, "the TMFPA purports to grant . . . control [over claims under that statute] to *qui tam* relators to file suit for the State without the involvement or approval of the Attorney General." *Id.* Remarkably, to support its position, Novartis cites a <u>dissent</u> in *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 764 (5th Cir.

19

2001) (Smith, J., dissenting)—without acknowledging that 11 judges of the Fifth Circuit Court of Appeals rejected (in the FCA context) the very arguments Novartis is pressing here:

> We hold that the qui tam provisions of the False Claims Act *do not violate the principle of separation of powers by impermissibly infringing upon the constitutional duty of the Executive to take care that the laws are faithfully executed* under the Take Care Clause of Article II.

*Id.* at 758.

The Fifth Circuit's en banc *Riley* holding is instructive here. The TMFPA simply does not strip OAG of control or prosecutorial discretion. As explained above, the TMFPA contains multiple provisions that protect OAG's autonomy to investigate and prosecute (or not prosecute) suits as it sees fit. The relator must file the petition under seal, it must make extensive disclosure to OAG, and then, while the petition remains sealed, wait for OAG to investigate the claims and decide whether to take over the lawsuit. Upon review of the relator's petition, OAG is free to intervene, decline intervention, or dismiss the action altogether. *See* Tex. Hum. Res. Code §§ 36.102, 36.103, 36.104.11. Contrary to Novartis's assertions, a private TMFPA plaintiff neither supplants OAG's role with respect to, nor does it "control," the litigation. Rather, "control" and prosecutorial discretion remain with OAG at all times, and OAG retains complete discretion to proceed only with the TMFPA cases that it chooses. To be sure, if OAG deems a TMFPA case unmeritorious, it can

20

dismiss the relator's case even over the objections of the relator. *See* Tex. Hum. Res. Code § 36.107(b). Indeed, the government's power to dismiss and settle a *qui tam* action over the objection of the person who brought it was recently described by an 8-1 majority of the U.S. Supreme Court as being "uncommon, even extraordinary." *See United States, ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 430 (2023). Novartis acknowledges OAG's power to unilaterally dismiss a case but fails to explain how intervening to dismiss or settle an action amounts to the State being forced to prosecute the case. To the contrary, when OAG intervenes to dispose of a TMFPA case that is a far cry from usurping OAG's executive decision-making. As such, the TMFPA does not erode OAG's prosecutorial discretion.

*Second*, Novartis argues that the TMFPA improperly "circumscribes the Attorney General's discretion by granting the relator the right to participate as a party even when the Attorney General elects to intervene to take over the action." Mandamus at 44. Not so. If OAG exercises the State's right to intervene in a relator-initiated TMFPA action, the TMFPA dictates that "the State has the primary responsibility for prosecuting the action and is not bound by an act of the person bringing the action." Tex. Hum. Res. Code § 36.107(a) (emphasis added). As discussed above, this gives the State full control over the case at that point. Novartis's assertions—that, post-intervention, private plaintiffs "may [yet] act independent of the Attorney General's litigation strategy" thereby "inevitably

21

hinder[ing] the Attorney General's ability to prosecute the State's claims free from the relator's influence and interference" (Mandamus at 44-45)—are nonsensical. Nothing in the TMFPA *requires* OAG to pay any attention to the relator's views on litigation strategy, much less agree with them. True, the relator's legal team may *assist* OAG, but the notion that, consistent with the TMFPA, a relator may go rogue and interfere or undermine the prosecution is simply made up. Indeed, in *Riley*, when describing the similarly broad authority of the federal government in prosecuting actions under the FCA, the Fifth Circuit rejected the very arguments Novartis is making here:

> [T]he powers of a *qui tam* relator to interfere in the Executive's overarching power to prosecute and to control litigation are seen to be slim indeed when the *qui tam* provisions of the FCA are examined in the broad scheme of the American judicial system.

*Riley*, 252 F.3d at 756.

*Third*, Novartis asserts that the TMFPA "also requires the Attorney General to obtain relator or state-court approval for his discretionary decisions to dismiss or settle the State's claims." Mandamus 45; *see id.* at 46. Not true. Nothing in the TMFPA requires OAG to obtain "relator . . . approval" for anything. Indeed, OAG may *always* dismiss the TMFPA action over the objections of the relator so long as the relator is provided notice and the opportunity to be heard. Tex. Hum. Res. Code § 36.107(b). Courts examining the analogous FCA provision of 31 U.S.C. § 3730(c)(2)(A) afford the government significant deference in choosing to dismiss.

22

*See, e.g.*, *Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003) ("Nothing in § 3730(c)(2)(A) purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States."); *Polansky*, 599 U.S. at 437 (noting that, in the context of a 3730(c)(2)(A) motion, the "Government's views are entitled to substantial deference."). Given this degree of deference, it is wrong to suggest that either the TMFPA or FCA impermissibly restricts the government's authority to conduct—or not conduct—civil litigation as it deems appropriate.

Similarly, OAG may settle the TMFPA action notwithstanding the objections of the relator, "if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." Tex. Hum. Res. Code § 36.107(c). While Novartis highlights this requirement of court approval as evidence of the judiciary usurping the executive's exclusive function, this ignores that it is well settled in criminal law to require court approval of pleas and the dismissal of indictments. *See, e.g.*, Riley, 252 F.3d at 756-57:

> [W]hen the Executive has made the decision to initiate the criminal case, its large discretion is narrowed considerably and the power to dispose of the case is shared in part with the Third Branch.
>
> For example, Rule 48(a) of the Federal Rules of Criminal Procedure clearly states that although the Executive has the power to indict an individual, it may not dismiss such an indictment without "leave of court." FED.R.CRIM.P. 48(a). Similarly, Rule 11 of the Federal Rules of Criminal Procedure requires court approval of plea bargains, a judicial check that functions in a manner similar to that of Rule 48.

23

FED.R.CRIM.P. 11(a)(2).

Because court approval of criminal dismissals and settlement-analogues survive constitutional muster, so too should the scheme enumerated in the TMFPA—which in this instance closely mirrors the FCA.

Furthermore, the requirement that _courts_ approve TMFPA dismissals and settlements is hardly an impingement on the Executive Branch's prerogative to enforce the law. By definition, the litigation of a TMFPA claim _requires_ the involvement of another branch of government, _i.e._, the Judicial Branch. "Historically, the judiciary has been privileged with a sacred independence necessary to maintain the impartiality required to determine the law." _Thompson v. City of Austin_, 979 S.W.2d 676, 682 (Tex. App.—Austin 1998). The involvement of the Judicial Branch in the resolution of matters that fall squarely within its exclusive power is decidedly constitutional. Indeed, to dismiss or settle various types of litigations (criminal and civil), litigants typically require court approval. The fact that such approval is also required in a TMFPA action is unremarkable.

24

*     *     *

As a recidivist offender, Novartis has every interest to have the TMFPA and other *qui tam* statutes declared unconstitutional. At bottom, however, Novartis's purported concerns about the Texas Constitution ring hollow. The Court should see Novartis's efforts for what they are—a cynical attempt to void the very statutes that have brought taxpayers justice for Novartis's long history of unlawful conduct.

## III.   THERE IS NO BASIS FOR A STAY.

Novartis's stay motion is predicated on the supposed merit of its mandamus petition. Because the petition fails for procedural and substantive reasons, there is no basis for the Court to issue a stay order.

## CONCLUSION

For the foregoing reasons, the writ and motion for temporary stay should be denied.

4819-9393-4558

**MR380**

Dated: February 20, 2024                    Respectfully submitted,

*/s/ Sam Baxter*
Samuel F. Baxter (co-lead counsel)
sbaxter@mckoolsmith.com
Jennifer L. Truelove
jtruelove@mckoolsmith.com
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
(903) 923-9000
Fax: (903) 923-9099

*/s/ Mark Lanier*
Mark Lanier (co-lead counsel)
Zeke DeRose
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N
Houston, TX 77064
(800) 723-3216
Fax: (713) 659-2204


***ATTORNEYS FOR PLAINTIFF/REAL-PARTY-IN-INTEREST HEALTH SELECTION GROUP, LLC***

26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on February 20, 2024 to counsel of record.

/s/ Samuel F. Baxter
Samuel F. Baxter

## CERTIFICATE OF COMPLIANCE

Based on a word count run in Microsoft Word 2016, this Combined Response to Petition for Writ of Mandamus and Motion to Stay contains 6,638 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Samuel F. Baxter
Samuel F. Baxter

27

No. 06-24-00005-CV

IN THE COURT OF APPEALS
FOR THE SIXTH COURT OF APPEALS DISTRICT
TEXARKANA, TEXAS

IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

*Relator*

Original Proceeding from the 71st Judicial District Court
in Harrison County, Texas
The Honorable Brad Morin, Presiding

**SUPPLEMENTAL MANDAMUS RECORD**

Samuel F. Baxter
Jennifer L. Truelove
McKool Smith, P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
(903) 923-9000
Fax: (903) 923-9099

Mark Lanier
Zeke DeRose
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N, Suite 100
Houston, TX 77064
(800) 723-3216
Fax: (713) 659-2204

***Attorneys for Plaintiff and Real-Party-in-Interest Health Selection Group, LLC***

## DECLARATION OF SAMUEL F. BAXTER

I, Samuel F. Baxter, hereby declare under penalty of perjury the following:

1.     I am counsel of record for Plaintiff/Real-Party-in-Interest Health Selection Group, LLC in connection with the Petition for Writ of Mandamus styled *In re Novartis Pharmaceuticals Corporation*, No. 06-24-0005-CV, pending in the Sixth Court of Appeals.

2.     In compliance with Texas Rule of Appellate Procedure 52.7, I have reviewed the copies of the documents contained in this Supplemental Mandamus Record, and I hereby verify that they are true and correct copies of the documents they purport to be, which were filed in connection with the underlying district court proceeding, Case No. 23-0276, in the 71st Judicial District Court, Harrison County, Texas, the Honorable Brad Morin presiding.

3.     My birthdate is May 25, 1945, and my firm address is 104 E. Houston Street, Marshall, Texas 75670.

Executed in Harrison County, Texas on February 20, 2024.


Samuel F. Baxter

# TABLE OF CONTENTS

**Page**

December 14, 2023 Letter from Danny S. Ashby to the Honorable Brad Morin    SMR1
enclosing proposed orders on Defendant's Motion to Dismiss/Plea to Jurisdiction



O'Melveny & Myers LLP
2801 North Harwood Street
Suite 1600
Dallas, TX 75201-2692

T: +1 972 360 1900
F: +1 972 360 1901
omm.com

File Number:

December 14, 2023

**Danny S. Ashby**
D: +1 972 360 1904
dashby@omm.com

**VIA E-FILE**

The Honorable Brad Morin
71st Judicial District Court for Harrison County
Harrison County Courthouse
200 West Houston, Suite 219
Marshall, TX 75670

Re:     **Cause No. 23-0276;** *State of Texas ex rel. Health Selection Group v. Novartis Pharmaceuticals Corporation,* **71st Judicial District, Harrison County, Texas**

Dear Judge Morin:

As requested by the Court, Defendant has enclosed herewith a proposed order granting Defendant's Plea to the Jurisdiction and Motion to Dismiss ("Motion") and, in the alternative, a proposed order denying Defendant's Motion and granting permission to appeal the order pursuant to Texas Rule of Civil Procedure 168.

Sincerely,

*/s/ Danny S. Ashby*

Danny S. Ashby
of O'MELVENY & MYERS LLP

Enclosures

cc:     All Counsel of Record via E-File

Austin • Century City • Dallas • Houston • Los Angeles • Newport Beach • New York • San Francisco • Silicon Valley • Washington, DC
Beijing • Brussels • Hong Kong • London • Seoul • Shanghai • Singapore • Tokyo

SMRH031

| THE STATE OF TEXAS *ex rel.* HEALTH SELECTION GROUP, LLC, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| v. | § § § | 71st JUDICIAL DISTRICT |
| NOVARTIS PHARMACEUTICALS CORPORATION, | § § § | |
| *Defendant.* | § § | OF HARRISON COUNTY, TEXAS |

## ORDER GRANTING DEFENDANT'S PLEA TO THE JURISDICTION AND MOTION TO DISMISS

Defendant Novartis Pharmaceuticals Corporation's Plea to the Jurisdiction and Motion to Dismiss is hereby **GRANTED**.

**IT IS SO ORDERED.**

SIGNED this _____ day of _____, 2023.

_____

Hon. Brad Morin, Judge Presiding

| | | |
|---|---|---|
| THE STATE OF TEXAS *ex rel*. HEALTH SELECTION GROUP, LLC, | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| *Plaintiff,* | §<br>§ | |
| v. | §<br>§<br>§ | 71st JUDICIAL DISTRICT |
| NOVARTIS PHARMACEUTICALS CORPORATION, | §<br>§<br>§ | |
| *Defendant.* | §<br>§ | OF HARRISON COUNTY, TEXAS |

**ORDER DENYING DEFENDANT'S PLEA TO THE JURISDICTION AND MOTION TO DISMISS, AND GRANTING PERMISSION FOR INTERLOCUTORY APPEAL**

Defendant Novartis Pharmaceuticals Corporation's Plea to the Jurisdiction and Motion to Dismiss is hereby **DENIED**.

Pursuant to Texas Rule of Civil Procedure 168, permission for an interlocutory appeal is hereby **GRANTED** to decide the following controlling questions of law:

1. Whether a relator who files suit for a violation of the Texas Medicaid Fraud Prevention Act under the Act's *qui tam* provision, Tex. Hum. Res. Code § 36.101, must allege that the relator personally suffered an injury from the violation to confer subject matter jurisdiction over the action; and

2. Whether the Texas Medicaid Fraud Prevention Act's *qui tam* provisions, authorizing any person to file suit for and in the name of the State, is unconstitutional and void under Articles II, IV, and/or V of the Texas Constitution.

There is substantial ground for difference of opinion on each of these two questions. With regard to the first question, Health Selection Group, LLC ("Relator") and the State of Texas argue that the Texas Medicaid Fraud Prevention Act ("TMFPA") grants Relator standing under the Texas Constitution to file suit without showing that Relator itself suffered an injury, citing Texas court decisions indicating that statutes may confer such standing. Defendant contends that "statutory

standing" is distinct from, and does not satisfy, "constitutional standing" requirements, citing case law dictating that whether a plaintiff has established a right to proceed with a suit or satisfied a statute's prerequisites pertains to a plaintiff's right to relief, not a court's subject matter jurisdiction to afford relief. The issue presented is one of first impression, as neither party has identified a Texas state court decision that has addressed or resolved whether Texas state courts have subject matter jurisdiction over a suit filed pursuant to the TMFPA's *qui tam* provision, Tex. Hum. Res. Code § 36.101, by a person who has suffered no personal harm from the alleged violation.

There is also substantial ground for difference of opinion on the second question. Article IV, Section 22 and Article V, Section 21, together, provide that the Attorney General and the County Attorneys and District Attorneys shall bring and maintain suits for the State of Texas. The parties have not identified any Texas state court decision that has addressed the constitutionality of the TMFPA's *qui tam* provisions, Tex. Hum. Res. Code § 36.101, *et seq*., under Articles II, IV, and/or V of the Texas Constitution.

An immediate interlocutory appeal would materially advance the ultimate termination of the litigation as an answer in the affirmative on either question would result in the dismissal of the case for either lack of subject matter jurisdiction or a valid cause of action.

**IT IS SO ORDERED.**

SIGNED this _____ day of _____, 2023.

_____
Hon. Brad Morin, Judge Presiding

NO. 06-24-00005-CV

IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS
AT TEXARKANA

IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

*Relator.*

Original Proceeding From The 71st District Court
in Harrison County, Texas
The Honorable Brad Morin Presiding

THE STATE OF TEXAS'S RESPONSE

TO PETITION FOR WRIT OF MANDAMUS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

ELIZABETH BROWN FORE
Chief, Civil Medicaid Fraud Division

JORDAN UNDERHILL
State Bar No. 24102586
JONATHAN D. BONILLA
State Bar No. 24073939
LYNNE KURTZ-CITRIN
State Bar No. 24081425

Assistant Attorneys General
Office of the Attorney General
Civil Medicaid Fraud Division
Phone: (512) 936-1410
Fax: (512) 936-0674

*Counsel for the State of Texas/
Real Party in Interest*

**MR390**

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ARGUMENT ...................................................................1

ARGUMENT .............................................................................................3

    I.    **Novartis Has an Adequate Remedy by Appeal**.............................3

    II.    **The Trial Court Did Not Abuse its Discretion in Finding Subject Matter Jurisdiction** ..........................................................7

        A.    The Court Should Look to Federal Precedent to Resolve the Issue of Standing as it Pertains to *Qui Tam* Suits........................9

            1.  Vermont Agency of Nat'l Res. v. United States ex rel. Stevens Controls.........................................................11

            2.  Texas Law, Like Federal Law, Draws Upon the Tradition of English Common Law.........................16

            3.  Texas Law Does Not Prohibit Standing-By-Assignment......18

        B.    The Texas Supreme Court Has Repeatedly Held that When Standing Is Conferred by Statues, a Particularized Injury Is Not Required. ...............................................................20

    III.    **The Trial Court Did Not Commit a Clear Abuse of Discretion in Finding the TMFPA Constitutional** ...........................................28

        A.    *Qui Tam* Statutes Do Not Violate Article IV or Article V of the Texas Constitution ...........................................................28

        B.    The TMFPA Specifically Does Not Run Afoul of the Texas Constitution ................................................................32

            1.  The TMFPA's qui tam provisions do not unconstitutionally usurp the Attorney General's authority and prosecutorial discretion....................................................................32

            2.  The TMFPA does not unduly interfere with the Attorney General's authority to litigate and resolve the state's claims. ..............................................................35

PRAYER .............................................................................................43

CERTIFICATE OF COMPLIANCE ...........................................................45

CERTIFICATION ....................................................................................45

CERTIFICATE OF SERVICE.....................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agey v. Am. Liberty Pipe Line Co.*,
172 S.W.2d 972 (1943) ............................................................ 30, 31

*Andrade v. Venable*,
372 S.W.3d 134, 137 (Tex. 2012) ........................................... 21

*Bell Helicopter Textron, Inc. v. Walker*,
787 S.W.2d 954 (Tex. 1990) ................................................... 3,4

*Bland Indep. Sch. Dist. v. Blue*,
34 S.W.3d 547 (Tex. 2000) ..................................................... 21, 25

*Braden v. Downey*,
811 S.W.2d 922 (Tex. 1991) ................................................... 2

*Brown v. De La Cruz*,
156 S.W.3d 560 (Tex 2004) ..................................................... 26, 31

*Camp v. Gulf Prod. Co.*,
122 Tex. 383, 61 S.W.2d 773 (1933) ...................................... 30

*City of Houston v. Houston Prof'l. Fire Fighters' Ass'n, Loc. 341*,
664 S.W.3d 790 (Tex. 2023), reh'g denied (June 23, 2023) .................................. 9

*Curtis v. Gibbs*,
511 S.W.2d 263 (Tex. 1974) ................................................... 5

*Data Foundry, Inc. v. City of Austin*,
620 S.W.3d 692 (Tex. 2021) ................................................... 9, 11

*EBS Sols., Inc. v. Hegar*,
601 S.W.3d 744 (Tex. 2020) ................................................... 9

*El Paso Elec. Co. v. Tex. Dep't of Ins.*,
937 S.W.2d 432 (Tex. 1996) ................................................... 29

MR392

*Ewing v. Cohen,*
63 Tex. 482 (1885) ...................................................................................... 4

*Grossman v. Wolfe*,
578 S.W.3d 250 (Tex. App.—Austin 2019, pet. denied) ....................................... 23

*Holy Cross Church of God in Christ v. Wolf,*
44 S.W.3d 562 (Tex. 2001) ........................................................................... 19

*Hooks v. Fourth Ct. of Appeals*,
808 S.W.2d 56 (Tex. 1991) ......................................................................... 5, 6

*Hunt v. Bass,*
664 S.W.2d 323 (Tex. 1984) ......................................................................... 21

*Iley v. Hughes,*
158 Tex. 362, 311 S.W.2d 648, 85 A.L.R.2d 1 (1958) ........................................... 4

*In re Christianson Air Conditioning & Plumbing, LLC,*
639 S.W.3d 671 (Tex. 2022) ........................................................................... 2

*In re Farmers Tex. Cnty. Mut. Ins. Co.*,
621 S.W.3d 261 (Tex. 2021) ........................................................................... 8

*In re Liberty Mut. Ins. Co.,*
24 S.W.3d 637 (Tex. App.—Texarkana 2000, no pet.) ........................................... 5

*In re Prudential Ins. Co. of Am.,*
148 S.W.3d 124 (Tex. 2004) ........................................................................... 4

*In re Sullivan*,
157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, no pet.) .................. 20

*In re SWEPI, L.P.,*
85 S.W.3d 800 (Tex. 2002) ......................................................................... 3, 5

MR393

*In re Xerox Corp.,*
555 S.W.3d 518 (Tex. 2018) ...................................................................... 15, 43

*Johnson v. Fourth Ct. of Appeals,*
700 S.W.2d 916 (Tex. 1985) ......................................................................... 2, 7

*Jones v. Turner,*
646 S.W.3d 319 (Tex. 2022) ............................................................................ 25

*Koy v. Schneider,*
110 Tex. 369, 221 S.W. 880 (1920) ................................................................. 9

*LeCroy v. Hanlon,*
713 S.W.2d 335 (Vernon 1984) ...................................................................... 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014) ......................................................................................... 24

*Little v. Morris,*
10 Tex. 263 (1853) .............................................................................................. 4

*Matlock v. Smith,*
96 Tex. 211, 71 S.W. 956 (1903) ...................................................................... 4

*Maud v. Terrell,*
109 Tex. 97, 200 S.W. 375 (1918) ................................................28, 29, 30, 42

*Meshell v. State,*
739 S.W.2d 246 (Tex. Crim. App. 1987) ...................................................... 35

*Neville v. Brewster,*
163 Tex. 155, 352 S.W.2d 449 (1962) ............................................................. 4

*Pennington v. Singleton,*
606 S.W.2d 682, 690 (Tex. 1980) ................................................................... 35

*Perez v. Turner*,
653 S.W.3d 191 (Tex. 2022), reh'g denied (Oct. 21, 2022)..................................25

*Perry v. Del Rio,*
66 S.W.3d 239 (Tex. 2001) ....................................................................................5

*PermiaCare v. L.R.H.*,
600 S.W.3d 431 (Tex. App.—El Paso 2020, no pet.) ...........................................27

*Pike v. Tex. EMC Mgmt., LLC,*
610 S.W.3d 763 (Tex. 2020) ..................................................................... 10, 24, 27

*Pope v. Ferguson*,
445 S.W.2d 950 (Tex. 1969) ............................................................................ 2, 4, 6

*PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*,
146 S.W.3d 79 (Tex. 2004) ...................................................................................34

*Scott v. Bd. of Adjustment*,
405 S.W.2d 55 (Tex. 1966) ............................................................................. 22, 23

*Shamrock Fuel and Oil Sales Co. v. Tunks*,
416 S.W.2d 779 (Tex. 1967) ...................................................................................4

*Smith v. Davis*,
426 S.W.2d 827 (Tex. 1968) ...................................................................................9

*Sneed v. Webre*,
465 S.W.3d 169 (Tex. 2015) .................................................................................21

*Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*,
308 S.W.3d 909 (Tex. 2010) ........................................................................... 18, 27

*Spence v. Fenchler*,
107 Tex. 443, 180 S.W. 597 (1915)................................................................. 22, 23

*Staples v. State*,
112 Tex. 61, 245 S.W. 639 (1922).......................................................... 18, 29, 30

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ..................................................................................... 16

*Steele v. Goodrich,*
87 Tex. 401, 28 S.W. 939 (1894)................................................................... 4

*Swift v. United States*,
318 F.3d 250, 253 (D.C. Cir. 2003)............................................................. 38

*Terrell v. Sparks*,
104 Tex. 191, 135 S.W. 519 (1911)......................................................... 33, 42

*Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*,
952 S.W.2d 454 (Tex. 1997) ....................................................................... 34

*Tex. Dep't of Family & Protective Services v. Dickensheets*,
274 S.W.3d 150 (Tex. App.—Houston [1st Dist.] 2008, no pet.)......................... 38

*Tex. Dep't of Protective and Regulatory Services v. Sherry*,
46 S.W.3d 857 (Tex. 2001) ......................................................................... 20

*Touchy v. Houston Legal Found.*,
432 S.W.2d 690 (Tex. 1968) ....................................................................... 26

*United States, ex rel. Polansky v. Executive Health Res., Inc.,*
599 U.S. 419 (2023) ........................................................................ 38, 39, 40

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000)......................................10, 11, 12, 13, 15, 16, 18, 19, 27

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) .................................................................. 3, 6, 7

*Williams v. Lara*,
52 S.W.3d 171 (Tex. 2001) ................................................................. 20, 21, 25

**Statutes**

31 U.S. Code § 3730(b)(2) ..................................................................... 37

31 U.S.C. § 3730(c)(2)(A) .................................................................. 38, 39

31 U.S. Code § 3730(d)(1) ..................................................................... 13

31 U.S. Code §3730(d)(2) ..................................................................... 13

Tex. Hum. Res. Code § 36.101 .............................................................. 26

Tex. Hum. Res. Code §§ 36.102-36.104 ................................................ 35

Tex. Hum. Res. Code § 36.102(c) .......................................................... 37

Tex. Hum. Res. Code § 36.102(e) .......................................................... 42

Tex. Hum. Res. Code § 36.104(a) .......................................................... 40

Tex. Hum. Res. Code § 36.104(b-1) .................................................. 41, 42

Tex. Hum. Res. Code § 36.107(a) ...................................................... 35, 40

Tex. Hum. Res. Code § 36.107(b) .......................................... 37, 38, 38, 42

Tex. Hum. Res. Code § 36.107(c) ..................................................... 39, 42

Tex. Hum. Res. Code § 36.107(d) .......................................................... 41

Tex. Hum. Res. Code § 36.108 .............................................................. 42

Tex. Hum. Res. Code § 36.109 .............................................................. 42

MR397

Tex. Nat. Res. Code Ann. § 191.173(a) ................................................................ 23

**Other Authorities**

14 Encyclopedia Britannica 576 (1967) .............................................................. 17

**Rules**

TEX. R. CIV. P. 91a.1 ........................................................................................ 8

MR398

TO THE HONORABLE SIXTH COURT OF APPEALS:

Pursuant to this Court's directive, the State of Texas ("State" or "Texas"), the real party in interest in this action, respectfully submits its Response to the Petition for Writ of Mandamus ("Petition") filed by Relator-Defendant ("Novartis"). The State retains an interest in this matter, even though it has declined to intervene, because the State is entitled to a portion of any proceeds awarded in a Texas Medicaid Fraud Prevention Act ("TMFPA")[1] case and because the State has an ongoing interest in ensuring the consistent and correct interpretation of the TMFPA.

## SUMMARY OF THE ARGUMENT

In its Hail Mary for mandamus review, Novartis makes the remarkable argument that the trial court abused its discretion by not ruling the TMFPA unconstitutional. Because Novartis has brought a facial challenge to a statute through the vehicle of a mandamus petition, it now faces a double burden. To rule for Novartis, this Court would have to hold that the TMFPA—a statute in use for nearly three decades and the subject of numerous court decisions—is so obviously

---

[1] Chapter 36 of the Human Resources Code was renamed, effective September 1, 2023, to the Texas Health Care Program Fraud Prevention Act. Because the filings in this case use the previous title, this response will continue to refer to Chapter 36 as the Texas Medicaid Fraud Prevention Act.

1

unconstitutional on its face that the trial court could have come to no other conclusion when ruling on Novartis's Motion to Dismiss/Plea to the Jurisdiction ("Motion"). Novartis cannot and has not met that burden.

Further, Novartis has not demonstrated that it meets the mandamus standard itself. To obtain the extraordinary writ of mandamus Novartis has to show that the "trial court abused its discretion and there is no adequate remedy by appeal." *In re Christianson Air Conditioning & Plumbing, LLC,* 639 S.W.3d 671, 681 (Tex. 2022) (citing *Johnson v. Fourth Ct. of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985). "[A] writ positively will not issue for the purpose of controlling or correcting rulings or judgments on motions or pleas which are mere incidents in the normal trial process and there is an adequate remedy by appeal for correction of any such rulings or judgments which may be erroneous." *Pope v. Ferguson*, 445 S.W.2d 950, 954 (Tex. 1969). After all, appellate courts do not "embroil themselves unnecessarily in incidental pre-trial rulings of the trial courts" otherwise mandamus "would soon cease to be an extraordinary writ." *Braden v. Downey,* 811 S.W.2d 922, 928 (Tex. 1991. Novartis has simply not met this standard. Novartis has not shown why they could not seek review in the normal course on appeal, nor have they demonstrated how the trial court abused its discretion by following clear and unambiguous precedent. And yet, Novartis believes it is entitled to a writ of mandamus because

2

the trial court chose *not* to become the first court in Texas and, possibly, the first court in the entire United States to rule against the constitutionality of a *qui tam* statute. To suggest that the trial court abused its discretion in *not* taking such a massive leap stretches credulity.

## <u>ARGUMENT</u>

## I.      **Novartis Has an Adequate Remedy by Appeal**

This Court need not reach the merits of Novartis's argument because Novartis has failed to show that it lacks an adequate remedy by appeal. Seeking mandamus on the denial of a motion to dismiss is not only unusual, but unnecessary givent there is a mechanism for rectifying the denial: appeal after final judgment. That is how litigation works.

The requirement that "mandamus will not issue where there is an adequate remedy by appeal is well-settled." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). The Texas Supreme Court has consistently held that courts "lack jurisdiction to issue writs of mandamus to supervise or correct incidental rulings of a trial judge when there is an adequate remedy by appeal." *Bell Helicopter Textron, Inc. v. Walker*, 787 S.W.2d 954, 955 (Tex. 1990). This includes pleas to the jurisdiction which "will not ordinarily be reviewed by mandamus, because they are incidental trial rulings for which the relator generally has an adequate appellate remedy." *In re SWEPI, L.P.,*

3

85 S.W.3d 800, 808 (Tex. 2002) (citing *Bell Helicopter Textron, Inc.* at 955).

The Court has interpreted "adequate" as a "proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004). Importantly, the Court notes that "[m]andamus review of incidental, interlocutory rulings by the trial courts unduly interferes with trial court proceedings, distracts appellate court attention to issues that are unimportant both to the ultimate disposition of the case at hand and to the uniform development of the law, and adds unproductively to the expense and delay of civil litigation." *Id.*; *see also Pope v. Ferguson,* 445 S.W.2d 950 (Tex. 1969); *Shamrock Fuel and Oil Sales Co. v. Tunks,* 416 S.W.2d 779 (Tex. 1967); *Neville v. Brewster,* 163 Tex. 155, 352 S.W.2d 449 (1962); *Iley v. Hughes,* 158 Tex. 362, 311 S.W.2d 648, 85 A.L.R.2d 1 (1958); *Matlock v. Smith,* 96 Tex. 211, 71 S.W. 956 (1903); *Steele v. Goodrich,* 87 Tex. 401, 28 S.W. 939 (1894); *Ewing v. Cohen,* 63 Tex. 482 (1885); *Little v. Morris,* 10 Tex. 263 (1853). Here, Novartis seeks mandamus review of an interlocutory ruling, but the trial court's denial of Novartis's Motion is not an issue that "eludes answer by appeal." *Id.* at 138. "Absent extraordinary circumstances not present here, a denial of a motion to dismiss or a plea in abatement is a ruling incident to the ordinary trial process which will *not* be corrected by

4

mandamus, but by the legal remedy of the ordinary appellate process." *Hooks v. Fourth Ct. of Appeals*, 808 S.W.2d 56, 59 (Tex. 1991) (emphasis in original).

Further, this Court has already noted that "appeal is generally an adequate remedy for errors in subject matter jurisdiction…" *In re Liberty Mut. Ins. Co.,* 24 S.W.3d 637, 639 (Tex. App.—Texarkana 2000, no pet.). Exceptions may exist, such as when "parties are in danger of permanently losing substantial rights" or "to settle a conflict as to jurisdiction when courts are directly interfering with each other by issuing conflicting orders or injunctions." *Id.* The Texas Supreme Court has likewise noted some examples of when the denial of a plea to the jurisdiction warrants mandamus review. *See Curtis v. Gibbs,* 511 S.W.2d 263, 267 (Tex. 1974) ("If the second court … attempts to interfere with the prior action, this court has the power to act by mandamus or other appropriate writ to settle the conflict of jurisdiction."); *Perry v. Del Rio,* 66 S.W.3d 239, 258 (Tex. 2001) (mandamus relief appropriate when one court actively interfered with the dominant jurisdiction of another court by setting its case for trial at the same date and time); *In re SWEPI,* 85 S.W.3d at 809 (mandamus relief proper because the probate court transferred suit to itself without statutory authority, actively interfering with another court's jurisdiction over the case).

But no such extraordinary circumstances exist here. The trial court is not

5

interfering with another court's jurisdiction nor is Novartis at risk of losing any substantial rights. Novartis proffers no argument to suggest otherwise. Instead, Novartis complains about the resources it will have to devote to litigate this case, but the "cost or delay of having to go through trial and the appellate process does *not* make the remedy at law inadequate, and hence mandamus will not lie." *Hooks* 808 S.W.2d at 59 (emphasis in original). Further, "an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ." *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992). As the Texas Supreme Court noted in *Pope v. Ferguson*, 445 S.W.2d 950, 954 (Tex. 1969):

> There is sound reason why appellate courts should not have jurisdiction to issue writs of mandamus to control or to correct incidental rulings of a trial judge when there is an adequate remedy by appeal. Trials must be orderly; and constant interruption of the trial process by appellate courts would destroy all semblance of orderly trial proceedings. Moreover, with this type of intervention, the fundamental concept of all American judicial systems of trial and appeal would become outmoded. Having entered the thicket to control or correct one such trial court ruling, the appellate courts would soon be asked in direct proceedings to require by writs of mandamus this trial judges enter orders, or set aside orders, sustaining or overruling (1) pleas to the jurisdiction, (2) pleas of privilege, (3) pleas in abatement, (4) motions for summary judgment, (5) motions for instructed verdict, (6) motions for judgment non obstante veredicto, (7) motions for new trial and a myriad of interlocutory orders and judgments; and, as to each, it might logically be argued that the petitioner for the writ was entitled, as a matter of law, to the action sought to be compelled.

This is precisely the sort of interference Novartis demands. In requesting

6

exceptional treatment, Novartis invites this Court to short-circuit the ordinary trial and appellate process. This Court should reject their efforts because Novartis has an adequate remedy by appeal in the normal course of litigation.

**II.     The Trial Court Did Not Abuse its Discretion in Finding Subject Matter Jurisdiction**

Novartis takes the extraordinary position that the trial court clearly abused its discretion by applying longstanding precedent and ruling that TMFPA is constitutional. Though this Court need not consider whether the trial court clearly abused its discretion given Novartis's failure to explain why the appeal process is inadequate, if it does, it should soundly reject Novartis's argument for the following reasons.

As noted by the Supreme Court of Texas in *Walker*, "[a] trial court clearly abuses its discretion if 'it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" 827 S.W.2d at 839 (citing *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985). The *Walker* Court held that "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ." *Id.* at 840. Analyzing and applying the existing law correctly, as the trial court did here, is thus not a clear abuse of discretion.

**MR405**

Additionally, while courts have occasionally issued mandamus relief when a motion to dismiss is denied, that too is reserved for extraordinary situations in which the trial court clearly abused its discretion. For example, *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261 (Tex. 2021) involved a reimbursement suit by an insured against her insurer when the insurer settled a claim within policy limits. The insurer filed a 91a motion to dismiss, arguing that the insured had "no *Stowers* claim for negligent failure to settle because there was no judgment or settlement in excess of policy limits." *Id*. at 264. The Court agreed that the motion to dismiss should have been granted, because the insured's "'allegations, taken as true, ... do not entitle [her] to the relief sought' under *Stowers*." *Id*. at 268 (quoting TEX. R. CIV. P. 91a.1). Importantly, the Court issued mandamus because, given the precedent and policy at issue, the trial court could have reached no other conclusion but to grant the motion to dismiss. But in this case, if Health Selection Group, LLC's ("HSG") claims are taken as true, it unquestionably is entitled to relief under the TMFPA. Presumably aware of this, Novartis instead asked the trial court to jettison the TMFPA in its entirety.

Accordingly, to find for Novartis on its Motion, the trial court would have had to determine that the TMFPA is unconstitutional—an extremely high bar. In fact, the Supreme Court of Texas has said that to rule a statute unconstitutional the

8

highest standard applies, and that a statute "should not be held invalid unless its unconstitutionality be made to appear beyond any reasonable doubt." *Koy v. Schneider*, 110 Tex. 369, 407, 221 S.W. 880, 888 (1920). Indeed, when "evaluating whether a statute is constitutionally infirm, **we presume at the outset that it is constitutional**. A party challenging a statute as unconstitutional bears a heavy burden to overcome this presumption." *City of Houston v. Houston Prof'l. Fire Fighters' Ass'n, Loc. 341*, 664 S.W.3d 790, 798 (Tex. 2023), reh'g denied (June 23, 2023) (emphasis added); *see also EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 754 (Tex. 2020)("In line with this presumption, if a statute is susceptible to two interpretations—one constitutional and the other unconstitutional—then the constitutional interpretation will prevail."); *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968)("[A] mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable."). To summarize, Novartis comes nowhere close to overcoming the presumption of constitutionality and proving beyond a reasonable doubt that TMFPA is unconstitutional.

## A. The Court Should Look to Federal Precedent to Resolve the Issue of Standing as it Pertains to *Qui Tam* Suits.

In Novartis's Motion, it argued that "Texas standing doctrine parallels 'the federal requirements for standing.'" MR076, citing *Data Foundry, Inc. v. City of*

9

*Austin*, 620 S.W.3d 692, 696 (Tex. 2021). The State agrees. As the Texas Supreme Court has recently noted, "[b]ecause Texas's test for constitutional standing parallels the federal test for Article III standing, we look to federal standing jurisprudence for guidance…" *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 776 (Tex. 2020). And under federal standing jurisprudence it has long been held constitutional for the Sovereign to assign to private citizens its right to pursue a claim in the context of a *qui tam* action. *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000). In *Stevens*, the Court held that the FCA made the plaintiff in a *qui tam* suit an assignee of the claim, which is sufficient to confer standing assuming the assignor itself has standing. That is the end of the question, and the line for Novartis's argument, which fails to show how the TMFPA assigning of standing for a *qui tam* suit differs substantively from the FCA.

Novartis devoted most of its section on standing to federal jurisprudence. *See* MR075 to MR082. In response, the State pointed out that Novartis largely ignored *Stevens*, 529 U.S. at 765,[2] and that, insofar as the trial court wished to consider federal precedent, it should treat *Stevens* as controlling.

Apparently sensing its tactical error, Novartis now pivots in its mandamus

---

[2] Despite being precisely on point in its discussion of Article III standing as applied to *qui tam* suits, Novartis only mentioned *Stevens* in a footnote. *See* MR082, n.5.

petition and argues that the Court should disregard federal precedent and focus exclusively on Texas case law. Petition at 24-25, 28-29. Though Novartis goes to great pains to suggest that the Texas constitutional standard is significantly different from the Article III standard, this does not align with the various cases that say precisely the opposite.[3]

### 1. Vermont Agency of Nat'l Res. v. United States ex rel. Stevens Controls.

In *Stevens*, the Supreme Court considered the question of whether the federal False Claims Act's ("FCA") *qui tam* provision passed muster under the U.S. Constitution's Article III standing doctrine. Justice Scalia delivered the majority opinion,[4] which held that "adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Stevens*, 529 U.S. at 773. Because the United States suffered an "injury in fact," this was sufficient to "confer standing on respondent Stevens." *Id.* at 774.

---

[3] In fact, the requirements for finding standing as set forth by both the Texas Supreme Court in *Data Foundry*, 620 S.W.3d at 696, and the United States Supreme Court in *Stevens*, 529 U.S. at 771, are identical.

[4] *Stevens* was a 7-2 decision (with a concurrence by Justice Ginsberg in which she agreed with the majority's reasoning regarding standing). However, the dissent did not even mention the issue of Article III standing. Rather, the dissenting opinion focused on another aspect of the case: the meaning of the word "person" under 31 U.S.C. § 3729. Justices Stevens and Souter argued for a broader understanding than the majority, such that "person" would encompass the States.

**MR409**

Novartis takes issue with the Supreme Court's acknowledgement that the FCA "can reasonably be regarded as effecting a partial assignment of the Government's damages claim…" *Id*. at 765-66. Novartis argues that the TMFPA is a civil enforcement statute and that, by providing for civil penalties rather than "damages," the reasoning in *Stevens* is inapplicable. Novartis's attempt to distinguish *Stevens* fails for two reasons.

First, contrary to Novartis's attempt to twist the Court's language, nothing in *Stevens* limits the underlying holding—that a *qui tam* relator has constitutional standing by assignment—solely to *qui tam* actions for "damages." In *Stevens*, the Supreme Court's focus is on the assignment of the *injury-in-fact* by the government, which the Court defines as being "the injury to its sovereignty arising from violation of its laws … and the proprietary injury resulting from the alleged fraud." *Id*. at 771. In concluding that "the United States' injury in fact suffices to confer standing on respondent Stevens," *id*. at 774, the *Stevens* Court does not differentiate between the two injuries-in-fact being assigned, which is to say that an obviously non-pecuniary injury-in-fact—the violation of the government's sovereignty—is part of the assignment to the relator/plaintiff. Thus, while it is correct that the Supreme Court used the word "damages" in describing the relator's claim, that appears to have been done so as a statement of fact (since the FCA provides for the recovery of

**MR410**

damages), and not because it was a *requirement* for the assignment.

Second, while it is true that the TMFPA is an action for civil remedies and penalties,[5] the FCA and other *qui tam* laws similarly include civil penalties as part of their remedy. As the Supreme Court notes in *Stevens*, a defendant is "liable for up to treble damages and a *civil penalty* of up to $10,000 per claim." *Id.* at 769 (emphasis added). The Supreme Court did not say its holding regarding the assignment of a claim extended only to the treble damages and not the civil penalty. And a private party who brings a *qui tam* action under the FCA is eligible to collect a portion of the civil penalty and damages.[6] In this additional sense, the FCA does *not* distinguish between "damages" and "penalties." The *qui tam* relator's award is apportioned from the *entire amount recovered. See* 31 U.S. Code § 3730(d)(1). So, when the *Stevens* Court acknowledges that the FCA functions as a "partial assignment of the Government's damages claim…" it is not only reasonable but correct to conclude that this assignment includes the civil penalties.

To support its decision, the *Stevens* Court cites to a variety of historical *qui tam* provisions that use words such as "penalty" and "fine," not just "damages." *See Id.* at n. 6 and 7, citing (among others) Act of May 31, 1790, ch. 15,

---

[5] *See* Tex. Hum. Res. Code §36.052(a).

[6] *See* §3730(d)(1) and §3730(d)(2).

§ 2, 1 Stat. 124–125 (allowing author or proprietor to sue for and receive half of **penalty** for violation of copyright); cf. Act of Mar. 1, 1790, ch. 2, § 6, 1 Stat. 103 (allowing census taker to sue for and receive half of **penalty** for failure to cooperate in census); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 (extending same to Rhode Island); Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 102 (allowing informer to sue for, and receive half of **fine** for, failure to file census return); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 (extending same to Rhode Island); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (allowing private individual to sue for, and receive half of **fine** for, carriage of seamen without contract or illegal harboring of runaway seamen); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 209 (allowing person who discovers violation of spirits duties, or officer who seizes contraband spirits, to sue for and receive half of **penalty** and forfeiture, along with costs, in action of debt); cf. Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116 (allowing informer to conduct prosecution, and receive half of **fine**, for criminal larceny or receipt of stolen goods). Act of July 31, 1789, ch. 5, § 29, 1 Stat. 44–45 (giving informer full **penalty** paid by customs official for failing to post fee schedule); Act of Aug. 4, 1790, ch. 35, § 55, 1 Stat. 173 (same); Act of July 31, 1789, ch. 5, § 38, 1 Stat. 48 (giving informer quarter of **penalties**, **fines**, and forfeitures authorized under a customs law); Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 60 (same under a maritime law); Act of Aug. 4, 1790, ch. 35, § 69, 1 Stat. 177

14

(same under another customs law); Act of Sept. 2, 1789, ch. 12, § 8, 1 Stat. 67 (providing informer half of **penalty** upon conviction for violation of conflict-of-interest and bribery provisions in Act establishing Treasury Department); Act of Mar. 3, 1791, ch. 8, § 1, 1 Stat. 215 (extending same to additional Treasury employees); Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 195–196 (providing informer half or fifth of **fines** resulting from improper trading or lending by agents of Bank of United States); cf. Act of Aug. 4, 1790, ch. 35, § 4, 1 Stat. 153 (apportioning half of **penalty** for failing to deposit ship manifest to official who should have received manifest, and half to collector in port of destination).

Further, the *Stevens* Court notes that the "current version of the FCA imposes damages that are essentially punitive in nature…" *Stevens*, 529 U.S. at 784. The same is true of the TMFPA. The Texas Supreme Court looked to *Stevens* when it noted that "treble damages under fraud-deterrent statutes like the TMFPA are 'essentially punitive' even if they have 'compensatory traits.'" *In re Xerox Corp.,* 555 S.W.3d 518, 532 (Tex. 2018) (citation omitted).

Yet, despite this ample history of *qui tam* statutes that use words other than "damages" (and the presence of the word "penalty" in the FCA), and that both the FCA and TMFPA are punitive statutes, Novartis would have this Court believe that the *entire basis* of the *Stevens* assignment theory rests on the usage of the word

15

"damages." This is patently absurd and such arguments should be soundly rejected.[7]

### 2. Texas Law, Like Federal Law, Draws Upon the Tradition of English Common Law.

The *Stevens* Court also considered the long history of *qui tam* actions in England and the American colonies, which it referenced to confirm its position. This historical inquiry was relevant because "Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Stevens* 529 U.S. at 774. (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). As the US Supreme Court acknowledged, "[q]ui tam actions appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf." *Id.*

Novartis takes issue with the historical aspect of the *Stevens* decision and seems to imagine a world where Texas law developed within a vacuum. But this is simply not the case. Like the U.S. Constitution (as well as the various state

---

[7] Novartis's citation to *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) does not change the analysis here, as the statute at issue in *TransUnion* was not a *qui tam* statute, and *TransUnion* in no way reversed or otherwise affected the Supreme Court's reasoning set forth in *Stevens*.

16

constitutions), the Texas Constitution draws upon traditional English law. Consider the Open Courts provision, which Novartis seems to believe is wholly unique to the State of Texas. In fact, the Open Courts provision "originates from Chapter 40 of Magna Carta, the great charter of English liberties obtained from King John in 1215: 'To none will we sell, to none deny or delay, right or justice.'" *LeCroy v. Hanlon*, 713 S.W.2d 335, 339 (citing Tex. Const. art. I, sec. 13, interp. commentary (Vernon 1984); 14 Encyclopedia Britannica 576 (1967)).

Given the common history from which Texas drew for its constitution, it should come as no surprise that nearly half of the states have nearly identical provisions in their own constitutions.[8] Like Texas, many of these states have at least one *qui tam* statute that allows whistleblowers to assert causes of action for fraud on the states' behalf, in a manner similar to the TMFPA and federal False Claims Act.[9]

---

[8] *See, e.g.,* Colorado Constitution Art 2 § 6; Connecticut Constitution Art 1 § 10; Delaware Constitution Art 1 § 9; Florida Constitution Art 1 § 21; Idaho Constitution Art. 1 § 18; Indiana Constitution Art 1 § 12; Kentucky Const. § 14; Louisiana Constitution Art 1 § 22; Missouri Const. Art. II § 14; Montana Const. Art. II § 16; Nebraska Const. Art 1 § 13; North Carolina Const. Art 1 § 18; North Dakota Const. Art. 1 § 16; Ohio Const 1.16; Oklahoma Const Art II § 6; Oregon Const. Art. 1 § 10; Pennsylvania Const. Art 1 § 11; South Dakota Const. Art VI § 20; Tennessee Const. Art 1 § 17; Utah Const. Art 1 § 11; West Virginia Const. Art. III § 17; Wyoming Const. Art 1 § 8.

[9] *See, e.g.,* the Colorado False Claims Act and Medicaid False Claims Act; Connecticut False Claims Act; Delaware False Claims and Reporting Act; Florida False Claims Act; Indiana False Claims and Whistleblower Protection Act and Indiana Medicaid False Claims and Whistleblower Protection Act; Louisiana Medical Assistance Programs Integrity Law; Montana False Claims Act; North Carolina False Claims Act; Oklahoma Medicaid False Claims Act; Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

Reversing the trial court will thrust Texas into an almost singular position with respect to its *qui tam* jurisprudence.

### 3.     Texas Law Does Not Prohibit Standing-By-Assignment.

Novartis further argues that standing-by-assignment as described by the United States Supreme Court in *Stevens* cannot apply to the TMFPA because Texas Supreme Court caselaw prohibits such assignment. Novartis is wrong.

In support of its argument, Novartis cites to *Allen v. Fisher*, 118 Tex. 38, 9 S.W.2d 731 (Comm'n App. 1928), *Staples v. State*, 112 Tex. 61, 245 S.W. 639 (1922), and *City of San Antonio v. Stumburg*, 70 Tex. 366, 7 S.W. 754 (1888) for the proposition that "a private party lacks standing to vindicate a matter of public concern unless he can show an injury particular to himself." However, none of these cases, or any other cited by Novartis, address *qui tam* suits or standing-by-assignment, and thus, have no application where the Legislature has chosen to allow a private party to bring an action based on the assignment of the government's injury-in-fact.

Novartis also ignores *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909 (Tex. 2010). In that case, the Texas Supreme Court considered a class action suit in which STA entered into assignment agreements on behalf of several of Southwestern Bell's customers and proceeded to bring a suit against Southwestern Bell for various

18

claims, including breach of contract and unjust enrichment. Southwestern Bell argued that STA lacked standing to sue as a class representative because its assignments were void as a matter of law. In rejecting Southwestern Bell's argument, the Court noted that "[b]ecause STA holds contractually valid assignments, STA steps into the shoes of the claim-holders and is considered under the law to have suffered the same injury as the assignors and have the same ability to pursue the claims." *Id*. at 916. (citing *Holy Cross Church of God in Christ v. Wolf,* 44 S.W.3d 562, 572 (Tex. 2001) and *Stevens,* 529 U.S. at 773). The Court further noted that it is "well-settled that a valid assignee of a claim has standing to be a member of a class action related to that claim." *Id*. at 927.[10]

As noted above, the Texas Supreme Court has cited the *Stevens* assignment theory to support its own decisions. Additionally, *Stevens* settles the standing issue that Novartis takes umbrage with, by permitting assignment of the State's interest in the *qui tam* lawsuit—which Novartis does not dispute—to the plaintiff/relator, HSG, thereby fulfilling HSG's standing requirement. Novartis's argument that standing-by-assignment is invalid in Texas ignores the full context of the *Stevens*

---

[10] Novartis also argues that since the TMFPA is unconstitutional under the Texas Constitution, it cannot properly grant standing-by-assignment. Petition at 26-27. However, this circular argument presupposes the unconstitutionality of the TMFPA, which would necessarily end the TMFPA causes of action, and thus does not move the needle on the issue of whether HSG has constitutional standing.

19

decision, the historical source of Texas' Open Courts provision, as well as Texas Supreme Court jurisprudence, which is why, among other reasons, it fails and should be rejected.

**B.    The Texas Supreme Court Has Repeatedly Held that When Standing Is Conferred by Statute, a Particularized Injury Is Not Required**

In this case, the underlying claim is derived from a statute, rather than a common law cause of action. This is important because, while common law standing often requires a particularized injury, "the judge-made criteria regarding standing do not apply when the Texas Legislature has conferred standing through a statute." *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001)). Instead, in a case that involves a statutory cause of action, "the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls in that category." *Id.* (citing *Tex. Dep't of Protective and Regulatory Services v. Sherry,* 46 S.W.3d 857, 859–61 (Tex. 2001), which considered whether a putative father had standing to maintain a suit affecting the parent-child relationship based solely on construction of a statutory standing provision).

Despite Novartis's claims to the contrary, the Texas Supreme Court has

**MR418**

repeatedly acknowledged that the Legislature may grant standing by statute and that in those cases the plaintiff need not demonstrate a particularized injury. *See, e.g., Sneed v. Webre*, 465 S.W.3d 169, 180 (Tex. 2015) ("Generally, ***unless standing is conferred by statute***, a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury.") (emphasis added) (citation and internal quotation marks omitted); *Andrade v. Venable*, 372 S.W.3d 134, 137 (Tex. 2012) ("***Unless standing is conferred by statute***, a plaintiff must show that he has suffered a particularized injury distinct from the general public.") (emphasis added); *Williams v. Lara*, 52 S.W.3d 171, 178-79 (Tex. 2001) ("As a general rule of Texas law, to have standing, ***unless it is conferred by statute***, a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury.") (emphasis added); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555–56 (Tex. 2000) ("***Unless standing is conferred by statute***, taxpayers must show as a rule that they have suffered a particularized injury distinct from that suffered by the general public in order to have standing to challenge a government action or assert a public right.") (emphasis added); *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984) ("Standing consists of some interest peculiar to the person individually and not as a

**MR419**

member of the general public. This general rule of standing is applied in all cases ***absent a statutory exception to the contrary***.") (emphasis added) (citations omitted). This is well settled law in Texas.

In *Scott v. Bd. of Adjustment*, 405 S.W.2d 55 (Tex. 1966) the Texas Supreme Court considered the question of whether a plaintiff had standing under a statute that allowed any taxpayer to appeal the decision of the board of adjustment. Specifically, "the statute provides for three separate classes of people who may appeal: (1) any persons aggrieved; or (2) any taxpayer; or (3) any officer, department, board of bureau of the municipality." *Id*. at 56. The Court noted that "[i]n most cases of this general nature, it has usually been required that the plaintiff be a 'person aggrieved' or a person whose interests are adversely affected, or a person having a special interest in the matter." *Id*. The Court further acknowledged that "[t]his has been held to be true *in the absence of statute*." *Id*. (emphasis added).

The Court held that the uninjured plaintiff had standing under the statute because "[w]ithin constitutional grounds, the Legislature may grant a right to a citizen or to a taxpayer to bring an action against a public body or a right of review on behalf of the public without proof of particular or pecuniary damage peculiar to the person bringing the suit." *Id*. (citing *Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597, 603 (1915)).

22

The decision in *Scott* built on the Court's earlier decision in *Spence v. Fenchler*, 180 S.W.597 (1915). At issue in *Spence* was a statute that allowed "any citizen" to sue to enjoin the operation of a "bawdy or disorderly house." *Id.* at 602. The statute specifically stated that "such citizen shall not be required to show that he is personally injured by the acts complained of…" *Id.* at 603. As a result, the Court rejected the defendant's special exception that the plaintiff had not been personally injured, because the statute required no such thing. *See id.* at 603.

In *Grossman v. Wolfe*, 578 S.W.3d 250 (Tex. App.—Austin 2019, pet. denied), the Court of Appeals of Texas, Austin considered a provision of the Antiquities Code providing that "[a] citizen of the State of Texas may bring an action in any court of competent jurisdiction for restraining orders and injunctive relief to restrain and enjoin violations or threatened violations of this chapter, and for the return of items taken in violation of the provisions of this chapter." Tex. Nat. Res. Code Ann. § 191.173(a). That Court noted that both *Scott* and *Spence* upheld similar standing statutes and that, as a result, "Grossman has standing under subsection 191.173(a) of the Antiquities Code to sue to restrain and enjoin violations of the Antiquities Code even though he has not suffered a particularized injury distinct from the general public." *Grossman*, 578 S.W.3d at 257.

Novartis misreads recent Texas Supreme Court cases that examine statutory

**MR421**

prerequisites for filing suit and issues relating to subject-matter jurisdiction. In *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763 (Tex. 2020), the Court considered a variety of issues that arose out of the breakup of a limited partnership. One of these issues (and the portion relevant to Novartis's argument) related to whether a partner's ability to recover damages for injury to the value of its partnership interest was jurisdictional. *Id.* at 773. The Court first noted that the label "standing" is sometimes misleadingly applied to "statutory or prudential considerations that 'do[] not implicate subject matter jurisdiction' but determine whether a plaintiff 'falls within the class of [persons]…authorized to sue' or otherwise has 'a valid…cause of action.'" *Id* at 774 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4, 134 S. Ct. 1377, 188 L.Ed.2d 392 (2014)). This quote is important to take in context because the Court is discussing whether the *failure of a party to satisfy statutory requirements* is **jurisdictional**. The Court's answer to this question is "no" and, more specifically, that statutory prerequisites do not call into question a court's subject-matter jurisdiction. Contrary to Novartis's position, the Court is *not* saying that the Legislature cannot confer standing by statute, nor does the Court even consider this question.

Given the extensive line of Texas Supreme Court cases referenced above, which expressly acknowledge that the Legislature can confer standing by statute, it

24

is quite unlikely that the Court is overruling that lineage in *Pike* without directly announcing so seismic an intention. It appears instead that, in its fruitless pursuit of legal support, Novartis overlooked the nuanced context underlying the Court's decision.

This is critical because, if this Court were to take Novartis's argument seriously, it would overrule other aspects of the Texas Supreme Court's jurisprudence. Consider taxpayer standing, which is recognized in a long line of Texas Supreme Court decisions. In *Bland*, the Court notes:

> Unless standing is conferred by statute, taxpayers must show as a rule that they have suffered a particularized injury distinct from that suffered by the general public in order to have standing to challenge a government action or assert a public right. But in Texas law there is a long-established exception to this general rule: a taxpayer has standing to sue in equity to enjoin the illegal expenditure of public funds, *even without showing a distinct injury*.

34 S.W.3d at 555 to 56 (emphasis added). The Court reiterated this point in *Williams v. Lara*, stating that "[t]axpayers in Texas have standing to enjoin the illegal expenditure of public funds, and need not demonstrate a particularized injury." 52 S.W.3d 171, 179. As recently as 2022, the Texas Supreme Court has reaffirmed its commitment to taxpayer standing, stating in *Perez v. Turner* that "taxpayer standing is an exception to the usual particularized injury requirement." 653 S.W.3d 191, 200 (Tex. 2022), reh'g denied (Oct. 21, 2022). *See also Jones v. Turner*, 646 S.W.3d 319,

323 (Tex. 2022) (saying the same).

Consider also *Touchy v. Houston Legal Found.*, 432 S.W.2d 690, 691 (Tex. 1968), in which the Texas Supreme Court considered the question of "whether a lawyer has standing to maintain a suit to enjoin a corporation from violating the Texas Canons of Ethics, engaging in the unauthorized practice of law, and engaging in practices which are demeaning to the legal profession and economically harmful to individual practitioners." The Court reversed a lower court's sustaining of a plea in abatement, which had the effect of holding that the petitioner attorneys did not have standing to maintain the suit. In so doing, the Court noted that "due to the special interest attorneys have in their profession, they have standing to maintain a suit to enjoin action which allegedly damages their profession." *Id.* at 694. What the Court did *not* require is that there be some particularized injury to the petitioners.

Further, in *Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex 2004), the Texas Supreme Court noted that "the Legislature may grant private standing to bring [actions under a penal statute], but it must do so clearly." As a punitive statute that clearly grants a private right of action to a relator, *see* Tex. Hum. Res. Code § 36.101 ("ACTION BY PRIVATE PERSON AUTHORIZED"), the TMFPA fits squarely within this definition as a permissible statute.

Because this is a statutory case, the proper inquiry is to determine whether

26

Relator has satisfied the statutory requirements of the TMFPA when Relator filed its *qui tam* suit. *See PermiaCare v. L.R.H.*, 600 S.W.3d 431, 447 (Tex. App.—El Paso 2020, no pet.) ("the TMFPA gives a private party standing to bring a claim for Medicaid fraud, but only if he or she follows the statutory framework. ... When, as here, standing is conferred by statute, we must use that statutory framework to determine whether a particular party has standing.") (citations omitted).

As outlined above, "Texas's test for constitutional standing parallels the federal test for Article III standing." *Pike*, 610 S.W.3d at 776. Here, there is no question that the State has suffered an injury-in-fact at the hands of Novartis, and this injury-in-fact is capable of being redressed by the instant TMFPA action. Under both federal and Texas caselaw, this injury-in-fact can be assigned to a third party, granting them standing. *See Stevens*, 529 U.S. 765; *Sw. Bell Tel. Co.*, 308 S.W.3d 909. Likewise, the Texas Supreme Court has *repeatedly* acknowledged exceptions to the particularized injury requirement, which further support that a plaintiff/relator has standing when bringing a *qui tam* action under the TMFPA.

This is not a case where a plaintiff seeks redress for a hypothetical or non-existent injury-in-fact. Rather, HSG has alleged a statewide scheme of kickbacks that threatens the integrity of the Texas Medicaid program, and the State has permitted HSG to proceed with those claims. Accordingly, the trial court did not commit a

clear abuse of discretion in finding that it has subject-matter jurisdiction.

### III. The Trial Court Did Not Commit a Clear Abuse of Discretion in Finding the TMFPA Constitutional

#### A. *Qui Tam* Statutes Do Not Violate Article IV or Article V of the Texas Constitution

Novartis cites several cases to argue that the TMFPA violates Article IV, Section 22 and Article V, Section 21 of the Texas Constitution, but, contrary to Novartis's position, *Maud, Staples*, and many other Texas cases show how the TMFPA is constitutional.[11]

In *Maud v. Terrell*, 109 Tex. 97, 200 S.W. 375 (1918), the Court upheld a statute authorizing the Texas Comptroller to appoint individuals to collect certain taxes. In its decision, the court noted that the statute empowered the appointed individuals to initiate lawsuits; to represent the State to enforce its tax collection efforts; and to aid in the collection of such taxes. *Id*. at 377. In holding the statute valid, the court acknowledged that the Legislature "may provide assistance for the proper discharge by [the Attorney General and county and district attorneys] of their duties" but cannot "obtrude other persons upon them and compel the acceptance

---

[11] A federal judge recently rejected a similar motion in another TMFPA case, *U.S. ex rel. Doe v. Planned Parenthood Federation of America Inc. et al*., No. 2:21-cv-00022-Z, in the U.S. District Court for the Northern District of Texas (Amarillo Division). In that case, Defendants' Motion for Judgment on the Pleadings (filed September 1, 2023) and Memorandum in Support of the Motion (filed September 1, 2023) argued that the TMFPA violated the U.S. Constitution and Texas Constitution. The district judge rejected those arguments in a series of sealed orders.

MR426

of their services." *Id.* at 376. The court further established that for a challenged statute to violate separation of powers under the Texas Constitution, a litigant must meet the high bar of showing that the statute "unequivocally supplant[s] the county attorneys and the Attorney-General in their authority to prosecute the suits of the State." *Id.* at 377-378; *see also El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 439 (Tex. 1996) (citing *Maud*). As explained below, the *qui tam* provisions of the TMFPA do not "unequivocally supplant" the Attorney General in its prosecution of Medicaid fraud.

Another case cited by Novartis, *Staples v. State*, 112 Tex. 61, 245 S.W. 639 (1922),[12] stemmed from a *quo warranto* suit instituted by litigants "in the name of the state of Texas" and "in their own names" to prevent the placement of a Senate candidate's name on a ballot for a general election. The respondents argued that the statute was unconstitutional for infringing upon the exclusive authority of the County Attorneys, District Attorneys, and the Attorney General. *Id.* at 639-40. Citing *Maud*, the *Staples* court disagreed, holding that the statute was "not in violation of section 21, art. 5, and section 22, art. 4, of the [Texas] Constitution," *Id.* at 643, though the court did note that litigants did not have the "legal capacity or right to institute" their suit. *Id.* Importantly, the Court construed the statute at issue

---

[12] Petition at 34-35.

**MR427**

as providing safeguards to the constitutional powers of the Attorney General and county and district attorneys, such that *quo warranto* suits **could** be related through a private citizen as long as the suits were first presented to, and approved by, the State's authorized agents and officers, *e.g.*, the Attorney General or country or district attorney. *Id.*

In 1933, the Texas Supreme Court cited both *Maud* and *Staples* to uphold a statute authorizing an individual to bring suit on behalf of the state. *Camp v. Gulf Prod. Co.*, 122 Tex. 383, 394, 61 S.W.2d 773, 777 (1933). The *Camp* Court held that under *Maud* and *Staples*, "an act will not be held unconstitutional" under Texas Const. Section 22, Art. 4, and Section 21, Art. 5, "unless it, by plain and unambiguous language, deprives the county and district attorneys and the Attorney General of their authority to represent the state in the suits prosecuted under such act." *Id.* The TMFPA does no such thing.

Novartis also cites a decision from a Court of Appeals (*Am. Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580 (Tex. App.—Austin 1942) aff'd, 141 Tex. 379, 172 S.W.2d 972 (1943)) to support its contention that *qui tam* suits are not maintainable under the Texas Constitution.[13] However, the cited case was superseded by the Texas Supreme Court in *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972 (1943).

---

[13] *See* Petition at 34.

**MR428**

Further, the statute at issue in the *Agey* cases is distinguishable from the TMFPA, as the *Agey* statute was not a *qui tam* statute and did not explicitly authorize a private right of action. *See Agey*, 172 S.W.2d at 974 ("If the Legislature had intended by this Act to authorize an individual to file a suit on behalf of himself and on behalf of the State, without the joinder of the Attorney General or some district or county attorney, it could have expressed such intention in clear language. This it did not do.").

This provides important context for the Texas Supreme Court's language in *Agey*, cited by Novartis, that "it is incumbent upon [the Attorney General] to institute in the proper courts proceedings to enforce or protect any right of the public that is violated," Petition at 37; *Agey*, 172 S.W.2d at 974. This specific language arose precisely because *Agey* did not involve a statute with a private right of action. Additionally, and as mentioned earlier, the Texas Supreme Court clarified the language used in *Agey* in the more recent *Brown v. De La Cruz* decision, noting "[a]s we held long ago in *Agey*, the Legislature may grant private standing to bring such [*qui tam*] actions, but it must do so clearly." *Brown* at 566 (citing *Agey*, 172 S.W.2d at 974).

As shown in greater detail below, the TMFPA does not deprive the Attorney General of the authority to represent the State in any TMFPA case, including cases

MR429

initiated by *qui tam* relators, and, therefore, is constitutional.

**B.    The TMFPA Specifically Does Not Run Afoul of the Texas Constitution**

Novartis alleges that the TMFPA's *qui tam* provisions violate the Texas Constitution by authorizing private parties to represent the state and by infringing upon the constitutional duties of the Executive by (1) usurping the state attorneys' constitutional duty and authority by authorizing private parties to bring suit on behalf of the State[14] and (2) interfering with the Attorney General's authority to litigate and resolve the State's claims.[15]

As explained below, Novartis's arguments largely misstate the State's authority under the TMFPA and overlook critical control mechanisms built into the statute. Moreover, none of the arguments even approaches the high bar needed to overcome the TMFPA's presumption of constitutionality.

**1.    The TMFPA's *qui tam* provisions do not unconstitutionally usurp the Attorney General's authority and prosecutorial discretion.**

As noted throughout this response, there is a wealth of support for *qui tam* statutes—in Texas, at the federal level, and in other states that share similar constitutional language with Texas. That Novartis ignores all of this—or tries

---

[14] Petition at 38.

[15] *Id.* at 43.

**MR430**

fruitlessly to recast that bounty of precedent to somehow support the opposite—is evidence that the trial court *did not clearly abuse its discretion* in choosing not to rule the TMFPA unconstitutional.

In *Terrell v. Sparks*, 104 Tex. 191, 135 S.W. 519, 521 (1911), the Texas Supreme Court acknowledged that the Attorney General may appoint an outside attorney to assist with the discharge of his duties. *Terrell* dealt specifically with a statute enacted by the Thirty-First Legislature appropriating money to be expended at the Attorney General's discretion to pursue various cases on behalf of the state. *See id.* at 519-20. The Attorney General used a portion of that money to contract with a private attorney, who worked on various public lawsuits on the Executive's behalf. *See id.* As is frequently the case when pursuing fraudulent actors on behalf of the public, the Court acknowledged that "the Legislature regarded it as impossible for [the Attorney General] to perform this vast amount of professional work…" *Id.* at 522. Thus, the Court found no constitutional issue with the statute or contract between the Attorney General and private attorney, noting that "[t]he Governor and the Attorney General were authorized to determine the necessity of employing special counsel to assist the Attorney General and also to provide for the payment of his fees…" *Id.*

Unsurprisingly, Novartis ignores the *Terrell* case. Instead, it casts about

33

restlessly, piecing together stray sentences from every manner of inapposite decision—appellate, concurrence, dissent, but never on point—in its attempt to find support for its argument. Novartis goes so far as to cite *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454 (Tex. 1997), a case which is about the *Legislature delegating its power to a private entity* and has absolutely nothing to do with Article IV or Article V of the Texas Constitution, which are not even mentioned in the Court's opinion.

Novartis also misleadingly cites *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79 (Tex. 2004), another case which is not about either Article IV or Article V. Instead, it is about whether claims under the Deceptive Trade Practices Act can be assigned. The Court held that, because the statute was silent on this point, the claims were not assignable. *See id.* at 84-85. This analysis did *not* turn on an evaluation of the Texas Constitution or even state that claims in general can *never* be assigned. The Court's decision relied primarily on the actual language of the DTPA. In fact, the Court noted that "one purpose of the DTPA's treble damages provisions is to encourage *privately initiated* consumer litigation, reducing the need for public enforcement." *Id.* at 85 (Tex. 2004) (quoting *Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex. 1980), with emphasis added by the Court).

As more fully explored below, the Legislature is not foisting anyone upon the

MR432

Attorney General, nor does the TMFPA supplant the Attorney General's authority. Instead, the TMFPA gives the Attorney General *more options* for rooting out fraud and recovering misappropriated public funds by encouraging private parties to assist the State in exchange for a share of the recovery.

## 2. The TMFPA does not unduly interfere with the Attorney General's authority to litigate and resolve the State's claims.

The TMFPA's authorization of a relator's lawsuit does not impermissibly strip the State of its prosecutorial discretion regarding whether to file suit and what allegations that suit should contain. Relator-initiated cases are filed under seal, during which time the State may investigate the allegations to determine whether to intervene and take control of the action; to decline and allow relator to proceed with the action; or to dismiss the action. *See* Tex. Hum. Res. Code §§ 36.102-36.104.[16] In making its decision while the case is under seal, the State is exercising its prosecutorial discretion. Thus, the TMFPA does not undermine the State's authority but rather complements it by permitting the State time to decide how to handle the relevant case.

*Meshell v. State,* 739 S.W.2d 246 (Tex. Crim. App. 1987), incorrectly cited by

---

[16] Additionally, upon intervention the State has "primary responsibility for prosecuting the action," including the ability to amend the petition. *See* Tex. Hum. Res. Code § 36.107(a). Thus, if the State elects to intervene and proceed with the case, the State has full control over the scope of its allegations.

MR433

Novartis as supportive of its argument, provides some insight into what courts consider when determining whether the Legislature has infringed upon prosecutorial discretion. While the Court found that the Speedy Trial Act was unconstitutional in *Meshell*, that Act dealt with a prosecutor's *preparation for a criminal trial*. To say it is unclear how the Speedy Trial Act is analogous to the TMFPA is to woefully understate its irrelevance. The Court noted that the Speedy Trial Act was deficient for several reasons, including that it gave no consideration for a prosecutor's "reason for delay," that it treated as "irrelevant whether the appellant actually wanted a speedy trial," and that it did not consider "whether appellant actually suffered any prejudice as a result of the delay in his trial." *Id.* at 256-57. For those reasons, the Court noted that the "Legislature exceeded its authority to protect appellants substantive right to a speedy trial through procedural legislation." *Id.* at 257.

Following *Meshell*, the Department of Family and Protective Services sought to invalidate a statute requiring it to commence a parental rights termination trial within one year of obtaining a temporary order appointing DFPS as temporary managing conservator of a child. *See Tex. Dep't of Family & Protective Services v. Dickensheets,* 274 S.W.3d 150 (Tex. App.—Houston [1st Dist.] 2008, no pet.). The Court rejected DFPS's argument that, like the Speedy Trial Act, the statute represented an unconstitutional legislative encroachment upon prosecutorial

discretion. The Court noted that the "one-year deadline for rendition of a final order can be extended by 180 days" and, unlike the Speedy Trial Act, "does not guarantee either party a dismissal if a final order is not rendered" within the one-year time limit to initiate termination proceedings. *Id* at 160.

Nothing in the TMFPA is remotely akin to the limitations placed on prosecutorial discretion under the Speedy Trial Act. Contrary to Novartis's claims, the State has complete discretion to proceed only with the TMFPA cases that it chooses and a substantial timeframe in which to investigate while the case is under seal (compare the Federal False Claims Act's ("FCA") 60-day intervention timeframe[17] with the TMFPA's 180-day timeframe[18]). And, if the 180-day timeframe is inadequate, the State can simply request an extension. This is incomparable to the demands the Legislature placed on prosecutors with the Speedy Trial Act, which, notably, dealt with the commencement of a trial, rather than the investigation and subsequent filing of a case.

In sum, the State has full discretion to proceed with a TMFPA case as it chooses, including by intervening and taking control over the case; dismissing the

---

[17] 31 U.S. Code § 3730(b)(2).

[18] Tex. Hum. Res. Code § 36.102(c).

case—including over the objection of the relator;[19] or declining to intervene and allowing the relator to proceed. As such, the TMFPA does not impermissibly undermine the State's prosecutorial discretion.

Novartis also misstates how much deference the TMFPA gives to a relator if the State intervenes and decides to settle or dismiss the case. If the State deems a TMFPA case unmeritorious, the State can dismiss the case even over the relator's objections. *See* Tex. Hum. Res. Code § 36.107(b). The TMFPA requires only that the State give the relator notice and that the court provides the relator an opportunity for a hearing on the dismissal. *Id.* Courts examining the similar provision within the Federal False Claims Act[20] have given significant deference to the government's decision to dismiss an FCA action. *See Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003) ("Nothing in § 3730(c)(2)(A) purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States."); *see also United States, ex rel. Polansky v. Executive Health Res., Inc.,* 599 U.S. 419, 437, 143 S. Ct. 1720, 216 L. Ed. 2d 370 (2023). Indeed, in *Swift*, the court found that "the function of [the dismissal] hearing when the relator requests one is simply to give the relator a formal opportunity to convince

---

[19] Tex. Hum. Res. Code § 36.107(b).

[20] 31 U.S.C. § 3730(c)(2)(A).

MR436

the government not to end the case," and does not involve an element of judicial review. *Swift*, 318 F.3d at 253. Similarly, nothing in Tex. Hum. Res. Code § 36.107(b) deprives the Office of the Texas Attorney General of its prerogative to dismiss a TMFPA case.

The same is true for a settlement. Novartis erroneously claims that the "TMFPA effectively requires the Attorney General to obtain the relator's consent to settle the State's claims..."[21] This is patently false. As delineated in the TMFPA, the government can choose to settle a case over the relator's objection so long as the court holds a hearing and determines "that the proposed settlement is fair, adequate, and reasonable under all the circumstances." Tex. Hum. Res. Code § 36.107(c). Court approval of settlements is a common procedure in civil cases—as well as the analogous plea agreement in criminal cases—and Novartis's contention that a requirement for court approval of a settlement in a *qui tam* action is uniquely burdensome on the State is unfounded. Unsurprisingly, Novartis cites no authority to support its broad assertion. On the contrary, the government's power to dismiss or settle an FCA *qui tam* action over the objection of a relator was described by the U.S. Supreme Court as being "uncommon, even extraordinary." *Polansky*, 599 U.S.

---

[21] Petition at 46.

MR437

at 430.[22]

Novartis also wrongly claims that when the State intervenes in a *qui tam* action, the TMFPA contravenes the Texas Constitution by compelling the Attorney General to accept the relator's services.[23] Once again, Novartis expresses a deep misunderstanding of the TMFPA and how it works. First, as previously discussed, if the State in its discretion intervenes in a relator-initiated TMFPA action, then it cannot be said that the relator is being compelled upon the State, because the State at that point has **chosen** to accept the relator. Second, the TMFPA spells out that the "state has **the primary responsibility** for prosecuting the action and **is not bound by an act of the person bringing the action**." Tex. Hum. Res. Code § 36.107(a) (emphasis added). This gives the State full control over the case, including the right to amend or drop allegations initially asserted by relator.[24] That the relator may conduct its own discovery does not limit the rights of the State as the entity with

---

[22] While the *Polansky* opinion relates to the Federal FCA, which is different from the TMFPA in many ways, certain procedural aspects of the FCA closely mirror the TMFPA, including the government's ability to dismiss a lawsuit notwithstanding the objections of the relator. *Compare* 31 U.S.C. § 3730(c)(2)(A) *with* Tex. Hum. Res. Code § 36.107(b).

[23] Petition at 43.

[24] This opinion is further bolstered by Tex. Hum. Res. Code § 36.104(a), which provides two options for the State at the conclusion of its under seal investigation: 1) intervention, where the State "proceed[s] with the action," and 2) "declin[ing] to take over the action." Thus, the language of 2) suggests that when the State intervenes, it is "tak[ing] over the action." *See also Polansky*, 599 U.S. at 425 ("If the Government, during that so-called seal period, elects to intervene, **the relator loses control** … though the relator can continue as a party in a secondary role.") (emphasis added).

MR438

**primary responsibility** for prosecuting the case. Novartis cites no authority to the contrary.

Additionally, when the State elects to intervene in a relator's TMFPA action, the State may severely restrict a relator's participation in the suit. *See* Tex. Hum. Res. Code § 36.107(d). This fact directly contradicts Novartis's claim that relator's "right to participate inevitably hinders the Attorney General's ability to prosecute the State's claims free from the relator's interference and influence."[25] Novartis cites no authority to support the idea that § 36.107(d), along with the TMFPA's other safeguards, is insufficient to protect the interests of the State.

Finally, Novartis alleges, that if the Attorney General declines to intervene, the TMFPA "impermissibly authorizes an unharmed private party and its attorney to prosecute violations of state law in place of the Attorney General."[26] This is wrong. The TMFPA provides numerous mechanisms by which the State remains engaged in the litigation. By way of example, Tex. Hum. Res. Code § 36.104(b-1) permits the State to receive ongoing information about such cases. The State also remains the "real party in interest" in the case and may submit Statements of Interest—such as it has in this case—and appear at hearings to advocate for its rights

---

[25] Petition at 44-45.

[26] Petition at 40.

as the real party in interest.

Likewise, the State may elect to pursue its claims through an alternate remedy in a separate proceeding;[27] can stay the relator's ability to conduct discovery that would interfere with the State's other civil or criminal investigations;[28] and retains the ultimate authority to consent to—or veto—any proposed settlement.[29] The State may also intervene in a TMFPA case even if it initially declines, allowing the State to prosecute, dismiss, or settle the action over the objections of the relator.[30] Most importantly, as discussed above, a relator may only proceed with a TMFPA action without the State's participation when the State, at its discretion, permits the relator to do so. For these reasons, Novartis is wrong to claim that the TMFPA impermissibly displaces the Attorney General's control over relator-initiated actions.

Throughout its Petition, Novartis routinely ignores or misreads the various safeguards within the TMFPA that protect the Attorney General's constitutional authority to prosecute claims on behalf of the state. Novartis likewise disregards that suits initiated by private parties on behalf of the State have long been a feature of

---

[27] Tex. Hum. Res. Code § 36.109.

[28] Tex. Hum. Res. Code § 36.108.

[29] Tex. Hum. Res. Code § 36.102(e).

[30] Tex. Hum. Res. Code §§ 36.104(b-1); 36.107(b), (c).

**MR440**

Texas's governance. More critically, the TMFPA does not "unequivocally supplant" the State's constitutional authority to bring and conduct civil litigation. *See Maud v. Terrell*, 109 Tex. 97 at 377. The State agrees with the Texas Supreme Court that the TMFPA "is a powerful tool for targeting fraud against the Texas Medicaid program and securing the program′s integrity," which "imbues the attorney general with broad investigative and enforcement authority." *In re Xerox*, 555 S.W.3d at 525. This authority is only enhanced—rather than restricted—by the existence of *qui tam* suits. Thus, the trial court did not commit a clear abuse of discretion in refusing to find the TMFPA unconstitutional.

## **PRAYER**

For the foregoing reasons, the TMFPA is not unconstitutional and the trial court did not clearly abuse its discretion in denying Novartis's Motion to Dismiss/Plea to the Jurisdiction. Moreover, even if the trial court's interpretation of the law was incorrect—and it was not—Novartis has an adequate remedy on appeal such that mandamus is improper. The State prays that the Court deny Novartis's Petition.

Dated: February 20, 2024

MR441

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

ELIZABETH BROWN FORE
Chief, Civil Medicaid Fraud Division

/s/ Jordan Underhill
JORDAN UNDERHILL
Texas State Bar No. 24102586
JONATHAN D. BONILLA
Texas State Bar No. 24073939
LYNNE KURTZ-CITRIN
Texas State Bar No. 24081425
Assistant Attorneys General
Office of the Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1410 (Office)
(512) 936-0674 (Fax)
jordan.underhill@oag.texas.gov
lynne.kurtz-citrin@oag.texas.gov
jonathan.bonilla@oag.texas.gov

**ATTORNEYS FOR THE STATE
OF TEXAS**

44

## CERTIFICATE OF COMPLIANCE

Based on a word count run in Microsoft Word, this Petition for Writ of Mandamus contains 10,933 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Jordan Underhill*

Jordan Underhill

## CERTIFICATION

I certify that I have reviewed the Response to the Petition and concluded that every factual statement in the petition is supported by competent evidence included in the appendix or record.

*/s/* Jordan Underhill

Jordan Underhill

**MR443**

## CERTIFICATE OF SERVICE

I hereby certify on February 20, 2024 a true and correct copy of the foregoing

document was served to the following counsel of record via electronic service:

ACCEPTED
06-24-00005-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
2/21/2024 6:27 PM
DEBBIE AUTREY
CLERK

## NO. 06-24-00005-CV

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
2/21/2024 6:27:20 PM
DEBBIE AUTREY
Clerk

# IN THE COURT OF APPEALS
# FOR THE SIXTH DISTRICT OF TEXAS
# AT TEXARKANA

## IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

### *Relator*.

## Original Proceeding From The 71st District Court
## in Harrison County, Texas
## The Honorable Brad Morin Presiding

## REPLY IN SUPPORT OF MOTION FOR TEMPORARY STAY

**DANNY S. ASHBY**
Texas Bar No. 01370960
**MEGAN WHISLER**
Texas Bar No. 24079565
**O'MELVENY & MYERS LLP**
2801 N. Harwood Street, Suite 1600
Dallas, Texas  75201
Telephone:  +1 972 360 1900

**DERON R. DACUS**
Texas Bar No. 00790553
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

**ROSS GALIN**
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000
(*Pro hac vice*)

**MEREDITH GARAGIOLA**
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
(*Pro hac vice*)

*Counsel for Relator*
*Novartis Pharmaceuticals Corporation*

**MR445**

Real Party in Interest HSG asks the Court to deny the Motion for Temporary Stay, but its Response offers no meritorious reason for doing so. The Response only opposes a stay based on HSG's claim that the Petition lacks merits, but—as Novartis will show in a Reply in support of the Petition that it intends to filed by February 27—HSG and the State are wrong on the merits for several reasons. The Petition is not only meritorious, but also provides firm grounds for the mandamus relief requested. And because a stay of the district court proceedings is precisely the sort of "just relief" that Texas Rule of Appellate Procedure 52.10(b) contemplates "pending the court's action on the petition," the Court should grant the Motion to stay the case pending its resolution of the Petition.

HSG's sole contention (at 25)—that the Motion should be denied because HSG contends that the Petition fails on the merits—misses the point of Novartis's request for a stay *pending* the Court's decision on the merits. As the Motion explained, courts routinely grant such requests to "maintain[] the status quo of the underlying proceeding *while the [C]ourt considers the merits of the original proceeding.*" *In re Johnston*, No. 07-22-00177-CV, 2022 WL 2376294, at *1 (Tex. App.—Amarillo June 28, 2022, orig. proceeding) (emphasis added); *see also In re Kelleher*, 999 S.W.2d 51, 52 (Tex. App.—Amarillo 1999, orig. proceeding) (Rule 52.10 exists to afford court opportunity to address dispute encompassed within petition for mandamus by maintaining status quo until it can address that dispute);

1

*In re Reed*, 901 S.W.2d 604, 609 (Tex. App.—San Antonio 1995, orig. proceeding) (holding under predecessor to Rule 52.10 that appellate court's temporary order "is not a writ of prohibition against holding the trial; it is a stay order issued ancillary to the mandamus proceeding and for the purpose of protecting our jurisdiction so that we could consider the merits of that mandamus action.").

As the State itself acknowledges, the Petition raises "serious constitutional questions," State's Mot. for Ext. of Time to File Resp. at 1, that are central to the Separation of Powers under the Texas Constitution. Indeed, that is why Novartis suggested that, if the district court were inclined to deny the Plea to the Jurisdiction and Motion to Dismiss, then the district court should grant a permissive appeal under Texas Rule of Civil Procedure 168. In submitting a proposed order to that end, however, Novartis was not representing that *Novartis* believed that there was a substantial ground for difference of opinion regarding the correctness of its position, as HSG claims (at 10). Novartis simply submitted a proposed order that tracked the language in Rule 168 in the event the district court was inclined to grant a permissive appeal. *Compare* SMR003–004 *with* Tex. R. Civ. P. 168 (an order granting permission to appeal "must identify the controlling question of law *as to which there is a substantial ground for difference of opinion*, and must state why an immediate appeal may materially advance the ultimate termination of the litigation" (emphasis added)). In any event, the Court should not permit the district court to move forward

2

with the underlying proceeding when "serious constitutional questions" concerning Judicial, Executive, and Legislative jurisdiction remain pending before this Court, including the district court's subject-matter jurisdiction to hear any disputes and issue any orders in the underlying litigation.

The Real Parties' arguments concerning the Court's jurisdiction and the adequacy of an appellate remedy are wrong, as Novartis will further explain in its forthcoming Reply in support of the Petition. Suffice it to say that when, as here, the district court acts without subject-matter jurisdiction, its orders are void and a party need not satisfy the no-adequate-appellate-remedy test to obtain mandamus relief. *See, e.g., In re John G. & Marie Stella Kenedy Mem. Found.*, 315 S.W.3d 519, 522–23 (Tex. 2010) (orig. proceeding) (holding any order entered by a court without jurisdiction, other than one to dismiss, is "void" and "mandamus relief is appropriate without a showing that the relators lack an adequate appellate remedy"); *In re Giles*, 675 S.W.3d 376, 381 (Tex. App.—Corpus Christi–Edinburg 2023, orig. proceeding) ("[I]f a trial court issues an order when it lacks jurisdiction to do so, mandamus relief is appropriate because such an order is void ab initio" and the relator "need not show that he lacks an adequate remedy by appeal")*; In re J.R.*, 622 S.W.3d 602, 604 (Tex. App.—Fort Worth 2021, orig. proceeding [mand. dism'd]) ("A trial court abuses its discretion if it enters a void order, and mandamus will issue to remedy the void order regardless of whether the relator has an adequate remedy

3

by appeal."). And numerous Texas courts have recognized that the denial of a Rule 91a motion to dismiss is subject to mandamus review because, "'[i]n laying the groundwork for a rule mandating the early dismissal of baseless causes of action, the Legislature has effectively already balanced most of the relevant costs and benefits of an appellate remedy, and mandamus review of orders denying Rule 91a motions comports with the Legislature's requirement for an early and speedy resolution of baseless claims.'" *In re Farmers Tex. Cty. Mut. Ins. Co.*, 604 S.W.3d 421, 429 (Tex. App.—San Antonio 2019, orig. proceeding) (quoting *In re Odebrecht Constr., Inc.* 548 S.W.3d 739, 745 (Tex. App.—Corpus Christi-Edinburg 2018, orig. proceeding)); *see also ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 880 (Tex. 2018) (not an original proceeding, but noting, "Burlington could have challenged the trial court's denial of its motion to dismiss at the time it was denied" and citing *In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding)).

If the Court permits the case to proceed pending the Court's resolution of the merits of the Petition, it will indisputably (and unnecessarily) expose the parties, various third parties, the district court and the public to the very risk of irreparable harm that the Petition seeks to prevent. HSG does not dispute that, if the Court grants the Petition, then any time and resources expended—by the parties, third parties, and the district court—in litigating the underlying proceedings will be unrecoverable, and the Separation of Powers will have been violated. By contrast,

4

a decision granting the Motion poses no risk of harm (even in the unlikely event the Court ultimately denies the Petition) and would spare the parties, third parties, the public, and district court from suffering irreparable harm if the Court grants the Petition and orders the case dismissed.

The need for an immediate stay pending the Court's resolution of the Petition is also clear. Every week, every day, every hour that the case remains unstayed, the parties are advancing through one of the most expensive and time-consuming stages of litigation in an effort to meet the impending May 17, 2024 deadline for the substantial completion of document production. Indeed, in the twenty days since it filed the Petition and Motion, Novartis served its Initial Disclosures identifying 25 Novartis employees likely to have knowledge of relevant facts, engaged a vendor to conduct an initial collection of documents, and made its first production of documents on February 9, 2024, which Novartis must continue to make on a rolling basis if the case is not stayed. Novartis also will soon need to meet and confer with HSG to discuss the parameters of its ongoing review and production of documents. Since filing the Petition, Novartis has also served HSG with its First Set of Requests for Production and, with discovery between the parties underway, turned its attention to third-party discovery. Within the past week, Novartis served document subpoenas on the Texas Health and Human Services Commission and its Office of Inspector General on February 14 and February 20, 2024, respectively, requesting that they

5

produce all responsive documents by March 12, 2024. All the time, effort, and money expended on these and future discovery efforts will be utterly wasted if the Court grants the Petition, as it should, because mandamus relief is indisputably warranted when, as here, the district court lacks subject-matter jurisdiction and HSG's cause of action is legally invalid.

## PRAYER

For these reasons, Novartis respectfully requests that the Court temporarily stay the district court proceedings pending the Court's resolution of the Petition, which raises "serious constitutional questions" concerning the jurisdiction of the Executive, Legislative, and Judicial departments under the Texas Constitution.

6

Dated:  February 21, 2024          Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Danny S. Ashby*
Danny S. Ashby
Texas Bar No. 01370960
dashby@omm.com
Megan Whisler
Texas Bar No. 24079565
mwhisler@omm.com
2801 North Harwood Street, Suite 1600
Dallas, Texas  75201
Telephone:  +1 972 360 1900
Facsimile:  +1 972 360 1901

Ross Galin (*pro hac vice*)
rgalin@omm.com
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000

Meredith Garagiola (*pro hac vice*)
mgaragiola@omm.com
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300


THE DACUS FIRM, P.C.

Deron R. Dacus
Texas Bar No. 00790553
ddacus@dacusfirm.com
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

*Counsel for Relator*
*Novartis Pharmaceuticals Corporation*

7

**MR452**

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of the foregoing Reply has been

forwarded this 21st day of February 2024, to the following attorneys of record via

electronic service:

Samuel F. Baxter
Jennifer L. Truelove
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
sbaxter@mckoolsmith.com
jtruelove@mckoolsmith.com

Eric B. Halper
Radu A. Lelutiu
MCKOOL SMITH P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
ehalper@mckoolsmith.com
rlelutiu@mckoolsmith.com

W. Mark Lanier
Alex J. Brown
Zeke DeRose III
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
WML@LanierLawFirm.com
Alex.Brown@LanierLawFirm.com
Zeke.DeRose@LanierLawFirm.com
Jonathan.Wilkerson@LanierLawFirm.com

*Counsel for Health Selection Group, LLC*

Jonathan D. Bonilla
Jordan Underhill
Lynne Kurtz-Citrin
Office of the Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Jonathan.Bonilla@oag.texas.gov
Jordan.Underhill@oag.texas.gov
Lynne.Kurtz-Citrin@oag.texas.gov

*Counsel for the State of Texas*

*/s/ Danny S. Ashby*
Danny S. Ashby

8

MR453

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84767465
Filing Code Description: Response
Filing Description: REPLY IN SUPPORT OF MOTION FOR TEMPORARY STAY
Status as of 2/22/2024 7:48 AM CST

Associated Case Party: Novartis Pharmaceuticals Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Danny S.Ashby | | dashby@omm.com | 2/21/2024 6:27:20 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 2/21/2024 6:27:20 PM | SENT |
| Ross Galin | | rgalin@omm.com | 2/21/2024 6:27:20 PM | SENT |
| Meredith Garagiola | | mgaragiola@omm.com | 2/21/2024 6:27:20 PM | SENT |

Associated Case Party: Health Selection Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jonathan Wilkerson | 24050162 | jonathan.wilkerson@lanierlawfirm.com | 2/21/2024 6:27:20 PM | SENT |
| Samuel F. Baxter | 1938000 | sbaxter@mckoolsmith.com | 2/21/2024 6:27:20 PM | SENT |
| Zeke DeRose | 24057421 | zeke.derose@lanierlawfirm.com | 2/21/2024 6:27:20 PM | SENT |
| Jennifer Leigh Truelove | 24012906 | jtruelove@mckoolsmith.com | 2/21/2024 6:27:20 PM | SENT |
| Alex Jerome Brown | 24026964 | alex.brown@lanierlawfirm.com | 2/21/2024 6:27:20 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 2/21/2024 6:27:20 PM | SENT |
| Radu A.Lelutiu | | rlelutiu@mckoolsmith.com | 2/21/2024 6:27:20 PM | SENT |
| W. Mark Lanier | | WML@LanierLawFirm.com | 2/21/2024 6:27:20 PM | SENT |
| audrey moore | | audrey.moore@lanierlawfirm.com | 2/21/2024 6:27:20 PM | SENT |
| denise lopez | | dlopez@mckoolsmith.com | 2/21/2024 6:27:20 PM | SENT |
| veronica manning | | vmanning@mckoolsmith.com | 2/21/2024 6:27:20 PM | SENT |
| michael catapano | | mcatapano@mckoolsmith.com | 2/21/2024 6:27:20 PM | SENT |

Associated Case Party: State of Texas

MR454

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84767465
Filing Code Description: Response
Filing Description: REPLY IN SUPPORT OF MOTION FOR TEMPORARY STAY
Status as of 2/22/2024 7:48 AM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lynne Kurtz-Citrin | 24081425 | lynne.kurtz-citrin@oag.texas.gov | 2/21/2024 6:27:20 PM | SENT |
| Jonathan Bonilla | 24073939 | Jonathan.Bonilla@oag.texas.gov | 2/21/2024 6:27:20 PM | SENT |
| Jordan Underhill | 24102586 | jordan.underhill@oag.texas.gov | 2/21/2024 6:27:20 PM | SENT |
| Cynthia Lu | | Cynthia.Lu@oag.texas.gov | 2/21/2024 6:27:20 PM | ERROR |

**MR455**

ACCEPTED
06-24-00005-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
2/27/2024 6:25 PM
DEBBIE AUTREY
CLERK

NO. 06-24-00005-CV

IN THE COURT OF APPEALS
FOR THE SIXTH DISTRICT OF TEXAS
AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
2/27/2024 6:25:14 PM
DEBBIE AUTREY
Clerk

IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

*Relator*.

Original Proceeding From The 71st District Court
in Harrison County, Texas
The Honorable Brad Morin Presiding

REPLY IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS

TEMPORARY STAY REQUESTED
ORAL ARGUMENT REQUESTED

**DANNY S. ASHBY**
Texas Bar No. 01370960
**MEGAN WHISLER**
Texas Bar No. 24079565
**O'MELVENY & MYERS LLP**
2801 N. Harwood Street, Suite 1600
Dallas, Texas 75201
Telephone: +1 972 360 1900


**DERON R. DACUS**
Texas Bar No. 00790553
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

**ROSS GALIN**
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000
(*Pro hac vice*)


**MEREDITH GARAGIOLA**
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
(*Pro hac vice*)

*Counsel for Relator*
*Novartis Pharmaceuticals Corporation*

**MR456**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................1

ARGUMENT .........................................................................................3

I. The Court's Jurisdiction To Grant Mandamus Relief Is Clear. ...........3

II. HSG Fails To Carry Its Burden To Demonstrate The Court's Subject-Matter Jurisdiction To Hear Its Statutory Cause Of Action. ........................................................................................8

    A. The Real Parties Continue To Conflate "Statutory Standing" With The "Constitutional Standing" Required For Subject-Matter Jurisdiction. ................................................8

    B. HSG Does Not Have "Representative Standing" To Sue For The State. ..............................................................................14

    C. The Standing-By-Assignment Theory Conflicts With Texas Law. ...............................................................................15

III. HSG's *Qui Tam* Action Is Legally Invalid Under The Texas Constitution. ................................................................................20

    A. The Real Parties Continue To Mischaracterize *Brown v. De La Cruz*. ................................................................................20

    B. The Real Parties Also Misrepresent The Texas Supreme Court Decisions Cited By Novartis. ..........................................21

    C. The TMFPA *Qui Tam* Action Violates The Texas Constitution. ..............................................................................26

CONCLUSION ....................................................................................29

CERTIFICATE OF COMPLIANCE ...........................................................31

CERTIFICATE OF SERVICE ..................................................................32

**MR457**

**Cases**

*Abor v. Black*,
695 S.W.2d 654 (Tex. 1985) ...................................................................4

*Allen v. Fisher*,
9 S.W.2d 731 (Tex. 1928) ............................................................... passim

*Am. Liberty Pipe Line Co. v. Agey*,
167 S.W.2d 580 (Tex. App.—Austin 1942) .................................... 23, 24

*Austin Nursing Center v. Lovato*,
171 S.W.3d 845 (Tex. 2005) .................................................................14

*Bell Helicopter Extron, Inc. v. Walker*,
787 S.W.2d 954 (Tex. 1990) ...............................................................4, 5

*Bland Indep. Sch. Dist. v. Blue*,
34 S.W.3d 547 (Tex. 2000) ...................................................................11

*Brady v. Brooks*,
89 S.W. 1052 (Tex. 1905) ....................................................................22

*Brown v. De La Cruz*,
156 S.W.3d 560 (Tex. 2004) .............................................................. 7, 21

*Busbee v. County of Medina*,
681 S.W.3d 391 (Tex. 2023) .................................................................13

*Camp v. Gulf Product Company*,
61 S.W.2d 773 (Tex. 1933) ...................................................................24

*Children of the Kingdom v. Central Appraisal Dist. of Taylor Cty.*,
674 S.W.3d 407 (Tex. App.—Eastland 2023, pet. denied.)................................10

*City of Dallas v. Stewart*,
361 S.W.3d 562 (Tex. 2012) .................................................................18

*ConocoPhillips Co. v. Koopmann*,
547 S.W.3d 858 (Tex. 2018) ...................................................................6

*Davenport v. Garcia*,
834 S.W.2d 4 (Tex. 1992) .....................................................................18

*Everett v. TK-Taito, L.L.C.*,
178 S.W.3d 844 (Tex. App.—Fort Worth 2005, no pet.) ...................................10

*Ex parte Wolters*,
144 S.W. 531 (Tex. Crim. App. 1911) ....................................................18

*Fin. Comm'n of Tex. v. Norwood*,
418 S.W.3d 566 (Tex. 2013) ...............................................................................12

*Green v. Tex. Comptroller of Pub. Accounts*,
No. 08-23-99986-CV, 2023 WL 8100236 (Tex. App.—El Paso Nov. 21,
2023, no pet. h.) ..................................................................................................13

*Hill County v. Sheppard*,
178 S.W.2d 261 (Tex. 1944) ................................................................. 22, 24, 25

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ............................................................................................16

*In re Amazon.com Servs., LLC*,
2023 WL 8791266 (Tex. App.—Austin 2023, orig. proceeding) .........................6

*In re Essex Ins. Co.*,
450 S.W.3d 524 (Tex. 2014) .................................................................................6

*In re Houston Specialty Ins. Co.*,
569 S.W.3d 138 (Tex. 2019) .................................................................................6

*In re J.B. Hunt Trans., Inc.*,
492 S.W.3d 287 (Tex. 2016) .............................................................................3, 4

*In re John G. & Maria Stella Kenedy Mem. Found.*,
315 S.W.3d 519 (Tex. 2010) .................................................................................5

*In re Liberty Mutual Insurance*,
24 S.W.3d 637 (Tex. App.—Texarkana 2000, orig. proceeding) .........................5

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124 (Tex. 2004) ...................................................................... 1, 4, 5

*In re Sullivan*,
157 S.W.3d 911 (Tex. App.—Houston [14th Dist.] 2005, orig.
proceeding) .........................................................................................................10

*In re SWEPI, L.P.*,
85 S.W.3d 800 (Tex. 2002) ...................................................................................5

*Interest of P.R.*,
615 S.W.3d 474 (Tex. App.—Texarkana 2020, pet. denied).................... 9, 11, 13

*LeCroy v. Hanlon*,
713 S.W.2d 335 (Tex. 1986) ...............................................................................18

*Magill v. Watson*,
409 S.W.3d 673 (Tex. App.—Houston [1st Dist.] 2013, no pet.) .......................15

*Marauder Corp. v. Beall*,
301 S.W.3d 817 (Tex. App.—Dallas 2009, no pet.) .............................................10

*Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*,
573 S.W.3d 912 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ............ 9, 10, 11

*PermiaCare v. L.R.H.*,
600 S.W.3d 431 (Tex. App.—El Paso 2020, no pet.) ..........................................13

*Pike v. Tex. EMC Mgmt., LLC*,
610 S.W.3d 763 (Tex. 2020) ...................................................................... 9, 11

*Pope v. Ferguson*,
445 S.W.2d 950 (Tex. 1969) ....................................................................................4

*Reyes v. State*,
753 S.W.2d 382 (Tex. Crim. App. 1988)...................................................................7

*Scott v. Bd. of Adjustment*,
405 S.W.55 (Tex. 1966) .........................................................................................12

*Staples v. State ex rel. King*,
245 S.W. 639 (Tex. 1922) ................................................ 17, 20, 23, 24

*State ex rel. Owen v. Starnes*,
246 S.W. 424 (Tex. App.—Fort Worth 1922, no writ).......................................29

*State v. Moore*,
57 Tex. 307 (1882) .................................................................................................22

*State v. Stephens*,
663 S.W.3d 45 (Tex. Crim. App. 2021).................................................................19

*State v. Stephens*,
664 S.W.3d 293 (Tex. Crim. App. 2022)................................................................28

*State v. Walker-Texas Inv. Co.*,
325 S.W.2d 209 (Tex. App.—San Antonio 1959, writ ref'd n.r.e. sub
nom.).......................................................................................................................22

*Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*,
308 S.W.3d 909 (Tex. 2010) ..................................................................................19

*Terrell v. Sparks*,
135 S.W. 519 (1911) ...............................................................................................25

*Tex. Medicine Res., LLP v. Molina Healthcare of Tex., Inc.*,
659 S.W.3d 424 (Tex. 2023) ..................................................................................21

**MR460**

**Page(s)**

*Touchy v. Houston Legal Foundation,*
432 S.W.2d 690 (Tex. 1968) ...............................................................................13

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ...........................................................................................17

*Vermont Agency of Nat'l Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) ..................................................................................... 16, 19

*Zaatari v. City of Austin,*
615 S.W.3d 172 (Tex. App.—Austin 2019, pet. denied)....................................10

**Statutes**

Tex. Hum. Res. Code § 36.107 ..................................................................... 27, 28

**MR461**

## PRELIMINARY STATEMENT

The Real Parties in Interest invite this Court to perpetuate the errors of the district court by ignoring Texas Supreme Court precedent in urging the Court to apply a stringent mandamus standard that was abrogated by *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124 (Tex. 2004). As shown by the Petition, the Court's jurisdiction to grant mandamus relief from the district court's failure to dismiss the case for lack of subject-matter jurisdiction or a valid cause of action is firmly established under *Prudential*.

HSG, by contrast, has not carried its burden to demonstrate the district court's subject-matter jurisdiction to hear its claims concerning a statutory violation that did not injure it. The Real Parties continue to maintain that "standing may be conferred by statute," even though the Texas Supreme Court has made abundantly clear that constitutional standing is a separate prerequisite to conferring subject-matter jurisdiction over a plaintiff's statutory cause of action. HSG alternatively argues that it has "representative standing" to sue for the State, but the Texas Supreme Court has explained that "representative standing" only applies in situations where the party with standing to sue lacks the legal capacity to do so—and the State undoubtedly has that capacity. Meanwhile, the State's bare assertion that federal law is "controlling" in advancing a standing-by-assignment theory without support

1

in Texas law is itself telling.  The Court thus need go no further to grant the Petition and order the case dismissed for lack of subject-matter jurisdiction.

But HSG and the State also fail to identify any authority that would support HSG's continued prosecution of its self-described "civil law enforcement action" under the TMFPA.  First Am. Pet. at 2 (MR005).  Instead, they fundamentally mischaracterize the Texas Supreme Court's decisions in their attempt to preserve a "decades" old statute.  For the past century, the Texas Supreme Court has consistently recognized that Article IV, Section 22 and Article V, Section 21 "mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court," and that "[t]he Legislature is impliedly restrained from conferring such duty and responsibility on the individual citizen." *Allen v. Fisher*, 9 S.W.2d 731, 732 (Tex. 1928) (citing *Maud v. Terrell*, 200 S.W. 375 (Tex. 1918)).[1]  By authorizing HSG to bring and maintain this action for and in the name of the State, the TMFPA *qui tam* provisions violate the Texas Constitution's preeminent separation-of-powers doctrine by depriving Texas

---

[1] That Novartis relies on Texas Supreme Court precedent that "is over 100 years old," as HSG points out (at 17), does not make it any less binding or relevant, but rather confirms that the principles of law underlying its Petition are well-established. *See, e.g., Tex. Gen. Land Office v. Biden*, No. 7:21-cv-00272, 2021 WL 5588160, at *3 n.27 (S.D. Tex. 2021) ("[O]nly the Attorney General of Texas (or a county or district attorney) may file suit on behalf of and represent Texas."); *Hill v. Tex. Water Quality Bd.*, 568 S.W.2d 738, 741 (Tex. App.—Austin 1978, writ ref'd n.r.e.) ("[E]ither the Attorney General or a county or district attorney may represent the State in a particular situation, but these are the only choices…"); *Sadler v. Newton*, 541 S.W.2d 194, 196 (Tex. App.—Austin 1976, no writ) ("Later opinions of the Court of Civil Appeals have recognized and followed, as we do, *Allen v. Fisher*.").

2

citizens of their constitutional right to select who will represent the State's (and, by extension, their) interests in court. The Court should grant the Petition and order the district court to dismiss HSG's legally invalid "civil law enforcement action."

Doing so for either of the reasons set forth above would not "forever shield [Novartis's] actions from TMFPA scrutiny," HSG Resp. at 3, but ensure that any claim that Novartis violated the TMFPA is brought, if at all, by the State and those to whom the Texas Constitution assigns the power and duty to represent the State.

## ARGUMENT

### I. The Court's Jurisdiction To Grant Mandamus Relief Is Clear.

Although the Real Parties nominally refer to the Texas Supreme Court's most recent articulation of the mandamus standard in *Prudential*, 148 S.W.3d 124, they fail to apply that standard and instead rely on cases applying the more stringent no-adequate-remedy standard that *Prudential* abrogated. In revisiting the contours of mandamus relief, the *Prudential* Court found that its prior precedent had adopted an inflexible understanding of an "adequate" remedy by appeal that had created a "wasteful standard" to foreclose appellate courts from correcting a reversible error through mandamus. *In re J.B. Hunt Trans., Inc.*, 492 S.W.3d 287, 298–99 (Tex. 2016) (orig. proceeding). In rejecting such "rigid rules" for mandamus relief as "necessarily inconsistent with the flexibility that is the remedy's principal virtue," the Court held that courts should instead conduct a balancing test to determine

3

whether the benefits of mandamus review are outweighed by the detriments. *Prudential*, 148 S.W.3d at 136–37.

The Court confirmed that position in holding that *Prudential* abrogated *Abor v. Black*, 695 S.W.2d 564 (Tex. 1985), which had relied on the State's case—*Pope v. Ferguson*, 445 S.W.2d 950 (Tex. 1969)—to deny mandamus review for pleas in abatement. *See J.B. Hunt Trans.*, 492 S.W.3d at 299–300. In so holding, the Court observed that *Abor*'s stringent approach "necessarily costs 'private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings,'" whereas "*Prudential*'s virtue is that it spares private parties and the public these costs." *Id.* at 299 (citation omitted). Those principles apply here. Allowing a case to proceed absent subject-matter jurisdiction or a legally valid cause of action would cause the parties and public to expend time and resources on a proceeding destined for dismissal, while violating the Separation of Powers by intruding upon Executive jurisdiction. *See Prudential*, 148 S.W.3d at 137 ("We simply could not justify putting the civil justice system itself to the trouble of grinding through proceedings that were certain to be 'little more than a fiction'").

The Real Parties' reliance on cases applying the Court's formerly "rigid rules" to deny mandamus relief from an order denying a plea to the jurisdiction are no longer good law after *Prudential*. *See, e.g., Bell Helicopter Extron, Inc. v. Walker*, 787 S.W.2d 954, 955 (Tex. 1990) (citing *Abor* and holding that the cost and delay

4

of pursuing an appeal would not alone render appeal an inadequate alternative for mandamus review from a denial of a plea to the jurisdiction); *In re SWEPI, L.P.*, 85 S.W.3d 800, 808 (Tex. 2002) (orig. proceeding) (citing *Bell Helicopter*); *In re Liberty Mutual Insurance*, 24 S.W.3d 637, 639 (Tex. App.—Texarkana 2000, orig. proceeding) (same). Those decisions conflict with the Texas Supreme Court's recent decisions recognizing that mandamus relief is appropriate when a district court fails to dismiss a case for lack of jurisdiction.

Because any order entered by a court without jurisdiction is void, the Texas Supreme Court has held that "mandamus relief is appropriate without a showing that the relators lack an adequate appellate remedy," and such relief "is appropriate to 'spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.'" *In re John G. & Maria Stella Kenedy Mem. Found.*, 315 S.W.3d 519, 522–23 (Tex. 2010) (orig. proceeding) (quoting *Prudential*, 148 S.W.3d at 136). Novartis's reliance on these and other cases granting mandamus relief to correct a district court's erroneous assertion of jurisdiction provide firm ground for its request for relief.[2]

The Real Parties' attacks on the Court's jurisdiction to grant mandamus relief from an erroneous denial of a Rule 91a motion fare no better. The Texas Supreme

---

[2] Given that the dispute over jurisdiction forms the basis of the Petition, HSG's assertion (at 9 n.6) that Novartis's authority is "unavailing because it is undisputed that the District Court has jurisdiction over HSG's TMFPA claims" is without support.

MR466

Court has confirmed that a legally invalid lawsuit subject to dismissal under Rule 91a satisfies the no-adequate-appellate-remedy test under *Prudential*. *See In re Houston Specialty Ins. Co.*, 569 S.W.3d 138, 141–42 (Tex. 2019); *see also ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 880 (Tex. 2018) (not an original proceeding, but noting, "Burlington could have challenged the trial court's denial of its motion to dismiss at the time it was denied" and citing *In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding)). While expense and delay may not render an appellate remedy inadequate under *other* circumstances, Texas courts have explained that "[i]n [the Rule 91a] context, an appeal after final judgment is an inadequate remedy because [the defendant] should not be required to spend time and money defending against claims that are precluded as a matter of law." *In re Amazon.com Servs., LLC*, No. 03-23-00634-cv, 2023 WL 8791266, at *6 (Tex. App.—Austin Dec. 20, 2023, orig. proceeding) (conditionally granting mandamus relief from denial of Rule 91a motion to dismiss).

In an effort to escape that authority, HSG suggests that Novartis's arguments concerning the invalidity of HSG's causes of action do not fall within the scope of a Rule 91a motion to dismiss. That is wrong. If HSG's statutory cause of action violates the Texas Constitution, then it is void *ab initio*, and a void statute cannot support a cause of action. *See Reyes v. State*, 753 S.W.2d 382, 383 (Tex. Crim. App.

6

MR467

1988) ("[A] void law is no law and confers no rights, bestows no power on anyone and justifies no act performed under it.").

While the separation-of-powers concerns and waste of time and resources outlined above provide sufficient grounds for mandamus relief, review is also appropriate because an unharmed private party's standing and capacity to bring a TMFPA *qui tam* action is an issue of first impression that warrants the Court's guidance. While HSG claims that is "not true," its own argument shows that it is. If "HSG is not aware of a single TMFPA defendant who has previously pressed Novartis's arguments in Texas court," HSG Resp. at 10, then *a fortiori* no Texas court has resolved those issues. These are undoubtedly issues of first impression and they are indisputably likely to recur so long as relators continue to file TMFPA lawsuits.

HSG also asserts that mandamus review is only available for a novel issue or one of first impression if "the law points to but one clear result" and claims that *Brown v. De La Cruz*, 156 S.W.3d 560 (Tex. 2004), points in its favor. Of course, if *Brown* actually addressed the constitutionality of *qui tam* statutes under the Texas Constitution, HSG would be right. But the Texas Supreme Court did no such thing in *Brown*, and misquoting the Court's decision by selectively inserting the words "*qui tam*" does not change that fact. The Texas Supreme Court precedent Novartis relies upon makes clear that Article IV, Section 22 and Article V, Section 21 "mark

7

the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court." *Allen*, 9 S.W.2d at 732. HSG's *qui tam* action facially exceeds those limits.

Finally, while HSG makes much of Novartis's request that the district court grant a permissive appeal, that request does not undercut the correctness of Novartis's position. The proposed order that Novartis submitted to the district court included language consistent with Texas Rule of Civil Procedure 168, requiring the order to "identify the controlling question of law as to which there is a substantial ground for difference of opinion," and outlined the parties' competing positions while—consistent with Novartis's position here—noting that no Texas court has resolved these precise issues. This Court undeniably has jurisdiction to grant mandamus relief in this case.

## II. HSG Fails To Carry Its Burden To Demonstrate The Court's Subject-Matter Jurisdiction To Hear Its Statutory Cause Of Action.

### A. The Real Parties Continue To Conflate "Statutory Standing" With The "Constitutional Standing" Required For Subject-Matter Jurisdiction.

The Real Parties fundamentally fail to respond to the Petition by continuing to conflate "statutory standing" with "constitutional standing." But if there were any doubt about the correctness of Novartis's position, the Court need only look to the opinion that this Court and the Texas Supreme Court cited with approval in "addressing [the] distinction between constitutional standing requirements and

8

statutory or rule-based requirements": *Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*, 573 S.W.3d 912 (Tex. App.—Houston [1st Dist.] 2019, no pet.). *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 & n.4 (Tex. 2020); *Interest of P.R.*, 615 S.W.3d 474, 480 (Tex. App.—Texarkana 2020, pet. denied). As the court in *Nephrology Leaders* noted, "[t]he label 'statutory standing' has been criticized for contributing to the erroneous assumption that statutory authority to bring an action or appeal includes a *per se* grant of constitutional standing.'" 573 S.W.3d at 916 n.5 (collecting cases). That is the precise mistake that the Real Parties make in arguing that HSG's statutory authority to bring a TMFPA action satisfies or displaces constitutional standing requirements.

The First Court of Appeals rejected the very arguments and authorities that the Real Parties advance here in asserting that "standing may be conferred by statute" without showing injury. Like the Real Parties, the appellant in *Nephrology Leaders* argued that "whether it has suffered an injury is 'immaterial'" to the court's subject-matter jurisdiction to hear its appeal "because it has 'statutory standing' to appeal without showing it was injured," and thus the court should "discard the 'judge-made criteria' of injury and redressability and instead look only to [the statute] to determine standing." *Id*. at 914–16. The First Court of Appeals rejected that position, citing the same points and authorities advanced in the Petition (and to which the Real Parties offer no substantive response).

9

MR470

The court explained that a statutory right to sue or appeal "do[es] not supplant the Texas Constitution's standing requirement for subject-matter jurisdiction," and the Legislature "cannot set a lower standard than that set by the general doctrine of standing because 'courts' constitutional jurisdiction cannot be enlarged by statute.'" *Id*. at 915 (citations omitted). To read the Legislature's enactment to displace constitutional standing requirements, the court noted, "would be to render it unenforceable," which is why courts construe them "'to extend no farther than what the Texas Constitution allows—to presume or incorporate the jurisdictional requirement' of standing." *Id*. at 915–16 (citation omitted).

The court further observed that the appellant—in arguing that a statutory-construction analysis displaced the "judge-made" injury and redressability requirements—misconstrued the holdings of two "statutory standing" cases also relied upon by the Real Parties: *In re Sullivan*, 157 S.W.3d 911 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding) and *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844 (Tex. App.—Fort Worth 2005, no pet.).[3] *See Nephrology Leaders*, 573 S.W.3d at 916. As the court there explained:

> [Appellant] is correct that in statutory standing cases such as *Sullivan* and *Everett*, the proper analysis is to determine whether the claimant falls within the category of claimants upon whom the Legislature

---

[3] The Real Parties also misconstrue several other cases that fall into the same category of "statutory standing" cases as *Everett* and *Sullivan* in arguing that standing may be conferred by statute. *See, e.g., Marauder Corp. v. Beall*, 301 S.W.3d 817 (Tex. App.—Dallas 2009, no pet.); *Zaatari v. City of Austin*, 615 S.W.3d 172 (Tex. App.—Austin 2019, pet. denied); *Children of the Kingdom v. Central Appraisal Dist. of Taylor Cty.*, 674 S.W.3d 407 (Tex. App.—Eastland 2023, pet. denied.).

10

conferred standing. In other words, courts must determine whether a particular plaintiff has established that he has been injured or wronged within the parameters of the statutory language.

But it does not follow that we disregard the Texas Constitution's standing requirements of injury and redressability. These requirements are not "judge-made"; they stem from the Texas Constitution's open courts provision, "which contemplates access to the courts only for those litigants suffering an injury," and cannot be discarded. Thus, while we are directed to Rule 76a in our assessment, we still must determine whether [appellant] has shown that it suffered a redressable injury for it to have standing to bring this appeal.

*Id*. at 916–17 (citations omitted). Because the appellant had not shown any injury, the court concluded that the appellant lacked standing and dismissed the appeal for want of subject-matter jurisdiction. *Id*. at 917. A year later, this Court relied upon *Nephrology Leaders* to dismiss an appeal for the same reason in *Interest of P.R.*, 615 S.W.3d 474.

The Real Parties' "taxpayer" and "citizen" suit cases fall into the same class of "statutory standing" cases as *Sullivan* and *Everett* and also address "prudential" concerns surrounding taxpayer suits against public bodies that do not implicate subject-matter jurisdiction.[4] *See Pike*, 610 S.W.3d at 774 (noting courts have applied the label "standing" to "prudential considerations that 'do not implicate subject-matter jurisdiction'" (citation omitted)); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555–56 (Tex. 2000) (discussing prudential limitations and exceptions to

---

[4] HSG's *qui tam* action also does not constitute a taxpayer or citizen suit against a public body, rendering this authority doubly inapposite.

11

taxpayers' "right to bring suit" given concerns that "governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review" (cleaned up)). In focusing on "exceptions" to the "particularized injury" requirement for "taxpayer standing," the State conflates a taxpayer's *right* to bring suit ("statutory standing") with the constitutional requirement that he have *standing* to do so. The Legislature cannot excuse a taxpayer plaintiff from satisfying constitutional standing requirements because, again, "courts' subject-matter jurisdiction cannot be enlarged by statute." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 582 n.83 (Tex. 2013); *see Scott v. Bd. of Adjustment*, 405 S.W.55, 56 (Tex. 1966) ("*[W]ithin constitutional bounds*, the Legislature may grant a right to a citizen or to a taxpayer to bring an action against a public body or a right of review…." (emphasis added)).

What's more, the State's argument overlooks the fact that HSG's lack of standing stems, not from its inability to show that it suffered an injury distinct from the general public, but its failure to show that it suffered *any injury at all*. A plaintiff must show that it personally suffered harm from the defendant's conduct—even if it is a non-pecuniary injury shared in common with others—to satisfy the constitutional standing requirements for courts' subject-matter jurisdiction. The State's case (at 26)—*Touchy v. Houston Legal Foundation*, 432 S.W.2d 690 (Tex.

12

1968)—demonstrates this point. Because the attorneys alleged that the defendant's practices were demeaning and "economically harmful to individual practitioners," the Court held the attorneys' "special interest" in their profession supported their "standing to maintain a suit to enjoin action which allegedly damages their profession." *Id*. at 691, 693–94.

As this Court recognized, "simply because a party has a *right* to appeal [or sue] does not mean that he has *standing* to appeal [or sue]." *Interest of P.R.*, 615 S.W.3d at 480 (emphasis added). Whether HSG falls within the class of persons statutorily authorized to sue under the TMFPA does not demonstrate "[its] standing to sue in the jurisdictional sense." *Busbee v. County of Medina*, 681 S.W.3d 391, 395 (Tex. 2023). That is why the Texas Supreme Court has looked to constitutional standing requirements to confirm subject-matter jurisdiction even in cases involving statutory causes of action. *See id*.; Pet. at 19–20 (discussing cases). Thus, while the El Paso Court of Appeals at one time treated the TMFPA's statutory requirements determinative of "standing," it has since acknowledged the Texas Supreme Court's clarification that "'standing' refers to the three constitutional elements" in rejecting as "inapposite" the plaintiffs' contention that they had statutory authority to sue. *See PermiaCare v. L.R.H.*, 600 S.W.3d 431, 447 (Tex. App.—El Paso 2020, no pet.); *Green v. Tex. Comptroller of Pub. Accounts*, No. 08-23-99986-CV, 2023 WL 8100236, at *5 (Tex. App.—El Paso Nov. 21, 2023, no pet. h.).

13

B.    HSG Does Not Have "Representative Standing" To Sue For The State.

This lawsuit also does not fit within the class of cases that recognize a plaintiff's "representative standing" to sue for the injury of another, such as a parent who sues on behalf of their child or an executor who sues on behalf of an estate. HSG's suggestion otherwise (at 13) should be rejected.

As the Texas Supreme Court explained in *Austin Nursing Center v. Lovato*, representative standing is reserved for situations where the injured party with standing to sue "lacks the legal authority" to do so, and "the law therefore grants another party the capacity to sue on their behalf." 171 S.W.3d 845, 849 (Tex. 2005). "For example," the Court observed, because "minors and incompetents are considered to be under a legal disability and are therefore unable to sue or be sued in their individual capacities[,] such persons are required to appear in court through a legal guardian, a 'next friend,' or a guardian ad litem." *Id*. Similarly, "'a decedent's estate is not a legal entity and may not properly sue or be sued as such,'" so the law grants the estate's personal representative the capacity to bring a claim on the estate's behalf. *Id*. at 850–51 (citation omitted).

But HSG's action on behalf of the State shares no similarities with those situations where the injured party with standing to sue lacks the legal authority to do so. The State of Texas can indisputably sue—and it sues all the time. That is Novartis's fundamental point in challenging the court's lack of subject-matter

14

jurisdiction. HSG suffered no injury from the conduct complained of and thus lacks constitutional standing to sue Novartis. Meanwhile, the party that purportedly suffered injury from the complained of conduct that has both standing and capacity to sue—the State of Texas—did not file this action. In addition, the Texas Constitution specifies who shall act as the State's representative in court. Just as a plaintiff could not claim "representative standing" to sue on behalf of an estate when another has been appointed executor, HSG cannot claim to act as the State's representative when the Texas Constitution exclusively confers that power on the State attorneys identified in Article IV, Section 22 and Article V, Section 21.

C. The Standing-By-Assignment Theory Conflicts With Texas Law.

That leaves only the standing-by-assignment theory. As the Petition points out (at 25 n.6)—and neither Real Party disputes—the burden falls on plaintiff HSG to demonstrate that it has standing as assignee, which requires that HSG show: (1) that a cause of action exists that was capable of assignment and (2) the cause was in fact assigned to HSG. *See Magill v. Watson*, 409 S.W.3d 673, 677–78 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Yet, *HSG* does not assert—let alone demonstrate that it meets the elements for—standing as assignee. The Court should reject it for that reason alone. Instead, it is the *State* that argues that theory based only on its assertion that federal law is "controlling" on a question of Texas constitutional law. The Court should reject that argument for the reasons explained in the Petition.

15

First, the U.S. Supreme Court did not, as the State suggests, misspeak when it said that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim." *Vermont Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). Although the State charges Novartis with "twisting" the Court's words, it is the State that seeks to do so.[5] Because the Court identified two types of injuries to the United States—an "injury to its sovereignty arising from the violations of its laws (which suffices to support a criminal lawsuit by the Government)" and a "proprietary injury from the alleged fraud," *id*. at 771— the State asserts (at 12) that the Supreme Court was "focused" "on the assignment of the injury-in-fact to the government." But that's incorrect. An assignor does not assign its "injury-in-fact" to an assignee; it assigns a claim for relief, which is why *Stevens* says that the FCA can be read to effect a partial assignment of the Government's "damages claim." *See id*. at 773 ("the assignee of *a claim* has standing to assert the injury in fact suffered by the assignor" (emphasis added)).

The State's argument also cannot be squared with the Court's reasoning in *TransUnion LLC v. Ramirez*:

> [I]f the law of Article III did not require plaintiffs to demonstrate a "concrete harm," Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who

---

[5] That the Court meant what it said is also clear from subsequent decisions observing that *Stevens* "justif[ied] *qui tam* actions based on a partial assignment of the Government's damages claim and a 'well nigh conclusive' tradition of such actions in English and American courts dating back to the 13th century." *Hollingsworth v. Perry*, 570 U.S. 693, 711 (2013).

16

violated virtually any federal law. Such an expansive understanding of Article III would flout constitutional text, history, and precedent. In our view, the public interest that private entities comply with the law cannot "be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue."

594 U.S. 413, 428–29 (2021) (citation omitted). By authorizing unharmed plaintiffs to bring a law enforcement action against defendants who violate the TMFPA, the Legislature has impermissibly "converted" the public interest that private entities comply with the law into an "individual right" through "a statute that denominates it as such and that permits all citizens . . . to sue." *Id.*

Ultimately, though, the Court need not resolve any question over *Stevens* and *TransUnion* because it is Texas—not federal—law that "controls" and, for well over a century, the Texas Supreme Court has held that the Legislature cannot enact a statute to authorize a private individual to bring suit on matters of public concern because any suit in respect of those matters must be prosecuted by the state. *See Staples v. State ex rel. King*, 245 S.W. 639, 641 (Tex. 1922); *Allen*, 9 S.W.2d at 732.

Second, in citing to "the long history of *qui tam* actions in England and the American colonies," the State does not answer why this Court should consider the historical practices and statutes enacted under a different system of government in resolving Texas courts' subject-matter jurisdiction under the Texas Constitution. As the Petition points out (at 28 & n.7)—and the State does not dispute—no Texas court has adopted that approach. And the Texas Supreme Court has made clear that simply

17

interpreting the Texas Constitution as a restatement of the U.S. Constitution or the constitutions of other states (as the State urges) "insults the dignity of the state charter and denies citizens the fullest protection of their rights" under the Texas Constitution. *Davenport v. Garcia*, 834 S.W.2d 4, 12 (Tex. 1992).

In highlighting these distinctions between Texas and federal law, Novartis does not "imagine a world where Texas law developed within a vacuum," State Resp. at 16, but rather honors Texas's unique history and the "separation of powers principles [that] are ingrained in the Texas Constitution." *City of Dallas v. Stewart*, 361 S.W.3d 562, 573–74 (Tex. 2012). As the State's own authority acknowledges, "[t]he powers restricted and the individual rights guaranteed in the present constitution reflect Texas' values, customs and traditions," and the "court has the power and duty to protect the additional state guaranteed rights of all Texans." *LeCroy v. Hanlon*, 713 S.W.2d 335, 339 (Tex. 1986). That the Open Courts provision can be traced back to the Magna Carta does not demonstrate that *qui tam* actions are permissible under a government charter that contains the separation-of-powers guarantees and protections found in Article II, Section 1 of the Texas Constitution. *Cf. Ex parte Wolters*, 144 S.W. 531, 587 (Tex. Crim. App. 1911) (unlike Texas, the English government was never "divided into three separate and distinct departments, with the limitation that no one of the departments should exercise the power attached to the other department"). Unlike the U.S. Constitution,

18

MR479

the Texas Constitution contains an express separation-of-powers provision that Texas courts more aggressively enforce than their federal counterparts. *See State v. Stephens*, 663 S.W.3d 45, 50 (Tex. Crim. App. 2021). And, as the Petition observed, the State has not identified anything in Texas's constitutional or legislative history that suggests that the framers of the 1876 Texas Constitution considered *qui tam* actions consistent with the Separation of Powers provision or the powers and duties conferred on the State attorneys in Article IV, Section 22 and Article V, Section 21.[6]

Finally, the State (at 18) makes the strawman argument that Texas law does not prohibit standing by assignment. Novartis never suggested that it does. Rather, Novartis argued it does not apply because (1) the TMFPA, unlike the FCA, does not give rise to an assignable damages claim and (2) an assignment that requires the performance of an act in violation of the Texas Constitution would be invalid in any event. *Cf. Sw. Bell Tel. Co. v. Mktg. on Hold Inc.,* 308 S.W.3d 909, 916 (Tex. 2010) (holding plaintiff had standing based on "contractually valid assignments"). Texas Supreme Court precedent makes clear that "[i]t is necessary for the state to be a party where the action is for the benefit of the public at large," and a "statute cannot confer

---

[6] The First Congress's enactment of the *qui tam* statutes cited by the State (at 13–15) only supports an inference that the framers of the federal Constitution believed such statutes were consistent with the federal constitutional structure. *See Stevens*, 529 U.S. at 776–77. That says nothing about whether *qui tam* statutes comply with the Texas Constitution. *See Stewart*, 361 S.W.3d at 573 ("The scope of separation of powers is a function of governmental structure, and because of the differences between Texas and federal government, its requirements at the state level are different. This is especially true given its explicit treatment in our constitution.").

19

a right upon private individuals to act for all where it is shown they have no interest different from all others." *Staples*, 245 S.W. at 641.

Because HSG does not have constitutional standing to sue Novartis over an alleged statutory violation that did not injure it, the Court should grant the Petition and order the district court to dismiss the case for lack of jurisdiction.

## III. HSG's *Qui Tam* Action Is Legally Invalid Under The Texas Constitution.

### A. The Real Parties Continue To Mischaracterize *Brown v. De La Cruz.*

The Real Parties offer no response to the Petition's observations (at 47-48) that *Brown v. De La Cruz* does not (1) address a *qui tam* statute or (2) the constitutionality of any statute under the Texas Constitution. Instead, they continue to misrepresent the Court's opinion by disingenuously inserting the words "*qui tam*" in quoting *Brown*. *See* HSG Resp. at 15; State Resp. at 31. As the Real Parties know, a "*qui tam*" action is one brought by a private plaintiff on behalf of the government, and the plaintiff in *Brown* did not seek to bring any action on behalf of the government.

As the Petition (at 47-48) explains, *Brown* addressed a question over the legislature's creation of a *private* cause of action for an *individual* injury. While a 2001 amendment to the Property Code "clearly provide[d] a private cause of action for purchasers" to recover liquidated damages of $500-per-day for a seller's failure to timely transfer a deed to the purchaser, the *Brown* Court addressed "whether the

20

original statute . . . did as well" and held that it did not.  156 S.W.3d at 562.  In reaching that conclusion, the Court recognized that the Legislature had the authority to create a private cause of action for a purchaser to recover a statutory penalty "beyond the damages that purchaser is likely to suffer," but if the Legislature intends to create a private cause of action, "it must do so clearly."  *Id*. at 566.  Thus, *Brown* has principally been cited for the principle that "the existence of a private cause of action must be clearly implied in the statutory text."  *Tex. Medicine Res., LLP v. Molina Healthcare of Tex., Inc*., 659 S.W.3d 424, 431 (Tex. 2023).

Novartis does not dispute the Legislature's authority to grant individuals a statutory cause of action to sue defendants for statutory violations that injure *them*.  But the Legislature does *not* have the authority to grant individuals a statutory cause of action to sue defendants for violations that injure the *State* because the Texas Constitution assigns that power *exclusively* to the State attorneys.  *See Maud*, 200 S.W. at 376 ("[T]he powers thus conferred by the Constitution upon these officials are exclusive.  The Legislature cannot devolve them upon others.").

B.    <u>The Real Parties Also Misrepresent The Texas Supreme Court Decisions Cited By Novartis.</u>

The Real Parties do not dispute that the Constitution confers on the State attorneys the duty and authority to represent the State.  Nor do they dispute their failure to identify any provision in the Texas Constitution that expressly allows the

21

Legislature to confer that power upon another. They instead attempt to sow confusion by misrepresenting the Texas Supreme Court precedent cited by Novartis.

HSG first tries to undercut one of the most basic tenets of Texas constitutional law by wrongly arguing that *Brady v. Brooks*, 89 S.W. 1052 (Tex. 1905), overruled *State v. Moore*'s pronouncement that "the constitution, in selecting the depositaries of a given power . . . intended that depositary should exercise an exclusive power, with which the legislature could not interfere by appointing some other officer to exercise of the power," 57 Tex. 307, 314 (1882). But, as Novartis pointed out below, "[t]he *Moore* case has not been regarded as being overruled, through the years. It has been cited with approval many times since *Brady v. Brooks*." *State v. Walker-Texas Inv. Co.*, 325 S.W.2d 209, 212 (Tex. App.—San Antonio 1959, writ ref'd n.r.e. sub nom.) (collecting cases); *see also Hill County v. Sheppard*, 178 S.W.2d 261, 264 (Tex. 1944) (citing *Moore*).

The Real Parties also misrepresent *Maud* in suggesting that the Court there upheld a statute to permit a tax collector to file suit for the State in place of the State attorneys. To the contrary, the Court indicated that if the statute were so construed to authorize the tax collector to prosecute a suit for the State, then it would be "condemned by the Constitution." 200 S.W. at 376. The Court thus rejected that construction in favor of one that would render the statute valid under the principle that, "where the language [of a statute] is of doubtful meaning, reasonably

22

susceptible of different constructions, rendering the act valid if construed in one sense and invalid if construed in another, that construction will be adopted which sustains the act rather than destroys it." *Id*. Rather than construe the statute to "authorize the [tax] collector to file the suit" (which would render it invalid), the Court construed the statute to provide that the tax collector "should cause the suit to be filed by the official charged by law with that specific duty" (i.e., the Attorney General). *Id*. at 377. In doing so, however, the Court made clear that if the statutory language had reflected an unambiguous intent to authorize the tax collector to file suit for the State, then the Court would have had "no alternative but to declare the enactment void" under the Texas Constitution. *Id.* at 376; *see also Am. Liberty Pipe Line Co. v. Agey*, 167 S.W.2d 580, 583 (Tex. App.—Austin 1942) (*Maud* construed the statute "as not so vesting that power in such party, under the established presumption of validity," and "[t]hus clearly in effect holding that it would have been invalid if given the construction contended for by respondent").

The Real Parties similarly mischaracterize *Staples*. Like the Real Parties here, the plaintiffs in that case contended that the Legislature had enacted a statute authorizing private individuals to bring suit for and in the name of the State. *See* 245 S.W. at 640–42. The Court rejected their position, stating: "To give the section the meaning contended for by appellees would be to seriously infringe upon the mandate of section 21, art. 5 of the Constitution, that the county attorneys shall

23

represent the state in all cases in their respective counties, and of section 22, art. 4, relating to the Attorney General." *Id.* at 642. The Court refused to adopt a construction of the statute that would "endanger its validity under the Constitution" and instead held that the statute was valid because it did *not* grant the plaintiffs "legal capacity or right to institute and maintain" a suit in the name of the State. *Id*. at 643.

Contrary to the State's argument, *Camp v. Gulf Product Company*, 61 S.W.2d 773 (Tex. 1933), provides no support for HSG's prosecution of this civil law enforcement action. As the Austin Court of Appeals explained, the *Camp* case was in the nature of a mandamus proceeding involving a suit by "an applicant to purchase alleged unsurveyed school land . . . to compel the county surveyor to make an official survey of the land." *Agey*, 167 S.W.2d at 583–84. *Camp* "was written under discussion of the question whether [the statute] made the State a party to the suit," not whether the applicant could institute or maintain a suit for the State. *Id*. at 284 (noting "[s]uits with similar objective have in later decisions been treated as suits *against* the State").

The State notably offers no response to *Hill County v. Sheppard*, 178 S.W.2d 261 (Tex. 1944), while HSG makes an insubstantial attempt to distinguish it on the assertion that "[n]othing in the TMFPA authorizes private citizens to 'take over' OAG's prerogative to enforce the TMFPA." HSG Resp. at 19. But that is precisely what HSG is doing. In its own words, it has brought this "civil law enforcement

24

action pursuant to the Texas Medicaid Fraud Prevention Act" for and in the name of the State of Texas. First Am. Pet. at 2 (MR005). A statute that authorizes an extra-constitutional "private attorney general" to file suit for the State is fundamentally no different from a statute authorizing an extra-constitutional "criminal district attorney" to do so. To the extent HSG suggests that the TMFPA would run afoul of the Texas Constitution only if it *precluded* the Attorney General from exercising his "prerogative to enforce the TMFPA," HSG provides no authority to support its position. *Cf. Agey*, 167 S.W.2d at 581 (rejecting a similar argument because an action which "inures to the State . . . is maintainable only in the State's name and by its authorized officials"). The Court invalidated the statute in *Sheppard* because the Texas Constitution *exclusively* assigns to the State attorneys the duty to represent the State and, "in the absence of constitutional authority therefor," the Legislature cannot confer that power on any other. 178 S.W.2d at 264–65.

*Terrell v. Sparks*, 135 S.W. 519 (Tex. 1911)—which the State cites for the first time in this proceeding—is not to the contrary. That case pre-dates the foregoing authority and does not address the constitutional provisions at issue here (Article IV, Section 22 and Article V, Section 21), but whether the statute there violated Article VIII, Section 6, governing legislative appropriations. *Id*. at 520. It also concerned the Attorney General's employment of outside counsel to assist him in the prosecution of the State's cases. *See id*. at 521. Although not presented here,

25

a statute authorizing the Attorney General to employ outside counsel would arguably be consistent with the Court's recognition that the Legislature "may provide assistance for the proper discharge by [the State attorneys] of their duties," but it "cannot, for the performance of that function, obtrude other persons upon them and compel the acceptance of their services. Wherever provision is made for the services of other persons for the express purpose, it is the constitutional right of the Attorney-General . . . to decline them or not at [his] discretion, and, if availed of, the services are to be rendered in subordination to [his] authority." *Maud*, 200 S.W. at 376. Consistent with *Maud*, such outside counsel may be hired or fired at the Attorney General's discretion; their duty of loyalty runs to the Attorney General and the State; and their services are rendered in subordination to his authority. If the Attorney General exercises his discretion to not file suit, then they may not override it. The same cannot be said of the TMFPA's *qui tam* provisions, which authorize any person—even from outside Texas (or the United States)—to appoint themselves "private attorney general" with the power to file and maintain a civil law enforcement action for the State.

C.     The TMFPA *Qui Tam* Action Violates The Texas Constitution.

Neither Relator nor the State dispute that the TMFPA grants the relator the unfettered discretion and authority to institute an action for and in the name of the State. And the Court need look no further than the instant case to see that the

26

TMFPA also grants the relator the authority to maintain a suit for and in the name of the State. That alone renders it invalid under the Texas Constitution. *See Allen*, 9 S.W.2d at 732 (Article IV, Section 22 and Article V, Section 21 "mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court. The Legislature is impliedly restrained from conferring such duty and responsibility on the individual citizen.").

But the remainder of the Real Parties' strawman arguments are also easily knocked down. They simply ignore the Petition's explanation (at 49-51) why federal authority is unavailing under the Texas Constitution and Texas Supreme Court precedent. And while they say it is "not true" that the Attorney General must obtain relator or state-court approval to dismiss or settle the State's claims, that is the plain import of the statutory provisions requiring court approval if the relator "objects" to the Attorney General's decision to dismiss or settle the case. *See* Tex. Hum. Res. Code § 36.107(b)-(c). They intimate that this judicial check on prosecutorial discretion is perfectly fine because court approval of pleas and dismissal of indictments is common in federal criminal law, but they overlook the critical point that supports the narrowing of Executive discretion in such cases: "'*[W]hen the Executive has made the decision to initiate the criminal case*, its large discretion is narrowed considerably and the power to dispose of the case is shared in part with the Third Branch.'" HSG Resp. at 23 (citation omitted; emphasis added). In a

27

TMFPA *qui tam* action, it is the *Legislature's self-appointed agent (the relator)*, not the Attorney General, who "has made the decision to initiate the [] case." *Id.* And while the State tries to minimize the relator's right to continue as a party in an intervened action, the indisputable fact remains that the relator and its counsel are not hired by the Attorney General, do not serve under his direction, and exercise independent discretion in litigating the case. Nobody would question that a statute granting a private citizen the right to participate in a criminal trial—to call, examine, and cross-examine witness—would unconstitutionally interfere with the district attorney's prosecutorial discretion even if he exercised "full control" over the indictment. The relator's right to participate in a "civil law enforcement action" under the TMFPA is no different.

At bottom, the framers of the Texas Constitution enacted constitutional provisions to "decentralize the state government" and to "assure that the government would be responsive to public will" by "precisely defining the rights, powers, and prerogatives of the various governmental departments and agencies." *State v. Stephens*, 664 S.W.3d 293, 294 (Tex. Crim. App. 2022) (Walker, J., concurring in denial of motion for rehearing). The "vice in [the TMFPA] is that . . . a private citizen, with no personal interest alleged or shown, is authorized, of his own volition, to institute and prosecute a suit in behalf of the state, in violation of a provision of the Constitution vesting that authority *exclusively* in the county attorney or district

28

attorney or Attorney General" elected by and accountable to the people of Texas. *State ex rel. Owen v. Starnes*, 246 S.W. 424, 425 (Tex. App.—Fort Worth 1922, no writ) (emphasis added). Mandamus relief is thus warranted to correct the district court's clear abuse of discretion in failing to dismiss HSG's legally invalid "civil law enforcement action."

## CONCLUSION

Novartis respectfully requests that the Court grant the Petition and order the district court to dismiss the case.

**MR490**

Dated:  February 27, 2024

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Danny S. Ashby*

Danny S. Ashby
Texas Bar No. 01370960
dashby@omm.com
Megan Whisler
Texas Bar No. 24079565
mwhisler@omm.com
2801 North Harwood Street, Suite 1600
Dallas, Texas 75201
Telephone:  +1 972 360 1900
Facsimile:  +1 972 360 1901

Ross Galin
rgalin@omm.com
7 Times Square
New York, NY 10036
Telephone: +1 212 326 2000
(*Pro hac vice*)

Meredith Garagiola
mgaragiola@omm.com
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: +1 202 383 5300
(*Pro hac vice*)

THE DACUS FIRM, P.C.

Deron R. Dacus
Texas Bar No. 00790553
ddacus@dacusfirm.com
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: +1 903 705 1117

*Counsel for Relator*
*Novartis Pharmaceuticals Corporation*

**MR491**

**CERTIFICATE OF COMPLIANCE**

Based on a word count run in Microsoft Word for Microsoft 365, this Reply in Support of the Petition for Writ of Mandamus contains 7498 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Danny S. Ashby*
Danny S. Ashby

**MR492**

# CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the foregoing Reply in Support of the Petition for Writ of Mandamus has been forwarded this 27th day of February 2024, to the following attorneys of record via electronic service:

Samuel F. Baxter
Jennifer L. Truelove
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
sbaxter@mckoolsmith.com
jtruelove@mckoolsmith.com

Eric B. Halper
Radu A. Lelutiu
MCKOOL SMITH P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
ehalper@mckoolsmith.com
rlelutiu@mckoolsmith.com

W. Mark Lanier
Alex J. Brown
Zeke DeRose III
Jonathan Wilkerson
THE LANIER FIRM
10940 W. Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
WML@LanierLawFirm.com
Alex.Brown@LanierLawFirm.com
Zeke.DeRose@LanierLawFirm.com
Jonathan.Wilkerson@LanierLawFirm.com

*Counsel for Health Selection Group, LLC*

Jordan Underhill
Jonathan D. Bonilla
Lynne Kurtz-Citrin
Office of the Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Jordan.Underhill@oag.texas.gov
Jonathan.Bonilla@oag.texas.gov
Lynne.Kurtz-Citrin@oag.texas.gov

*Counsel for the State of Texas*

/s/ *Danny S. Ashby*
Danny S. Ashby

32

MR493

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84975216
Filing Code Description: Response
Filing Description: REPLY IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS
Status as of 2/28/2024 7:34 AM CST

Associated Case Party: Novartis Pharmaceuticals Corporation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Danny S.Ashby | | dashby@omm.com | 2/27/2024 6:25:14 PM | SENT |
| Megan Whisler | | mwhisler@omm.com | 2/27/2024 6:25:14 PM | SENT |
| Ross Galin | | rgalin@omm.com | 2/27/2024 6:25:14 PM | SENT |
| Meredith Garagiola | | mgaragiola@omm.com | 2/27/2024 6:25:14 PM | SENT |

Associated Case Party: Health Selection Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jonathan Wilkerson | 24050162 | jonathan.wilkerson@lanierlawfirm.com | 2/27/2024 6:25:14 PM | SENT |
| Samuel F. Baxter | 1938000 | sbaxter@mckoolsmith.com | 2/27/2024 6:25:14 PM | SENT |
| Zeke DeRose | 24057421 | zeke.derose@lanierlawfirm.com | 2/27/2024 6:25:14 PM | SENT |
| Jennifer Leigh Truelove | 24012906 | jtruelove@mckoolsmith.com | 2/27/2024 6:25:14 PM | SENT |
| Alex Jerome Brown | 24026964 | alex.brown@lanierlawfirm.com | 2/27/2024 6:25:14 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 2/27/2024 6:25:14 PM | SENT |
| Radu A.Lelutiu | | rlelutiu@mckoolsmith.com | 2/27/2024 6:25:14 PM | SENT |
| W. Mark Lanier | | WML@LanierLawFirm.com | 2/27/2024 6:25:14 PM | SENT |
| audrey moore | | audrey.moore@lanierlawfirm.com | 2/27/2024 6:25:14 PM | SENT |
| denise lopez | | dlopez@mckoolsmith.com | 2/27/2024 6:25:14 PM | SENT |
| veronica manning | | vmanning@mckoolsmith.com | 2/27/2024 6:25:14 PM | SENT |
| michael catapano | | mcatapano@mckoolsmith.com | 2/27/2024 6:25:14 PM | SENT |

Associated Case Party: State of Texas

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 84975216
Filing Code Description: Response
Filing Description: REPLY IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS
Status as of 2/28/2024 7:34 AM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lynne Kurtz-Citrin | 24081425 | lynne.kurtz-citrin@oag.texas.gov | 2/27/2024 6:25:14 PM | SENT |
| Jonathan Bonilla | 24073939 | Jonathan.Bonilla@oag.texas.gov | 2/27/2024 6:25:14 PM | SENT |
| Jordan Underhill | 24102586 | jordan.underhill@oag.texas.gov | 2/27/2024 6:25:14 PM | SENT |
| Cynthia Lu | | Cynthia.Lu@oag.texas.gov | 2/27/2024 6:25:14 PM | SENT |

MR495



CHIEF JUSTICE
SCOTT E. STEVENS

JUSTICES
CHARLES VAN CLEEF
JEFF RAMBIN

# Court of Appeals
### Sixth Appellate District
## State of Texas

CLERK
DEBRA K. AUTREY

BI-STATE JUSTICE BUILDING
100 NORTH STATE LINE AVENUE #20
TEXARKANA, TEXAS 75501
(903) 798-3046

Friday, March 1, 2024

Sam F. Baxter
McKool Smith, PC
104 E Houston St, Ste 300
Marshall, TX 75670
* DELIVERED VIA E-MAIL *

Megan Whisler
O'Melveny & Myers LLP
2801 N Harwood St, Ste 1600
Dallas, TX 75201
* DELIVERED VIA E-MAIL *

Danny S. Ashby
O'Melveny & Myers LLP
2801 N Harwood St, Ste 1600
Dallas, TX 75201
* DELIVERED VIA E-MAIL *

Deron R. Dacus
The Dacus Firm, PC
821 ESE Loop 323, Ste 430
Tyler, TX 75701
* DELIVERED VIA E-MAIL *

W. Mark Lanier
The Lanier Law Firm
10940 W Sam Houston Pkwy N, Ste 100
Houston, TX 77064
* DELIVERED VIA E-MAIL *

Jonathan Wilkerson
The Lanier Law Firm
10940 W Sam Houston Parkway N, Ste 100
Houston, TX 77064
* DELIVERED VIA E-MAIL *

Meredith N. Garagiola
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
* DELIVERED VIA E-MAIL *

Jessica Weltge
Office of the Attorney General of Texas
P O Box 12548, Capitol Station
Austin, TX 78711-2548
* DELIVERED VIA E-MAIL *

Jennifer Truelove
McKool Smith, PC
104 E Houston St, Ste 300
Marshall, TX 75670
* DELIVERED VIA E-MAIL *

Zeke DeRose III
The Lanier Law Firm
10940 W Sam Houston Pkwy N, Ste 100
Houston, TX 77064
* DELIVERED VIA E-MAIL *

Jordan Underhill
Office of Attorney General of Texas
P O Box 12548, Capitol Station
Austin, TX 78711-2548
* DELIVERED VIA E-MAIL *

Ross B. Galin
O'Melveny & Myers LLP
7 Time Square
New York, NY 10036
* DELIVERED VIA E-MAIL *

Jonathan Bonilla
Office of the Attorney General of Texas
P O Box 12548, Capitol Station
Austin, TX 78711
* DELIVERED VIA E-MAIL *

**MR496**

**RE**:     Appellate Case Number:     06-24-00005-CV
              Trial Court Case Number:     23-0276

**Style:**   In re Novartis Pharmaceuticals Corporation

The Court entered its order this date in the referenced proceeding whereby Relator's Petition for Writ of Mandamus was **DENIED**.

A true copy of this Court's Opinion and Judgment is enclosed.

Respectfully submitted,

**Debra K. Autrey, Clerk**

By: Kim Robinson, Deputy Clerk

cc:     Hon. Brad Morin, Judge, Respondent (DELIVERED VIA E-MAIL)

**MR497**



# Court of Appeals
# Sixth Appellate District of Texas

## J U D G M E N T

In re Novartis Pharmaceuticals Corporation

No. 06-24-00005-CV

Original Mandamus Proceeding

Panel consists of Chief Justice Stevens and Justices van Cleef and Rambin. Memorandum Opinion delivered by Chief Justice Stevens.

As stated in the Court's opinion of this date, we find that Relator is not entitled to the relief sought. Therefore, we deny the petition.

RENDERED MARCH 1, 2024
BY ORDER OF THE COURT
SCOTT E. STEVENS
CHIEF JUSTICE

ATTEST:
Debra K. Autrey, Clerk

MR498



# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00005-CV
_____

IN RE NOVARTIS PHARMACEUTICALS CORPORATION

Original Mandamus Proceeding

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

Relator Novartis Pharmaceuticals Corporation has filed a petition for a writ of mandamus seeking to dismiss a lawsuit filed in Harrison County under the Texas Medicaid Fraud Prevention Act (TMFPA)[1] arguing both that (1) the real party in interest, Health Selection Group, LLC (HSG), does not have standing to maintain this lawsuit and (2) the TMFPA's *qui tam* provisions are unconstitutional under the Texas Constitution.

The trial court denied Novartis's plea to the jurisdiction and motion to dismiss pursuant to Rule 91a of the Texas Rules of Civil Procedure, which sought dismissal of HSG's case on these two bases.  Because we find no abuse of discretion in the trial court's denial of relief under Rule 91a of the Texas Rules of Civil Procedure, we deny the petition.[2]

## I.      Standard for Mandamus

"Mandamus is an extraordinary remedy requiring the relator to show that (1) the trial court abused its discretion and (2) the relator lacks an adequate remedy on appeal."  *In re USAA Gen. Indem. Co.*, 624 S.W.3d 782, 787 (Tex. 2021) (orig. proceeding) (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding)).  "Mandamus relief is only appropriate when the relators have established that only one outcome in the trial court was permissible under the law."  *In re Murrin Bros. 1885, Ltd.*, 603 S.W.3d 53, 56 (Tex. 2019) (orig. proceeding).  Mandamus relief may be available when a trial court denies a Rule 91a motion to

---

[1]Act of May 26, 1995, 74th Leg., R.S., ch. 824, 1995 Tex. Gen. Laws 4202 (amended 1997, 2005, 2011, 2015, 2023) (current version at TEX. HUM. RES. CODE §§ 36.001–.132).  The TMFPA was amended effective September 1, 2023, and it is now known as the Texas Health Care Program Fraud Prevention Act.  Act of April 3, 2023, 88th Leg., R.S., ch. 273, §§ 2–15, 2023 Tex. Sess. Law Serv. 585, 585–89 (codified at TEX. HUM. RES. CODE §§ 36.001–.132).  Novartis brings this action under a prior version of the act, the TMFPA.

[2]In conjunction with the petition for a writ of mandamus, Novartis filed a motion for a temporary stay of the trial court's proceedings.  Because we deny the petition, that motion is also denied.

2

dismiss. *See In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 266 (Tex. 2021) (orig. proceeding) (recognizing "[m]andamus relief is appropriate when the trial court abuses its discretion in denying a Rule 91a motion to dismiss"); *see also In re Shire PLC*, 633 S.W.3d 1, 11 (Tex. App.—Texarkana 2021, orig. proceeding).

"When reviewing matters committed to a trial court's discretion, an appellate court may not substitute its own judgment for the trial court's judgment." *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (per curiam) (orig. proceeding) (citing *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding)). As a result, we may not "set aside the trial court's [order] unless it is clear from the record that the trial court could only reach one decision." *Id.*

## II.     Conclusion

Having examined and fully considered the mandamus petition and record, the responses, the reply, and the applicable law, the Court is of the opinion that the mandamus petition should be denied.

Scott E. Stevens
Chief Justice

Date Submitted:      February 29, 2024
Date Decided:        March 1, 2024

3

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Court Services on behalf of Danny Ashby
Bar No. 1370960
ommsvc2@omm.com
Envelope ID: 108084361
Filing Code Description: Original Proceeding Petition
Filing Description: Petition for Writ of Mandamus
Status as of 11/14/2025 4:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Danny S.Ashby | | dashby@omm.com | 11/14/2025 4:30:06 PM | SENT |
| Litigation Calendar | | litigationcalendar@omm.com | 11/14/2025 4:30:06 PM | SENT |
| Lynne Kurtz-Citrin | 24081425 | lynne.kurtz-citrin@oag.texas.gov | 11/14/2025 4:30:06 PM | SENT |
| Jonathan Wilkerson | 24050162 | jonathan.wilkerson@lanierlawfirm.com | 11/14/2025 4:30:06 PM | SENT |
| Zeke DeRose | 24057421 | zeke.derose@lanierlawfirm.com | 11/14/2025 4:30:06 PM | SENT |
| Alex Brown | 24026964 | alex.brown@lanierlawfirm.com | 11/14/2025 4:30:06 PM | SENT |
| W. Mark Lanier | | WML@LanierLawFirm.com | 11/14/2025 4:30:06 PM | SENT |
| Radu A. Lelutiu | | rlelutiu@mckoolsmith.com | 11/14/2025 4:30:06 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 11/14/2025 4:30:06 PM | SENT |
| Jonathan D. Bonilla | | Jonathan.Bonilla@oag.texas.gov | 11/14/2025 4:30:06 PM | ERROR |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 11/14/2025 4:30:06 PM | ERROR |
| Jennifer Truelove | 24012906 | jtruelove@mckoolsmith.com | 11/14/2025 4:30:06 PM | SENT |
| Samuel Baxter | 1938000 | sbaxter@mckoolsmith.com | 11/14/2025 4:30:06 PM | SENT |
| Deron Dacus | 790553 | ddacus@dacusfirm.com | 11/14/2025 4:30:06 PM | SENT |
| Meredith Garagiola | | mgaragiola@omm.com | 11/14/2025 4:30:06 PM | SENT |
| Ross Galin | | rgalin@omm.com | 11/14/2025 4:30:06 PM | SENT |
| Anton Metlitsky | | ametlitsky@omm.com | 11/14/2025 4:30:06 PM | SENT |